MARY H. HAAS (State Bar No. 149770)
  maryhaas@dwt.com
JOHN D. FREED (State Bar No. 261518)
  jakefreed@dwt.com
MATTHEW E. LADEW (State Bar No. 318215)
  mattladew@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

JOSEPH M. VANLEUVEN (*pro hac vice pending*)
  joevanleuven@dwt.com
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
Telephone:  (503) 778-5325
Fax:  (503) 701-0023

Attorneys for
U.S. BANK NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; and PGIM REAL ESTATE FINANCE, LLC,<br><br>                    Plaintiffs,<br>     vs.<br><br>ACDF, LLC; ASSEMI AND SONS, INC.; AVILA RANCH EA, LLC; BEAR FLAG FARMS, LLC; C & A FARMS, LLC; CANTUA ORCHARDS, LLC; DA REAL ESTATE HOLDINGS, LLC; FAVIER RANCH, LLC; FG2 HOLDINGS LLC; GRADON FARMS, LLC; GRANVILLE FARMS, LLC; GRANTLAND HOLDINGS NO. 1, LLC; GRANTLAND HOLDINGS NO. 2, LLC; GRANTOR REAL ESTATE INVESTMENTS, LLC; GVM INVESTMENTS, LLC; GV AG, LLC; LINCOLN GRANTOR FARMS, LLC; MARICOPA ORCHARDS, LLC; PANOCHE PISTACHIOS, LLC; SAGEBERRY FARMS, LLC; DEREK BELL; and RACHEL MARIE WHITE,<br><br>                    Defendants. | Case No. 1:24-cv-01102-KES-SAB<br><br>**DECLARATION OF KAREN BOYER IN SUPPORT OF U.S. BANK NATIONAL ASSOCIATION'S OPPOSITION TO *EX PARTE* APPOINTMENT OF A RECEIVER** |

## DECLARATION OF KAREN BOYER

I, Karen Boyer, under penalty of perjury, make the following declaration in support of U.S. Bank, National Association's ("**U.S. Bank**")[1] Opposition to *Ex Parte* Appointment of a Receiver in this case:

1. I am a Senior Vice President in U.S. Bank's Special Assets Group. As such I am responsible for the collection of the Loans (defined below) at issue in this case, and I am familiar with the Loan files and history. I am also readily familiar with the Intercreditor Agreements (defined below). I have engaged in negotiations with Plaintiffs The Prudential Insurance Company of America ("**Prudential**") and PGIM Real Estate Finance, LLC ("**PGIM**") (collectively, "**Plaintiffs**"), and Defendant Maricopa Orchards, LLC ("**Maricopa**"), and I have first-hand knowledge of the matters covered in this Declaration. The following facts are of my own personal knowledge, and if called upon to testify, I would competently testify to the facts set forth herein.

2. I have read U.S. Bank's Opposition to *Ex Parte* Appointment of a Receiver, including the factual recitations therein concerning certain loans U.S. Bank made to Maricopa, the Conterra refinance, and the intercreditor agreement between Plaintiffs' and U.S. Bank. I hereby attest that each fact set forth in U.S. Bank's Opposition is accurate and true, and if called to testify as a witness, I would competently to the facts set forth therein.

3. In addition to the above attestation, this Declaration sets forth the below facts concerning U.S. Bank's senior security interest in Maricopa's crops.

4. U.S. Bank has been Maricopa's crop lender for several years. Maricopa is currently indebted to U.S. Bank on a 2023 revolving crop line (the "Crop Loan") in an amount exceeding $145 million. The collateral for the Crop Loan includes Maricopa's crops.

5. Plaintiffs made real estate loans to Maricopa, secured by trust deeds on specific parcels of farmland and crops on that land—the same crops U.S. Bank holds a senior security interest in. Because the collateral for Plaintiffs' loans and the Loans both include the crops, U.S.

---

[1] By a bank merger in 2022, U.S. Bank succeeded to the interest of MUFG Union Bank, N.A. under the Intercreditor Agreement and other loan documents described below. In referring to "U.S. Bank" in this declaration, I mean either U.S. Bank or MUFG Union Bank, N.A. as the context requires.

Bank executed Intercreditor Agreements with Plaintiffs, whereby Plaintiffs agreed to subordinate their interests in Maricopa's crops to U.S. Bank's interest therein.

6. Section 3 of the form of Intercreditor Agreement between Plaintiffs and U.S. Bank, effective July 9, 2020, (one of which is attached hereto as <u>Exhibit 1</u>), provides that:

> "Notwithstanding the time, order or method of the granting, attachment or perfection of the respective security interests of Bank and Prudential in Crop Collateral, but subject to Section 4 **Prudential[2] <u>hereby subordinates the Prudential Lien on Crop Collateral to Crop Collateral Advances under the Bank Lien, and agrees that, subject to Section 3, the Bank Lien on Crop Collateral is senior and prior to the Prudential Lien on Crop Collateral</u>**."

Ex. 1, § 3 (emphasis added).

7. U.S. Bank is prepared to lend Maricopa up to $20 million in new money to enable Maricopa to complete this year's harvest, collect A/R, and permit repayment of Maricopa's obligations under the Loans. Attached as <u>Exhibit 2</u> is a term sheet listing the basic terms of such funding.

8. If a receiver is appointed as requested by Prudential, U.S. Bank will not fund Maricopa's harvesting efforts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on this 20th day of September, 2024 at Greenwich, CT 06830.

_____
Karen Boyer

---

[2] The Intercreditor Agreement defines "Prudential" to include Plaintiff PGIM. *See* Ex. 1 at p.1.

3

BOYER DECLARATION ISO U.S. BANK'S OPPOSITION TO EX PARTE APPOINTMENT OF A RECEIVER
Case No. 1:24-cv-01102-KES-SAB

# EXHIBIT 1

eRecording Partners Network LLC
400 Second Avenue South
Minneapolis, MN 55401-2499



## ELECTRONIC RECORDING RECEIPT

TO:
CA - Old Republic Title C
275 Battery St. #1500
San Francisco, CA 94111

Date:  7/24/2020
Receipt#:  14530675
Customer Reference:  1190001157

**Tulare County, CA**

| Recorded Date | Doc Name | Document | Recorder's Fee | Tax | E-Recording Fee | Total Fees | Memo |
|---|---|---|---|---|---|---|---|
| 7/24/2020  9:46:01AM | 20200043489 | Agreement | $126.00 | $0.00 | $5.00 | $131.00 | |
| | | Total: | **$126.00** | **$0.00** | **$5.00** | **$131.00** | |

```
Recorded at Request of EPN              |  Recorded             | REC FEE          51.00
Old Republic Title Company              |  Official Records     |
                                        |  County of            | AFF SB2 HOUSE   75.00
11900011 57                             |  Tulare               |
                                        |  ROLAND P. HILL       |
RECORDING REQUESTED BY                  |  Clerk Recorder       |
AND WHEN RECORDED MAIL TO:              |                       |
                                        |                       | CS
Thomas L. Palotas                       |                       |
Jameson Pepple Cantu PLLC               | 09:46AM 24-Jul-2020   | Page 1 of 11
801 Second Avenue, Suite 700
Seattle, Washington 98104
```

2020-0043489

---

Prudential Loan Nos. 717611236, 717611624, 717611763, 717611810, 717611848, 717611852

[SPACE ABOVE THIS LINE FOR RECORDER'S USE]

**This instrument is executed in quadruplicate for simultaneous recording in Fresno, Kern, Merced and Tulare Counties**

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT (this *"Agreement"*) dated as of July 9, 2020, is made by PGIM REAL ESTATE FINANCE, a Delaware limited liability company, (*"PGIM-REF"*) THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, (*"PICA"*, and together with PGIF-REF, *"Prudential"*) and MUFG UNION BANK, N.A. (for itself and as administrative agent for other lenders pursuant to any Bank Loan Agreement (as defined below), together, *"Bank"*).

Recitals

A.  **Prudential Loans**. Prudential has made loans (together, the *"Prudential Loans"*) to
    104 INVESTMENTS, LLC, a California limited liability company
    104 PARTNERS, LLC, a California limited liability company
    ACAP HOLDINGS, LLC, a California limited liability company
    ACDF, LLC, a California limited liability company
    ADAMS GRANTOR LAND, LLC, a California limited liability company
    ASHLAN & HAYES FARMS, LLC, a California limited liability company
    BEAR FLAG FARMS, LLC, a California limited liability company
    BISHOP FARMS 22, LLC, a California limited liability company
    C & A FARMS, LLC, a California limited liability company
    DA REAL ESTATE HOLDINGS, LLC, a California limited liability company
    FAVIER RANCH, LLC, a California limited liability company
    GRANTLAND HOLDINGS NO. 1, LLC, a California limited liability company
    GRANTLAND HOLDINGS NO. 2, LLC, a California limited liability company
    GRANTOR REAL ESTATE INVESTMENTS, LLC, a California limited liability company
    LINCOLN GRANTOR FARMS, LLC, a California limited liability company,
    MARICOPA ORCHARDS, LLC, a California limited liability company
(individually and together, *"Borrowers"*).

B. **Prudential Deeds of Trust**. The Prudential Loans are secured by, among other instruments and collateral, the following deeds of trust, each a Deed of Trust, Security Agreement, Crop Filing and Fixture Filing with Assignment of Rents and Proceeds, Leases and Agreements (together, as amended to date, the *"Deeds of Trust"*):

    deed of trust on property in Merced County recorded on August 21, 2017, under no. 2017026836;

    deed of trust on property in Fresno and Kern Counties recorded in Fresno County on October 23, 2018, under no. 2018-0129050, and in Kern County on October 22, 2018 under no. 218139395;

    deed of trust on property in Fresno County recorded on October 17, 2019, under no. 2019-0124295

    deed of trust on property in Fresno and Kern Counties recorded in Fresno County on November 13, 2019, under no. 2019-0136753, and in Kern County on November 13, 2019, under no. 219151263; and

    deed of trust on property in Kern and Tulare Counties recorded in Kern County on January 23, 2020, under no. 220009640, and in Tulare County on January 23, 2020, under no. 2020-0004578;

C. **Bank Loan**. Bank has made loans (together, the *"Bank Loan"*) to one or more Borrowers pursuant to, among other instruments, the Loan and Security Agreement dated as of February 20, 2018, and the Second Amended and Restated Loan and Security Agreement dated as of March 25, 2019 (each, a "Bank Loan Agreement" and, together with other Loan and Security Agreements between Bank and one or more Borrowers, as amended from time to time, the *"Bank Loan Agreements"*).

D. **Shared Collateral**. The collateral for the Bank Loan includes some of the same property that is included within Prudential's collateral. Prudential and Bank desire to set forth their relative priorities in the Borrowers' personal property comprising collateral for their respective loans on the terms and conditions set forth below.

E. **Existing ICA's**. PGIM-REF and Bank are parties to two previous Intercreditor Agreements, one dated June 1, 2018, and recorded in Merced County, and the other dated October 12, 2018, and recorded in Fresno and Kern Counties, as further described in Section 1 of this Agreement.

Agreement

NOW, THEREFORE, the parties agree as follows:

1. **Amendment and Restatement**. This Agreement amends and restated in their entireties the Intercreditor Agreement between PGIM-REF (formerly known as Prudential Mortgage Capital Company, LLC) and Bank recorded in Merced County on August 21, 2017, under no. 2017026836, and the Intercreditor Agreement between PGIM-REF and Bank recorded in Fresno County on October 23, 2018, under no. 2018-0129052, and in Kern County on October 22, 2018, under no. 218139396.

2. **Definitions**. In addition to the definitions in the Recitals and elsewhere in this Agreement, the following terms have the following meanings:

*"Bank Lien"* means, collectively, the liens and security interest held by Bank under the Bank Loan Agreements and such other documents, instruments and related UCC financing statements to the extent securing Crop Collateral Advances (including fees and costs for which a Borrower is liable under the documents evidencing or securing the Bank Loan), and to all advances or charges made or accruing thereunder, and to all modifications, extensions, renewals, and replacements thereof.

*"Bank Collateral"* means the collateral encumbered by the Bank Lien.

***"Crop Collateral"*** means:
(a) Equipment: All equipment used on, about or in connection with the Land (other than Prudential Exclusive Collateral) (***"Bank Equipment Collateral"***);
(b) Crops, Government Payments, Farm Products, Inventory, Accounts and General Intangibles: (i) All Crops growing or to be grown on the Land; (ii) all crop insurance payments, and all government subsidy payments of whatever kind or form, including payment-in-kind, storage, deficiency and interest payment, in connection with Crops growing or to be grown on the Land; (iii) all farm products or inventory arising from or related to farming operations conducted by Borrower on the Land; (iv) all accounts and general intangibles (other than general intangibles consisting of (A) ground water, water rights, permits, rights or licenses for the use of water, water allocation rights for water not yet delivered, water storage or banking rights, water distribution rights, and shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity and any entitlement to water delivery or storage or allocation under any reclamation law, and (B) contract rights, licenses, permits, and the like, relating to operation of the Land, or other general intangibles which constitute Prudential Exclusive Collateral) arising from or related to farming operations conducted on the Land;
(c) Swap: All rights and interests under the interest rate swap agreement evidenced by or arising under that certain ISDA Master Agreement dated February 13, 2018, between Bank and the Maricopa Borrower, and the Confirmation dated February 22, 2018, and any and all amendments, modifications, extensions or renewals thereof, including, without limitation, all rights to the payment of money from Bank under such interest rate swap agreement and all accounts, deposit accounts and general intangibles, including payment intangibles, described in such interest rate swap agreement; and
(d) Proceeds: All proceeds of the foregoing.

***"Crop Collateral Advances"*** means advances for the financing of Crop Collateral and related Borrower's operations, including the costs of production, cultivation, harvesting of Crop Collateral, and for costs of transporting Crop Collateral to a packer or processor. Amounts advanced to pay real estate taxes and assessments and other statutory liens against the Land shall be treated as Crop Collateral Advances.

***"Crops"*** means annual and perennial crops and crops grown on trees or vines growing or to be grown on the Land, but does not include the trees, vines or other permanent plantings.

***"Crop Year"*** means (i) for citrus crops, an 18-month period beginning on November 1st and ending on May 31st of the second calendar year thereafter, and (ii) for all other crops, a 13-month period beginning on November 1st and ending on November 30th of the following calendar year.

***"Land"*** means the real property encumbered by the Deeds of Trust.

***"Prudential Collateral"*** means the Land, fixtures, and personal property collateral encumbered by the Prudential Lien, including the Crop Collateral.

***"Prudential Exclusive Collateral"*** means that portion of the Prudential Collateral that is:
(a) the Land and all right, title and interest (including water rights) appurtenant to the Land;
(b) all fixtures located on the Land;
(c) all leases of all or any portion of the Land and all rents and other proceeds from such leases;
(d) all irrigation and drainage equipment now or hereafter located on the Land, including without limitation wells, pumps, motors, gearheads, windmills, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe, drainage pipe, culverts and well casings;
(e) all wind machine and other frost protection equipment now or hereafter located on the Land;

(f) all electric, gas and water lines and equipment located on the Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe;

(g) all trees, vines and other permanent plantings, whether *fructus naturales*, mature or immature, now or hereafter growing on the Land, together with all trellises, wires, end-posts, and stakes relating thereto; and

(h) all proceeds of the foregoing.

Notwithstanding the foregoing or any other provision in this Agreement, "***Prudential Exclusive Collateral***" does not include:

(a) Vehicles, rolling stock, farm machinery (including tractors, combines and other farm machinery), or any other *"equipment"*, as defined in Article 9 of the Uniform Commercial Code, that is not part of the Improvements; or

(b) portable irrigation motors on wheels customarily towed by a motorized vehicle; or

(c) any mobile or manufactured home that may be located on the Land; or

(d) any Bank Equipment Collateral.

*"Prudential Lien"* means the liens and security interest granted to Prudential under the Deed of Trust and related UCC financing statements for the Prudential Loan and to all advances or charges made or accruing thereunder, and to all modifications, extensions, renewals, and replacements thereof.

3. **Subordination of Prudential's Security Interest in Crop Collateral**.

   (a) Subordination. Notwithstanding the time, order or method of the granting, attachment or perfection of the respective security interests of Bank and Prudential in Crop Collateral, but subject to Section 4 Prudential hereby subordinates the Prudential Lien on Crop Collateral to Crop Collateral Advances under the Bank Lien, and agrees that, subject to Section 3, the Bank Lien on Crop Collateral is senior and prior to the Prudential Lien on Crop Collateral.

   (b) Continuing Subordination. Subject to Section 4 below, the subordination set forth in this Section 3 is intended to be a continuing subordination and agreement and is intended to govern the relative rights and priorities of Bank and Prudential with respect to successive Crop Years without the need for the execution of other or additional subordinations or agreements.

   (c) Bank's Termination. Bank agrees to comply with applicable law and Bank's customary practice with respect to the termination of this Agreement and Bank's financing statements either (i) upon full and final payment of all obligations heretofore, now or hereafter secured by Crop Collateral; or (ii) pursuant to Section 4below.

4. **Limitations to Prudential's Subordination**. Notwithstanding Section 3, the subordination of the Prudential Lien on Crop Collateral is subject to the following terms and conditions.

   (a) Crops. The agreement herein of Prudential with respect to the subordination of its security interest in Crop Collateral consisting of Crops shall be applicable only to Crops for which Bank provides financing. If Bank does not provide financing to grow and complete harvesting of Crops grown on the Land, then Prudential's security interest in those Crops shall be senior to any interest of Bank; provided that this does not affect Bank's first priority security interest with respect to all Crops produced in prior Crop Years and the proceeds thereof.

   (b) Following Prudential Foreclosure. Bank has no lien or any other interest in Crops planted, grown or harvested in the Crop Year following the Crop Year in which any foreclosure of the Land by Prudential is completed.

5.  **License for Bank to Grow and Harvest Crop Collateral.** If at such time as the Bank Lien on Crop Collateral is senior to the Prudential Lien, Prudential or any successor of Prudential or any third-party purchaser (each, a *"Successor Owner"*) acquires the right to possess or occupy the Land or any portion thereof as a result of foreclosure, trustee's sale, deed in lieu of foreclosure, receivership, court order or action or the consent of Borrower or its successor(s), then a non-exclusive license, occupancy right, or right to enter onto the Land (the *"License"*) shall be provided to Bank subject to the following terms and conditions:

    (a) Notices. Bank notifies Prudential or such other Successor Owner of its desire to exercise the License no later than fifteen (15) business days after Bank receives notice of the foreclosure, trustee's sale, deed in lieu of foreclosure, receivership, court order or action under the Prudential Lien, or of the consent of Borrower or its successor(s) to Prudential's possession of any portion of the Land (the *"Election Period"*); provided, however, that if Borrower is the subject of a bankruptcy proceeding filed prior to the conclusion of the Election Period, Bank's notice must be received by Prudential or such Successor Owner within fifteen (15) business days following the granting of relief from stay, but in no event later than fifteen (15) business days after a trustee's sale under the Deed of Trust. Bank's failure to timely notify Prudential or any other Successor Owner of its exercise of the License is an irrevocable waiver of its right to exercise the License.

    (b) Scope of License. The License shall only permit entry onto the portion of the Land on which the Crop Collateral subject to the prior Bank Lien is then located or under cultivation, at such times and places as shall be reasonably necessary to exercise Bank's rights, powers and remedies with respect to its Crop Collateral. Bank may care for, cultivate and harvest all such Crop Collateral, dispose of such Crop Collateral, and apply the proceeds in accordance with the terms and conditions of this Agreement, any other documents and instruments delivered to Bank by Borrower in connection with the Bank Loan, and applicable law, all at Bank's sole expense.

    (c) Water Rights. The License shall also include the non-exclusive right to use available water rights and irrigation and drainage equipment in connection with the portion of the Land subject to the License, provided that (i) such use is in compliance with all applicable laws, ordinances, regulations and agreements governing the Land, including without limitation all rules and regulations of any water district in which the Land is located, (ii) such use is only to the extent reasonably necessary, in the exercise of Bank's commercially reasonable discretion, to properly care for and maintain the Land and the permanent plantings located thereon to conclude annual production and harvest the Crop Collateral growing thereon, and (iii) Bank shall discharge any obligation incurred by Bank or its agent, the non-payment of which would give rise to a lien on the Land or for which Prudential may have liability.

    (d) Termination of License. Except as set forth in Section 5(h), below, the License shall terminate at the end of the Crop Year in which it is exercised.

    (e) Bank's Payment of Taxes, Costs. As a condition to continuation of the License, Bank agrees to reimburse Prudential for: (i) a *pro rata* portion of any real property taxes and assessments encumbering the Land that accrue for the Crop Year in which the License is exercised; (ii) that portion of water, utilities and insurance reasonably allocable to Bank's period of actual use of the Land, and (iii) the cost of repair of any physical damages to the Land caused by Bank's exercise of any of its rights hereunder, including but not limited to any removal of any of the Crop Collateral, but not for any diminution in value of the Land resulting from the removal of the Crop Collateral.

    (f) Standard of Care. Bank agrees that its exercise of a License shall be conducted with reasonable agricultural and/or viticultural standards and practices, in good and farmer-like

manner in accordance with the standards and practices customarily employed for similar crops and properties in the vicinity and in compliance with applicable laws, ordinances, regulations and agreements, including those related to agricultural chemicals, toxic materials, hazardous materials and petroleum products. In return, Prudential agrees to cooperate with Bank and not interfere with the exercise of Bank's License rights hereunder, it being understood that Prudential also may be conducting agricultural and/or viticultural activities on the Land during the period Bank is exercising the License. Prudential agrees to exercise its rights, powers and remedies in connection with the Land in a reasonable manner so as not to cause or permit damage to or destruction of the Bank's Crop Collateral.

(g) Bank's Indemnity. Bank shall indemnify, protect, defend and hold Prudential and its agents (each, an *"Indemnitee"*, and collectively, *"Indemnitees"*) harmless from any and all loss, cost, damage, claims, expense and liability, including without limitation, property damage and personal injury to any person, and further including reasonable attorneys' fees, that any Indemnitee may suffer or experience arising out of the actions or omissions of Bank or its agents in connection with the exercise of the License. Notwithstanding the foregoing, no Indemnitee shall be entitled to indemnification for any liability, loss, cost or expense caused by its own gross negligence or willful misconduct.

(h) Bank's Right to Terminate License. If Bank exercises the License, and thereafter decides to terminate its rights under the License and cease caring for the Crops, it shall notify Prudential in writing at least fifteen (15) business days in advance to enable Prudential to adequately care for the Crops and the Land if Prudential, in its sole discretion, so elects. In the event Bank elects to terminate its rights under the License, then as to any Crops that Bank has elected to terminate its rights under the License, the Bank Lien shall terminate as of the last day of the immediately preceding Crop Year. Subject to its indemnification obligations set forth above, Bank shall have no liability to Prudential or any other Successor Owner or Borrower solely from its election to terminate its rights under the License and cease caring for the Crops or the Land, provided it gives the required notice thereof and it terminates its lien of record as required herein.

(i) Prudential Lien. In the event Bank exercises the License, the Prudential Lien shall continue to encumber the Crop Collateral subject only to the Bank Lien in such Crop Collateral.

6. **Borrower's Obligations to Prudential Regarding the Bank Loan**. Borrower's failure to timely perform all its obligations under the Bank Loan, at Prudential's election, is a Prudential Loan Default and an Event of Default under the Deed of Trust.

7. **Prudential Exclusive Collateral**. Bank agrees that the Bank Collateral does not include any of the Prudential Exclusive Collateral, and Bank hereby disclaims any Bank Lien or other security interest or lien on any of the Prudential Exclusive Collateral. Bank agrees that, without the prior written consent of Prudential, it will not obtain a consensual lien or security interest in any of the Prudential Exclusive Collateral, or on any insurance proceeds or other rights of payment which are derived from any Prudential Exclusive Collateral. Bank hereby authorizes Prudential to file any and all amendment or termination statements under the Uniform Commercial Code in the appropriate state and county filing/recording offices that are necessary to give effect to the terms and conditions of this Section 7.

8. **Consent to Prudential Lien; Prudential Loans**. Bank consents to the Prudential Loan and to the Prudential Lien encumbering all or part of the Bank Collateral, and agrees that the Prudential Lien shall not constitute a default under the Bank Loan. Notwithstanding any provision in the loan documents evidencing or securing the Bank Loan, Bank hereby consents to any and all loans by Prudential secured primarily by real estate, including vineyards, winery facilities, buildings, fixtures and other improvements. Bank agrees that its knowledge or consent is not required to any new

loan, modification, extension, renewal, additional advance, or refinance of any Prudential loan to Borrower secured by real estate collateral. Additional Prudential loans to Borrower shall be deemed included within "Prudential Loans" and additional real estate collateral shall be deemed included within "Prudential Real Estate Collateral" for the purposes of this Agreement. At Bank's or Prudential's request, the parties agree to amend and update this Agreement to include such additional Prudential loans and real estate collateral, or to reflect Bank's then current Bank Loan documentation.

9. **Prudential Lien as to Other Collateral**. Notwithstanding anything to the contrary in this Agreement or otherwise, the Prudential Lien shall at all times constitute and continue as a first priority lien on all of the Prudential Collateral, excluding only Crop Collateral subject to the Bank Lien as provided in Section 4 and Section 3 above.

10. **Bank Loan**. Bank certifies to Prudential: (a) that Bank is the owner and holder of the Bank Loan, (b) true, correct and complete copies of all of the documents evidencing and securing the Bank Loan any and all amendments thereof have been given to Prudential, and (c) to the actual knowledge of Bank, no default, or event or condition which, with the giving of notice or passage of time, or both, would constitute a default, exists under the Bank Loan.

11. **Notice and Opportunity to Cure**. Bank, upon giving Borrower notice of any default under the Bank Loan, shall simultaneously give notice thereof to Prudential. Upon Bank's giving of any such notice of default to Prudential, Prudential shall have the same period of time after the giving of such notice to Prudential, to remedy or cause to be remedied the default(s) specified in the notice, and Bank shall accept such performance as if the same had been done by Borrower. Any notice given to Prudential under this Section may, at Bank's option, be a duplicate original of the notice given to Borrower or a copy of the notice.

12. **No Commitment to Extend Financing**. Nothing in this Agreement shall be construed by Bank, Prudential or Borrower (or any of them) as constituting a commitment by Bank or Prudential to provide any crop financing for any future Crop Year, it being hereby acknowledged by all parties that such financing shall be considered independently on a case-by-case basis by Bank and on a case-by-case basis by Prudential.

13. **Notices**. All notices, demands or requests under this Agreement must be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by a nationally recognized courier service (such as Federal Express or Airborne), addressed to the addressee at its address below or such other address or addresses as the addressee may specify by notice:

    If to Bank:   MUFG Union Bank, N.A.
    7108 N. Fresno Street, Suite 200
    Fresno, California 93720
    Attn: Scott Lisle

    If to Prudential:   PGIM Real Estate Finance
    c/o Prudential Asset Resources
    2100 Ross Avenue, Suite 2500
    Dallas, Texas 75201
    Attention: Agricultural Loan Servicing
    Ref. Loan Nos. 717611236, 717611624, 717611763,
    717611810, 717611848, 717611852

With a copy to:  PGIM Real Estate Finance, LLC
c/o Prudential Asset Resources
2100 Ross Avenue, Suite 2500
Dallas, Texas 75201
Attention: Legal Department
Ref. Loan Nos. 717611236, 717611624, 717611763,
717611810, 717611848, 717611852

Notices shall be deemed properly given (i) upon receipt if by hand delivery, or (ii) on the third business day after the day mailed, or (iii) on the first business day after the date sent if sent by nationally recognized overnight courier service.

14. **Exchange of Information**. Prudential and Bank (together, *"Lenders"*) may exchange information regarding Lenders' respective collateral and the respective obligations owed to each by Borrower or any guarantor at such time and in such manner as they may mutually agree, which information may include, but is not limited to, the value, location, and description of the collateral, financial information regarding Borrower or any guarantor of Borrower, or loan balances, loan terms, and such other information as is agreed to by and between Lenders, provided that, as between them, Lenders shall be not liable to each other for any error or omission in any information so exchanged.

15. **General Terms**.

    (a) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its conflict of laws rules.

    (b) Recitals True. Each party approves and acknowledges the accuracy of the Recitals in all respects, and agrees that the Recitals are an integral part of this Agreement.

    (c) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties.

    (d) No Third Party Beneficiaries. Except for Prudential and Bank and their respective successors and assigns, no person (including without limitation, Borrower or any successor to Borrower) is intended or shall be construed to be a third party or other beneficiary of this Agreement.

    (e) Waiver of Order of Sale and Marshaling. To the fullest extent permitted by law, each party hereby waives any and all right to require marshaling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein, or to direct the order in which any of the Bank Collateral or Prudential Collateral will be sold in the event of any sale under the Prudential Lien or the Bank Lien.

    (f) Interpretation. This Agreement has been submitted to the scrutiny of all parties and their counsel and shall be given a fair and reasonable interpretation without consideration as to which party or counsel drafted any provision. All Section titles or captions are only for convenience and shall not be deemed part of the context or affect the interpretation of this Agreement.

    (g) Integration; Amendments. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous understandings, undertakings, and agreements with respect thereto. This Agreement may be amended or modified only through a non-electronic or facsimile transmission of a non-electronic writing, and in either case bearing the handwritten, authorized signature the party sought to be bound thereby, and which by its express terms refers to this Agreement.

    (h) Other Documents. Each party agrees to execute such further and additional documents and instruments as may be reasonably requested by the other party in order to effectuate the

agreements contained herein, including without limitation, amendments to UCC Financing Statements.

(i) <u>Attorneys' Fees</u>. If legal action is necessary to enforce or interpret any of the provisions of this Agreement, the prevailing party, as determined by the court, shall be entitled to be reimbursed by the other party for all costs and expenses incurred in connection with such legal action, including reasonable attorneys' fees. Such fees, costs and expenses include those of outside counsel and the allocated cost of in-house counsel, whether incurred in any appeal, any proceeding under any present or future federal bankruptcy act or state receivership (including the adjudication of issues peculiar to bankruptcy law), or any post-judgment collection proceeding.

(j) <u>Recording in Multiple Counties</u>. This Agreement is being executed in quadruplicate originals for simultaneous recording in Fresno, Kern, Merced and Tulare Counties. The quadruplicates together constitute a single instrument.

(k) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be effective upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

*The rest of this page is left blank intentionally.*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

*"Bank"*

MUFG UNION BANK, N.A., for itself and as administrative agent for other lenders from time to time party to a Bank Loan Agreement

By: _____
Scott Lisle, Director

---

**A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF FRESNO        )

On July 17, 2020 before me, Luanne Crater Notary Public (here insert name and title of the officer), personally appeared Scott Lisle, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

(notary stamp or seal)

WITNESS my hand and official seal.

_____
Signature (Seal)

LUANNE CRATER
Notary Public - California
Fresno County
Commission # 2276463
My Comm. Expires Feb 2, 2023

*"Prudential"*

PGIM REAL ESTATE FINANCE, LLC, a Delaware limited liability company

By: _____
Name: L. Frank Oberti   *L. Frank Oberti*
Title: Vice President

PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation

By: _____
Name: L. Frank Oberti   *L. Frank Oberti*
Title: Vice President

---

**A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA       )
                          ) ss.
COUNTY OF  PLACER         )

On  JULY 9, 2020 , before me,  L. WEAKS, NOTARY PUBLIC ,
(here insert name and title of the officer), personally appeared  L. FRANK OBERTI , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

(notary stamp or seal)

WITNESS my hand and official seal.

_____
Signature (Seal)

L. WEAKS
Notary Public - California
Placer County
Commission # 2251759
My Comm. Expires Aug 12, 2022

# EXHIBIT 2

**MARICOPA ORCHARDS, LLC, ET AL.**
**TERMS FOR HARVEST LINE AMENDMENT**
**(FOR DISCUSSION ONLY)**

The terms and conditions set forth in this "Term Sheet" address the proposed terms of a Fifth Amendment and Forbearance Agreement (the "Harvest Line Amendment") to that certain Second Amended and Restated Loan and Security Agreement dated March 25, 2019 (the "Loan Agreement") by and between U.S. Bank National Association (as successor in interest to MUFG Union Bank, N.A. ("U.S. Bank")), in its capacity as administrative agent and lender, and Maricopa Orchards, LLC, a California limited liability company and all of its co-borrowers (collectively, the "MOC Borrowers").  Capitalized terms used but not defined herein have the meanings given to them in the Loan Agreement.

This is a non-binding term sheet and does not create any legally binding obligation on any party. Any obligations of the parties will only arise upon the execution of definitive documentation that is acceptable to all parties in their sole and absolute discretion.

| Summary of Proposed Harvest Line Terms ||
|---|---|
| **Harvest Line Increase** | ▪ The Maximum Amount of the line of credit reflected in the Loan Agreement will be increased to $166 million, reflecting an increase in availability of $20 million (the "Harvest Line Increase"). |
| **Forbearance Period / Maturity of Increase** | ▪ Notwithstanding that the Loan has been accelerated and is fully due and owing, U.S. Bank would forbear from exercising remedies relative to the MOC Borrowers only until the conclusion of the harvest on November 1, 2024 (the "Forbearance Period").<br>▪ The entire amount of the Loan including the amount of the Harvest Line Increase is fully due and payable on the earlier of (x) November 1, 2024, or (y) early termination of the Forbearance Period.<br>▪ In addition to existing security agreement, MOC Borrowers will execute crop assignments directing the receiving processors to make payment of amounts due for 2023 and 2024 crop directly to U.S. Bank, which payments will be applied to reduce the outstanding balance of the Loan. |
| **Interest** | ▪ Interest on all amounts advanced as part of the Harvest Line Increase will accrue at the default rate set forth in the Loan Agreement, in light of the fact that the default rate has been implemented. |
| **Use of Proceeds** | ▪ Proceeds of the Harvest Line Increase shall be used solely for the purpose of paying the operating expenses relative to the 2024 harvest, interest on the MOC crop line, and professional fees as set forth in an agreed budget attached to the Harvest Line Amendment (the "Harvest Budget"). |
| **Draw Period** | ▪ Monday, September 23, 2024 through the earlier of (x) October 31, 2024, or (y) the occurrence of any Forbearance Trigger set forth below, with all draws subject to the satisfaction of all conditions precedent to funding set forth below. |
| **Non-Revolving** | ▪ Amounts repaid under the Harvest Line Increase may not be reborrowed. |
| **Funding Mechanics** | ▪ Funding would occur weekly pursuant to the Harvest Budget, on Monday of each week commencing on September 23, 2024. |
| **Reporting and Oversight** | ▪ MOC Borrowers to provide a weekly budget to actual report to Bank on Sunday of week demonstrating compliance with the Harvest Budget.<br>▪ MOC Borrowers to provide a weekly report every Sunday during the Forbearance Period setting forth the identity and terms of all agreements with |

| | |
|---|---|
| | all processors of the MOC Borrowers' 2024 crop, along with copies of all such agreements.<br>- BDO to be provided with daily disbursement review in manner consistent with TPC loan.<br>- BDO to be provided with unfettered access to MOC Borrowers' books and records and employees as part of its oversight. |
| **Conditions Precedent to Funding** | - The execution and delivery by all MOC Borrowers of a Fifth Amendment and Forbearance Agreement in form substance acceptable to U.S. Bank.<br>- The MOC Borrowers shall have executed and delivered any other agreements, instruments or documents as may be requested by U.S. Bank, all in form and substance acceptable to U.S. Bank, including without limitation resolutions, good standing certificates, incumbency certificates, and organizational documents.<br>- Execution and delivery by all Guarantors of an Amended and Restated Guaranty to cover full amount of Loan after Harvest Line Increase.<br>- Provision of a full release by MOC Borrowers and Guarantors in form and substance acceptable to U.S. Bank.<br>- No forbearance termination trigger shall have occurred, including without limitation no receiver shall have been appointed over any portion of the MOC Borrowers' property.<br>- The pending receivership motion filed by PGIM must have been denied or continued to a date after the conclusion of the draw period.<br>- U.S. Bank named as loss payee on all crop insurance policies.<br>- MOC Borrowers provide evidence satisfactory to U.S. Bank that MOC Borrowers have entered into processing agreements to process the crop for that week. |
| **RPA** | - Chip Cummins and RPA continue to serve as FA of the MOC Borrowers for the duration of the Forbearance Period. MOC Borrowers and RPA to provide full cooperation with BDO in BDO's onsite monitoring of compliance with Harvest Budget and this Agreement. |
| **Forbearance Termination Triggers** | The Forbearance Period would immediately terminate, without notice, upon the occurrence of any of the following:<br>- The appointment of a receiver over any portion of the MOC Borrowers' property.<br>- Failure to deliver the required reporting set forth in this term sheet.<br>- Failure to adhere to the cash flow projections set forth in the Harvest Budget.<br>- Failure to abide by any term of this term sheet. |