UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.,<br><br>Plaintiff,<br><br>v.<br><br>ACDF, LLC, et al.,<br><br>Defendants. | No. 1:24-cv-01102-KES-SAB<br><br>**DECLARATION OF JASON HOLLRAH** |

I, Jason Hollrah, declare:

1. I am the Chief Operating Officer of the Assemi Group. I am over 18 years of age. The statements contained in this declaration are true and based on my personal knowledge, except as otherwise indicated. If called upon as a witness to testify to these statements, I could and would competently do so under oath.

2. In my capacity as Chief Operating Officer of the Assemi Group, I am familiar with many of the businesses entities that are the Defendants in this action, as well as the collateral over which The Prudential Insurance Company of America ("Prudential") seeks

to impose a receivership. I have been involved in discussions with Prudential over these issues for several months.

3. Assemi Group provides management services for its related business entities, including Maricopa Orchards LLC and Defendants ACDF, LLC, Assemi and Sons, Inc., Bear Flag Farms, LLC, C & A Farms, LLC, Cantua Orchards, LLC, Favier Ranch, LLC, Grandon Farms, LLC, Granville Farms, LLC, Lincoln Grantor Farms, LLC, Panoche Pistachios, LLC, and Sageberry Farms, LLC (the "Maricopa Defendants"). Among other things, the Assemi Group manages business entities and real property parcels of the Assemi family farming enterprise comprising tens of thousands of both planted and unplanted acres throughout the Central Valley. In total, the planted and unplanted acres extend over hundreds of separate legal parcels and legal business entities.

4. Because we are an agricultural business, the value of our enterprise is in the crop. Based on my knowledge and experience in the agricultural industry, I would estimate that a farmed acre is significantly more valuable than an acre that is not farmed.

5. In order to farm an acre, there is the obvious requirement of water. Crops, which for us include pistachios, almonds, citrus, row crops, cherries and others, also require significant ongoing attention and expertise including regular farm services such as planting, fertilizing, pruning, watering and pest control. Short-term neglect of the trees on the properties will result in damage and long-term diminution of crop productivity. Longer-term neglect will result in more significant damage and potential loss of the trees. Mature trees that produce crop are responsible for about 70% of the value of these parcels.

6. In my experience, it is difficult to hire and retain employees and agents with the specialized agriculture knowledge required to turn an unfarmed acre into a successfully farmed acre. This is because the amount of experience that is required means there are not

that many qualified individuals, but also because of the competition among other competing businesses in the Central Valley.

7. Harvesters are paid by the week during the harvest. A typical harvest is just a few weeks, depending on the crop. Any downtime during harvest translates into a significant loss of income to the harvester. With many competing producers looking to harvest at the same time, I understand that harvesters choose to work with our organization due to its history of stability. If we were to inform our harvesters that they could not continue to harvest on property under our management and leadership, I am informed from farm personnel that harvesters would lose opportunity to operate during the short harvest season and would leave our operation out of economic necessity.

8. A lack of personnel to farm and harvest the crop is critically devastating to value as the commodity is left to rot instead of being sold. For instance, pistachios, the crop which is the impetus of the instant Motion is particularly susceptible to day-to-day fluctuations in harvest schedule and must be harvested within a specific window of time in order to maximize economic value. This is exacerbated for an organization like ours where harvest is done at scale and harvesters, equipment, trucks, and processor availability must be aligned in order achieve a successful harvest. A pistachio fruit, or nut, is surrounded by a hull and shell. If the pistachio is ripe and harvested and the nut does not get to processor within 24 hours to remove the hull, the fruit will rot and the pistachio will begin to get staining on the shell. This staining dramatically reduces the value of the pistachio, sometimes entirely. In addition, the rotting fruit becomes increasing susceptible to pests. Pistachios that have pests are not saleable. As a result, during this critical period, the enterprise needs to be fully staffed with harvesters so that the fruit can be picked and delivered immediately to the processors.

9. Harvest is going on right now. Every day, the Maricopa Defendants are harvesting between 75 and 100 loads of pistachios, with about 40,000 pounds of raw pistachios in each load. The harvesting is occurring approximately 20 hours a day. Quite clearly, the operation of the farm enterprise involves more than just the harvesters. The Maricopa Defendants have an integrated team of over thirty people in operations deeply involved in all aspects of harvest from logistics and safety to pest control and data. For example, there three primary farm managers who are responsible for coordinating all aspects of harvest logistics. This knowledge and know-how cannot be readily replaced, particularly during harvest. There are numerous other examples of such people who are not easily replaceable or hirable by a third-party receiver.

10. One of the strengths of our business has been our ability to develop relationships with harvesters and other key agriculture personnel over decades so they have confidence that the farming enterprise will continue to operate such that we have sufficient personnel to turn our farmed acreage into revenue during the critical harvest periods, including the one that is currently occurring with pistachios. A receiver will not have these relationships and based on my experience with the harvesters and others we work with, the appointment of a receiver is likely to leave us understaffed at a critical point, jeopardizing the primary value of the farming enterprise, its crops.

11. A receiver will also be unable to effectively farm the existing enterprise. Financing which has been extended by lenders such as Prudential to help fund the farming enterprise has been collateralized in a variety of different ways. For example, in some instances, the lender has encumbered the real property itself (i.e., the "dirt"). And in other instances, the lender has encumbered either the underlying business entity, or specific assets of the business entity, such as the crops themselves. There are other lenders besides

Prudential which have encumbered other various assets of the farming enterprise but who would be affected by a receivership.

12. Regardless of how the collateral has been pledged in any specific instance, the entirety of the farming enterprise is managed collectively as one unit. There is no distinction between harvesting and managing crops that are a part of Plaintiffs' collateral, and the collateral of other lenders. Put another way, when the harvesting teams go out to pick pistachio nuts from the trees in the fields, they pay no attention to whether the tree they are picking from is secured by a loan from Plaintiffs, of that of another lender.

13. The parcels that are collateral for a particular lender—for Plaintiffs, for example—are also not contiguous. For example, the map attached as Exhibit A to this declaration shows "Calaveras Ranch," a collection of parcels that include *but are not limited to* parcels that are collateral for Plaintiffs. I oversaw the preparation of this map by the Assemi Group in the regular course of business. I have reviewed this map and compared it to the information contained in our records and confirmed its accuracy.

14. The green parcels in the map are Plaintiffs' collateral. The orange parcels in the map are collateral for another lender. The other parcels are not pledged as collateral. If a receiver were appointed, the receiver would be empowered to farm only the green properties. That is impossible without access to the other properties, which the receiver would not have.

15. I believe that given the complexity of the number of legal entities and legal parcels it would take years to segregate the parcels in such a manner that would allow a party to only farm specific collateral, as opposed to the enterprise as whole. At a minimum, extensive surveys would need to be done and physical infrastructure would need to be constructed.

16.     In many cases, physical segregation of a parcel would be impossible because the parcel would be landlocked by other parcels.  In other parcels, new infrastructure would be required to make it independently farmable from that of the other parts of the enterprise, such as the construction of water wells or electric meters for parcels that do not currently have such infrastructure.

17.     In addition, even if such a segregation of collateral was physically possible to achieve, I believe it would nonetheless be impossible to administer due to the complexity in obtaining water rights that are needed to make the parcels productive for farming.

18.     Each parcel owned by the Maricopa Defendants is in a water district.  The Maricopa Defendants' property is in as many as 15 distinct water districts, with the majority in three water districts.  Each water district features different water rights.  The Maricopa Defendants operate the properties as an integrated farm; collectively, they have a single account for each of the largest water districts.  That account commingles the water rights held by the different legal entities into a single managed account that dictates how water is used across the farm enterprise regardless of fee title holder.

19.     Water that is obtained from the water districts is delivered by a complex network of pipes to the parcels without regard to who owns the underlying property or who it is collateralized by.  Water wells exist but they are placed based on the best source of the water, not according to parcel or what lender owns the underlying collateral.  There is no distinction based on which lender identifies the parcel as collateral.  Pipelines cut across fields.  A parcel pledged as collateral to Plaintiffs may or may not have a well.  Similarly, some areas receive water from a canal.  The canal has turnouts on particular parcels; parcels without turnouts rely on water from the integrated business.  If the relief requested by Plaintiffs is granted, properties would be cut off from the integrated whole and would not

get water. Without water, the trees on the properties would die and the properties would subsequently be materially devalued.

1  I declare under the penalty of perjury that the foregoing is true and correct.

Executed by: _____          Date: September 20, 2024
JASON HOLLRAH

# Exhibit A



# CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing, including the following counsel for Plaintiff The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC :

M. Ryan Pinkerton, Esq.
Brandon J. Franklin, Esq.
Seyfarth Shaw LLP
560 Mission Street, 31st Floor
San Francisco, California 90017

By: /s/ *Michael S. Nadel*
Michael S. Nadel