SEYFARTH SHAW LLP
M. Ryan Pinkston (SBN 310971)
rpinkston@seyfarth.com
Brandon K. Franklin (SBN 303373)
bfranklin@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Plaintiffs
THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA; AND PGIM
REAL ESTATE FINANCE, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; and PGIM REAL ESTATE FINANCE, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>ACDF, LLC; ASSEMI AND SONS, INC.; AVILA RANCH EA, LLC; BEAR FLAG FARMS, LLC; C & A FARMS, LLC; CANTUA ORCHARDS, LLC; DA REAL ESTATE HOLDINGS, LLC; FAVIER RANCH, LLC; FG2 HOLDINGS LLC; GRADON FARMS, LLC; GRANVILLE FARMS, LLC; GRANTLAND HOLDINGS NO. 1, LLC; GRANTLAND HOLDINGS NO. 2, LLC; GRANTOR REAL ESTATE INVESTMENTS, LLC; GVM INVESTMENTS, LLC; GV AG, LLC; LINCOLN GRANTOR FARMS, LLC; MARICOPA ORCHARDS, LLC; PANOCHE PISTACHIOS, LLC; SAGEBERRY FARMS, LLC; DEREK BELL; and RACHEL MARIE WHITE,<br><br>                    Defendant. | Case No. 1:24-cv-01102-KES-SAB<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION**<br><br><br>Complaint Filed: September 16, 2024 |

**REPLY IN SUPPORT OF *EX PARTE* MOTION FOR
APPOINTMENT OF RECEIVER AND FOR PRELIMINARY INJUNCTION**

Now come Plaintiff THE PRUDENTIAL INSURANCE COMPANY OF AMERICA and PGIM REAL ESTATE FINANCE, LLC (collectively, "**Plaintiff**") each in its own capacity as a lender and PGIM REF also in its capacity as special servicer for and on behalf of PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST, a New York trust ("**Hartford Trust**" and together with Plaintiff, "**Lender**"), by and through their counsel, and for their *Reply* (the "**Reply**") *in Support of Ex Parte Motion for Appointment of Receiver and for Preliminary Injunction* (the "**Motion**"), state as follows:

**STATEMENT OF FACTS**

On September 16, 2024, Plaintiff filed its Complaint for (1) *Breach of Contract, Appointment of Receiver, Accounting and Specific Performance of Rents-and-Profits Clause; and (2) Injunctive Relief* (the "**Complaint**"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Complaint or the Motion, as applicable.

On September 18, 2024, Plaintiff filed the Motion and its *Ex Parte Application Regarding the Motion* (the "***Ex Parte* Application**"). Later that day, this Court entered a Minute Order setting certain deadlines and a hearing on the Motion. On September 20, 2024, Plaintiff and Borrower requested that this Court continue those dates by one day, which the Court agreed to do. As such, the Court set a deadline for Defendant to oppose the Motion of September 21, 2024, at 2:00 p.m. (PDT), setting a deadline for Plaintiff to reply of September 22, 2024, at 2:00 p.m. (PDT), and schedule a hearing on the Motion on September 24, 2024, at 9:30 a.m. (PDT) (the "**Hearing**").

Pursuant to the Motion, Plaintiff sought, among other things, the appointment of a receiver over the Property. The Property serves as Plaintiff's collateral securing the Loans and is at serious risk for damage and destruction if a receiver is not appointed.

On September 21, 2024, Borrower filed its *Opposition to Ex Parte Motion for Appointment of Receiver and Preliminary Injunction* (the "**Borrower Opposition**").

1

1       The Borrower Opposition raises two arguments against the relief sought in the Motion:

2   (1) it will be difficult for a receiver to manage the Property; and (2) U.S. Bank is willing to

3   provide financing for all of Borrower's farming operations, which include the Property. Neither

4   of these arguments trump the need for the appointment of a receiver.

5       On September 20, 2024, U.S. Bank filed its *Ex Parte Application for Leave to Intervene*

6   *Pursuant to FRCP 24 for the Limited Purpose of Filing an Opposition to Plaintiff's Ex Parte*

7   *Motion* (the "**US Bank Intervention Application**"). Pursuant to the US Bank Intervention

8   Application, US Bank seeks leave to intervene to file an opposition to the Motion. That same

9   day, US Bank filed its *Joinder and Opposition to Ex Parte Appointment of a Receiver* (the "**US**

10  **Bank Opposition**"), which is supported by the *Declaration of Karen Boyer*

11  (the "**Boyer Declaration**").

12      The US Bank Opposition raises one primary argument: Prudential has scuttled financing

13  negotiations, leaving US Bank and Borrower in a precarious position. However, at the time US

14  Bank filed the US Bank Opposition, U.S. Bank and Prudential were in active, good faith

15  negotiations regarding a consensual funding arrangement. This arrangement would ensure that

16  the harvest was funding and completed. The US Bank Opposition contains a number of similar

17  inaccurate statements, which Plaintiff finds deeply concerning.

18      Before and after the filings of the Borrower Opposition and the US Bank Intervention

19  Application and Opposition, Plaintiff has been engaged in good faith negotiations with both

20  Borrower and U.S. Bank. Plaintiff believes that it has reached an agreement with Borrower

21  pursuant to which it will fund harvest, and intends on filing a proposed stipulated receiver order

22  in this regard.

23  **ARGUMENT**

24  I.   **Plaintiff Has the Contractual Right to the Immediate Appointment of a Receiver**.

25      Defendants spend much of their Response arguing about their operations and their

26  integrated farm operations. As discussed below, Receiver is well-situated to address these issues,

27  and Plaintiff can provide its funding to Receiver (and allow Receiver to control Plaintiff's

28  

2

collateral) in an efficient manner based on the specific lots that make up the Property, and the crops growing on such Property, subject to Plaintiff's security interest. Moreover, to the extent U.S. Bank were to provide funding, Plaintiff's receivership will not impact said financial accommodations.

Despite filing 12-page response, Borrower does not address their contractual obligations in any fashion. Borrower contractually agreed to the appointment of a Receiver if they failed to comply with the Forbearance Agreement, dated May 29, 2024. Borrower did not limit when or how the Receiver would be appointed, including with respect to timing. When Borrower executed the Forbearance Agreement, all of the issues raised in the Borrower Opposition either existed or where reasonably foreseeable. U.S. Bank was their existing operating lender and Borrower's operations involved multiple parcels of land with several different agricultural lenders. Borrower could have provided some mechanism to address their concerns when they negotiated and executed the Forbearance Agreement. Borrower chose not limit their contractual obligations and agreement to the exercise of remedies by Plaintiff, presumably because such concerns were not material. As a result, Borrower should not be allowed to avoid their contractual obligations because of facts about their operations and businesses that existed when they signed the Forbearance Agreement.

## II.   Receiver Is Beyond Qualified to Manage the Property.

Borrower argues that the Property will be too difficult to manage because Borrower's farming operations are integrated, and the Property only consists of approximately 70% of Borrower's total real property. As a result, according to Borrower, the Receiver will be forced to manage a patchwork of non-contiguous real property that relies on certain employees of Borrower (who the Receiver may not be able to hire) and institutional knowledge of Borrower and those employees. These concerns do not render the receivership infeasible.

As an initial matter, the map of non-contiguous real property shown in the Borrower Opposition, Calaveras Ranch, shows that Plaintiff's real property collateral is open ground (i.e., *there exist no crops on such land*). As such, many of the concerns regarding harvest and

3

maintenance simply do not apply. In fact, Plaintiff's primary real estate orchard collateral consists of large, contiguous ranches. Similarly, the Borrower Opposition raises a purported difficulty in harvesting crops if the Receiver is appointed. However, these crops are harvested by third-party vendors pursuant to contracts, which the Receiver would be able to enforce after being appointed. Further, any issues regarding access to the real property, or related easements, will be addressed in the proposed order appointing the receiver.

As set forth in more detail in the declaration of Mr. Miller, attached to the Motion as Exhibit C, the Receiver and his firm have significant experience in managing and overseeing distressed agricultural operations similar to Borrower's operations. Receiver also has experience taking over operations that do not have, or no longer have, any employees. Further, the Receiver and his firm have strategic partnerships with third party consultants who similarly have extensive experience in distressed agricultural operations, and the Receiver is able to deploy those individuals and their experience immediately, as needed.

Further, Plaintiff has agreed to leverage its agricultural equity team to assist the Receiver in managing and operating the Property. As set forth in the Declaration of William Sciacqua, attached hereto as **Exhibit A**, Plaintiff has significant experience in managing and administering agricultural operations, and maintains unique capabilities as the only institutional investor with an agricultural debt and equity platform. Plaintiff's agricultural equity arm has operated since 1969, and has served institutional investors seeking portfolio diversification into the agricultural asset class since 1989.

Currently, Plaintiff manages and administers approximately $2.2 billion in agricultural equity investments, which includes approximately 160,000 acres of farmland nationwide across a wide range of crop types, such as almond and pistachio orchards, with approximately 39,000 acres in the state of California. Many of these properties are part of complex, non-contiguous operations. In managing these properties, Plaintiff bolsters its national platform with local knowledge and offices, with in-house accounting teams and related groups with expertise in overseeing complicated agricultural budgeting and cash flows.

4

1    In addition, Plaintiff employs Jason Pucheu ("**Mr. Pucheu**") as an Executive Director in

2    its Agricultural Investments group, where he manages Plaintiff's agriculture equity portfolio and

3    oversees the property management group for the Western region. Prior to joining Plaintiff, Mr.

4    Pucheu served as the Vice President of Operations for Borrower. In this role, Mr. Pucheu played

5    a significant, primary role in overseeing Borrower's farming operations – the very same

6    operations over which Plaintiff now seeks appointment of the Receiver – including overseeing

7    Borrower's water management, crop budgeting, and farming strategies.

8    In other words, not only does Plaintiff have significant experience and expertise

9    managing and administering vast tracts of farmland – including almond and pistachio orchards –

10   it has experience and expertise managing and administering the very Property at issue. The

11   Receiver, when combined with Plaintiff's own capabilities and deep experience (including with

12   the Property), is beyond qualified to effectively serve as receiver over the Property.

13   **III.    The U.S. Bank Funding Does Not Prevent the Receivership**.

14   Borrower has also asserted that funding of its operations, including the Property, from

15   U.S. Bank is imminent, eliminating the need for a receivership. While funding from U.S. Bank

16   *could* be beneficial, at least in the immediate future, such funding does not provide a longer-term

17   solution. In any event, this funding is far from certain.

18   U.S. Bank has proposed funding Borrower's operations through harvest. This is estimated

19   to last approximately six weeks, until late October or early November. However, there are a

20   number of potential pitfalls with this proposition.

21   *First*, U.S. Bank has had many, many months to fund Borrower's operations and has not

22   done so. This gives Plaintiff great concern that this is simply an empty, last-second proposition –

23   which arose shortly after Plaintiff filed the Motion – made to undermine Plaintiff's potential

24   receivership. U.S. Bank currently serves as the operating lender for all of Borrower's agricultural

25   operations, including with respect to the Property. In this role, U.S. Bank has historically funded

26   Borrower's agricultural operations, which includes the preservation and maintenance of trees and

27   the harvesting of crops.

28

313774737v.3

U.S. Bank's existing credit arrangement with Borrower exists in order to fund these operations. Further, U.S. Bank has intercreditor agreements with each of Borrower's real estate lenders, including Plaintiff. For reference, a true and correct copy of the intercreditor agreement between U.S. Bank and Plaintiff (the "**ICA**") is attached hereto as **Exhibit B**.

Pursuant to the ICA, Plaintiff initially subordinated its interest in crops in favor of U.S. Bank. However, this is a limited subordination. Plaintiff's subordination will only be effective as to Crops grown in a given Crop Year if U.S. Bank provides financing to grow and complete harvesting of those Crops. If U.S. Bank does not do so, Plaintiff will have a senior interest. Any loss in priority that U.S. Bank may face as a result of failing to fund harvest - or Plaintiff's funding of the same – is simply a mechanism explicitly contemplated under the ICA.

Together, U.S. Bank already has had the requisite agreements in place to begin funding at any time. On the eve of the Hearing they announced their interest in potentially funding Borrower's current harvest. However, they have not actually done so and there has been no explanation for the months-long delay. Further, Borrower has not indicated that it has agreed to terms with U.S. Bank regarding such funding. Given the above, Plaintiff is concerned that this funding will not actually occur.

Fortunately, the ICA was drafted to offer a safeguard: if additional funding is needed to complete harvest, Plaintiff is incentivized to provide such additional funding. Given that, at the time of filing the Complaint and the Motion, no agreement was in place to fund harvest (and Plaintiff did not know whether there was any material probability that third-party funding might occur) and Plaintiff faced the very real prospect of its collateral being damaged, Plaintiff felt forced to act to protect the Property. The ICA provided, in part, a mechanism to do so.

***Second***, there is no backstop for when funding stops. U.S. Bank only proposes to fund Borrower's operations for approximately six weeks. However, there is no guarantee that it will actually fund for that whole period. There is no plan in place in the event that U.S. Bank begins funding and then stops funding prior to the expiration of the six-week period. And because Borrower is already in default under the U.S. Bank Credit Agreement, any funding that U.S.

6

Bank makes would be completely discretionary and subject to cessation at any moment. If funding does stop, the parties will immediately be back before this Court, with Plaintiff again seeking relief and the appointment of a receiver to safeguard the Property.

Even if U.S. Bank does fund, and funds the entirety of this six-week period, there is no proposed plan for when it ceases funding. Instead, Borrower will once again be left without adequate funds, once again leaving Plaintiff's collateral unprotected. This would, at best, be a brief stopgap measure after which Plaintiff would come before this Court seeking the ability to protect and preserve its collateral.

**Third**, the proposed U.S. Bank funding is not inconsistent with the receivership. If U.S. Bank does fund harvest, the order appointing the Receiver can be modified to ensure that the receivership does not interfere with U.S. Bank's funding or the use of those funds. Instead, the Receiver would serve in a monitoring capacity, overseeing the Property and ensuring that it is being adequately maintained and protected. Once U.S. Bank's funding ceases sometime over the next several weeks, the receivership would convert to a "full" receivership consistent with what Plaintiff requested in the Motion. Thereafter, the Receiver could take all actions necessary to preserve and protect the Property, and Plaintiff is already poised to fund such actions. This would also prevent Plaintiff from having to once again rush into Court to seek the appointment of a receiver to protect the Property once funding runs out.[1]

If anything, having Receiver in place while U.S. Bank funds on an interim, temporary basis increases the protection of the Property. While U.S. Bank funds, there will be increased monitoring and oversight of the Property, for which Plaintiff will be paying. When the U.S. Bank funding ceases, whether at the end of six weeks or sometime sooner, the Receiver will already be in place, with potentially weeks of on-site experience, ready to manage and administer the Property and Plaintiff will be ready to begin funding immediately. Not only is this the most

---

[1]   In fact, the proposed stipulated receiver order that Plaintiff intends on filing contains a similar concept – Plaintiff will fund harvest, during which the Receiver would only be appointed on a limited basis.

7

1   seamless way to oversee the Property, it avoids the need for Plaintiff to rush into Court to again

2   seek the appointment of a receiver once the funding dries up.

3   **IV.   <u>Plaintiff is Best Situated to Fund the Property</u>**.

4          Even if U.S. Bank funds Borrower's operations, it is at best a very short term solution.

5   U.S. Bank's primary collateral is crops, which will likely be fully harvested by late October.

6   Thereafter, U.S. Bank has no incentive to fund further, and has not expressed any interest in

7   doing so. Conversely, Plaintiff is incentivized to fund the Property indefinitely.

8          As a real estate lender, Plaintiff's primary concern is ensuring that the Property is

9   maintained and preserved. This includes not just the immediate needs to complete this season's

10  harvest, but also ensuring that the trees and other Property are cared for thereafter. As such,

11  Plaintiff was prepared to immediately fund, through the receivership, in excess of $17 million in

12  additional monies to ensure that the harvest could be completed on the Property. Indeed, Plaintiff

13  offered to split the funding with U.S. Bank, with Plaintiff's portion of the funding to be directed

14  towards the Property.

15         In addition, the ICA already contemplates and incentivizes Plaintiff to fund harvest

16  immediately. As set forth above, if U.S. Bank is not advancing funds to Borrower then it will

17  lose priority in the crops, with Plaintiff becoming senior. This provides further incentive to

18  Plaintiff to fund harvest.

19         Plaintiff has no objection to U.S. Bank funding the harvest with respect to Defendants'

20  other real estate. Such a process should not create any financial issues for Defendants. As set

21  forth in the declaration of Peter Richter (the "**Richter Declaration**"), Plaintiff's financial advisor

22  retained in connection with the Property and this matter, Plaintiff will be able to distinguish

23  between the Property and Borrower's other property. Specifically, Plaintiff's real property

24  collateral is identified by APN and farming block. Borrower's operational expenses, in turn, can

25  also primarily be identified and/or apportioned by farming block. As a result, Plaintiff and the

26  Receiver should be able to identify the operational expenses associated with the Property,

27

28                                                    8

1    thereby ensuring that Plaintiff can adequately fund and the Receiver manage the Property. A

2    copy of the Richter Declaration is attached hereto as **Exhibit C**.

3            As of now, Plaintiff has no assurance that U.S. Bank will fund the harvest through

4    completion or that it will protect Plaintiff's collateral. U.S. Bank's interest extends only to the

5    crops, and once harvest is completed, it will have no other interest in Plaintiff's collateral,

6    including its preservation. At best, the U.S. Bank funding is a very temporary stop-gap solution.

7    Borrower has no plan in place to protect the Property beyond the next six weeks. Plaintiff is the

8    only party with the incentive and sufficient funds to protect and preserve the Property on a

9    longer-term basis, and Plaintiff is ready to do so now.

10           Notwithstanding the foregoing – and omitted from the Borrower Opposition (and the U.S.

11   Bank Opposition) – Plaintiff remains actively engaged in discussions with Borrower and U.S.

12   Bank regarding short- and medium-term funding for Borrower's operations.[2] In fact, Plaintiff

13   believes that it has reached an agreement with Borrower regarding funding, and intends on filing

14   a proposed stipulated receiver order prior to the Hearing in this regard.

15                                          **CONCLUSION**

16           Based upon the foregoing, and as set forth in the Motion, Plaintiff respectfully requests

17   that this Court overrule the Borrower Opposition and US Bank Opposition and grant the relief

18   requested in the Motion.

19   / /

20   / /

21   / /

22   / /

23   

24   [2]    The US Bank Opposition asserts that Plaintiff backed out of an agreement and broke off
negotiations on Friday, September 20. This refers to proposed terms that professionals of

25   both U.S. Bank and Plaintiff discussed on the evening of September 19, which was not
finalized and remained subject to review, comment, and sign-off by U.S. Bank and

26   Plaintiff. No agreement was ever in place. During the morning of September 20, U.S.
Bank and Plaintiff held a conference call to discuss the proposal, during which Plaintiff

27   provided a counter-offer. Thereafter, Plaintiff has continued engaging in negotiations on
Friday and throughout this week, and expects to continue to do so in advance of

28   the Hearing.

PLAINTIFFS' REPLY IN SUPPORT OF *EX PARTE* MOTION FOR ORDER
APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION

313774737v.3

1    DATED: September 22, 2024          SEYFARTH SHAW LLP

2

3                                       By    */s/ M. Ryan Pinkston*

4                                             M. Ryan Pinkston
                                              Attorneys for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            10

313774737v.3

# EXHIBIT A

1   SEYFARTH SHAW LLP
    M. Ryan Pinkston (SBN 310971)
2   rpinkston@seyfarth.com
    Brandon K. Franklin (SBN 303373)
3   bfranklin@seyfarth.com
    560 Mission Street, 31st Floor
4   San Francisco, California 94105
    Telephone: (415) 397-2823
5   Facsimile: (415) 397-8549

6   Attorneys for Plaintiffs
    The Prudential Insurance Company
7   Of America and PGIM
    Real Estate Finance, LLC

8

9                   **IN THE UNITED STATES DISTRICT COURT**
                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10  THE      PRUDENTIAL      INSURANCE        Case No. 1:24-cv-01102-KES-SAB
    COMPANY OF AMERICA and PGIM REAL
11  ESTATE FINANCE, LLC

12                   Plaintiffs,

13  v.

14  ACDF, LLC; ASSEMI AND SONS, INC.;
    AVILA RANCH EA, LLC; BEAR FLAG
15  FARMS, LLC; C & A FARMS, LLC;
    CANTUA ORCHARDS, LLC; DA REAL
16  ESTATE   HOLDINGS,   LLC;   FAVIER
    RANCH, LLC; FG2 HOLDINGS LLC;
17  GRADON FARMS, LLC; GRANVILLE        **DECLARATION OF WILLIAM**
    FARMS, LLC; GRANTLAND HOLDINGS      **SCIACQUA IN SUPPORT OF REPLY**
18  NO. 1, LLC; GRANTLAND HOLDINGS NO.  **IN SUPPORT OF *EX PARTE* MOTION**
    2,  LLC;  GRANTOR  REAL  ESTATE      **FOR ORDER APPOINTING**
19  INVESTMENTS,       LLC;       GVM    **RECEIVER AND FOR PRELIMINARY**
    INVESTMENTS, LLC; GV AG, LLC;       **INJUNCTION**
20  LINCOLN   GRANTOR   FARMS,   LLC;
    MARICOPA ORCHARDS, LLC; PANOCHE
21  PISTACHIOS, LLC; SAGEBERRY FARMS,
    LLC; DEREK BELL; and RACHEL MARIE
22  WHITE.

23

24                   Defendants.

25       I, William Sciacqua, declare as follows:

26       1.      I am an Executive Director of PGIM Real Estate Finance, LLC, a Delaware limited

27  liability company ("**PGIM REF**"). The Prudential Insurance Company of America, a New Jersey

28

corporation ("**Prudential**" and together with PGIM REF, "**Plaintiff**"), and PGIM REF, each in its own capacity as a lender and PGIM REF also in its capacity as special servicer for and on behalf of PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST, a New York trust ("**Hartford Trust**" and together with Plaintiff, "**Lender**"), are the plaintiffs in the above-captioned case.

2.      I have personal knowledge of the matters set forth in this declaration, either through firsthand experience or from my personal review of Lender's records over which I am a custodian. Those records were kept and made in the ordinary course of Lender's business at or near the time of the act or occurrence described therein by someone with knowledge thereof. I make this declaration based on such personal knowledge. If called upon as a witness in this case, I could and would testify competently to the truth thereof.

3.      Plaintiff has significant experience in managing and administering agricultural operations, and maintains unique capabilities as the only institutional investor with an agricultural debt and equity platform. Plaintiff's agricultural equity arm has operated since 1969, and has served institutional investors seeking portfolio diversification into the agricultural asset class since 1989.

4.      Currently, Plaintiff manages and administers approximately $2.2 billion in agricultural equity investments, which includes approximately 160,000 acres of farmland nationwide across a wide range of crop types, such as almond and pistachio orchards, with approximately 39,000 acres in the state of California. Many of these properties are part of complex, non-contiguous operations.

5.      In managing these properties, Plaintiff bolsters its national platform with local knowledge and offices, with in-house accounting teams and related groups with expertise in overseeing complicated agricultural budgeting and cash flows.

6.      In addition, Plaintiff employs Jason Pucheu ("**Mr. Pucheu**") as an Executive Director in its Agricultural Investments group, where he manages Plaintiff's agriculture equity portfolio and oversees the property management group for the Western region. Prior to joining Plaintiff, Mr. Pucheu served as the Vice President of Operations for Maricopa. In this role, Mr.

DECLARATION OF WILLIAM SCIACQUA IN SUPPORT OF REPLY IN SUPPORT OF *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION

Pucheu played a significant, primary role in overseeing Maricopa's farming operations, including overseeing Maricopa's water management, crop budgeting, and farming strategies.

[*signature page follows*]

DECLARATION OF WILLIAM SCIACQUA IN SUPPORT OF REPLY IN SUPPORT OF *EX PARTE*
MOTION FOR ORDER APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION

1

2        I declare under penalty of perjury under the laws of the State of California that the

3  foregoing is true and correct and that this Declaration was executed this 20th day of September,

4  2024, at 7108 N Fresno Street, Suite 380, Fresno, CA 93720.

5

6

7                                 By: _____

8                                    William Sciacqua

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF WILLIAM SCIACQUA IN SUPPORT OF REPLY IN SUPPORT OF *EX PARTE*
MOTION FOR ORDER APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION

# EXHIBIT B

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Thomas L. Palotas
Jameson Pepple Cantu PLLC
801 Second Avenue, Suite 700
Seattle, Washington 98104

---

[SPACE ABOVE THIS LINE FOR RECORDER'S USE]

Prudential Loan Nos. 717611236, 717611624, 717611763,
717611810, 717611848, 717611852

**This instrument is executed in quadruplicate for simultaneous recording
in Fresno, Kern, Merced and Tulare Counties**

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT (this *"Agreement"*) dated as of July 9, 2020, is made by PGIM REAL ESTATE FINANCE, a Delaware limited liability company, (*"PGIM-REF"*) THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, (*"PICA"*, and together with PGIF-REF, *"Prudential"*) and MUFG UNION BANK, N.A. (for itself and as administrative agent for other lenders pursuant to any Bank Loan Agreement (as defined below), together, *"Bank"*).

Recitals

A.  **Prudential Loans**.  Prudential has made loans (together, the *"Prudential Loans"*) to
        104 INVESTMENTS, LLC, a California limited liability company
        104 PARTNERS, LLC, a California limited liability company
        ACAP HOLDINGS, LLC, a California limited liability company
        ACDF, LLC, a California limited liability company
        ADAMS GRANTOR LAND, LLC, a California limited liability company
        ASHLAN & HAYES FARMS, LLC, a California limited liability company
        BEAR FLAG FARMS, LLC, a California limited liability company
        BISHOP FARMS 22, LLC, a California limited liability company
        C & A FARMS, LLC, a California limited liability company
        DA REAL ESTATE HOLDINGS, LLC, a California limited liability company
        FAVIER RANCH, LLC, a California limited liability company
        GRANTLAND HOLDINGS NO. 1, LLC, a California limited liability company
        GRANTLAND HOLDINGS NO. 2, LLC, a California limited liability company
        GRANTOR REAL ESTATE INVESTMENTS, LLC, a California limited liability company
        LINCOLN GRANTOR FARMS, LLC, a California limited liability company,
        MARICOPA ORCHARDS, LLC, a California limited liability company
(individually and together, *"Borrowers"*).

B. **Prudential Deeds of Trust**. The Prudential Loans are secured by, among other instruments and collateral, the following deeds of trust, each a Deed of Trust, Security Agreement, Crop Filing and Fixture Filing with Assignment of Rents and Proceeds, Leases and Agreements (together, as amended to date, the *"Deeds of Trust"*):

deed of trust on property in Merced County recorded on August 21, 2017, under no. 2017026836;

deed of trust on property in Fresno and Kern Counties recorded in Fresno County on October 23, 2018, under no. 2018-0129050, and in Kern County on October 22, 2018 under no. 218139395;

deed of trust on property in Fresno County recorded on October 17, 2019, under no. 2019-0124295

deed of trust on property in Fresno and Kern Counties recorded in Fresno County on November 13, 2019, under no. 2019-0136753, and in Kern County on November 13, 2019, under no. 219151263; and

deed of trust on property in Kern and Tulare Counties recorded in Kern County on January 23, 2020, under no. 220009640, and in Tulare County on January 23, 2020, under no. 2020-0004578;

C. **Bank Loan**. Bank has made loans (together, the *"Bank Loan"*) to one or more Borrowers pursuant to, among other instruments, the Loan and Security Agreement dated as of February 20, 2018, and the Second Amended and Restated Loan and Security Agreement dated as of March 25, 2019 (each, a "Bank Loan Agreement" and, together with other Loan and Security Agreements between Bank and one or more Borrowers, as amended from time to time, the *"Bank Loan Agreements"*).

D. **Shared Collateral**. The collateral for the Bank Loan includes some of the same property that is included within Prudential's collateral. Prudential and Bank desire to set forth their relative priorities in the Borrowers' personal property comprising collateral for their respective loans on the terms and conditions set forth below.

E. **Existing ICA's**. PGIM-REF and Bank are parties to two previous Intercreditor Agreements, one dated June 1, 2018, and recorded in Merced County, and the other dated October 12, 2018, and recorded in Fresno and Kern Counties, as further described in Section 1 of this Agreement.

Agreement

NOW, THEREFORE, the parties agree as follows:

1. **Amendment and Restatement**. This Agreement amends and restated in their entireties the Intercreditor Agreement between PGIM-REF (formerly known as Prudential Mortgage Capital Company, LLC) and Bank recorded in Merced County on August 21, 2017, under no. 2017026836, and the Intercreditor Agreement between PGIM-REF and Bank recorded in Fresno County on October 23, 2018, under no. 2018-0129052, and in Kern County on October 22, 2018, under no. 218139396.

2. **Definitions**. In addition to the definitions in the Recitals and elsewhere in this Agreement, the following terms have the following meanings:

*"Bank Lien"* means, collectively, the liens and security interest held by Bank under the Bank Loan Agreements and such other documents, instruments and related UCC financing statements to the extent securing Crop Collateral Advances (including fees and costs for which a Borrower is liable under the documents evidencing or securing the Bank Loan), and to all advances or charges made or accruing thereunder, and to all modifications, extensions, renewals, and replacements thereof.

*"Bank Collateral"* means the collateral encumbered by the Bank Lien.

***"Crop Collateral"*** means:

(a) <u>Equipment</u>: All equipment used on, about or in connection with the Land (other than Prudential Exclusive Collateral) (***"Bank Equipment Collateral"***);

(b) <u>Crops, Government Payments, Farm Products, Inventory, Accounts and General Intangibles</u>: (i) All Crops growing or to be grown on the Land; (ii) all crop insurance payments, and all government subsidy payments of whatever kind or form, including payment-in-kind, storage, deficiency and interest payment, in connection with Crops growing or to be grown on the Land; (iii) all farm products or inventory arising from or related to farming operations conducted by Borrower on the Land; (iv) all accounts and general intangibles (other than general intangibles consisting of (A) ground water, water rights, permits, rights or licenses for the use of water, water allocation rights for water not yet delivered, water storage or banking rights, water distribution rights, and shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity and any entitlement to water delivery or storage or allocation under any reclamation law, and (B) contract rights, licenses, permits, and the like, relating to operation of the Land, or other general intangibles which constitute Prudential Exclusive Collateral) arising from or related to farming operations conducted on the Land;

(c) <u>Swap</u>: All rights and interests under the interest rate swap agreement evidenced by or arising under that certain ISDA Master Agreement dated February 13, 2018, between Bank and the Maricopa Borrower, and the Confirmation dated February 22, 2018, and any and all amendments, modifications, extensions or renewals thereof, including, without limitation, all rights to the payment of money from Bank under such interest rate swap agreement and all accounts, deposit accounts and general intangibles, including payment intangibles, described in such interest rate swap agreement; and

(d) <u>Proceeds</u>: All proceeds of the foregoing.

***"Crop Collateral Advances"*** means advances for the financing of Crop Collateral and related Borrower's operations, including the costs of production, cultivation, harvesting of Crop Collateral, and for costs of transporting Crop Collateral to a packer or processor. Amounts advanced to pay real estate taxes and assessments and other statutory liens against the Land shall be treated as Crop Collateral Advances.

***"Crops"*** means annual and perennial crops and crops grown on trees or vines growing or to be grown on the Land, but does not include the trees, vines or other permanent plantings.

***"Crop Year"*** means (i) for citrus crops, an 18-month period beginning on November 1st and ending on May 31st of the second calendar year thereafter, and (ii) for all other crops, a 13-month period beginning on November 1st and ending on November 30th of the following calendar year.

***"Land"*** means the real property encumbered by the Deeds of Trust.

***"Prudential Collateral"*** means the Land, fixtures, and personal property collateral encumbered by the Prudential Lien, including the Crop Collateral.

***"Prudential Exclusive Collateral"*** means that portion of the Prudential Collateral that is:

(a) the Land and all right, title and interest (including water rights) appurtenant to the Land;

(b) all fixtures located on the Land;

(c) all leases of all or any portion of the Land and all rents and other proceeds from such leases;

(d) all irrigation and drainage equipment now or hereafter located on the Land, including without limitation wells, pumps, motors, gearheads, windmills, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe, drainage pipe, culverts and well casings;

(e) all wind machine and other frost protection equipment now or hereafter located on the Land;

(f)    all electric, gas and water lines and equipment located on the Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe;

(g)    all trees, vines and other permanent plantings, whether *fructus naturales*, mature or immature, now or hereafter growing on the Land, together with all trellises, wires, end-posts, and stakes relating thereto; and

(h)    all proceeds of the foregoing.

Notwithstanding the foregoing or any other provision in this Agreement, "***Prudential Exclusive Collateral***" does not include:

(a)    Vehicles, rolling stock, farm machinery (including tractors, combines and other farm machinery), or any other ***"equipment"***, as defined in Article 9 of the Uniform Commercial Code, that is not part of the Improvements; or

(b)    portable irrigation motors on wheels customarily towed by a motorized vehicle; or

(c)    any mobile or manufactured home that may be located on the Land; or

(d)    any Bank Equipment Collateral.

***"Prudential Lien"*** means the liens and security interest granted to Prudential under the Deed of Trust and related UCC financing statements for the Prudential Loan and to all advances or charges made or accruing thereunder, and to all modifications, extensions, renewals, and replacements thereof.

3.    **Subordination of Prudential's Security Interest in Crop Collateral.**

(a)    Subordination.  Notwithstanding the time, order or method of the granting, attachment or perfection of the respective security interests of Bank and Prudential in Crop Collateral, but subject to Section 4 Prudential hereby subordinates the Prudential Lien on Crop Collateral to Crop Collateral Advances under the Bank Lien, and agrees that, subject to Section 3, the Bank Lien on Crop Collateral is senior and prior to the Prudential Lien on Crop Collateral.

(b)    Continuing Subordination.  Subject to Section 4 below, the subordination set forth in this Section 3 is intended to be a continuing subordination and agreement and is intended to govern the relative rights and priorities of Bank and Prudential with respect to successive Crop Years without the need for the execution of other or additional subordinations or agreements.

(c)    Bank's Termination.  Bank agrees to comply with applicable law and Bank's customary practice with respect to the termination of this Agreement and Bank's financing statements either (i) upon full and final payment of all obligations heretofore, now or hereafter secured by Crop Collateral; or (ii) pursuant to Section 4 below.

4.    **Limitations to Prudential's Subordination.**  Notwithstanding Section 3, the subordination of the Prudential Lien on Crop Collateral is subject to the following terms and conditions.

(a)    Crops.  The agreement herein of Prudential with respect to the subordination of its security interest in Crop Collateral consisting of Crops shall be applicable only to Crops for which Bank provides financing. If Bank does not provide financing to grow and complete harvesting of Crops grown on the Land, then Prudential's security interest in those Crops shall be senior to any interest of Bank; provided that this does not affect Bank's first priority security interest with respect to all Crops produced in prior Crop Years and the proceeds thereof.

(b)    Following Prudential Foreclosure.  Bank has no lien or any other interest in Crops planted, grown or harvested in the Crop Year following the Crop Year in which any foreclosure of the Land by Prudential is completed.

5. **License for Bank to Grow and Harvest Crop Collateral**. If at such time as the Bank Lien on Crop Collateral is senior to the Prudential Lien, Prudential or any successor of Prudential or any third-party purchaser (each, a *"Successor Owner"*) acquires the right to possess or occupy the Land or any portion thereof as a result of foreclosure, trustee's sale, deed in lieu of foreclosure, receivership, court order or action or the consent of Borrower or its successor(s), then a non-exclusive license, occupancy right, or right to enter onto the Land (the *"License"*) shall be provided to Bank subject to the following terms and conditions:

(a) Notices. Bank notifies Prudential or such other Successor Owner of its desire to exercise the License no later than fifteen (15) business days after Bank receives notice of the foreclosure, trustee's sale, deed in lieu of foreclosure, receivership, court order or action under the Prudential Lien, or of the consent of Borrower or its successor(s) to Prudential's possession of any portion of the Land (the *"Election Period"*); provided, however, that if Borrower is the subject of a bankruptcy proceeding filed prior to the conclusion of the Election Period, Bank's notice must be received by Prudential or such Successor Owner within fifteen (15) business days following the granting of relief from stay, but in no event later than fifteen (15) business days after a trustee's sale under the Deed of Trust. Bank's failure to timely notify Prudential or any other Successor Owner of its exercise of the License is an irrevocable waiver of its right to exercise the License.

(b) Scope of License. The License shall only permit entry onto the portion of the Land on which the Crop Collateral subject to the prior Bank Lien is then located or under cultivation, at such times and places as shall be reasonably necessary to exercise Bank's rights, powers and remedies with respect to its Crop Collateral. Bank may care for, cultivate and harvest all such Crop Collateral, dispose of such Crop Collateral, and apply the proceeds in accordance with the terms and conditions of this Agreement, any other documents and instruments delivered to Bank by Borrower in connection with the Bank Loan, and applicable law, all at Bank's sole expense.

(c) Water Rights. The License shall also include the non-exclusive right to use available water rights and irrigation and drainage equipment in connection with the portion of the Land subject to the License, provided that (i) such use is in compliance with all applicable laws, ordinances, regulations and agreements governing the Land, including without limitation all rules and regulations of any water district in which the Land is located, (ii) such use is only to the extent reasonably necessary, in the exercise of Bank's commercially reasonable discretion, to properly care for and maintain the Land and the permanent plantings located thereon to conclude annual production and harvest the Crop Collateral growing thereon, and (iii) Bank shall discharge any obligation incurred by Bank or its agent, the non-payment of which would give rise to a lien on the Land or for which Prudential may have liability.

(d) Termination of License. Except as set forth in Section 5(h), below, the License shall terminate at the end of the Crop Year in which it is exercised.

(e) Bank's Payment of Taxes, Costs. As a condition to continuation of the License, Bank agrees to reimburse Prudential for: (i) a *pro rata* portion of any real property taxes and assessments encumbering the Land that accrue for the Crop Year in which the License is exercised; (ii) that portion of water, utilities and insurance reasonably allocable to Bank's period of actual use of the Land, and (iii) the cost of repair of any physical damages to the Land caused by Bank's exercise of any of its rights hereunder, including but not limited to any removal of any of the Crop Collateral, but not for any diminution in value of the Land resulting from the removal of the Crop Collateral.

(f) Standard of Care. Bank agrees that its exercise of a License shall be conducted with reasonable agricultural and/or viticultural standards and practices, in good and farmer-like

manner in accordance with the standards and practices customarily employed for similar crops and properties in the vicinity and in compliance with applicable laws, ordinances, regulations and agreements, including those related to agricultural chemicals, toxic materials, hazardous materials and petroleum products. In return, Prudential agrees to cooperate with Bank and not interfere with the exercise of Bank's License rights hereunder, it being understood that Prudential also may be conducting agricultural and/or viticultural activities on the Land during the period Bank is exercising the License. Prudential agrees to exercise its rights, powers and remedies in connection with the Land in a reasonable manner so as not to cause or permit damage to or destruction of the Bank's Crop Collateral.

(g)   <u>Bank's Indemnity</u>.  Bank shall indemnify, protect, defend and hold Prudential and its agents (each, an *"Indemnitee"*, and collectively, *"Indemnitees"*) harmless from any and all loss, cost, damage, claims, expense and liability, including without limitation, property damage and personal injury to any person, and further including reasonable attorneys' fees, that any Indemnitee may suffer or experience arising out of the actions or omissions of Bank or its agents in connection with the exercise of the License. Notwithstanding the foregoing, no Indemnitee shall be entitled to indemnification for any liability, loss, cost or expense caused by its own gross negligence or willful misconduct.

(h)   <u>Bank's Right to Terminate License</u>.  If Bank exercises the License, and thereafter decides to terminate its rights under the License and cease caring for the Crops, it shall notify Prudential in writing at least fifteen (15) business days in advance to enable Prudential to adequately care for the Crops and the Land if Prudential, in its sole discretion, so elects. In the event Bank elects to terminate its rights under the License, then as to any Crops that Bank has elected to terminate its rights under the License, the Bank Lien shall terminate as of the last day of the immediately preceding Crop Year. Subject to its indemnification obligations set forth above, Bank shall have no liability to Prudential or any other Successor Owner or Borrower solely from its election to terminate its rights under the License and cease caring for the Crops or the Land, provided it gives the required notice thereof and it terminates its lien of record as required herein.

(i)   <u>Prudential Lien</u>.  In the event Bank exercises the License, the Prudential Lien shall continue to encumber the Crop Collateral subject only to the Bank Lien in such Crop Collateral.

6.   **Borrower's Obligations to Prudential Regarding the Bank Loan**.  Borrower's failure to timely perform all its obligations under the Bank Loan, at Prudential's election, is a Prudential Loan Default and an Event of Default under the Deed of Trust.

7.   **Prudential Exclusive Collateral**.  Bank agrees that the Bank Collateral does not include any of the Prudential Exclusive Collateral, and Bank hereby disclaims any Bank Lien or other security interest or lien on any of the Prudential Exclusive Collateral. Bank agrees that, without the prior written consent of Prudential, it will not obtain a consensual lien or security interest in any of the Prudential Exclusive Collateral, or on any insurance proceeds or other rights of payment which are derived from any Prudential Exclusive Collateral. Bank hereby authorizes Prudential to file any and all amendment or termination statements under the Uniform Commercial Code in the appropriate state and county filing/recording offices that are necessary to give effect to the terms and conditions of this <u>Section 7</u>.

8.   **Consent to Prudential Lien; Prudential Loans**.  Bank consents to the Prudential Loan and to the Prudential Lien encumbering all or part of the Bank Collateral, and agrees that the Prudential Lien shall not constitute a default under the Bank Loan. Notwithstanding any provision in the loan documents evidencing or securing the Bank Loan, Bank hereby consents to any and all loans by Prudential secured primarily by real estate, including vineyards, winery facilities, buildings, fixtures and other improvements. Bank agrees that its knowledge or consent is not required to any new

loan, modification, extension, renewal, additional advance, or refinance of any Prudential loan to Borrower secured by real estate collateral. Additional Prudential loans to Borrower shall be deemed included within "Prudential Loans" and additional real estate collateral shall be deemed included within "Prudential Real Estate Collateral" for the purposes of this Agreement. At Bank's or Prudential's request, the parties agree to amend and update this Agreement to include such additional Prudential loans and real estate collateral, or to reflect Bank's then current Bank Loan documentation.

9. **Prudential Lien as to Other Collateral**. Notwithstanding anything to the contrary in this Agreement or otherwise, the Prudential Lien shall at all times constitute and continue as a first priority lien on all of the Prudential Collateral, excluding only Crop Collateral subject to the Bank Lien as provided in <u>Section 4</u> and <u>Section 3</u> above.

10. **Bank Loan**. Bank certifies to Prudential: (a) that Bank is the owner and holder of the Bank Loan, (b) true, correct and complete copies of all of the documents evidencing and securing the Bank Loan any and all amendments thereof have been given to Prudential, and (c) to the actual knowledge of Bank, no default, or event or condition which, with the giving of notice or passage of time, or both, would constitute a default, exists under the Bank Loan.

11. **Notice and Opportunity to Cure**. Bank, upon giving Borrower notice of any default under the Bank Loan, shall simultaneously give notice thereof to Prudential. Upon Bank's giving of any such notice of default to Prudential, Prudential shall have the same period of time after the giving of such notice to Prudential, to remedy or cause to be remedied the default(s) specified in the notice, and Bank shall accept such performance as if the same had been done by Borrower. Any notice given to Prudential under this Section may, at Bank's option, be a duplicate original of the notice given to Borrower or a copy of the notice.

12. **No Commitment to Extend Financing**. Nothing in this Agreement shall be construed by Bank, Prudential or Borrower (or any of them) as constituting a commitment by Bank or Prudential to provide any crop financing for any future Crop Year, it being hereby acknowledged by all parties that such financing shall be considered independently on a case-by-case basis by Bank and on a case-by-case basis by Prudential.

13. **Notices**. All notices, demands or requests under this Agreement must be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by a nationally recognized courier service (such as Federal Express or Airborne), addressed to the addressee at its address below or such other address or addresses as the addressee may specify by notice:

If to Bank:        MUFG Union Bank, N.A.
7108 N. Fresno Street, Suite 200
Fresno, California 93720
Attn: Scott Lisle

If to Prudential:    PGIM Real Estate Finance
c/o Prudential Asset Resources
2100 Ross Avenue, Suite 2500
Dallas, Texas 75201
Attention: Agricultural Loan Servicing
Ref. Loan Nos. 717611236, 717611624, 717611763, 717611810, 717611848, 717611852

|  |  |
|---|---|
| With a copy to: | PGIM Real Estate Finance, LLC |
|  | c/o Prudential Asset Resources |
|  | 2100 Ross Avenue, Suite 2500 |
|  | Dallas, Texas 75201 |
|  | Attention: Legal Department |
|  | Ref. Loan Nos. 717611236, 717611624, 717611763, |
|  | 717611810, 717611848, 717611852 |

Notices shall be deemed properly given (i) upon receipt if by hand delivery, or (ii) on the third business day after the day mailed, or (iii) on the first business day after the date sent if sent by nationally recognized overnight courier service.

14. **Exchange of Information**. Prudential and Bank (together, ***"Lenders"***) may exchange information regarding Lenders' respective collateral and the respective obligations owed to each by Borrower or any guarantor at such time and in such manner as they may mutually agree, which information may include, but is not limited to, the value, location, and description of the collateral, financial information regarding Borrower or any guarantor of Borrower, or loan balances, loan terms, and such other information as is agreed to by and between Lenders, provided that, as between them, Lenders shall be not liable to each other for any error or omission in any information so exchanged.

15. **General Terms**.

   (a) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its conflict of laws rules.

   (b) <u>Recitals True</u>. Each party approves and acknowledges the accuracy of the Recitals in all respects, and agrees that the Recitals are an integral part of this Agreement.

   (c) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties.

   (d) <u>No Third Party Beneficiaries</u>. Except for Prudential and Bank and their respective successors and assigns, no person (including without limitation, Borrower or any successor to Borrower) is intended or shall be construed to be a third party or other beneficiary of this Agreement.

   (e) <u>Waiver of Order of Sale and Marshaling</u>. To the fullest extent permitted by law, each party hereby waives any and all right to require marshaling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein, or to direct the order in which any of the Bank Collateral or Prudential Collateral will be sold in the event of any sale under the Prudential Lien or the Bank Lien.

   (f) <u>Interpretation</u>. This Agreement has been submitted to the scrutiny of all parties and their counsel and shall be given a fair and reasonable interpretation without consideration as to which party or counsel drafted any provision. All Section titles or captions are only for convenience and shall not be deemed part of the context or affect the interpretation of this Agreement.

   (g) <u>Integration; Amendments</u>. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous understandings, undertakings, and agreements with respect thereto. This Agreement may be amended or modified only through a non-electronic or facsimile transmission of a non-electronic writing, and in either case bearing the handwritten, authorized signature the party sought to be bound thereby, and which by its express terms refers to this Agreement.

   (h) <u>Other Documents</u>. Each party agrees to execute such further and additional documents and instruments as may be reasonably requested by the other party in order to effectuate the

agreements contained herein, including without limitation, amendments to UCC Financing Statements.

(i)     Attorneys' Fees.  If legal action is necessary to enforce or interpret any of the provisions of this Agreement, the prevailing party, as determined by the court, shall be entitled to be reimbursed by the other party for all costs and expenses incurred in connection with such legal action, including reasonable attorneys' fees.  Such fees, costs and expenses include those of outside counsel and the allocated cost of in-house counsel, whether incurred in any appeal, any proceeding under any present or future federal bankruptcy act or state receivership (including the adjudication of issues peculiar to bankruptcy law), or any post-judgment collection proceeding.

(j)     Recording in Multiple Counties.  This Agreement is being executed in quadruplicate originals for simultaneous recording in Fresno, Kern, Merced and Tulare Counties.  The quadruplicates together constitute a single instrument.

(k)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be effective upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

*The rest of this page is left blank intentionally.*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

<div style="margin-left:40%">

*"Bank"*

MUFG UNION BANK, N.A., for itself and as administrative agent for other lenders from time to time party to a Bank Loan Agreement

By: _____

Scott Lisle, Director

</div>

---

> **A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA          )
                                     ) ss.
COUNTY OF FRESNO            )

On July 17, 2020, before me, Luanne Crater Notary Public (here insert name and title of the officer), personally appeared Scott Lisle, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

<div style="text-align:right">(notary stamp or seal)</div>

WITNESS my hand and official seal.

_____
Signature (Seal)

> LUANNE CRATER
> Notary Public - California
> Fresno County
> Commission # 2276463
> My Comm. Expires Feb 2, 2023

Notary Public - California
Fresno County
Commission #
My Comm. Expires Feb 2, 2023

*"Prudential"*

PGIM REAL ESTATE FINANCE, LLC, a Delaware
limited liability company

By: _____
Name: _____L. Frank Oberti_____
Title: _____Vice President_____

PRUDENTIAL INSURANCE COMPANY OF
AMERICA, a New Jersey corporation

By: _____
Name: _____L. Frank Oberti_____
Title: _____Vice President_____

---

**A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA )
                                                ) ss.
COUNTY OF __PLACER____ )

On ___JULY 9, 2020_____, before me, ____L. WEAKS, NOTARY PUBLIC_____, (here insert name and title of the officer), personally appeared _____L. FRANK OBERTI_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

(notary stamp or seal)

WITNESS my hand and official seal.

_____
Signature (Seal)

L. WEAKS
Notary Public - California
Placer County
Commission # 2251759
My Comm. Expires Aug 12, 2022

# EXHIBIT C

1   SEYFARTH SHAW LLP
    M. Ryan Pinkston (SBN 310971)
2   rpinkston@seyfarth.com
    Brandon K. Franklin (SBN 303373)
3   bfranklin@seyfarth.com
    560 Mission Street, 31st Floor
4   San Francisco, California 94105
    Telephone: (415) 397-2823
5   Facsimile: (415) 397-8549

6   Attorneys for Plaintiffs
    The Prudential Insurance Company
7   Of America and PGIM
    Real Estate Finance, LLC

8
                    **IN THE UNITED STATES DISTRICT COURT**
9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10  THE      PRUDENTIAL       INSURANCE          Case No. 1:24-cv-01102-KES-SAB
11  COMPANY OF AMERICA and PGIM REAL
    ESTATE FINANCE, LLC
12
                            Plaintiffs,
13
    v.
14
    ACDF, LLC; ASSEMI AND SONS, INC.;
15  AVILA RANCH EA, LLC; BEAR FLAG
    FARMS, LLC; C & A FARMS, LLC;
16  CANTUA ORCHARDS, LLC; DA REAL
    ESTATE    HOLDINGS,    LLC;   FAVIER
17  RANCH, LLC; FG2 HOLDINGS LLC;          **DECLARATION OF PETER RICHTER**
    GRADON FARMS, LLC; GRANVILLE          **IN SUPPORT OF REPLY IN SUPPORT**
18  FARMS, LLC; GRANTLAND HOLDINGS        **OF *EX PARTE* MOTION FOR ORDER**
    NO. 1, LLC; GRANTLAND HOLDINGS NO.    **APPOINTING RECEIVER AND FOR**
19  2,  LLC;  GRANTOR  REAL  ESTATE       **PRELIMINARY INJUNCTION**
    INVESTMENTS,       LLC;       GVM
20  INVESTMENTS, LLC; GV AG, LLC;
    LINCOLN    GRANTOR    FARMS,   LLC;
21  MARICOPA ORCHARDS, LLC; PANOCHE
    PISTACHIOS, LLC; SAGEBERRY FARMS,
22  LLC; DEREK BELL; and RACHEL MARIE
    WHITE.
23
24                          Defendants.

25       I, Peter Richter, declare as follows:

26       1.      I am Manager and Managing Partner of Hillmoor Advisors LLC, an Illinois limited

27  liability company ("**Hillmoor**"). The Prudential Insurance Company of America, a New Jersey

28

corporation ("**Prudential**" and together with PGIM REF, "**Plaintiff**"), and PGIM REF, each in its own capacity as a lender and PGIM REF also in its capacity as special servicer for and on behalf of PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST, a New York trust ("**Hartford Trust**" and together with Plaintiff, "**Lender**"), are the plaintiffs in the above-captioned case. Plaintiff has engaged Hillmoor and me to serve as their financial advisor in connection with the above captioned case.

2.      I have personal knowledge of the matters set forth in this declaration, either through firsthand experience or from my personal review of records provided by Lender and the defendants in this case. I make this declaration based on such personal knowledge. If called upon as a witness in this case, I could and would testify competently to the truth thereof.

3.      I make this Declaration in support of Plaintiff's *Reply in Support of Ex Parte Motion for Appointment of Receiver and for Preliminary Injunction* (the "**Reply**"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Reply.

4.      It is my belief and understanding that Plaintiff will be able to distinguish between the Property and Borrower's other property. Specifically, Plaintiff's real property collateral is identified by APN and farming block.

5.      It is also my understanding that the Borrower's operational expenses can primarily be identified and/or apportioned by farming block.

6.      As a result, Plaintiff and the Receiver will be able to identify the operational expenses associated with the Property.

[*signature page follows*]

DECLARATION OF PETER RICHTER IN SUPPORT OF REPLY IN SUPPORT OF *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER AND FOR PRELIMINARY INJUNCTION

1

2      I declare under penalty of perjury under the laws of the State of California that the

3 foregoing is true and correct and that this Declaration was executed this 20th day of September,

4 2024, at 1415 W. 22nd street, Tower Floor Oak Brooke, IL 60523.

5

6

7                                      By: *Peter Richter*

8                                          Peter Richter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28