# Exhibit A

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

1.6     <u>Members</u>.  The name of each Member is set forth above and in Section 2.1 of this Agreement.  Each Member shall keep the Managers informed of such Member's present mailing address and taxpayer identification number and such information shall be included in the Company's books and records.

**ARTICLE II**
**MEMBERS; CAPITAL**

2.1     <u>Percentage Interests in Company</u>.  In exchange for their initial capital contributions made by each Member as shown on the books and records of the Company, the Percentage Interests of the Company are held as follows:

| <u>Member</u> | <u>Percentage Interest</u> |
|---|---|
| Kevin | 45 percent |
| Jeremy | 5 percent |
| Devon | 5 percent |
| Malakan | 5 percent |
| Maricopa | 40 percent |

2.2     <u>Additional Capital Contributions; Member Loans.</u>

(a)     <u>Additional Capital Contributions</u>.  If the Managers (by vote of a majority of Managers with Kevin being at least one of such voting majority) determine that the Company requires additional capital to fund its operations, the Managers shall deliver a written capital call notice at least fifteen (15) days in advance of the funding date to the Members of the amount, timing, and reason(s) for the additional capital requirement; provided, however, that any capital call in excess of One Million and No/100ths Dollars ($1,000,000.00) shall be approved by all Members.  Without altering the preceding sentence, the Managers may establish a monthly (or other periodic) schedule for additional capital contributions, which may be amended from time to time.  If the Managers establish such a schedule and notify the Members thereof, it is not necessary to send further capital call notices regarding scheduled payments until the schedule is revised.

(b)     <u>Failure to Make Capital Contributions</u>.  Unless otherwise provided in this Agreement, all capital calls are mandatory and all Members are required to contribute the required additional capital in proportion to their respective Percentage Interests.  If any Member fails to make an additional capital contribution for any reason whatsoever and the amount of that Contribution is not loaned to the Company by the other Members in accordance with Section 2.5 within 15 days of the deadline for the capital contribution, the remaining Members shall have the right, but not the obligation, to purchase the entire Percentage Interest of the Member failing to make the additional capital contribution in accordance with Section 5.2 of this Agreement.  Such purchase shall not waive any remedies for the breach of this Agreement.  If the Company borrows funds as the result of any Member's failure to make a required additional capital contribution, in addition to other available remedies, the Company shall be entitled to reimbursement by each

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

defaulting Member for all related loan points/fees, interest and other related charges. Such charges shall not affect the defaulting Member's Capital Account balance.

2.3     Return of Contributions, Distributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return or withdrawal of any Contribution from the Company, except upon the Company's dissolution. Except for distributions required by Section 3.4, a Member has no right to demand and receive any capital or other distribution from the Company. Except as specifically provided in this Agreement, no Member may be compelled to accept a distribution of any asset in kind.

2.4     Capital Accounts. A separate Capital Account shall be maintained for each Member in accordance with Code Section 704 and the Regulations thereunder.

2.5     Loans and Other Business Transactions. At the Company's request, any Member (including a Member who is a Manager) or any Manager may make or cause a loan to be made to the Company in such amount and on such terms as are mutually agreeable to the Manager and such Member or Manager. Further, the Manager may make or cause a loan to be made by the Company to third parties, including to Members or Manager of the Company or an entity in which a Member or Manager holds an interest, on such terms as are mutually agreeable to the Manager and such Member or Manager. Members may also transact other business with the Company, and in so doing shall have the same rights and obligations as are afforded to and imposed upon Persons who are not Members. All transactions between the Company and a Member and/or Manager shall be at "arms length" (i.e., for full and fair consideration and adequate security).

2.6     No Interest. Members shall not be paid interest on their Contributions.

2.7     No Personal Liability. No Member shall have personal liability for any obligation of the Company, except as expressly provided by law.

2.8     Meetings and Voting. Meetings will be held at such times and place as the Managers or one or more Members holding at least a majority of the Percentage Interest may designate. Notice of the time, date, and location of the meeting shall be given by the Managers to all Members at least forty-eight (48) hours prior to the meeting. Any Member may waive notice of a meeting. The attendance of a Member at any meeting will constitute a waiver of notice of such meeting, except where a Member attends such meeting for the express purpose of objecting to the transaction of any business because such meeting was not lawfully called or convened. The presence of one or more Members holding at least a majority of the Percentage Interests at a meeting shall constitute a quorum for conducting business at the meeting. Except as otherwise required by this Agreement or the Act, the affirmative vote or approval of one or more Members holding at least a majority of the Percentage Interests of the quorum at a meeting will constitute the act of the Members. A Member who is present at a meeting at which action on any matter is taken will be presumed to have assented to the action unless a dissent is entered in the meeting minutes or such Member files a written dissent to such action with the Person acting as secretary of such meeting before the adjournment of such meeting or forwards such dissent by registered mail to the Company immediately after the adjournment of such meeting. The right to dissent will not apply to a Member who voted in favor of such action. A Member may participate in a meeting by means of telephone conference or similar electronic communications equipment (including video conferencing via third-party providers such as Zoom and Microsoft Teams) by which all persons participating in

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

the meeting can hear each other at the same time. Such participation will constitute presence at the meeting. Any action required or permitted to be taken at a meeting may be taken without a meeting if the Members holding at least a majority of the Percentage Interests approve the action under this Agreement or consent thereto in writing. Reasonably prompt notice of the taking of any action without a meeting by less than the unanimous written consent, together with a copy of the action taken, will be given to those Members who have not consented in writing. The transactions of the Members at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if, either before or after the meeting, each Member not present signs a written waiver of notice of a consent to the holding of such meeting or an approval of the minutes of such meeting.

2.9    <u>Conflicts of Interest</u>. The Members and Managers acknowledge and agree that (i) each Member and Manager, and their Affiliates, (A) may have, and are permitted to have, investments and other business relationships with Persons that provide goods or services to the Company and (B) may develop, and are permitted to develop, strategic relationships with and investments in business that may be competitive with or complimentary to the Company's business so long as such strategic relationships and investments in business (1) are not under consideration by the Company and (2) do not result in a negative financial impact on the Company's then existing operations, and therefore (ii)(A) each Member and Manager, and their Affiliates, will not be prohibited (by virtue of their investments in the Company or their service as a Manager or an officer) from pursuing or engaging in such activities, (B) each Member and Manager, and their Affiliates, will not be obligated to inform or present to the Company or any other Member or Manager of any such opportunity, relationship or investment, except where such opportunity, relationship or investment is related to an opportunity, relationship or investment under consideration by the Company, (C) no Member or Manager will acquire or be entitled to any interest or participation in any such activity by virtue of the participation therein by any other Member or Manager, or their Affiliate, and (D) the involvement of any Member or Manager, or their Affiliate, in any such activity will not constitute a conflict of interest with respect to the Company or any Member or Manager. Notwithstanding the foregoing, no Member or its Affiliate shall have become interested in (as owner, equityholder, lender, partner, joint venturer, director, limited liability company manager, officer, employee, independent contractor, agent, consultant or otherwise) a nursery for commercial agriculture other than any such interest held by the Company.

2.10    <u>Confidentiality</u>. Each Member acknowledges that it may receive Confidential Information of the Company, including Confidential Information regarding business opportunities being pursued by the Company. Each Member will, and will cause its Affiliates to keep confidential and not disclose, directly or indirectly, to any other Person or use for such Person's own benefit or the benefit of any other Person the terms of this Agreement or any Confidential Information; provided, however, that a Member may disclose the terms of this Agreement and Confidential Information:

(a)    to (i) authorized directors, limited liability company managers, officers, employees, agents and representatives of the Company and (ii) lenders and prospective lenders of the Company, in each case, in the ordinary course of business in furtherance of the Company's purposes;

(b)      to such Member's spouse, Affiliates, auditors, lenders, attorneys or other agents who are advising such Member with respect to such Member's interest in the Company or such Member's rights and obligations under this Agreement and the agreements expressly contemplated hereby to which such Member is party, but only (i) for legitimate business purposes related to the management of such Member's interest in the Company or such Member's rights and obligations under this Agreement and the agreements expressly contemplated hereby to which such Member is a party and (ii) with a covenant from such Persons to maintain the confidentiality of such information in accordance with this Section 2.9; or

(c)      if the terms of this Agreement or such Confidential Information is required by any Law or Order; provided that as soon as reasonably practicable before such disclosure, the disclosing Member gives the other Members prompt written notice of such disclosure to enable the Company to seek a protective Order or otherwise preserve the confidentiality of such information.

Promptly after the expiration or termination of this Agreement, each Member will return to the Company or destroy, delete or erase (with written certification of such destruction, deletion or erasure provided to the Company upon request) all written, electronic or other tangible forms of this Agreement and all Confidential Information in such Member's possession or under such Member's control. After the date that a Member ceases to own any interest in the Company, such Member will not, directly or indirectly, retain any copies, summaries, analyses, compilations, reports, extracts or other materials containing or derived from this Agreement or any Confidential Information, except to the extent required by applicable Law or for such Member's legal compliance purposes and/or in accordance with such Member's internal document retention policies. Notwithstanding such return, destruction, deletion or erasure, the terms of this Agreement, all oral Confidential Information and the information embodied in all written Confidential Information will continue to be held confidential pursuant to this Section 2.10. Nothing in this Section 2.10 will be construed to limit or otherwise modify any confidentiality covenant in any other agreement between a Member and the Company or any of its subsidiaries. The termination of this Agreement and/or dissolution of the Company notwithstanding, this Section 2.10 will survive and continue in full force and effect in accordance with its terms indefinitely.

## ARTICLE III
## PROFIT, LOSS, AND DISTRIBUTIONS

3.1      <u>Allocations of Profits and Losses to Members</u>.  It is the intent of the Members that the tax allocations of the Company will meet the requirements for "substantial economic effect" of Section 704 of the Code, and the Treasury Regulations or similar authority promulgated thereunder.  The tax allocations set forth herein shall be interpreted consistently with the foregoing intent.  Except as set forth in Section 3.2, all items of Company Profit or Loss and any Company expenditure that is neither deductible nor properly chargeable to a Capital Account under Code Section 705(a)(2)(B) or treated as an expenditure under Regulation Section 1.704-1(b)(2)(iv)(i), shall be allocated for federal, state, local and foreign income tax purposes in accordance with the Percentage Interests.

3.2      <u>Special Allocations.</u>

(a) <u>Nonrecourse Deductions</u>.  In the event the Company incurs nonrecourse liabilities or Member nonrecourse liabilities within the meaning of Regulation Section 1.704-2(b)(3) and (4), this Section 3.2 shall be amended to provide for allocations of nonrecourse deductions, Member nonrecourse deductions, and items of minimum gain in accordance with the then-applicable Regulations.

(b) <u>Contributed Property and Book-Ups</u>.  Notwithstanding anything to the contrary herein, in accordance with Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 3.2(b) are solely for purposes of federal, state, and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distribution pursuant to any provision of this Agreement.

(c) <u>Code Section 745 Adjustment</u>. At the request of any Member, the Company may elect to adjust the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b), and associated items of income, gain, loss, deduction or credit shall be specially allocated to the Members in a manner consistent with the applicable Regulations. Such election shall be made if a majority in Percentage Interests of the Members determines that such an election is in the best interest of the Company and a majority in Percentage Interests of the Members.

(d) <u>Allocations for Net Income, Gains, and Net Losses</u>. All net income, other gains and net losses shall be allocated to the Members in accordance with their Percentage Interests, unless otherwise specified in a deficit restoration obligation agreement.

3.3   <u>Distribution of Cash</u>.  Cash shall be distributed to the Members in proportion to their Percentage Interests periodically in the reasonable discretion of the Managers taking into account all working capital requirements, capital reserves and retention of capital for future Company acquisitions of property, and, <u>provided</u> that no distribution shall be made if, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due, or (ii) the Company's total assets would be less than the sum of its total liabilities.

3.4   <u>Liquidation and Dissolution.</u>

(a) <u>Distribution</u>. Upon liquidation of the Company, and after payment of or provisions for all outstanding obligations of the Company, the Company's assets shall be distributed to the Members pro rata in accordance with the positive balances in their respective Capital Accounts, after giving effect to all prior contributions, distributions and allocations, and thereafter in accordance with the Members' Percentage Interests.

(b) <u>Deficit Balances</u>.  Except as otherwise set forth in a separate written agreement, in the event that after all allocations of gain, income and loss and after all distributions (in cash or in-kind) in liquidation, there exists a deficit balance in a Member's Capital Account, such Member shall not be required to contribute any amount to the Company or otherwise have liability to such deficit balance.

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

3.5     <u>General Distributive Provisions.</u>

(a)     <u>Timing</u>.  Except as otherwise provided in this Agreement, the Managers shall determine the timing and amount of all distributions in their sole and absolute discretion.

(b)     <u>In-Kind Distribution</u>.  If any Company assets are distributed in kind to the Members, those assets shall be valued on the basis of their agreed value.  Unless otherwise determined by the Managers, any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled.  The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its agreed value, and the Profit or Loss shall be allocated as provided herein and be credited or charged to the Members' Capital Accounts prior to the distribution of assets in liquidation.

(c)     <u>Persons Receiving Distributions</u>.  All Profit and Loss shall be allocated and all distributions made to the persons shown on the Company's records to have been Members as of the last day of the taxable year for which the allocation or distribution is made.  If there is a transfer of a Percentage Interest or an Economic Interest during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each held the interest during the taxable year.

3.6     <u>Modifications</u>.  The Managers are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article III if necessary to comply with the Code and the Regulations promulgated under Code Section 704(b), <u>provided</u>, that no such amendment shall materially affect distributions to a Member without the affected Members' prior written consent.

3.7     <u>Income Tax Provisions</u>.  The Members are aware of the income tax consequences of this Article III and attached Tax Addendum and agree to be bound by these provisions in reporting their shares of Profit, Loss, and other items for federal and state income tax purposes.

**ARTICLE IV**
**MANAGEMENT: RIGHTS, POWERS, DUTIES, AND INSURANCE**

4.1     <u>Management of Company Business</u>.  The Company shall be manager-managed.  The Members agree Kevin Assemi, Devon Yurosek, and Jeremy Yurosek shall manage and control the Company's business and affairs, for the benefit of all Members, as the "<u>Managers</u>" of the Company and each a "<u>Manager</u>."  The Managers shall have sole authority to manage the affairs of the Company.  Each Manager shall serve until their resignation.  The Managers shall not be required to devote all of his time to the affairs of the Company but shall devote such time, effort, and skill as may be necessary or appropriate for the successful conduct of the Company.  A Manager, or any of them, may resign from that position by delivering a written resignation notice to the Members, specifying the effective date of the resignation.  If, at any time, there is no Manager duly elected and acting under this Agreement, the duties of the Managers shall be performed by the Members of the Company.  Except as otherwise provided in this Agreement or by law, and subject to any right by the Member(s) to meet, confer and vote on the matter at issue and provided that a majority of Managers has approved or consented to such action, any Manager, acting alone, shall have the right, power and authority, on behalf and at the expense of the Company, to exercise (or cause to be exercised) all of the rights, powers and authority granted under the California Revised Uniform Limited Liability Company Act, and to execute such agreements and documents as are

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

required to exercise such powers, including the following:

(a)     Protect and preserve the right, title, and interest of the Company with respect to all of its assets;

(b)     Pay on behalf of the Company all taxes, assessments, and other charges imposed against the assets owned by the Company;

(c)     Perform all other obligations of the Company;

(d)     To the extent not covered by Section 7.2 keep such records of financial and other transactions as any Member reasonably may request, and in any event, such records as customarily are kept by similar well-managed organizations;

(e)     Prepare and deliver to the Members periodic oral or written reports (not less often than annually) as to the state of the business and affairs of the Company;

(f)     Use reasonable efforts to promptly comply with or appropriately contest all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions or any other body exercising functions similar to those of any of the foregoing, which may be applicable to the Company and the operation and management of its business;

(g)     Enter into contracts in the name of and on behalf of the Company including short term and long-term loans collateralized by the Company's real and personal property including, without limitation, loans from institutional lenders;

(h)     Employ and dismiss from employment employees, managers, agents, independent contractors, brokers, escrow agents, attorneys, and accountants;

(i)     Prepare an appropriate accounting system, including prudent checks and balances mechanisms;

(j)     Delegate certain administrative duties to non-Members or Members acting as independent contractors, who may perform the following services under the supervision of the Managers:  Administer the day-to-day operations of the Company; serve as the Company's advisor and consultant in connection with policy decisions; and perform such other acts or services for the Company as the Managers, in their discretion, may approve, including the duties enumerated above; but all major policy and all investment decisions shall be made by or under the direct supervision of the Managers, unless otherwise provided in this Agreement;

(k)     Perform other normal business functions and otherwise operate and manage the business and affairs of the Company in accordance with and as limited by this Agreement and prudent business practices;

(l)     Loan surplus cash held by the Company and not otherwise distributable to the Members to third parties including entities owned or controlled by the Managers; and

(m)     Execute all documents required by or requested from federal, State, and local

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

governments on behalf of the Company.

4.2     Actions by Managers. Actions of the Managers shall be taken at meetings or as otherwise provided in this Section 4.2 by a majority. No regular meetings of the Managers need be held. Any two (2) Managers may call a meeting of the Managers by giving written notice of the time and place of the meeting at least forty-eight (48) hours before the time of the holding of the meeting. The notice need not specify the purpose of the meeting, nor the location if the meeting is to be held at the principal executive office of the Company. A majority of managers shall constitute a quorum for the transaction of any business at any meeting of the Managers. The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if, either before or after the meeting, each Manager not present signs a written waiver of notice of a consent to the holding of such meeting or an approval of the minutes of such meeting. Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if the Managers unanimously consent in writing to such action. Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another. The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of meetings, and all written consents to actions of the Managers.

4.3     Bureau of Reclamation Signature Authorization.   In addition to the authorizations described in Section 4.1 above, each of the Members hereby expressly authorizes any one Manager to sign certification or reporting forms for compliance with the Reclamation Reform Act of 1982 on behalf of each of the Members.  This authorization applies only to the certification and reporting of lands held or managed directly by the Company. Only one Manager's signature shall be required on any certification or reporting forms submitted by the Company.

4.4     Right to Meet, Confer and Vote.  Notwithstanding any other provision of this Agreement, except in exigent circumstances, no act shall be taken, sum expended, decision made or obligation incurred by the Company, which is enumerated below as a "Major Decision," unless all Members are notified in writing of the intent to make a Major Decision (the "Major Decision Notice") and the Members meet, confer and a majority of the Percentage Interests of the Members affirmatively approve the matter at issue.  A Major Decision includes any of the following:

        (a)     Amendment of this Agreement;

        (b)     Change in the nature of the Company's business;

        (c)     Sell, lease, exchange, or otherwise dispose of all or substantially all of the Company's property with or without the goodwill of the Company, outside the Company's ordinary course of business;

        (d)     Approve a merger or conversion under the Act;

        (e)     Undertake any act outside the ordinary course of the Company's business; and

        (f)     Any act that, pursuant to other provisions of this Agreement or applicable law, requires a unanimous vote by the Members.

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

4.5     <u>Additional Limitations on Managers' Power and Authority</u>. Without the written consent of a majority of the Percentage Interests of the Members, the Managers shall have no right to:

(a)     Do any act in contravention of this Agreement, or any act that would make it impossible or impractical to carry on the ordinary business of the Company;

(b)     Confess judgment against the Company; or

(c)     Possess Company property, or assigns rights to specific Company property, for other than a Company purpose.

4.6     <u>Performance of Duties, Liability of a Manager</u>. A Manager, in performing managerial duties, shall refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. A Manager shall not be liable to the Company or its members for monetary damages, except for (i) a breach of the duty of loyalty, (ii) a financial benefit received by the Managers to which the Managers are not entitled, (iii) intentional infliction of harm on the Company or a Member, or (iv) an intentional violation of criminal law. An action that otherwise would be a violation of the Managers' duty of loyalty to the Company may be ratified, after full disclosure of all material facts to all Members, by the holders of a majority of the outstanding Membership Interests not held by the Manager which is the subject of the vote.

4.7     <u>Insurance</u>. The Managers shall obtain on behalf of the Company liability insurance covering risks commonly associated with the business of the Company.  Such liability insurance shall have a "single limit" of at least $1,000,000.  The liability insurance shall cover the Company, the Members (including the Managers), and their agents.<u>Indemnification</u>. The Members and certain other parties specifically identified in this Section 4.9 shall be entitled to indemnification from the Company as follows:

(a)     To the fullest extent permitted by law, each Member (the "Indemnitee") shall be indemnified, defended and held harmless by the Company from and against all losses, claims, investigations, damages, liabilities, joint and several, expenses (including fees of experts, attorneys, investigators and other support personnel), costs, judgments, fines, settlements and other amounts arising from its performance of services or incurring of obligations on behalf of the Company, or its status as (i) a Member, (ii) a Manager, or (iii) a person serving as a director, officer, trustee, employee or agent at the request of the Company in another entity, which relate to or arise out of the Company, its property, business or affairs, regardless of whether the Indemnitee continues to be a Member, Manager, or a director, officer, trustee, employee or agent at the time any such liability or expense is paid or incurred, if the Indemnitee acted in good faith and in a manner it believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnitee acted in a manner contrary to that specified in the preceding sentence.  Any indemnification pursuant to this Section 4.8 shall be made only out of insurance funds and the assets of the Company (including those distributed to one or more Members after the claim giving rise to the indemnification right arose).

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

(b)     To the fullest extent permitted by law, expenses (including legal fees) incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding shall be advanced from time to time by the Company prior to the final disposition of such matter, but the Company first may require an undertaking on behalf of the Indemnitee (in form and of a nature reasonably satisfactory to the Company) to repay such amount if it later is determined that the Indemnitee is not entitled to be indemnified as authorized in this Section 4.8.

(c)     The indemnification provided by this Section 4.8 shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, vote of the Members, as a matter of law or otherwise, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(d)     The Company may purchase and maintain insurance on behalf of each Member and such other persons as the majority of the Percentage Interests of the Members shall determine, against any liability that may be asserted against or expense that may be incurred by such person in connection with the Company's activities, regardless of whether the Company would have the power to indemnify such person against such liability under the provisions of this Agreement.

(e)     An Indemnitee shall not be denied indemnification in whole or in part under this Section 4.5 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(f)     The provisions of this Section 4.8 are for the benefit of the Indemnities and shall not be deemed to create any rights for the benefit of any other persons.

4.9     Contracts between Members and Company.  Subject to the limitations set forth in this Agreement, any Member (including a Manager) may directly or indirectly, through one or more corporations, partnerships, trusts or other entities in which such Member has an interest, contract on a fair and reasonable basis with the Company for any purpose(s) in furtherance of the business of the Company including, without limitation, loaning the Company money on terms and conditions acceptable to the Managers and the Member making such loan.

4.10    Reimbursement of Expenses.  Unless otherwise provided, the Managers shall be entitled to reimbursement in full from the Company for all direct, good faith expenses reasonably incurred in furtherance of the Company business.  If approved by a majority in interest of the Members, the Managers shall be entitled to a salary, or reimbursement from the Company for overhead expenses, including without limitation, rent, general office expenses, and salaries and compensation and fringe benefits of executives.  All expenses and obligations incurred to form the Company are expenses of the Company and shall be paid with Company funds (or if already paid by one or more Members, reimbursed to them).

4.11    Dissociation. Except as set forth in Article V, no Member may dissociate as a Member without the written consent of all other Members.  A Member that dissociates with such written consent shall divest his, her, or its entire Membership Interest before the effective date of dissociation in accordance with the provisions of Section 5.3. In the event a Member dissociates in violation of this Section, or Transfers his, her, or its Membership Interest in violation of section 5.1, his, her, or its Membership Interest shall be converted into a Transferable Interest and thereafter that Member shall only have the rights of a Transferee. Each Member acknowledges and

agrees that such conversion of Membership Interest on the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date of this Agreement. Whether with or without the written consent of the other Members, dissociation shall not release a Member from any obligation or liability under this Agreement accrued or incurred before the effective date of withdrawal.

## ARTICLE V
## TRANSFER OF INTERESTS AND WITHDRAWLS OF MEMBERS

5.1    Transfer of Percentage Interest. No Member may transfer all or any portion of a Percentage Interest without the written consent of the other Members.  The attempted transfer of all or any portion of a Percentage Interest in violation of this Article V shall be null and void and of no force or effect, except as required by law, and any such attempted transfer shall create a right in the other Members to purchase the Percentage Interest under Section 5.2.

5.2    Purchase Option Under Certain Events.

(a)    An option (the "Option") to purchase all of the Percentage Interest (the "Optioned Interest") of a Member (an "Optionor") for cash shall arise in favor of the other Members (the "Optionees"), upon the occurrence of any of the following events:

(i)    The voluntary or involuntary transfer or hypothecation of all or any portion of the Optioned Interest; the creation or execution of a judgment lien on the Optioned Interest; or a voluntary or involuntary transfer to the spouse or companion of a beneficiary of a Member; notwithstanding any contrary provision, the Option shall only apply as to the portion of the Optioned Interest transferred or hypothecated;

(ii)    The filing of a petition by or against a Member or the beneficiary of a Member that is a trust, under the provisions of the Bankruptcy Reform Act, Title 11 of the U.S. Code, as amended or recodified from time to time, or under any similar or other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of a Member; any Member becomes insolvent, makes a general assignment for the benefit of creditors that is not vacated within 30 days;

(iii)    The transfer of part or all of an interest in the Company in violation of this Agreement;

(iv)    The failure of a Member to make an Additional Capital Contribution in accordance with Section 2.2 above;

(v)    If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion of it, to that Member's spouse (an "Award"), then, notwithstanding that Award, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion of it, that was the subject of the Award, and the former spouse shall sell the Membership Interest or portion of it to that Member at the price set forth in Section 5.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after

the Award (the "Expiration Date"), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion of it under Section 5.2 of this Agreement, provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award; and

(vi)     If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is Transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually, possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion of it from the estate or other successor of his or her deceased spouse or Transferee of his or her deceased spouse, and the estate, successor, or Transferee must sell the Membership Interest or portion of it at the price set forth in Section 5.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the option to purchase from the estate or other successor or Transferee of the deceased spouse the Membership Interest or portion of it under Section 5.2 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

(b)     The Optionor shall give written notice (the "Option Notice") to the Optionees within ninety (90) days of the occurrence of an event giving rise to an Option under Section 5.2(a)(1)-(3) and 5.2(a)(5).

(c)     The purchase price (the "Purchase Price") for the Optioned Interest of the Member(s) shall be based upon an appraisal prepared by an appraiser familiar with agricultural land values selected by the Managers within 20 days of the Option Notice.  The appraisal shall not take into account any minority interest or lack of marketability discounts.  Optionees shall pay no less than twenty percent (20%) of the Purchase Price in cash or other immediately available good funds within thirty (30) days of delivery of the foregoing appraisal (referred to as the "Closing").  The balance of the purchase price will be paid by a execution and deliver of a promissory note given by the Optionees in favor of the Optionor bearing interest at the mid-term Applicable Federal Rate in effect as of the date of the note.  Principal and interest shall be paid in four equal annual payments beginning on the first anniversary of the note and continuing on the second, third and fourth anniversaries, at which time all remaining principal and interest shall be due.  The maker of the note shall have the right to prepay the note in part or in full at any time without penalty and shall contain such other terms and conditions as are commercially customary for a note of this type.

At Closing, the Optionor shall execute and deliver an assignment of the applicable portion of the Percentage Interest in favor of the purchase thereof.  From and after the Closing, the Withdrawing Member shall have no further right to receive distributions from the Company or participate in any decisions permitted to the Members.  Upon conclusion of the tax year in which the Closing occurs, the Optionor will be allocated a portion of the income, loss, and other tax items applicable to the period of their ownership and the Optionor shall be obligated to report such items on their income tax return in the normal course.

(d)      If the Option is exercised pursuant to this Section 5.2 in connection with an event that otherwise would cause the dissolution of the Company, the Company shall not dissolve, but instead shall continue in full force and effect.

(e)      The foregoing Option applies each time one of the events described in Section 5.1 or this Section 5.2 occurs, even if the Option previously has arisen with respect to the same Percentage Interest regardless of whether the Optionees previously waived or failed to exercise their right to purchase the Optioned Interest.

5.3      Purchase upon Disassociation and Withdrawal.  In the event that a Member elects to withdraw from ownership in the Company and disassociate in accordance with Section 4.13 (such Member being the "Withdrawing Member"), the Withdrawing Member shall give written notice of their election to withdraw to the Managers at least ninety (90) days before the effective date of withdrawal.  The Managers will give written notification to the non-Withdrawing Members of the election.  The non-Withdrawing Members shall have the right, but not the obligation, to purchase the entire Membership Interest of the Withdrawing Member on the terms and conditions set forth herein. Where the non-Withdrawing Members do not exercise the right to purchase the entire Membership Interest of the Withdrawing Member, the Withdrawing Member shall have no obligation to make or liability for additional capital contributions.

(a)      Election by non-Withdrawing Members.  Those non-Withdrawing Members who wish to purchase a portion of the Percentage Interest of the Withdrawing Member shall notify the Managers in writing of their election to purchase and how much of the Withdrawing Member's Percentage Interest that non-Withdrawing Member is electing to purchase.  If more than one non-Withdrawing Member elects to purchase the Percentage Interest of the Withdrawing Member, the non-Withdrawing Members may purchase their pro rata share of the Withdrawing Member's Percentage Interest.  If any non-Withdrawing Member elects to purchase less than their pro-rata share, then the other non-Withdrawing Members who have elected to purchase may purchase additional portions of the Percentage Interest.

(b)      Determination of Purchase Price.  For a period of 10 days from delivery of notice to the non-Withdrawing Members of the purchase right, the non-Withdrawing Members and the Withdrawing Member shall negotiate in good faith to determine a fair market value for the purchase and sale of the Membership Interest.  If the Withdrawing Member and the Non-Withdrawing Members are unable to reach agreement on a purchase price, then the two groups will attempt to agree on a single appraiser who will appraise the fair market value of the Company, without respect to discounts for lack of marketability of the Percentage Interest or lack of controlling interest.  If the parties are successful in appointing a single appraiser, the selected appraiser will establish the fair market value of the Company and the purchase price for the Percentage Interest of the Withdrawing Member shall be determined by multiplying the Percentage Interest (expressed as a percentage) by the fair market value determined by the appraiser.  The cost of this single appraisal shall be born one-half by the Withdrawing Member and one-half by the non-Withdrawing Members.

If the parties are not able to agree upon a single appraiser, then each group will select a single appraiser.  The two selected appraisers will then engage the services of a third appraiser.  All three appraisers will independently appraise the fair market value of the Company,

- 14 -

without respect to discounts for lack of marketability of the Percentage Interest or lack of a controlling interest. That appraised value which is neither the highest nor the lowest of the three appraised values, without application of discounts, will establish the fair market value of the Company and the purchase price for the Percentage Interest of the Withdrawing Member shall be determined by multiplying the Percentage Interest (expressed as a percentage) by the fair market value established by appraisal. Each group shall bear the cost of the appraisal completed by the appraiser which they selected and the cost of the third appraisal shall be born one-half by the Withdrawing Member and one-half by the non-Withdrawing Member.

(c)     Payment of Purchase Price and Transfer. The non-Withdrawing Members and the Withdrawing Member shall complete the sale of the Percentage Interest within 30 days of determination of the purchase price as set forth in (b) above (such completion of the sale being referred to herein as the "Closing"). In the event that there is more than one non-Withdrawing Member who has elected to purchase, the payment of the purchase price shall be specific to each non-Withdrawing Member which is purchasing. The non-Withdrawing Member shall pay no less than twenty percent (20%) of the total purchase price in cash or other immediately available good funds at Closing. The balance of the purchase price will be paid by a execution and deliver of a promissory note given by the non-Withdrawing Member in favor of the Withdrawing Member bearing interest at the mid-term Applicable Federal Rate in effect as of the date of the note. Principal and interest shall be paid in four equal annual payments beginning on the first anniversary of the note and continuing on the second, third and fourth anniversaries, at which time all remaining principal and interest shall be due. The maker of the note shall have the right to prepay the note in part or in full at any time without penalty and shall contain such other terms and conditions as are commercially customary for a note of this type.

At Closing, the Withdrawing Member shall execute and deliver an assignment of the applicable portion of the Percentage Interest in favor of the purchase thereof. From and after the Closing, the Withdrawing Member shall have no further right to receive distributions from the Company or participate in any decisions permitted to the Members. Upon conclusion of the tax year in which the Withdrawing Member has withdrawn, the Withdrawing Member will be allocated a portion of the income, loss, and other tax items applicable to the period of their ownership and the Withdrawing Member shall be obligated to report such items on their income tax return in the normal course.

5.4

5.5     Conditions To All Transfers. In addition to the restrictions set forth in Article V of this Agreement, all transfers of all or a portion of a Member's Percentage Interest must satisfy each of the following conditions.

(a)     No Qualification. The transfer can be effected without registration or qualification under federal and state securities laws;

(b)     Transferee Bound By Agreement. If the party purchasing the Percentage Interest is not an existing Member, then the party purchasing the Percentage Interest offered (the "Transferee") delivers to the Company a written agreement to be bound by this Agreement with respect to the transferred interest;

(c)     No Termination.  The transfer will not result in the termination of the Company pursuant to Code Section 708;

(d)     Tax Identification Number.  The Transferee delivers to the Company his taxpayer identification number and initial tax basis in the transferred Percentage Interest.

## ARTICLE VI
## DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

6.1     Events of Dissolution. The Company shall be dissolved upon the happening of the first to occur of (i) the vote of a Majority of the Percentage Interests of the Members to dissolve the Company, or (ii) the entry of a decree of judicial dissolution pursuant to Corporations Code §17707.03.  The foregoing events shall be the only events which shall cause a dissolution of the Company.

6.2     Procedure for Winding Up and Dissolution.  If the Company is dissolved, the Managers (or a Member if there are no Managers) shall wind up its affairs.  On winding up, the Company's assets shall be distributed first to creditors, including Members who are creditors, in satisfaction of the Company's liabilities, and then to the Members in accordance with Section 3.4.

6.3     Filing of Certificate of Cancellation.  Upon completion of winding up of the Company's affairs, the Managers shall promptly file the Certificate of Cancellation of Articles of Organization with the Secretary of State.  If there is no remaining Manager, such Certificate shall be filed by the last person to be a Member; if there are no remaining Members, or last person to be a Member, the Certificate shall be filed by the legal or personal representatives of the Company.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTION

7.1     Bank Accounts. All Company funds shall be deposited in a bank account or accounts opened in the Company's name at such financial institution the Managers may reasonably choose. The Managers shall determine types of bank accounts.  Only the Managers and his designated agents shall have deposit and withdrawal authority.

7.2     Maintenance of Books and Records.  The Managers shall keep such complete and accurate Company books, records and financial statements as are required under the Act and as they reasonably deem necessary.  The books, records and financial statements shall be maintained on the cash method of accounting with generally accepted accounting principles consistently applied by the Company's primary accountants unless otherwise required by the Code.  The books, records and financial statements shall be maintained and available for inspection at the Company's principal office.

7.3     Rights to Inspect Books and Records; Receive Information.

(a)     Right of Inspection. Each Member has the right to inspect and copy during normal business hours the books, records and financial information the Company maintains pursuant to Section 7.2, and to obtain from the Company promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

(b)     Tax Returns. Each Member shall receive within 75 days after the end of each fiscal year such information as is necessary to complete federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for the fiscal year.

(c)     Reimbursement of Costs.  Unless otherwise expressly provided in this Agreement, the inspecting or requesting Member shall reimburse the Company for all reasonable costs and expenses the Company incurs in connection with such inspection and copying, including the production and delivery of Company books or records.

7.4     Annual Accounting Period. The Company's annual accounting period shall be its taxable year.  The Company's taxable year shall be selected by the Managers, subject to the requirements and limitations of the Code.

7.5     Tax Matters Member; Partnership Representative.

(a)     Appointment; Resignation.   KEVIN R. ASSEMI shall be the "partnership representative" as provided in Code Section 6223(a) (the "Partnership Representative").  The Partnership Representative can be removed at any time by a vote of a majority of the Members not then serving as the Tax Matters Member or Partnership Representative, as the case may be, whose removal is the subject of the vote (the "Other Members").  The Partnership Representative shall resign if it is no longer an officer, employee, shareholder, director, or member of the Company or any affiliate of the Company.  In the event of the Partnership Representative, as the case may be, a majority of the Other Members shall select a replacement.  If the resignation or removal of the Partnership Representative occurs prior to the effectiveness of the resignation or removal under applicable Treasury Regulations or other administrative guidance, the Partnership Representative, that has resigned or been removed shall not take any actions in its capacity as such except as directed by a majority of the Other Members.

(b)     Tax Examinations and Audits.  The Partnership Representative, with respect to tax years beginning on or after January 1, 2020, is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by the Internal Revenue Service, Franchise Tax Board, California Board of Tax and Fee Administration, or any other taxing authority (collectively, "Taxing Authorities"), including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Partnership Representative, as the case may be, shall promptly notify the Members of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit or resulting administrative or judicial proceeding.  Without the consent of a majority of the Members, the Partnership Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss, deduction, penalties, or additional tax owed with any Taxing Authority.

(c)     Tax Elections and Deficiencies.  The Partnership Representative, as to tax years beginning on or after January 1, 2020, in their sole discretion, shall have the right to make on behalf of the Company any and all tax elections.  Except as otherwise provided herein, the

Partnership Representative, in its sole discretion, shall have the right to take any actions that are available to be made or taken by the Partnership Representative or the Company under the BBA (including an election under Section 6226 of the Code), and the Members or former Members shall take such actions requested by the Partnership Representative.  To the extent that the Partnership Representative does not cause the Company to make an election under Sections 6221(b) (or the Company is not eligible to do so), or Section 6226 of the Code, (i) the Company shall use commercially reasonable efforts to make any modifications available under Sections 6225(c)(3), (c)(4), and (c)(5) of the Code, and (ii) the Members shall take such actions as requested by the Partnership Representative, including filing amended tax returns and paying any tax due under Section 6225(c)(2)(A) of the Code or paying any tax due and providing applicable information to the Internal Revenue Service under Section 6225(c)(2)(B) of the Code.  The Partnership Representative shall equitably apportion any imputed underpayment among the Members (including former Members) based on their interests in the Company for the reviewed year with respect to the  imputed underpayment.  In determining each Member's share of an imputed underpayment, the Partnership Representative shall take into account (by reducing the amount of an underpayment apportioned to a Member) any modifications to the imputed underpayment attributable to a Member under Code Section 6225(c)(2), (c)(3), (c)(4), or (c)(5).  Any such payment made by a Member or former Member shall not be treated as a capital contribution.  Any amount not paid by a Member or former Member within 60 days of a request by the Partnership Representative shall accrue interest at the applicable federal rate.

(d)     <u>Tax Returns and Tax Deficiencies</u>.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign, or other income tax return with the treatment of the item on the Company's return.  Any deficiency for taxes imposed on any Member or former Member (including penalties, additions to tax or interest imposed with respect to such taxes, and any taxes imposed pursuant to Section 6226 of the Code, as amended by the BBA) shall be paid by such Member or former Member, as the case may be, and if required to be paid (and actually paid) by the Company, will be recoverable from such Member or former Member.

(e)     <u>Income Tax Elections</u>.  Except as otherwise provided herein, the Partnership Representative shall have sole discretion to make any determination regarding income tax elections it deems advisable on behalf of the Company; provided that the Partnership Representative shall make an election under Section 754 of the Code, if requested in writing by another Member.

(f)     <u>Tax Returns</u>.  The Partnership Representative shall cause to be prepared and timely filed all tax returns required to be filed by or for the Company.

**ARTICLE VIII**
**INVESTMENT REPRESENTATIONS**

Each Member hereby represents and warrants to, and agrees with the other Members and the Company as follows:

8.1     <u>Preexisting Relationship or Experience</u>.  (i) He or she has a preexisting personal or business relationship with the Company, the Managers or the Members, or (ii) by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her

- 18 -

financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of any investment in the Company and of protecting his or her own interest in connection with this investment.

8.2    Investment Intent.  He or she is acquiring the Percentage Interest for investment purposes for his or her own account and not with a view to or for sale in connection with any distribution of all or any part of the Percentage Interest.

8.3    Economic Risk.  He or she is financially able to bear the economic risk of an investment in the Percentage Interest, including the total loss thereof.

8.4    No Registration of Percentage Interest.  He or she acknowledges that the Percentage Interest has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his or her representations, warranties, and agreements herein.

8.5    Percentage Interest in Restricted Security.  He or she understands that the Percentage Interest is a "restricted security" under the Securities Act in that the Percentage Interest will be acquired from the Company in a transaction not involving a public offering, and that the Percentage Interest may be resold without registration under the Securities Act only in certain limited circumstances.

8.6    No Disposition in Violation of Law or this Agreement.  Without limiting the representations set forth above, he or she will not make any disposition of all or any part of the Percentage Interest which will result in the violation by him or her or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws, or the provisions of this Agreement.

8.7    Legends.  He or she understands that the certificates (if any) evidencing the Percentage Interest may bear appropriate restrictive legends.

## ARTICLE IX
## GENERAL PROVISIONS

9.1    Further Assurances.  Each Member as necessary shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as are appropriate to comply with the requirements of law for the Company's formation and operation and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the Company's property.

9.2    Notifications.  Any notices given hereunder shall be given by (i) personal delivery, (ii) overnight courier, or (iii) by first class mail, postage prepaid.  Notices to a Member shall be sent to the address set forth below that Member's name on the signature page hereto.  Notices to the Company shall be sent to the address set forth in Section 1.2.  A party may change its address for purposes of this section by providing the other parties the new address in writing.  Notices shall

be deemed to be received and effective when (i) personally delivered, (ii) one day after the date of forwarding by overnight courier, or (iii) if mailed, three days after the date of mailing.

9.3     <u>Complete Agreement</u>.  This Agreement constitutes the complete agreement among the Members as to the subject matter hereof.  It supersedes all prior written and oral statements, any prior representation, statement, condition, or warranty.  Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.4     <u>Applicable Law, Jurisdiction and Venue</u>.  This Agreement shall be governed by and construed under California law.  Any suit involving any dispute or matter arising under this Agreement may only be brought in Fresno County, California.  All Members hereby consent to the exercise of personal jurisdiction by such court with respect to any such proceeding.

9.5     <u>Section Headings</u>.  The headings herein are for convenience only and do not define or limit, the scope of this Agreement or the intent of its provisions.

9.6     <u>Binding Provisions</u>.  This Agreement binds the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

9.7     <u>Terms</u>.  Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the context so requires.

9.8     <u>Severability</u>.  Each provision herein shall be considered severable; if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.9     <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document.  The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.10    <u>Legal Representation</u>.  The Members acknowledge that this Agreement has been prepared by legal counsel for Maricopa Orchards, LLC.  Members other than Maricopa Orchards, LLC have been encouraged to seek legal and tax advice, as their individual interests may not be consistent with those of Maricopa Orchards, LLC.  The non-Maricopa Orchards, LLC Members have either obtained such advise or have elected not to do so.  Further, the Members acknowledge that they have not received tax advise from Maricopa Orchards, LLC or the Maricopa Orchards, LLC tax advisors.

**ARTICLE X
DEFINITIONS**

The following capitalized terms used in this Agreement shall have the following meanings:

"<u>Act</u>" means California's Revised Uniform Limited Liability Company Act (Corporations Code §§17701.01-17713.13), as amended from time to time.

"Affiliate" means, with respect to a particular Person, (i) any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person, (ii) if such Person is a partnership, any partner thereof (other than a limited partner), (iii) any of such Person's spouse, siblings (by law or marriage), ancestors and descendants and (iv) any trust for the primary benefit of such Person or any of the foregoing. Notwithstanding the foregoing, for purposes of this Agreement, none of the Members or their Affiliates, solely by virtue of being Members of the Company, shall be considered Affiliates of any other Members or such other Members' Affiliates of Affiliates of the Company or of its Subsidiaries.

"Agreement" means this Operating Agreement and attached Exhibits, as amended from time to time.

"Capital Account" means the separate account the Company maintains for each Member in accordance with Regulation Section 1.704-1(b).

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

"Company" means the limited liability company formed under this Agreement.

"Confidential Information" means all confidential, proprietary and trade secret information (including all tangible and intangible embodiments thereof) of the Company and its businesses, including information or data concerning contracts and contractual relations, and financial information (including any business plans, forecasts and projections); provided, however, that "Confidential Information" does not include any information that (i) has been made generally available to the public (other than through a Member's breach of this Agreement or, to such Member's knowledge, by a third-party's breach of a confidentiality covenant), (ii) is lawfully received from a third-party having rights in the information without restriction and received without notice of any restriction against its further disclosure, or (iii) is disclosed by the Company to a Member with an affirmative acknowledgment that the Member may further disclosure such information without restriction.

"Contribution" means any money, property, services, or promissory note as permitted in this Agreement or by the Act, which a Member contributes to the Company as capital.

"Economic Interest" means a Person's right to share in the income, gains, losses, deductions, or credits of, and to receive distributions from, the Company.  The term Economic Interest does not include any other Member rights, including the right to vote or participate in Company management, or any right to information concerning the Company's business or affairs.

"Government Authority" means any (i) national, federal, state, provincial, county, municipal or local (foreign or domestic) government; (ii) political subdivision of any of the foregoing or (iii) entity, authority, agency, ministry or other similar body exercising any legislative, executive, judicial, regulatory or administrative authority or functions of or

pertaining to government, including any commission, tribunal or other quasi-governmental entity established to perform any such function.

"Law" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

"Order" means any order, injunction judgment, decree, ruling, assessment or arbitration award of any Government Authority or arbitrator.

"Percentage Interest" means a Member's collective rights in the Company, including the (i) Member's Economic Interest, (ii) right to vote or participate in management (if any), and (iii) any right to information concerning the Company's business and affairs. Percentage Interest shall not affected by change in Capital Account balances including those resulting from additional Capital Contributions made by fewer than all of the Members.

"Person" means an individual, corporation, partnership, association, limited liability company, joint venture, trust, estate, or other entity, whether to not legal entities, or any government entity, agency or political subdivision.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, credit, loss or deduction required to be states separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Secretary of State" means the California Secretary of State.

"Subsidiary" means, with respect to a particular Person, (i) any corporation in which such Person and/or other Subsidiaries of such Person own or control, directly or indirectly, a majority of the corporation's total economic interest or the total voting power of the corporation's capital stock (without regard to the occurrence of any contingency) to vote in the election of the corporation's directors and (ii) any limited liability company, partnership, association, or other business entity in which such Person and /or other Subsidiaries of such Person (A) owns or controls, directly or indirectly, a majority of the partnership or similar ownership interest, (B) is allocated a majority of entity gains or losses or (C) is or controls any managing member or general partner.

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

THE JEREMY J. YUROSEK TRUST,
DATED DECEMBER 26, 2008

_kevin Assemi_ _____

KEVIN ASSEMI

By: _____

JEREMY A. YUROSEK, Trustee

THE DEVON J. YUROSEK TRUST
DATED DECEMBER 26, 2008

By: _Devon Yurosek_ _____

DEVON YUROSEK, Trustee

By: _Jeffrey A. Yurosek_ _____

JEFFREY A. YUROSEK, Trustee

MALAKAN INVESTMENTS, LLC, a
California limited liability company

By: _NADER MALAKAN_ _____

Nader Malakan, Member/Manager

MARICOPA ORCHARDS, LLC, a
California limited liability company

By: _____

Farid Assemi, Manager

DocuSign Envelope ID: 5F6C9C5A-1AD5-46B6-846E-98BD9683F19C

## CONSENT OF SPOUSES

We, the undersigned, certify that:

1.  We are the spouses of the members who signed the foregoing Operating Agreement and who constitute the members of the limited liability company therein described.

2.  We have read and approve the provisions of the Operating Agreement, including but not limited to those related to the purchase, sale, or other disposition of the interest of a deceased, retiring, withdrawing, or terminating Member, as well as the option rights in favor of other members.

3.  We agree to be bound by and accept these provisions of the Operating Agreement in lieu of all other interests we, or any of us, may have in the Company, whether the interest may be community property or otherwise.

4.  Our spouses shall have full power of management of their interests in the Company, including that portion of those interests, if any, that is our community property, and they have the full right, without our further approval, to exercise their voting rights as Members in the Company, to execute any amendments to the Operating Agreement, and to sell, transfer, encumber, and deal in any manner with those Percentage Interests, including that portion of those interests, if any, that is our community property.

5.  The request for and/or obtaining our consent hereto is not intended and should not be construed as confirming the existence or non-existence of any community property interests in the Company.

Executed as of the date indicated below.

Dated: 02/16/2022 _____

_Rachel Yurosek_
Name: Rachel Yurosek _____

Dated: _____

_____
Name: _____

- 24 -