# EXHIBIT B

Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone:    (312) 902-5200
Facsimile:    (312) 902-1061

John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100
Dallas, TX 75201-2591
Telephone:    (214) 765-3600
Facsimile:    (214) 765-3602

*Attorneys for the Receiver*
Lance Miller

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, et al.,

        Plaintiffs,

    v.

ACDF, LLC; ASSEMI AND SONS, INC.;
AVILA RANCH EA, LLC; BEAR FLAG
FARMS, LLC; C & A FARMS, LLC;
CANTUA ORCHARDS, LLC; DA REAL
ESTATE HOLDINGS, LLC; FAVIER
RANCH, LLC; FG2 HOLDINGS LLC;
GRADON FARMS, LLC; GRANVILLE
FARMS, LLC; GRANTLAND HOLDINGS
NO. 1, LLC; GRANTLAND HOLDINGS NO.
2, LLC; GRANTOR REAL ESTATE
INVESTMENTS, LLC; GVM
INVESTMENTS, LLC; GV AG, LLC;
LINCOLN GRANTOR FARMS, LLC;
MARICOPA ORCHARDS, LLC; PANOCHE
PISTACHIOS, LLC; SAGEBERRY FARMS,
LLC; DEREK BELL; and RACHEL MARIE
WHITE,

        Defendants.

No. 1:24-cv-01102-KES-SAB

**BIDDING PROCEDURES FOR THE SALE
OF RECEIVERSHIP PROPERTY
MARKETED BY CAPSTONE CAPITAL
MARKETS, LLC (SEMITROPIC)**

Judge:        Hon. Kirk E. Sherriff

Action Filed:  September 16, 2024

---

[1] Designated as counsel for service pursuant to L.R. 182(c)(1).

-1-

On [●], 2025, the United States District Court for the Eastern District of California (the "**Court**") entered an Order [Docket No. ●] (the "**Bidding Procedures Order**"),[2] by which the Court approved the bidding procedures set forth herein (the "**Bidding Procedures**"). These Bidding Procedures establish the process by which the Receiver is authorized to conduct a public auction (the "**Auction**") for the sale of the following real property and related assets (the "**Property**"), solely to the extent they are Receivership Property, as set forth in Section 1 of asset purchase agreement attached to these Bidding Procedures as **Exhibit 2** (the "**Stalking Horse PSA**"):

(a)    The Land;[3]

(b)    All structures, permanent plantings, trees, whether fructus naturales or fructus industriales, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "Improvements"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State (the "Fixtures"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; all solar panels and all infrastructure related to solar panels, including mounting systems, inverters, wiring, conduits, and related equipment (but excluding all of the foregoing solar panels and infrastructure listed on Schedule 1.1(b) [to the Stalking Horse PSA]); and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3] A list of APNs that comprise the Land is attached hereto as **Exhibit 1**.

-2-

pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or otherwise used or useful to or of benefit to the use and enjoyment of the Land or that provides drainage, irrigation and/or water to the Land;

(c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "Appurtenant Rights");

(d)    Subject to the rights of Ranch 24, LLC in and to the crops growing on the Ranch 24 Premises (as defined on Schedule 5.2(i) [to the Stalking Horse PSA]), all crops and farm products, whether fructus naturales or fructus industriales (emblements), from and after the 2026 crop year (the "Crops");

(e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "Oil, Gas and Mineral Rights");

(f)    All surface water rights, groundwater rights, water credits, water entitlements, water expectancies, and banked water of any kind appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications, court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and

-3-

all rights in any contracts for the sale, lease, transfer, or exchange of water generated from irrigation wells or otherwise associated with the Land, but specifically excepting any banked water rights held by POSO CREEK WATER COMPANY, LLC, a California limited liability company ("Poso Creek"), whether or not any of the members for which such water is held by Poso Creek are the fee owners of the Land (collectively, "Water Rights"); and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on Schedule 1.1(g) [to the Stalking Horse PSA] that Buyer would like to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

(h)    All crops and farm products produced from 10,011.79 acres in Fresno County, California (the "Westlands Property") pursuant to the terms of the Pistachio Purchase Agreement attached hereto as Exhibit H (the "Westlands PPA") (the "Westlands Crops").

Stalking Horse PSA § 1.

## 1.    Key Dates

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Receiver and to submit Bids (as defined below) for the Property. The Receiver with the assistance of Capstone Capital Markets LLC ("**Capstone**") and Pivot Management Group, LLC ("**Pivot**") will assist interested parties in conducting their respective due diligence investigations.

The key dates for the sale process are as follows:

-4-

303970350

| Event | Deadlines[4] | Estimated Date[5] |
|---|---|---|
| Deadline to Serve Court-Approved Bidding Procedures[6] | Within one (1) business day of entry of the Bidding Procedures Order | |
| Deadline to Submit Bids (the "**Bid Deadline**") | Twenty-one (21) days after entry of Bidding Procedures Order at 5:00 p.m. (Pacific Time) | |
| Deadline for the Receiver to Either (1) Notify Bidders of Status as Qualified Bidder or (2) File Notice of Cancellation of Auction and Designating Stalking Horse as Successful Bidder ("**Notice of Auction Cancellation**")[7] | Three (3) business day after the Bid Deadline | |
| **Timeline if Competing Qualified Bids Received** | | |
| Auction | Seven (7) days after the Bid Deadline, at 10:00 a.m. (Pacific Time) | |
| Deadline to File Notice of (i) Successful Bid and Backup Bid, (ii) Identity of Successful Bidder and Backup Bidder, and (iii) Proposed form of Sale | Two (2) business days following conclusion of Auction | |

---

[4] All dates/deadlines are subject to extension or adjournment as provided for herein.

[5] The Estimated Date is given to help place the Deadlines into context. Actual dates will be calculated based on the column titled "Deadlines."

[6] A copy of the Court-approved Bidding Procedures will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property, and (d) the service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

[7] The Notice of Auction Cancellation, if applicable, will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property and (d) the master service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

-5-

| Event | Deadlines[4] | Estimated Date[5] |
|---|---|---|
| Order (the "**Notice of Successful Bidder**")[8] | | |
| Deadline to File Objections to Sale (the "**Sale Objection Deadline**") | Seven (7) days after filing of Notice of Successful Bidder | |
| Reply Deadline | Nine (9) days after the Sale Objection Deadline | |
| Sale Hearing, if Auction Held | | Monday December 1, 2025, at 1:30 p.m. (Pacific Time) |
| **Timeline if Notice of Auction Cancellation Filed** | | |
| Deadline to File Objections to Sale to the Stalking Horse Bidder if Notice of Cancellation of Auction Filed (the "**Sale Objection Deadline**") | Five (5) days after filing of Notice of Cancellation of Auction | |
| Reply Deadline | Three (3) days after the Sale Objection Deadline | |
| Sale Hearing if Notice of Cancellation of Auction Filed | | Monday November 17, 2025, at 1:30 p.m. (Pacific Time) |

2. **Consultation Parties.**

(a) Except as set forth in Section 2(b) below, the "**Consultation Parties**" referred to herein consist of the following entities, solely with respect to parcels subject to their respective liens or owner interests:

      i.      Plaintiffs;

---

[8] The Notice of Successful Bidder, if applicable, will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property and (d) the master service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

303970350

ii.      Farming Defendants (as defined in the Receivership Order); and

iii.     Any other person or entity that is participating in the sale process with respect to the Property in accordance with ¶ 2(d) of the Capstone Engagement Letter [Docket No. 157-2] and as agreed to by Receiver.

(b)    If any of the persons or entities listed in paragraph 2(a), above, submits a Bid, such person shall no longer be a Consultation Party for purposes of these Bidding Procedures.

**3.    Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "**Potential Bidder**") must deliver or have previously delivered to the Receiver the following documents:

(a)    an executed non-disclosure agreement (an "**NDA**") on terms acceptable to the Receiver;

(b)    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

(c)    proof of an ability to close the proposed transaction in form and substance acceptable to the Receiver in his business judgment and in consultation with the Consultation Parties.

**4.    Provisions Governing Joint Bid Discussions.**

If a Potential Bidder is interested in engaging in discussions with a third party concerning a potential joint Bid ("**Joint Bid**") for the purchase of the Property, such Potential Bidder shall, prior to engaging in such discussions, (a) complete and submit a form to be supplied by Capstone requesting the Receiver's consent to engage in such discussions and identifying the third party(ies), and (b) receive the Receiver's written consent to engage in such discussions (the "**Joint Bid Discussion Protocol**").

**5.    No Collusion**

All bidders, including Potential Bidders and Qualified Bidders (defined below), are expressly prohibited from directly or indirectly colluding or taking any other action in restraint of free competitive bidding in connection with the sale process.

-7-

**6.**     **Qualified Bidders**

(a)     A "**Qualified Bidder**" is a Potential Bidder who satisfies these Bidding Procedures and whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale, whose Bid  is a Qualified Bid, and that the Receiver determines should be considered a Qualified Bidder, in consultation with the Consultation Parties. No later three (3) business days after the Bid Deadline, the Receiver will notify each Potential Bidder in writing (email being sufficient) whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid (unless a Consultation Party is a Qualified Bidder or participates in a Qualified Bid).

(b)     If the Receiver in his discretion determines any Potential Bidder not to be a Qualified Bidder, the Receiver will refund such Qualified Bidder's Deposit (defined below) on or within five (5) business days after the Bid Deadline.

(c)     Without the written consent of the Receiver, a Qualified Bidder may not modify or amend its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**7.**     **Due Diligence**

Only Potential Bidders whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale shall be eligible to receive due diligence information and access to the Receiver's electronic data room and additional non-public information regarding the Property. No Potential Bidder will be permitted to conduct due diligence without signing an NDA in a form acceptable to the Receiver. The Receiver will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders, the due diligence

303970350

period will end on the Bid Deadline. The Receiver shall have no obligation to furnish any due diligence information after the Bid Deadline. Neither the Receiver nor his professionals make any representations as to the completeness or accuracy of information provided to Potential Bidders in relation to the sale of the Property.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Receiver or his advisors regarding the ability of the Potential Bidder to consummate a sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Receiver to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

All due diligence requests should be directed to Capstone Capital Markets, LLC, Attn: Arnav Virmani (avirmani@capstonepartners.com) and Hunter Costello (hcostello@capstonepartners.com).

**8.    Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of the Property (each, a "**Bid**") by a bidder that is submitted in writing and satisfies each of the following requirements (the "**Bid Requirements**") as determined by the Receiver, in his discretion and in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**":

(a)    Identity: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Receiver's advisors should contact regarding such Bid.

(b)    Purchase Price. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for the Property (the "**Purchase Price**"), which must be a minimum of **$69,451,881**.[9]

---

[9] Calculated as follows: $66,943,574 (Stalking Horse Bid) + $2,008,307 (Bid Protections) + $500,000 (Minimum Overbid).

(c)    <u>Deposit</u>. On or before the Bid Deadline, each Bid must be accompanied by a deposit in the amount equal to 10 percent (10%) of the aggregate cash Purchase Price of the Bid, to be held together with other bidders' cash deposits in a non-interest-bearing account to be established by the Receiver or Pivot (the "**Deposit**").

(d)    <u>Assumption of Obligations</u>. Each Bid must clearly state which liabilities the Bidder agrees to assume, if any.

(e)    <u>Qualified Bid Documents</u>. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid, as well as all other material documents integral to such Bid (the "**Qualified Bid Documents**"). Such documents must be based on and marked against form documents provided by the Receiver (including a summary of each Bid as may be reasonably requested by the Receiver). Any modifications to the form of documents provided by the Receiver must be in form and substance acceptable to the Receiver, in consultation with the Consultation Parties, to be considered Qualified Bid Documents.

(f)    <u>No Material Modifications to Stalking Horse PSA</u>. Each Bid must be on the form asset purchase agreement attached hereto as **Exhibit 2** and include all material terms in the Stalking Horse PSA, including the following:

1.    <u>Property</u>: The Bid must be for all Property, unless otherwise agreed to in writing by the Receiver in his sole discretion, in consultation with the Consultation Parties.

2.    <u>No Representations and Warranties by the Receiver</u>: The sale will be "as is" and "with all faults," without representations or warranties, and without recourse. Each Bidder will represent that it has relied solely on its independent diligence, and not on any representations of the Receiver or his agents, in formulating and submitting its Bid.

3.    <u>Free and Clear</u>: The sale will be free and clear of liens, claims and encumbrances, other than easements, rights of way and other encumbrances running with the land, (the "**Interests**") to the fullest extent permitted by applicable law.

(g)    <u>Committed Financing</u>. To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must

303970350

include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Receiver that demonstrates that the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Receiver.

(h)    Contingencies. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

(i)    Time Frame for Closing. Closing must occur within seven (7) days of the Sale Order becoming a final, non-appealable order, unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties.

(j)    Binding and Irrevocable. A Qualified Bidder's Bid shall be binding and irrevocable unless and until the Receiver accepts a higher Bid for the Property and such Qualified Bidder is not selected as the Backup Bidder.

(k)    Expenses and Disclaimer of Fees. Apart from the Qualified Bid submitted by the Stalking Horse Bidder, each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, with the exception of the Stalking Horse Bidder, no Qualified Bidder will be permitted to request, nor be granted by the Receiver, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis.

(l)    Authorization. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Receiver) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(m)    Completed Diligence. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due

-11-

diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Property in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Property or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid.

(n)     <u>Adherence to Bidding Procedures</u>. By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid not in conformity with these Bidding Procedures or seek to reopen the Auction after conclusion of the Auction.

(o)     <u>Regulatory Approvals and Covenants.</u> A Bid must set forth each regulatory approval required for the Bidder to consummate the sale, if any, and the time period within which the Bidder expects to receive such regulatory approvals.

(p)     <u>Consent to Jurisdiction</u>. Each Qualified Bidder shall be deemed to have submitted to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Receiver's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the sale documents, and the Closing, as applicable.

(q)     <u>Joint Bids</u>. Joint Bids are permitted, provided that the Qualified Bidders have complied with the Joint Bid Discussion Protocol.

(r)     <u>Bid Deadline</u>. Each Bid must be transmitted via email (in .pdf or similar format) so as to be actually received on or before twenty one (21) days after entry of thee Bidding Procedures Order at 5:00 p.m. (Pacific Time) (the "**Bid Deadline**")  by: (a) Counsel to the Receiver: Katten Muchin Rosenman LLP, Attn: John Mitchell (john.mitchell@katten.com) and Michaela Crocker (michaela.crocker@katten.com); (b) the Receiver's investment banker, Capstone Capital Markets, LLC, Attn: Skye Root (sroot@capstonepartners.com), Arnav Virmani (avirmani@capstonepartners.com), and Hunter Costello (hcostello@capstonepartners.com); and (c) Counsel for Plaintiffs: Seyfarth Shaw LLP, Attn: Jason DeJonker (JDeJonker@seyfarth.com) and Nicholas Marcus (nmarcus@seyfarth.com).

-12-

**9.     Auction**

If the Receiver receives more than one Qualified Bid for the Property, he will conduct the Auction to determine the Successful Bidder.

No later than the commencement of the Auction, the Receiver shall notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Property, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, as applicable (the "**Baseline Bid**"). The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Receiver reasonably deems, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid, including, but not limited to: (a) the amount and nature of the total consideration payable to the Receiver; (b) the likelihood of the Qualified Bidder's ability to close the sale and the timing thereof; and (c) the net economic effect of the value to be received by the Receiver from the transaction contemplated by the Qualified Bid Documents, including in light of the effect of any Bid Protections (collectively, the "**Bid Assessment Criteria**").

The Auction shall take place seven (7) days after the Bid Deadline at 10:00 a.m. (PT), or such later date and time, and by such other means, as selected by the Receiver in consultation with the Consultation Parties. The Auction shall be conducted in a timely fashion according to these Bidding Procedures, and the Receiver shall maintain a written or recorded transcript of the Auction. Remote participation by Qualified Bidders at the Auction will be permitted in the Receiver's discretion.

(a)     **The Receiver Shall Conduct the Auction.**

The Receiver and his professionals shall direct and preside over the Auction. At the start of the Auction, the Receiver or his professionals shall describe the terms of the Baseline Bid. All incremental Bids made thereafter for the Property shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Receiver shall maintain a written or recorded transcript of the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only (i) Qualified Bidders and their legal and financial advisors and (ii) the members of, and advisors to, the Consultation Parties shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person or via Zoom and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction. The Receiver may allow other parties to attend the Auction in his discretion.

(b)    **Terms of Overbid.**

"**Overbid**" means any Bid made at the Auction by a Qualified Bidder after the Receiver's announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

i.    *Minimum Initial Overbid*. The first overbid at the Auction (the "**Minimum Initial Overbid**") shall be in an amount not less than **$69,451,881** which is comprised of: (i) the purchase price set forth in the Stalking Horse PSA ($66,943,574.00) plus (ii) the Bid Protections ($2,008,307.00) plus (iii) $500,000 (the "**Initial Overbid Amount**").

ii.    *Minimum Overbid Increment*. Any Overbid following the Minimum Initial Overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Property shall be in increments of $500,000. The Receiver may establish different overbid increments at the Auction, as determined by the Receiver in the exercise of his business judgment, in consultation with the Consultation Parties.

iii.    *Conclusion of Each Overbid Round*. Upon the solicitation of each round of Overbids, the Receiver may announce a deadline (as he may, in his business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Receiver.

Subsequent to each Overbid Round Deadline, the Receiver shall announce whether he has identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Receiver as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Receiver shall describe to all Qualified Bidders the material terms of any new Overbid designated by him as the Prevailing

-14-

Highest Bid as well as the value attributable by the Receiver (after consultation with the Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

iv.    *Overbid Alterations.* An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable than any prior Bid or Overbid, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(c)    **Consideration of Overbids.**

The Receiver reserves the right, in his reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Receiver and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Receiver with such additional evidence as the Receiver, in his reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

(d)    **Closing the Auction.**

i.    The Auction shall continue until there is only one Qualified Bid that the Receiver determines, in his reasonable business judgment, and in consultation with the Consultation Parties, to be the highest or otherwise best Bid for the Property. Such Qualified Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**" and at which point the Auction will be closed as to the Property. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-Prevailing Highest Bid. The Receiver's acceptance of the Successful Bid is conditioned upon Court approval at the Sale Hearing.

303970350

  ii. The Receiver shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

  iii. No later than two (2) business days after the Auction, the Receiver shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid (defined below) to be filed with the Court.

  (e) **No Collusion; Good Faith *Bona Fide* Offer**

 Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Qualified Bid is a good-faith bona fide offer, and it intends to consummate the proposed transaction if selected as the Successful Bidder.

  (f) **Cancellation of Auction.**

 If the Receiver does not receive by the Bid Deadline a Qualified Bid other than that submitted by the Stalking Horse Bidder, then the Receiver may file a notice cancelling the Auction and designating such bid as the Successful Bid.

**10. Backup Bidder**

 The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the "**Backup Bid**") for the Property at the Auction, as determined by the Receiver in the exercise of his business judgment and in consultation with the Consultation Parties, as applicable, shall be required to serve as a backup bidder (the "**Backup Bidder**"). The Receiver shall announce the identity of any Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder at the conclusion of the Auction at the same time the Receiver announces the identity of the Successful Bidder. Unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties, the Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the Successful Bidder. The Backup Bidder's Deposit shall be held by the Receiver until the closing of the transaction with the Successful Bidder. If the Successful Bidder fails to consummate its Successful Bid, the Receiver may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder

303970350

for all purposes. The Receiver will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Receiver, and the Receiver specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

**11.    Reservation of Rights.**

The Receiver reserves the right to modify these Bidding Procedures in his reasonable business judgment, and in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids.

**12.    Sale Hearing.**

(a)    **Sale Hearing if Competing Qualified Bids Received**

If Competing Qualified Bids are received and an Auction held, the hearing to approve the sale (the "**Sale Hearing**") shall take place in the courtroom of the Honorable Kirk E. Sherriff in the United States District Court for the Eastern District of California, Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, Courtroom 6, 7th Floor, Fresno, California on **December 1, 2025, at 1:30 p.m. (PT)**. Following the conclusion of the Auction, with the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

(b)    **Sale Hearing if Notice of Auction Cancellation Filed**

If the Auction is cancelled, the hearing to approve the sale (the "**Sale Hearing**") shall take place in the courtroom of the Honorable Kirk E. Sherriff in the United States District Court for the

Eastern District of California, Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, Courtroom 6, 7th Floor, Fresno, California on **November 17, 2025, at 1:30 p.m. (PT)**. With the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

**13.    Return of Deposit.**

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the property at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Receiver in his sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Receiver will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Receiver as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Receiver, and the Receiver shall be free to consummate the proposed transaction with the Backup Bidder without the need for an additional hearing or order of the Court.

Dated: [_____], 2025

303970350

## EXHIBIT 1 TO BIDDING PROCEDURES

List of APNs

| Ranch | APNs | Acres |
|---|---|---|
| Ana Belle West | 047-040-08-00-7 | 10.0 |
| Ana Belle West | 047-010-01-01-6 | 438.3 |
| Ana Belle West | 047-040-03-01-1 | 160.0 |
| Ana Belle West | 047-040-06-00-1 | 55.0 |
| Ana Belle West | 047-040-07-00-4 | 15.0 |
| Ana Belle West | 047-040-09-00-0 | 80.0 |
| Ana Belle West | 047-040-13-00-1 | 220.2 |
| Gooselake | 069-230-05-01-2 | 297.0 |
| Gooselake | 069-230-07-00-9 | 159.6 |
| Gooselake | 069-230-20-00-6 | 240.0 |
| Gooselake | 069-230-21-01-8 | 159.9 |
| Gooselake | 069-230-22-01-1 | 160.0 |
| Gooselake | 069-230-36-00-3 | 269.1 |
| Gooselake | 069-230-55-00-8 | 44.6 |
| Gooselake | 086-010-03-00-8 | 278.7 |
| Gooselake | 086-010-08-00-3 | 185.2 |
| Gooselake | 086-010-11-00-1 | 0.4 |
| Gooselake | 086-010-18-00-2 | 52.0 |
| Gooselake | 086-010-19-00-5 | 258.7 |
| Gooselake | 086-020-03-00-1 | 120.0 |
| Gooselake | 086-020-10-00-1 | 56.2 |
| Gooselake | 086-100-28-00-7 | 201.8 |
| Gooselake | 086-110-01-01-0 | 20.0 |
| Gooselake | 086-110-03-01-6 | 80.0 |
| Gooselake | 086-110-04-00-0 | 141.9 |
| Gooselake | 086-110-05-01-2 | 160.0 |
| Gooselake | 086-110-09-00-5 | 40.0 |
| Gooselake | 086-120-01-00-4 | 5.0 |
| Gooselake | 086-120-05-00-6 | 1.3 |
| Gooselake | 087-080-25-00-0 | 90.7 |
| Kyte | 059-010-19-00-7 | 144.2 |
| Kyte | 059-070-01-00-2 | 79.1 |
| Ludy | 059-243-03-00-8 | 79.1 |

303970350

## EXHIBIT 1 TO BIDDING PROCEDURES

### List of APNs (Continued)

| Ranch | APNs | Acres |
|---|---|---|
| McCombs Ranch | 058-292-05-00-5 | 78.2 |
| McCombs Ranch | 058-291-40-00-9 | 80.3 |
| McCombs Ranch | 058-292-09-00-7 | 156.4 |
| McCombs Ranch | 058-292-23-00-7 | 159.1 |
| Jackson | 069-280-04-00-5 | 39.1 |
| Jackson | 069-280-16-00-0 | 40.0 |
| Jackson | 069-280-18-00-6 | 38.2 |
| Jackson | 069-280-25-00-6 | 38.2 |
| Jackson | 069-280-26-00-9 | 79.1 |
| Jackson | 069-280-38-00-4 | 77.3 |
| Jackson | 069-280-39-00-7 | 79.1 |
| Jackson | 069-310-09-00-8 | 158.2 |
| Jackson | 069-310-10-00-0 | 160.0 |
| Jackson | 069-310-11-00-3 | 158.2 |
| Jackson | 069-310-12-00-6 | 155.9 |
| Kimberlina | 069-340-02-02-4 | 314.5 |
| Kimberlina | 069-340-23-00-7 | 40.0 |
| Kimberlina | 069-340-24-00-0 | 105.4 |
| Kimberlina | 069-340-25-00-3 | 11.4 |
| Kimberlina | 069-340-26-00-6 | 41.4 |
| Kimberlina | 069-340-34-01-8 | 160.0 |
| Kimberlina | 069-340-35-01-1 | 158.2 |
| Lerdo | 087-080-46-00-1 | 211.2 |
| McCoy | 069-272-05-00-9 | 76.7 |
| McCoy | 069-272-08-00-8 | 40.0 |
| West Jackson | 069-310-21-00-2 | 40.0 |
| West Jackson | 069-320-01-00-7 | 19.5 |
| West Jackson | 069-320-02-01-9 | 19.5 |
| West Jackson | 069-320-03-00-3 | 19.5 |
| West Jackson | 069-320-04-01-5 | 19.6 |
| West Jackson | 069-320-05-01-8 | 80.0 |
| West Jackson | 069-330-02-00-3 | 20.0 |
| Total Acres | | 7176.7 |

## **EXHIBIT 2 TO BIDDING PROCEDURES**

<u>Stalking Horse PSA</u>

(see attached)

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

**PURCHASE AND SALE AGREEMENT**
**AND**
**JOINT ESCROW INSTRUCTIONS**

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated September 22, 2025, to be effective on the date when all parties have executed it after entry of the Marketing Procedures Order (defined below), which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") (ii) WONDERFUL NUT ORCHARDS LLC, a Delaware limited liability company ("**Land Buyer**") and (iii) WP PISTACHIOS LLC, a Delaware limited liability company ("**Crop Buyer**"). Land Buyer and Crop Buyer are sometimes referred to herein collectively as "**Buyer**", provided that Crop Buyer is a party to this Agreement solely with respect to the provisions expressly applicable to the purchase of the Westlands Crops (as defined below), and shall have no obligations with respect to the purchase of the Land. For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**." This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A. Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property consisting of approximately 7,166.71 assessed acres of land, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

B. Land Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

C. Crop Buyer desires to purchase and Seller desires to sell the Westlands Crops on the terms and subject to the conditions herein set forth.

D. The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order of the Court to be entered in the Proceeding substantially in the form attached hereto as **Exhibit B** (the "**Marketing Procedures Order**") and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially in the form attached hereto as **Exhibit C** ("**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1. <u>**Purchase and Sale**</u>

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

       1.1    <u>Purchase and Sale of Property</u>.  Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to the applicable Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the applicable Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following solely to the extent it is Receivership Property (as defined in the Receivership Order):

       (a)    The Land;

       (b)    All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; all solar panels and all infrastructure related to solar panels, including mounting systems, inverters, wiring, conduits, and related equipment (but excluding all of the foregoing solar panels and infrastructure listed on Schedule 1.1(b)); and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or otherwise used or useful to or of benefit to the use and enjoyment of the Land or that provides drainage, irrigation and/or water to the Land;

       (c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

       (d)    Subject to the rights of Ranch 24, LLC in and to the crops growing on the Ranch 24 Premises (as defined on Schedule 5.2(i)), all crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), from and after the 2026 crop year (the "**Crops**");

       (e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)    All surface water rights, groundwater rights, water credits, water entitlements, water expectancies, and banked water of any kind appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications, court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale, lease, transfer, or exchange of water generated from irrigation wells or otherwise associated with the Land, but specifically excepting any banked water rights held by POSO CREEK WATER COMPANY, LLC, a California limited liability company ("Poso Creek"), whether or not any of the members for which such water is held by Poso Creek are the fee owners of the Land (collectively, "**Water Rights**"); and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on <u>Schedule 1.1(g)</u> that Buyer would like to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

(h)    All crops and farm products produced from 10,011.79 acres in Fresno County, California (the "**Westlands Property**") pursuant to the terms of the Pistachio Purchase Agreement attached hereto as **Exhibit H** (the "**Westlands PPA**") (the "**Westlands Crops**").

For purposes of clarity, the Land, Improvements, Fixtures, Appurtenant Rights, Oil, Gas and Mineral Rights, Water Rights and licenses and agreements described in Sections 1.1 (a)through (g) (the "Real Property") shall be purchased by Land Buyer and the Crops described in Section 1.1(h) shall be purchased by Crop Buyer.

1.2    <u>As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures.</u>

(a)    Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER.  BUYER**

FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY. BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 1.2 SHALL RELIEVE SELLER FROM (I) OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY CLOSING DOCUMENTS, AND (II) LIABILITY FOR SELLER'S INTENTIONAL FRAUD OR WILLFUL MISCONDUCT.

(b) Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller unless expressly set forth in this Agreement or any representations or warranties (oral or written) of any Lenders (as defined below), or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders. **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF, EXCEPT TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT.**

(c) **EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS: (i) EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR**

4

**AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.**

       (d)      **BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS <u>SECTION 1.2</u>, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS, EXCEPT THAT BUYER DOES NOT WAIVE AND EXPRESSLY RESERVES (A) CLAIMS FOR SELLER'S INTENTIONAL FRAUD OR WILLFUL MISCONDUCT, AND (B) CLAIMS ARISING FROM SELLER'S FAILURE TO PERFORM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE CLOSING DOCUMENTS.**

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived by Buyer solely to the extent such claims do not involve (i) Seller's intentional fraud or willful misconduct, and (ii) Seller's obligations expressly set forth in this Agreement:

         **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

         *RY*
         _____
         **Land Buyer's Initials**



**Crop Buyer's Initials**

       1.3     <u>Release</u>.  At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and The Prudential Insurance Company of America ("**Prudential**"), PAR U Hartford Life & Annuity Comfort Trust ("**PAR U**"), and PGIM Real Estate Finance, LLC (together with Prudential and PAR U, collectively, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

       1.4     <u>Not a Residential Purchase</u>.  Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Property, Buyer represents and warrants:  (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's primary residence.  To the fullest extent permitted by applicable law, Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

       **2.**     **<u>Escrow</u>**.  Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA 93711 (Attention:  Sue Meyer) who shall act as "**Escrow Holder**," in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**").  The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct, violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

       **3.**     **<u>Close of Escrow</u>**.  Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before 5:00 p.m., Pacific Time, on **the date which is five (5) Business Days following the date on which the Sale Order becomes final and non-appealable** (the "**Closing Date**") or such other date as agreed to by the Parties; provided that the Closing Date shall in no event occur later than the Outside Date (as set forth in <u>Section 6.4</u>).

       3.1     <u>Purchase Price.</u>  The Purchase Price of the Property ("**Purchase Price**") is **Sixty-Six Million Nine Hundred Forty-Three Thousand Five Hundred Seventy-Four and 00/100thsDollars ($66,943,574.00) United States currency**. The Purchase Price shall be paid to Seller in installments as follows:

       (a)     <u>Independent Consideration</u>. Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred and 00/100ths Dollars ($100.00)** from the Bid Deposit (the "**Independent Consideration**") as

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof. The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under <u>Section 6.3</u>, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

(b)     <u>Bid Deposit</u>.    Concurrently with Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Land Buyer shall deposit into an interest-bearing receiver account with Pivot Management Group LLC (the "**Deposit Holder**") an amount equal to **Six Million Six Hundred Ninety Four Thousand Three Hundred Fifty Seven Dollars and 40/100ths ($6,694,357.40)** (the "**Bid Deposit**") in immediately available, goods funds of the United States of America or, at Buyer's election, by delivery of an irrevocable standby letter of credit issued by a nationally recognized bank in a standard form reasonably acceptable to Buyer and Seller (the "**Letter of Credit**"). If Buyer elects to deliver the Letter of Credit, Buyer shall have no obligation to fund the Bid Deposit in cash unless and until the Closing, at which time the Letter of Credit shall be drawn or replaced with cash and applied toward payment of the cash consideration due. The Letter of Credit must provide for written notice to Seller at least sixty (60) days prior to the expiration of the Letter of Credit if the Letter of Credit is not to be renewed by the issuer, and may be drawn upon only in the event of (i) a determination by a court of competent jurisdiction that Buyer is in default under this Agreement, or (ii) if the full amount of the Bid Deposit is not deposited with Deposit Holder, or a replacement Letter of Credit delivered to Seller, at least thirty (30) days prior to the expiration of the then current Letter of Credit. If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.

(c)     <u>Closing Payment</u>. **Fifty-Two Million Two Hundred Forty Nine Thousand Two Hundred Sixteen and 60/100ths Dollars ($52,249,216.60)** (the "**Closing Payment**") shall be deposited by Land Buyer into Escrow no later than one (1) business day prior to the Closing and shall be released to Seller in cash, by cashier's check or wire transfer of immediately available funds, at the Close of Escrow.

(d)     <u>2026 Post-Closing Payment</u>. Four Million Dollars ($4,000,000) (the "**2026 Post-Closing Payment**") shall be paid by Crop Buyer to Seller in cash, by cashier's check or wire transfer of immediately available funds, but only upon and conditioned on complete delivery of the 2026 pistachio crop from the Westlands Property pursuant to the terms of the Westlands PPA. The 2026 Post-Closing Payment shall be in addition to any amounts due to the then-current grower under the Westlands PPA.

(e)     <u>2027 Post-Closing Payment</u>. Four Million Dollars ($4,000,000) (the "**2027 Post-Closing Payment,**" and together with the 2026 Post-Closing Payment, collectively, the "**Post-Closing Payments**") shall be paid by Crop Buyer to Seller in cash, by cashier's check or wire transfer of immediately available funds, but only upon and conditioned on complete delivery of the 2027 pistachio crop from the Westlands Property pursuant to the Westlands PPA.

The 2027 Post-Closing Payment shall be in addition to any amounts due to the then-current grower under the Westlands PPA.

(f)     Survival; Breach by Crop Buyer. The obligation to make the Post-Closing Payments shall be a contractual payment obligation only, shall be a covenant surviving the Closing as to the Real Property, and shall not constitute or be deemed secured by the Property, and Seller's sole and exclusive remedy for non-payment shall be an action at law for such payment. Crop Buyer's failure to make the 2026 Post-Closing Payment within thirty (30) days following Seller's written notice confirming the complete delivery of the 2026 pistachio crop from the Westlands Property shall be grounds for termination by Seller of the Westlands PPA with respect to the 2027 pistachio crop from the Westlands Property.

**4.     LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIFTEEN (15) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIFTEEN (15) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIFTEEN (15) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF FORTY-FIVE DAYS, OR SUCH LONGER PERIOD AS APPROVED BY THE COURT, SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN SECTION 1.5 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN SECTION 1.5 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY**

**OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY.**

**ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION**



Seller                                           Land Buyer              Crop Buyer
Lance Miller, solely in his capacity
as Court-appointed Receiver

5.      **Seller's Deliveries; Condition of Title**.

5.1     Seller's Deliveries.

Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land.  Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other disclosures that are required in connection with the conveyance of the property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above. As used in this Agreement, "Disclosure Statutes" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property.  Buyer hereby agrees as follows with respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

(a)     Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

(b)     The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

9

5.2    Condition of Title.  Seller agrees to convey fee simple title in and to the Property to Land Buyer.  Title shall be conveyed by Seller to Land Buyer by receiver's deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject to the items enumerated in this Section. Land Buyer shall accept title to the Property subject to the following exceptions; provided, however, that nothing herein shall limit or restrict Land Buyer's right to (i) negotiate with the Title Company to remove or modify any such exceptions, or (ii) obtain title endorsements at Land Buyer's expense to insure over any such exceptions:

(a)    any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due;

(b)    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

(c)    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Effective Date, except as provided in Section 5.3 below;

(d)    physical matters and conditions, if any, that exist at the Property on the Effective Date and are disclosed by a current survey or inspection of the Property;

(e)    laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

(f)    any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

(g)    all recorded covenants, conditions, restrictions, easements, and agreements affecting the Property on the Effective Date, including without limitation the Permitted Exceptions (as defined below), except to the extent Seller has agreed in writing to terminate or remove;

(h)    the printed standard exceptions listed in the Preliminary Report; and

(i)    such other matters as Buyer either waives, assumes, or consents to in writing, including the leasehold and other rights listed in Schedule 5.2(i).

5.3    No Liens.  Notwithstanding the foregoing, the Property shall be sold free and clear of any and all monetary liens, deeds of trust, mortgages, security interests, tax liens (except those for taxes not yet due or payable), mechanics' liens, crop liens, and other financial encumbrances securing the payment of money, including any claims of tenants, contractors, or others with potential rights to the crops or improvements effective upon the Closing, other than the Permitted Exceptions. Seller shall have caused or obtained, to Buyer's reasonable satisfaction, prior to the Closing, a full release of all liens, claims, or encumbrances in and to the Crops that appear in the public record or that are known to Seller by any persons having an interest therein.

5.4    Buyer's Indemnification of Seller.  Any damage caused to the Property by Buyer or Buyer's Agents in connection with Buyer's Inspection shall be promptly and fully

repaired by Buyer and the Property returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement provided, however, that Buyer shall not be responsible for pre-existing conditions or defaults, including hazardous or toxic materials, not caused or exacerbated by Buyer or Buyer's Agents. Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's Agent's activities, which obligation shall survive any termination of this Agreement. Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's Agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses reasonably incurred by Seller Parties in connection therewith. The indemnity provided herein shall not extend to indirect, consequential, punitive or speculative damages and shall survive the Close of Escrow and any termination of this Agreement.

5.5    SGMA Disclosure.    The Sustainable Groundwater Management Act ("**SGMA**") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. Seller and its agents and representatives make no representation on water rights or the effect of SGMA on the Property now or in the future, except that Seller shall disclose to Buyer any notices, violations, or regulatory actions of which Seller has actual knowledge, and shall further disclose to Buyer, and deliver true and complete copies of, any contracts, agreements, or understandings (whether written or oral) with third parties relating to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property, whether or not of record, of which Seller has actual knowledge (provided that any such document which is included in the Preliminary Report is deemed delivered). Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future. In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property. Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property, provided this release shall not apply to any liability arising from Seller's or any Seller Parties' fraud or intentional misrepresentations in connection with SGMA or water rights information provided to Buyer.

Notwithstanding anything to the contrary in this Section 5.5 or elsewhere in this Agreement, Buyer shall not assume, and Seller shall remain solely responsible for, any fees, charges, penalties, assessments, or other liabilities imposed by the Semitropic Water District or any other governmental or quasi-governmental authority arising out of or relating to groundwater,

11

surface water, or allocation overages attributable to use of the Property prior to the Closing Date, including without limitation, any SGMA allocation overages for the 2025 water year (January 1, 2025 – December 31, 2025), regardless of whether such amounts are invoiced, assessed, or become due after Closing. Any such liability shall remain the sole responsibility of Seller, and Seller shall indemnify, defend, and hold Buyer harmless from and against the same. This carve-out shall survive Closing and delivery of the Grant Deed.

**6.    Conditions Precedent; Termination**.

6.1    Conditions to Obligations of all Parties. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

(a)    the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Owner, Lenders, and all parties of interest in the Action, and Title Company agrees to insure title to the Property without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order or the Lender Agreement Approval (defined below) will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit, plus all interest accrued thereon, shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination;

(b)    no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement; and

(c)    Lenders shall have provided their written approval of this Agreement.

6.2    Seller's Conditions Precedent. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in Section 9 below), and

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

the Buyer's share of the Closing Costs (as defined in <u>Section 12</u> below) and Prorations (as defined in <u>Section 13</u> below) into the Escrow by the Closing Date.

(b)     All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Seller in its sole discretion.

(c)     Each of Buyer's representations and warranties set forth in <u>Section 8</u> hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3     <u>Buyer's Conditions Precedent</u>.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)     Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed.

(b)     Except as listed in Schedule 5.2(i), Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)     Each of the representations and warranties of Seller contained in <u>Section 7</u> or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(d)     All monetary liens, deeds of trust, mortgages, security interests, tax liens, mechanics' liens, crop liens, and other financial encumbrances securing the payment of money against the Property which Seller is obligated to remove or cause the removal pursuant to this Agreement shall have been fully paid, released, and reconveyed (or other arrangements reasonably satisfactory to Buyer shall have been made for their release concurrently with Closing), so that title to the Property is conveyed to Buyer free and clear of all such monetary liens, subject only to the Permitted Exceptions (as defined below).

(e)     All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Buyer in its sole discretion.

(f)     Any and all past due or delinquent water bills or charges relating to the Property shall have been paid in full by Seller prior to the Close of Escrow or, if not paid, shall be satisfied from Seller's proceeds at Closing through escrow as a proration.

(g)     Seller has obtained the termination of, or the Court has ordered the sale of the Property free and clear of, the Water Supply Agreements listed on Schedule 6.3(g) as to the Property to Buyer's reasonable satisfaction, provided that failure of this condition shall not be a default of Seller under this Agreement.

(h)     Seller has obtained the termination of, or the Court has ordered the sale of the Property free and clear of,  the Rights of First Refusal listed on Schedule 6.3(h) (the "ROFRs") as to the Property to Buyer's reasonable satisfaction, or that the Court has entered a finding that the ROFRs are not enforceable against the Receiver or Receivership Property, provided that failure of this condition shall not be a default of Seller under this Agreement.

(i)     Buyer has completed its diligence review of all water matters, not later than 12:00 p.m., Pacific Time, on October 3, 2025 (the "**Diligence Deadline**").

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4     <u>Termination</u>.  This Agreement may be terminated in accordance with this <u>Section 6.4</u> at any time prior to the Closing:

(a)     By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes final and non-appealable, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Outside Date; provided, however, that the Outside Date may be extended (i) by Seller and Buyer upon mutual agreement., (ii) by Seller for no more than an additional fifteen (15) days if required to obtain releases of title matters to be removed by Seller hereunder at the Closing.

(b)     By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this <u>Section 6.4(b)</u> shall not be available to a Party if such order resulted from, or could have been avoided but for, the intentional breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)     By written notice of either Buyer or Seller if any Seller closes or consummates an alternative transaction or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 6.4(c)</u> until the earlier of the date (i) the alternative transaction closes, and (ii) sixty (60) days following the entry of the Sale Order.

(d)    By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.3 to be satisfied, and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in Section 6.3 shall become incapable of being satisfied by the Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this Section 6.4(d) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or;

(e)    By Buyer by giving written notice to Seller if the Sale Order is: (i) modified or otherwise altered in a manner materially adverse to Buyer not otherwise agreed to by Buyer, in writing, or (ii) stayed or vacated by the Court or a court of competent jurisdiction and such stay or vacatur shall not have been removed prior to the earlier of (x) ten (10) days following the implementation of such stay or vacatur, or (y) the Outside Date;

(f)    By Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.2 to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and forty-five (45) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 6.2 shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this Section 6.4(e) will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder;

(g)    By Buyer by giving written notice to Seller not later than the Diligence Deadline; and

(h)    By the mutual written consent of Seller and Buyer.

6.5    Effect of Termination

(a)    In the event of the termination of this Agreement as provided in Section 6.4, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, the Breakup Fee and Expense Reimbursement, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to Section 6.4(f), and Sellers are not then in breach of Sellers' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit and (y) for any reason other than pursuant to Section 6.4(f), Buyer shall be entitled to return of the Bid Deposit as set

forth in this Agreement. Notwithstanding the foregoing, nothing in this Article 6 will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to Section 6.4, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement, and in the case of any Seller breach, Buyer shall be entitled to pursue specific performance.

(b)      In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Sections 6.4(c), and an alternative transaction is consummated, Seller (subject to entry of the Marketing Procedures Order) shall pay to Bidder a break-up fee in an amount equal to **Two Million Eight Thousand Three Hundred Seven and 00/100ths Dollars ($2,008,307.00)** (the "**Breakup Fee**") concurrently with the consummation of , and only out of the cash proceeds of,  an alternative transaction, to an account designated by Buyer in writing to Seller.

(c)      In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate  this Agreement in accordance with Section 6.4 and to receive the Breakup Fee, in accordance with Section 6.5(b), if payable thereunder;  provided that in the case of any fraud or willful misconduct by Seller, Buyer shall have the right to pursue specific performance if applicable.

(d)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 6.5 are an integral part of this Agreement and that the Breakup Fee is not a penalty, but rather represents liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Breakup Fee is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision.

## 7.    Seller's Representations and Warranties.

7.1    Seller's Representations and Warranties.  Except as set forth on Schedule 7.1, attached hereto, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)      Court-Appointed Receiver.  Seller is the Court-appointed receiver over the Receivership Property, duly appointed and acting within the scope of authority granted by the Court, and has not received any written notice of challenge or appeal to such appointment that remains unresolved.

(b)      Authority.  Subject to entry of the Marketing Procedures Order and the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which any Seller is a

party or by which any Seller is otherwise bound, or any judicial order to which any Seller is a party or to which any Seller is subject. All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by such Seller, (ii) be legal, valid and binding obligations of such Seller, and (iii) not violate, to such Seller's knowledge, any provision of any agreement or judicial order to which such Seller is a party or to which such Seller is subject.

(c)    OFAC Compliance.    Seller (which, for the purposes of this Section 7.1(c), shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    Foreign Person and Withholding.    Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to such Seller or the Property. Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008. A Seller may be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

(e)    Organic Trees or Vines.    The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties, except that Seller shall disclose to Buyer any known certifications, contracts, or royalty obligations of which Seller has actual knowledge. Seller makes no representations or warranties in this regard.

(f)    Contracts. Except as disclosed to Buyer in writing or set forth on Schedule 7.1, Schedule 5.2(i), or which are Permitted Exceptions or otherwise set forth in the Preliminary Report, Seller has not entered into, and to Seller's Knowledge (as defined below) there are no, contracts, agreements, leases, licenses, management agreements, service contracts, maintenance agreements, construction contracts, or other similar arrangements, including, without limitation, agreements with third parties related to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property that will be binding on Buyer after the Close of Escrow.

(g)    Taxes and Assessments. To Seller's Knowledge, all general real property taxes and regular assessments currently due and payable with respect to the Property have

17

been paid or will be prorated at Closing. To Seller's Knowledge, there are no pending or threatened special assessments, impact fees, or similar charges affecting the Property other than those disclosed to Buyer in writing or that are matters of public record.

(h)    <u>Litigation</u>. To Seller's Knowledge, there are no actions, suits, or proceedings pending or threatened against Seller relating solely to the Property, other than those disclosed to Buyer in writing or matters of public record.

(i)    <u>Knowledge Definition</u>. As used in this Agreement, the term "Seller's Knowledge" means the current actual (and not constructive or imputed) knowledge of LANCE MILLER, solely in his capacity as court-appointed receiver, **w**ithout any duty of inquiry or investigation, and expressly excluding the knowledge of any other person, including Seller's agents, employees, consultants, or representatives. Any disclosure required hereunder shall be deemed made if such matter is listed in the Preliminary Report.

7.2    <u>Survival</u>. The express representations and warranties made in this Article by Seller will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

**8.    <u>Buyer's Representations and Warranties</u>**. Buyer hereby warrants, represents, convents and certifies to Seller and agrees that as of the Close of Escrow:

(a)    <u>Good Standing</u>. Each of Land Buyer and Crop Buyer is a limited liability company that is properly and duly formed, validly existing and in good standing under the laws of the Delaware, registered to transact business in the State of California, and is in good standing under the laws of the State of California.

(b)    <u>Authority</u>. Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of the Buyer executing such documents and instruments herein, and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject. All documents to be executed by Buyer and delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by the Buyer executing such documents, (ii) be legal, valid and binding obligations of such Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which such Buyer is subject.

(c)     OFAC Compliance.  Buyer or its Authorized Assignee (which, for the purposes of this Section 8(c), shall include its members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)     Bankruptcy.  Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e)     Debts, Liens, and Encumbrance.  Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that directly relate to any of Buyer's activities on the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.

(f)     No Collusion; Negotiations with Third-Party Owners.  Buyer represents and warrants that (i) it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder and (ii) absent Seller's express written consent, which consent may be withheld in Seller's sole discretion, any and all discussions and negotiations by Buyer regarding a Concurrent Sale or the purchase of a Concurrent Sale Property shall be conducted through Seller and that Buyer shall have no direct or indirect communications with a Third-Party Owner regarding a Concurrent Sale or a Concurrent Sale Property.

**9.     Cultural Costs; Crop Management**. Seller shall pay all cultural costs for the 2025 crop on the Property, including related crop insurance premiums. At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Property for the 2026 crop year (the "**Cultural Costs Reimbursement**").  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business

19

day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2026 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2026 crop year. Buyer shall also have the exclusive right to direct, in writing, reasonable farming operations for the 2026 crop on the Property, and Seller shall comply with such reasonable directions so long as they are consistent with standard agricultural practices.

**10.    Closing**.

10.1    Closing Date.  Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein.  Closing shall occur on or before the Closing Date.  Closing shall be conditioned upon:

(a)    Full Performance.  Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)    Conditions.  The conditions precedent set forth in Section 6.1, 6.2, and 6.3 have been satisfied or waived by the Party for whose benefit the condition exists.

(c)    Title Policies.  Title Company shall be ready, willing, and able to issue upon the Closing and following recordation of the Deed to Land Buyer, a current ALTA Extended Coverage Policy of title insurance, at no more than the insurer's standard rates (the "**Title Policy**").  The Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Land Buyer, subject only to the lien of real property taxes for the current fiscal year not yet due and payable, those Schedule B exceptions listed in the title commitment for the Title Policy including the exceptions listed on Schedule 10.1(c) attached hereto and incorporated herein by reference  (the "**Permitted Exceptions**"), except to the extent Seller and/or Escrow Holder has agreed in writing to remove. The premium for such Title Policy shall be paid as required under Section 12.

(d)    Delivery.  Possession of the Property shall be delivered to Land Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property.

10.2    Seller's Closing Obligations.  On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)    The Deed, executed by Seller.

(b)    A bill of sale in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)    To the extent required, duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements material to the Property

20

and operations thereon that are Receivership Property and that Buyer informs the Seller in writing that Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability).

(d)    An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(e)    The Westlands PPA executed by Seller, and a notarized memorandum thereof in recordable form for Fresno County, California in the form attached hereto as **Exhibit I** (the "**PPA Memo**").

(f)    The Closing Statement (as defined below) executed by Seller.

(g)    To the extent they are then in Seller's possession, comprise Receivership Property, and not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(h)    Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(i)    Seller's California Form 593, if required.

(j)    Seller's IRS Form 1099-S if required by Escrow.

(k)    All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(l)    Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

(m)    A copy of the Sale Order entered by the Court.

10.3    <u>Buyer's Closing Obligations</u>.  On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)    The Closing Balance of the Purchase Price and Buyer's share of the Closing Costs and Prorations.

(b)    Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)    A Preliminary Change of Ownership Report in the form specified by Kern County (the "**PCOR**").

(d)    To the extent required, duplicate counterparts of the Assignment Agreement.

(e)    The Westlands PPA, executed by Crop Buyer, along with the PPA Memo, executed and notarized by Crop Buyer.

(f)    The Closing Statement (as defined below) executed by Buyer.

(g)    Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

10.4    **Escrow Holder Closing Obligations**.  The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to Section 10.2, and all of the items to be deposited by Buyer pursuant to Section 10.3, and (ii) the Title Company is prepared to issue the Title Policy in the condition required in Section 10.1(c) above.  The Escrow Holder shall close escrow by:

(a)    Recording the Deed in the Official Records of Kern County, California, and return the recorded Deed to Land Buyer with a conformed copy to Seller, and file the PCOR in Kern County, California;

(b)    Recording the PPA Memo in the Official Records of Fresno County, California, and return the recorded PPA Memo to Crop Buyer with a conformed copy to Seller;

(c)    Issuing to Land Buyer the Title Policy (within fifteen (15) days after the Closing);

(d)    Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(e)    Delivering to Buyer Seller's certification that it is not a "foreign person";

(f)    Delivering to Land Buyer the items deposited into Escrow by Seller for delivery to Land Buyer, including the Bill of Sale;

(g)    Delivering to Crop Buyer the items deposited into Escrow by Seller for delivery to Crop Buyer, if any;

(h)    If applicable, delivering to each of Land Buyer and Seller, a fully executed counterpart of the Assignment Agreement; and

(i)    Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

**11.    Like-Kind Exchange**.  Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

**12.    Closing Costs**.  All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

(a)    Buyer and Seller shall pay their respective: (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)    Seller shall pay (i) one-half of the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, and (ii) one-half of the escrow fees.

(c)    Buyer shall pay (i) one-half of the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) one-half of the escrow fees, (iii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, and (iv) premium for Land Buyer's Title Policy, and (v) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)    Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.    Prorations**.  Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1    Utility Charges.  The Parties agree that utility and water charges (other than assessments collected with real property assessments by the Kern County tax assessor) shall not be prorated in Escrow.  Seller shall be liable for all such charges incurred prior to the Closing and Buyer shall be liable for all such charges incurred after the Closing.

13.2    Other Apportionments.  Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest tax bills. Such prorations and apportionments shall be made in the manner customary in Kern County for the sale of agricultural land. If any such taxes, assessments, or charges relate to periods prior to the Close of Escrow but are billed or become due after the Close of Escrow, Seller shall remain liable for (and promptly reimburse Buyer for) the portion allocable to the period prior to the Close of Escrow. Buyer shall be responsible only for its allocable share accruing from and after the Close of Escrow.

13.3   <u>Survival</u>.   The provisions of this Section 13 shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this Section 13 must be made in writing to the other Party within three (3) months after the Closing Date.

**14.**   **<u>Risk of Loss</u>**.   Risk of physical loss to the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof.   In the event of the loss or destruction of a material part of the Property prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, both Parties may be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property, within thirty (30) days of receipt of notice and has fully paid all costs thereof and cleared any potential liens associated therewith or Buyer and Seller agree to reduce the Purchase Price by the value of the lost or destroyed portion of the Property. Seller shall have the right to assign its rights to receive the Post-Closing Payments at any time following the Closing.

**15.**   **<u>Assignment</u>**.   Buyer may assign, for estate planning purposes, or to an entity owned or controlled by Buyer, any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of such assignment at least three (3) days prior to the Close of Escrow, containing the name of the assignee ("**Authorized Assignee**") and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement.   Any other proposed assignment shall require the written consent of Seller, which may be withheld at his sole discretion.   Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee.

**16.**   **<u>Receivership Matters</u>.** Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Sellers and Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Marketing Procedures Order and Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

**17.**   **<u>Backup Bidder</u>**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the Marketing Procedures, Buyer will serve as the Back-up Bidder.   If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of (i)

forty-five (45) days following the entry of the Sale Order, or (ii) the closing of the sale to the Successful Bidder. If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement within such forty-five (45) day period, Buyer will be deemed to be the Successful Bidder and shall consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

18.     **Brokers**.  Buyer and Seller each represent and warrant to the other that, except for Capstone Capital Markets, LLC ("**Seller's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the imposition of liability for the payment of any other real estate brokerage commission, finder's fee or otherwise in connection with the transaction described herein.  Seller shall be responsible for the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith.  In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

19.     **Attorney's Fees; Pre-litigation Dispute Resolution**.  Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement.  In the event of any action between the Parties hereto which a court of competent jurisdiction determines was frivolous or brought in bad faith by the unsuccessful Party, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action.  The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

20.     **Notices**.  All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery; provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice.  All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail shall be deemed delivered three (3) business days after deposit in the United States Mails, and any notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

| If to Buyer: | | |
|---|---|---|
| | For formal notices:<br><br>Wonderful Nut Orchards LLC | With a copy to:<br><br>The Wonderful Company LLC |

| | | |
|---|---|---|
| | 6801 E. Lerdo Highway<br>Shafter, CA 93263<br>Attention: Rob C. Yraceburu, President<br>Email: rob.yraceburu@wonderful.com<br>Telephone: (661) 399-4456 | 11444 W. Olympic Blvd, 10th Floor<br>Los Angeles, CA 90064<br>Attention: Craig B. Cooper,<br>General Counsel<br>Email: legalnotices@wonderful.com<br>Telephone (310) 220-9900 |
| | For Closing related correspondence:<br><br>Wonderful Nut Orchards LLC<br>6801 E. Lerdo Highway<br>Shafter, CA 93263<br>Attention: Mike Widhalm<br>Email: mike.widhlam@wonderful.com<br>Telephone: (661) 399-4456 | With a copy to:<br><br>The Wonderful Company LLC<br>11444 W. Olympic Blvd, 10th Floor<br>Los Angeles, CA 90064<br>Attention: Alissa Mafrice<br>Email: alissa.mafrice@wonderful.com<br>Telephone (310) 966-8633 |
| If to Seller: | Lance Miller, Receiver<br>c/o Pivot Group<br>1230 Rosecrans Avenue<br>Suite 300 – PMB928<br>Manhattan Beach, CA 90266<br>Attn: Lance Miller or Matt Covington<br>Telephone:      424-363-0599<br>Email: lance.miller@pivotgrp.com and<br>matt.covington@pivotgrp.com | With a copy to:<br><br>Katten Muchin Rosenman LLP<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201-2591<br>Attn: John Mitchell and Michaela<br>Crocker<br>Telephone:      214-765-3600<br>Email: john.mitchell@katten.com and<br>michaela.crocker@katten.com<br><br>AND<br><br>Cutts Law, PC<br>5088 N. Fruit Ave, Ste 101<br>Fresno, CA 93711<br>Attn: Lisa A. Cutts<br>Telephone:      559-226-8177<br>Email: lac@cutts-law.com |

**21.    Waivers**.  Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver.  Any such waiver shall be in writing and delivered to the other Party and the Escrow Holder.  No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

22.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement.  To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Kern, California.

23.    **Business Days**.  In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed.  Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24.    **WAIVER OF JURY TRIAL**.  TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY MUTUALLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "**DISPUTE**", AND COLLECTIVELY, ANY OR ALL, THE "**DISPUTES**") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS.  THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT EACH PARTY HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

25.    **Entire Agreement**.  This Agreement and the Confidentiality and Nondisclosure Agreement entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto.  The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement.  This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged.

26.    **Pending Receivership**.  Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Properties, or otherwise.

27.    **Bidding Procedures**.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order. Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order.

28.    **Validity**.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

29.    **Facsimile Electronic Signatures**.  For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

30.    **Time**.  Time is of the essence of this Agreement.

31.    **Counterparts**.  This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

*SIGNATURES FOLLOW NEXT PAGE*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER

By: _Lance Miller_

Lance Miller, solely in his capacity as Court-appointed Receiver

Date of Execution: ___9/22/2025___

BUYER

**WONDERFUL NUT ORCHARDS LLC,**
a Delaware limited liability company

By: _Rob Yraceburu_

Name: Rob Yraceburu

Its: President

Date of Execution: ___9/22/2025___

**WP PISTACHIOS LLC,**
a Delaware limited liability company

By: _Andy Anzaldo_

Name: Andy Anzaldo

Its: Owner

Date of Execution: ___9/22/2025___

Effective Date: ___9/22/2025___

29

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

ACCEPTANCE BY ESCROW HOLDER


CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.


CHICAGO TITLE COMPANY,
a California corporation

By: _____
Name: _____
Title: _____

Escrow Number: _____

Dated: _____

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**TRACT 1:**

**PARCEL 1: APN: 047-010-01**

ALL THAT PORTION OF SECTION 2, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING WESTERLY OF THE WESTERLY RIGHT OF WAY OF THE AT&SF RAILROAD.

EXCEPTING THEREFROM 1/2 OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND AS RESERVED BY JOHN F. POOLE AND GERTRUDE REINHARD POOLE, AS JOINT TENANTS, IN DEED RECORDED MARCH 21, 1960 IN BOOK 3250, PAGE 624 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING INTEREST IN AND TO ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS IN AND UNDER SAID LAND AS RESERVED BY CORNELIUS VANDER DUSSEN, A MARRIED MAN, IN DEED RECORDED FEBRUARY 18, 1981 IN BOOK 5352, PAGE 1894 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 047-040-06**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER AND THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE SOUTH HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES OR UNDERLYING SAID LAND, AS RESERVED BY JAMES P. GEORGE, ET UX, RECORDED SEPTEMBER 4, 1980 IN BOOK 5311 PAGE 1382 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 047-040-09**

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES OR UNDERLYING SAID LAND, AS RESERVED BY CALLON PETROLEUM, A CALIFORNIA CORPORATION, IN DEED RECORDED SEPTEMBER 4, 1980 IN BOOK 5311 PAGE 1381 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 047-040-13**

THE WEST HALF OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTHERLY ONE HUNDRED ACRES OF THE WEST HALF OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, AS GRANTED TO JEAN W. COFFMAN BY DEED RECORDED FEBRUARY 27, 1970 IN BOOK 4371 PAGE 968 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL MINERALS, OIL, GAS, MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY CARL W. COFFMAN IN DEED RECORDED FEBRUARY 5, 1980 IN BOOK 5262 PAGE 1993 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 047-040-03**

THE SOUTHEAST QUARTER OF SECTION 4, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 50% IN AND TO ALL OIL, GAS AND HYDROCARBON AND ALL GAS, OIL AND OTHER HYDROCARBON RIGHTS UPON AND UNDER SAID LAND, AS RESERVED BY R. W. GROBER AND S. VIRGINIA GROBER, HIS WIFE, IN DEED DATED JUNE 25, 1952 AND RECORDED OCTOBER 27, 1952 IN BOOK 1998 PAGE 1 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 45% INTEREST IN AND TO ALL OIL, GAS AND HYDROCARBONS AND ALL GAS, OIL AND OTHER HYDROCARBON RIGHTS UPON AND UNDER SAID LAND, TOGETHER WITH ALL RIGHTS TO ENTER THEREON AND TO USE SO MUCH OF THE SURFACE THAT MAY BE REASONABLE FOR THE PURPOSE OF EXTRACTING THE SAME, AS RESERVED BY RALPH E. CARPENTER AND JAN H. CARPENTER, IN DEED RECORDED SEPTEMBER 21, 1978 IN BOOK 5141, PAGE 298 OF OFFICIAL RECORDS.

**PARCEL 6:**

AN EASEMENT FOR INGRESS AND EGRESS OVER AND ACROSS THE EAST 20 FEET OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 7: APN: 047-040-07**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE NORTH HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL MAP OR PLAT THEREOF.

**TRACT 2:**

**PARCEL 1: APN: 069-320-04**

LOTS 41 TO 48, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM ALBERT DAINI AND SYLVIA DAINI, HUSBAND AND WIFE, RECORDED MAY 16, 1956, IN BOOK 2608, PAGE 73 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 069-320-03**

LOTS 49 TO 56, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ½ OF ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM A. F. HILDING, EXECUTOR OF THE LAST WILL AND TESTAMENT OF DAVID G. BROWN, ALIAS, DECEASED, RECORDED MAY 27, 1955, IN BOOK 2431 PAGE 148 OF OFFICIAL RECORDS.

ALSO EXCEPT AN UNDIVIDED 1/4TH INTEREST IN AND TO ALL OIL, HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED IN DEED DATED DECEMBER 3, 1968, FROM HARLEY BARLING, ET AL, TO THE SUPERIOR OIL COMPANY.

ALSO EXCEPT 1/8TH OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR WHICH MAY BE PRODUCED, SAVED OR SOLD FROM SAID LAND, AS RESERVED BY THE SUPERIOR OIL COMPANY, A NEVADA CORPORATION, IN DEED RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 360 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 069-320-02**

LOTS 73 TO 80, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM E. M. ALEXANDER AND VIOLET C. ALEXANDER, HIS WIFE, RECORDED JANUARY 3, 1955, IN BOOK 2345, PAGE 155 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 069-320-01**

LOTS 81 TO 88, BOTH INCLUSIVE, OF TRACT NO. 1219 IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ½ OF ALL MINERALS, OIL AND GAS RIGHTS AS EXCEPTED IN DEED FROM RAYMOND L. KING, RECORDED JANUARY 27, 1955, IN BOOK 2359 PAGE 88 OF OFFICIAL RECORDS.

ALSO EXCEPT AN UNDIVIDED 1/4TH INTEREST IN AND TO ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED IN DEED DATED DECEMBER 3, 1968, FROM HARLEY BARLING, ET AL, TO THE SUPERIOR OIL COMPANY, RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 377 OF OFFICIAL RECORDS.

ALSO EXCEPT 1/8TH OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR WHICH MAY BE PRODUCED, SAVED OR SOLD FROM SAID LAND, AS RESERVED BY THE SUPERIOR OIL COMPANY, A NEVADA CORPORATION, IN DEED RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 360 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-310-09**

THE NORTHWEST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBONS, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN, OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205 OF OFFICIAL RECORDS.

**PARCEL 6: APN: 069-310-12**

THE SOUTHWEST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND ALL OTHER MINERALS, WHETHER SIMILAR TO THESE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION, IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205, OF OFFICIAL RECORDS.

**PARCEL 7: APN: 069-310-11**

THE SOUTHEAST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252 PAGE 205 OF OFFICIAL RECORDS, UPON THE TERMS AND PROVISIONS THEREIN CONTAINED.

**PARCEL 8: APN: 069-310-10**

THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION, IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205 OF OFFICIAL RECORDS.

**PARCEL 9: APN: 069-340-35**

THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LANDS, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

**PARCEL 10: APN: 069-340-34**

THE SOUTHWEST QUARTER OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

**PARCEL 11: APN: 069-340-23**

THAT PORTION OF THE NORTHWEST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 34; THENCE WESTERLY ALONG THE NORTH LINE OF SAID SECTION A DISTANCE OF 1160.00 FEET; THENCE SOUTHERLY PARALLEL WITH THE EAST LINE OF THE WEST HALF OF SAID SECTION, A DISTANCE OF 1502.07 FEET; THENCE EASTERLY PARALLEL WITH THE NORTH LINE OF SAID SECTION, A DISTANCE OF 1160.00 FEET; THENCE NORTHERLY ALONG THE EAST LINE OF THE WEST HALF OF SAID SECTION, A DISTANCE OF 1502.07 FEET TO THE POINT OF BEGINNING.

**PARCEL 12: APN: 069-340-24**

THE NORTH HALF OF THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THE SOUTH 12 ACRES OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION.

ALSO EXCEPT AN UNDIVIDED ONE-HALF OF ALL PETROLEUM, OIL, GAS, MINERALS, COAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TITLE INSURANCE AND TRUST COMPANY, A CORPORATION, IN THE DEED RECORDED NOVEMBER 13, 1953, IN BOOK 2149, PAGE 430 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 49% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON AS RESERVED IN DEED RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

**PARCEL 13: APN: 069-340-02**

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

THE EAST HALF OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

ALSO EXCEPTING THEREFROM 4% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON, AS RESERVED IN DEED RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM, ANY MOBILE HOME, TRAILER AND/OR MANUFACTURED HOME LOCATED THEREON.

**PARCEL 14: APN: 069-340-25**

THE SOUTH 12 ACRES OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED IN DEED OF RECORD.

**PARCEL 15: APN: 069-272-08**

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN

SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH ANY AND ALL EASEMENTS, RIGHTS OF WAY AND SERVITUDES IN, UNDER, AND UPON SAID LAND, NECESSARY OR CONVENIENT (A) TO EXPLORE, TEST, OR SURVEY SAID LAND BY GEOPHYSICAL OR OTHER METHODS, WHETHER SIMILAR TO THOSE SPECIFIED OR NOT AND WHETHER NOW KNOWN OR NOT, INCLUDING THE DRILLING OF SHALLOW HOLES THEREON, FOR THE PURPOSES OF DETERMINING SUBSURFACE GEOLOGICAL CONDITIONS UNDERLYING SAID LAND, (B) TO DRILL FOR, MINE FOR, PRODUCE, EXTRACT AND TAKE ANY OF SAID MINERALS FROM SAID LAND AND FROM ADJACENT PROPERTIES, (C) TO TREAT AND STORE ANY OF SAID MINERALS ON SAID LAND, WHETHER PRODUCED FROM SAID LAND OR FROM ADJACENT PROPERTY, (D) TO CONSTRUCT, USE, MAINTAIN, ERECT, REPLACE, CHANGE THE LOCATION OF , INCREASE THE NUMBER OF AND REMOVE IN, UNDER, ON AND FROM SAID LAND, ALL PIPE LINES, POWER LINES, TELEPHONE AND TELEGRAPH LINES, ROADS, TANKS, MACHINERY, DERRICKS, PLANTS, BUILDINGS, AND OTHER STRUCTURES AND EQUIPMENT WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DESIRE IN CARRYING ON ANY OF SAID OPERATIONS WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DEEM NECESSARY IN THE EXERCISE OF THE RIGHTS HEREIN RESERVED, (E) TO TAKE AND USE ON SAID LAND WATER APPURTENANT TO OR DEVELOPED BY GRANTOR, ITS SUCCESSORS AND ASSIGNS, ON SAID LAND, NECESSARY FOR SUCH OPERATIONS, AS RESERVED BY FULLERTON OIL COMPANY, IN DEED RECORDED MARCH 4, 1944, IN BOOK 1186, PAGE 226 OF OFFICIAL RECORDS.

**PARCEL 16A: APN: 069-280-04 (PORTION)**

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPT THEREFROM THE WEST 425 FEET OF THE SOUTH 325 FEET THEREOF.

ALSO EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951, RECORDED MARCH 5, 1951, IN BOOK 1779 PAGE 479, OF OFFICIAL RECORDS.

ALSO EXCEPT THE REMAINDER OF OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY JESSE M. BUTLER, ET UX, IN DEED TO VERYL G. BOWLES, ET UX, DATED NOVEMBER 16, 1951, RECORDED JANUARY 23, 1953, IN BOOK 2029 PAGE 335 OF OFFICIAL RECORDS.

**PARCEL 16B: APN: 069-280-04 (PORTION)**

THE WEST 425 FEET OF THE SOUTH 325 FEET OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

ALSO EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH ELIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951, RECORDED MARCH 5, 1951, IN BOOK 1779 PAGE 479, OF OFFICIAL RECORDS.

ALSO EXCEPT THE REMAINDER OF OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY JESSE M. BUTLER, ET UX, IN DEED TO VERYL G. BOWLES, ET UX, DATED NOVEMBER 16, 1951, RECORDED JANUARY 23, 1953, IN BOOK 2029 PAGE 335 OF OFFICIAL RECORDS.

**PARCEL 17: APN: 069-310-21**

THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 20, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND AS RESERVED BY L. & B. PRODUCING AND DRILLING COMPANY, INCORPORATED, IN DEED RECORDED APRIL 11, 1957, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND AS RESERVED BY BOOKLAND FARMS, A GENERAL PARTNERSHIP, IN DEED RECORDED SEPTEMBER 16, 1986, IN BOOK 5916, PAGE 94, OF OFFICIAL RECORDS.

**PARCEL 18: APN: 069-320-05**

LOTS 33 TO 40, INCLUSIVE, LOTS 57 TO 72, INCLUSIVE, AND LOTS 89 TO 96, INCLUSIVE, OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5 PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, AS EXCEPTED AND RESERVED IN THE DEED FROM PACIFIC OIL AND GAS DEVELOPMENT CORPORATION, A CORPORATION, DATED MAY 04, 1960, AND RECORDED MAY 12, 1960, IN BOOK 3266 PAGE 626 OF OFFICIAL RECORDS.

**PARCEL 19: APN: 069-330-02**

LOTS 17 THROUGH 24, INCLUSIVE, OF TRACT 1219, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP FILED JUNE 30, 1942, IN BOOK 5 PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS, OTHER HYDROCARBONS SUBSTANCES AND MINERALS LYING IN AND UNDER SAID LAND AS RESERVED BY CALLON PETROLEUM COMPANY, SUCCESSOR BY MERGER TO PACIFIC OIL AND GAS DEVELOPMENT CORPORATION, A FORMER CALIFORNIA CORPORATION IN DEED RECORDED OCTOBER 02, 1986, IN BOOK 5922, PAGE 915, INSTRUMENT NO. 042158, KERN COUNTY OFFICIAL RECORDS.

**PARCEL 20: APN: 069-340-26**

THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPT 50% OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL OTHER MINERALS AS RESERVED IN PREVIOUS DEED OF RECORD.

EXCEPTING THEREFROM 49% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON, AS RESERVED IN DEEDS RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

**PARCEL 21: APN: 087-080-46**

THE SOUTHEAST QUARTER AND THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 28 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPTING THEREFROM PARCEL 1 OF PARCEL MAP NO. 11231, RECORDED APRIL 4, 2006, IN BOOK 54 AT PAGES 178 AND 179 OF PARCEL MAPS, IN THE OFFICE OF THE KERN COUNTY RECORDER.

SAID LAND IS ALSO SHOWN AS THE "DESIGNATED REMAINDER", ON SAID PARCEL MAP NO. 11231, AND WAS APPROVED AND DESCRIBED IN THE CONDITIONAL CERTIFICATE OF COMPLIANCE NO. 2270, RECORDED APRIL 4, 2006, AS DOCUMENT NO. 0206082470, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER AND THAT MAY BE PRODUCED FROM SAID LAND AS CONVEYED TO CHARLES FLOYD WHITAKER, ET AL, BY DEED RECORDED MARCH 20, 1970, IN BOOK 4382 PAGE 528 OF OFFICIAL RECORDS AND BY DEED RECORDED MAY 7, 1962 IN BOOK 3489 PAGE 344 OF OFFICIAL RECORDS.

**PARCEL 22: APN: 069-272-05**

THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA IN THE DEED RECORDED NOVEMBER 30, 1990, IN BOOK 6459, PAGE 1035 OF OFFICIAL RECORDS, AS DOCUMENT NO. 073509, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION;

THENCE (1), ALONG THE NORTH LINE OF SAID SECTION, SOUTH 89° 09' 35" EAST, 1320.80 FEET TO THE EAST LINE OF THE WEST HALF OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE (2), ALONG SAID EAST LINE, SOUTH 1° 26' 15" WEST, 50.00 FEET TO THE SOUTH LINE OF THE NORTH 50 FEET OF SAID SECTION;

THENCE (3), ALONG SAID SOUTH LINE, NORTH 89° 09' 35" WEST, 1274.74 FEET;

THENCE (4), SOUTH 58° 59' 14" WEST, 18.95 FEET TO THE EAST LINE OF WEST 30 FEET OF SAID SECTION;

THENCE (5), ALONG THE EAST LINE OF THE WEST 30 FEET OF SAID SECTION SOUTH 1° 22' 37" WEST, 50.46 FEET;

THENCE (6), NORTH 88° 37' 23" WEST, 30.00 FEET TO THE WEST LINE OF SAID SECTION;

THENCE (7), ALONG SAID WEST LINE, NORTH 1° 22' 37" EAST, 110.18 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH ANY AND ALL EASEMENTS, RIGHTS OF WAY AND SERVITUDES IN, UNDER, AND UPON SAID LAND, NECESSARY OR CONVENIENT (A) TO EXPLORE, TEST, OR SURVEY SAID LAND BY GEOPHYSICAL OR OTHER METHODS, WHETHER SIMILAR TO THOSE SPECIFIED OR NOT AND WHETHER NOW KNOWN OR NOT, INCLUDING THE DRILLING OF SHALLOW HOLES THEREON, FOR THE PURPOSES OF DETERMINING SUBSURFACE GEOLOGICAL CONDITIONS UNDERLYING SAID LAND, (B) TO DRILL FOR, MINE FOR, PRODUCE, EXTRACT AND TAKE ANY OF SAID MINERALS FROM SAID LAND AND FROM ADJACENT

PROPERTIES, (C) TO TREAT AND STORE ANY OF SAID MINERALS ON SAID LAND, WHETHER PRODUCED FROM SAID LAND OR FROM ADJACENT PROPERTY, (D) TO CONSTRUCT, USE, MAINTAIN, ERECT, REPLACE, CHANGE THE LOCATION OF, INCREASE THE NUMBER OF AND REMOVE IN, UNDER, ON AND FROM SAID LAND, ALL PIPE LINES, POWER LINES, TELEPHONE AND TELEGRAPH LINES, ROADS, TANKS, MACHINERY, DERRICKS, PLANTS, BUILDINGS, AND OTHER STRUCTURES AND EQUIPMENT WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DESIRE IN CARRYING ON ANY OF SAID OPERATIONS WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DEEM NECESSARY IN THE EXERCISE OF THE RIGHTS HEREIN RESERVED, (E) TO TAKE AND USE ON SAID LAND WATER APPURTENANT TO OR DEVELOPED BY GRANTOR, ITS SUCCESSORS AND ASSIGNS, ON SAID LAND, NECESSARY FOR SUCH OPERATIONS, AS RESERVED BY FULLERTON OIL COMPANY, IN DEED RECORDED MARCH 4, 1944, IN BOOK 1186, PAGE 226 OF OFFICIAL RECORDS.

ALL RIGHT TO ENTER UPON THE SURFACE OR ANY PORTION TO A DEPTH OF 100 FEET FROM THE SURFACE FOR THE PURPOSE OF EXPLORING FOR, EXTRACTING, REMOVING, MINING FOR OR IN ANY WAY OBTAINING ANY MINERALS OR OTHER SUBSTANCES WAS RELINQUISHED BY DEED RECORDED NOVEMBER 30, 1990, IN BOOK 6459, PAGE 1035 OF OFFICIAL RECORDS.

## RACT 3:

## PARCEL 1: APN: 058-292-05

PARCEL A OF PARCEL MAP WAIVER NO. 5-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED AUGUST 28, 2017 AS DOCUMENT NO. 217115585 OF OFFICIAL RECORDS OF KERN COUNTY, BEING A PORTION OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE WEST HALF OF SAID NORTHWEST QUARTER.

EXCEPTING THEREFROM THE INTEREST IN THE WEST 30 FEET THEREOF AS CONVEYED TO THE COUNTY OF KERN, STATE OF CALIFORNIA, FOR THE USE AND PURPOSE OF A PUBLIC HIGHWAY BY DEED RECORDED OCTOBER 25, 1921 IN BOOK 370, PAGE 483 OF DEEDS.

ALSO EXCEPTING THEREFROM ALL OF THE MINERALS INCLUDING OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES IN OR UNDERLYING SAID PREMISES, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, AND RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME, WITH FULL POWER OF INGRESS AND EGRESS FOR THESE PURPOSES, AND RIGHT TO DO ON AND IN PROPERTY ABOVE DESCRIBED, WHATEVER MAY BE REASONABLY NECESSARY FOR FULL ENJOYMENT AND EXERCISE OF PROPERTY AND RIGHTS AS RESERVED BY ARTHUR S. CRITES AND NELLIE L. CRITES, HIS WIFE, AND CHARLES B. WEBSTER AND HAZEL E. WEBSTER, HIS WIFE, IN DEED RECORDED MARCH 4, 1962 IN BOOK 1909, PAGE 344 AS DOCUMENT NO. 10863 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 058-291-40**

PARCEL 2 OF PARCEL MAP WAIVER NO. 1-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED JULY 5, 2017 AS DOCUMENT NO. 217086341 OF OFFICIAL RECORDS OF KERN COUNTY, BEING THE NORTH HALF OF THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY REGINA M. WATROUS, ET AL, IN DEED RECORDED JULY 20, 1977, IN BOOK 5042, PAGE 50 AS DOCUMENT NO. 05579 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 058-292-23**

PARCEL 2 OF PARCEL MAP WAIVER NO. 3-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED AUGUST 16, 2017 AS DOCUMENT NO. 217107678 OF OFFICIAL RECORDS OF KERN COUNTY, BEING THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL MINERALS AND MINERAL RIGHTS OF ANY KIND AND DESCRIPTION INCLUDING, BUT NOT LIMITED TO OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBON SUBSTANCES BY WHATSOEVER NAME KNOWN WITHIN OR BENEATH THE LANDS ABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT TO DRILL, MINE, EXPLORE, PRODUCE AND REMOVE SAID MINERALS FROM, OR TO INJECT AND STORE SAID MINERALS IN, SAID LAND OR OTHER LANDS, TO WHIPSTOCK OR DIRECTIONALLY DRILL, BORE AND MINE FROM OTHER LAND INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, ADITS, TUNNELS AND SHAFTS UNDER OR BEYOND THE BOUNDARIES OF SAID LAND AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES AND TO INJECT, STORE, AND REMOVE MINERALS AND WATER NOT PRODUCED FROM SAID LAND INTO OR FROM THE SUBSURFACE OF SAID LAND AND OTHER LANDS, AS RESERVED BY GETTY OIL COMPANY IN DEED RECORDED NOVEMBER 23, 1973 IN BOOK 4813, PAGE 2220 AS DOCUMENT NO. 36888 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 058-292-09**

THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST IN THE WEST 30 FEET THEREOF AS CONVEYED TO THE COUNTY OF KERN, STATE OF CALIFORNIA, FOR THE USE AND PURPOSE OF A PUBLIC HIGHWAY BY DEED RECORDED OCTOBER 25, 1921 IN BOOK 370, PAGE 483 OF DEEDS.

ALSO EXCEPTING THEREFROM FROM THE WEST HALF THEREOF, ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY AUSTIN WALDRON AND SARAH WALDRON, HIS WIFE, IN DEED RECORDED NOVEMBER 4, 1948 IN BOOK 1529, PAGE 236 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM FROM THE EAST HALF THEREOF ALL OF THE MINERALS, INCLUDING OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES IN OR UNDERLYING SAID PREMISES, AS RESERVED BY ARTHUR S. CRITES, ET AL, IN DEED RECORDED MARCH 4, 1952 IN BOOK 1909, PAGE 342 AS DOCUMENT NO. 10862 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 059-243-03**

THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 4, TOWNSHIP 26 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES, AS CONVEYED TO FIVE POINTS PROPERTIES, A GENERAL PARTNERSHIP, IN DEED RECORDED APRIL 5, 1968 IN BOOK 4147, PAGE 731 AS DOCUMENT NO. 19760 OFFICIAL RECORDS.

**TRACT 4:**

**PARCEL 1: APN: 059-010-19**

THE SOUTHWEST QUARTER OF SECTION 10, TOWNSHIP 26 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTH 200 FEET THEREOF, AS CONVEYED TO THE COUNTY OF KERN IN THE DEEDS RECORDED FEBRUARY 1, 1963, IN BOOK 3571, PAGES 309, 310, 311, 312 & 313 OF OFFICIAL RECORDS, AS DOCUMENT NOS. 7362, 7363, 7364, 7365 & 7366.

EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL MINERALS, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY KENDALL W. KNIGHTS, TRUSTEE UNDER THE WILL OF BEVERLY BOYLE KNIGHT IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 539, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY LOUIS M. BOYLE, JR., IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 541, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY MARION E. JENKS, A MARRIED MAN, IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 542, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY JONATHAN E. BOYLE, A MARRIED MAN, IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 544, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 OF ALL OIL, GAS AND OTHER MINERALS IN THE MINERAL DEED RECORDED AUGUST 10, 2011, INSTRUMENT NO. 0211101761, OFFICIAL RECORDS.

**PARCEL 2: APN: 059-070-01**

THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 15, TOWNSHIP 26 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER SAID LAND, AS RESERVED IN DEED RECORDED OCTOBER 2, 1986 IN BOOK 5922, PAGE 915 OF OFFICIAL RECORDS OF SAID COUNTY.

**PARCEL 3: APN: 069-230-05**

THE NORTH HALF OF SECTION 26, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTHERLY 190 FEET OF SAID LAND, AS CONVEYED TO BUTTONWILLOW IMPROVEMENT DISTRICT OF SEMITROPIC WATER STORAGE DISTRICT, IN THE FINAL ORDER OF CONDEMNATION, RECORDED APRIL 3, 1975, IN BOOK 4889, PAGE 1591, OF OFFICIAL RECORDS, AS DOCUMENT NO. 22532.

ALSO EXCEPTING THEREFROM ALL OIL AND GAS IN THE LANDS SO PATENTED, AND TO IT, OR PERSONS AUTHORIZED BY IT, THE RIGHT TO PROSPECT FOR, MINE, AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509) THIS ENTRY IS MADE UNDER SECTION 29 OF THE ACT OF FEBRUARY 25, 1920 (41 STAT., 437) AND THE PATENT IS ISSUED SUBJECT TO THE RIGHTS OF PRIOR PERMITTEES OR LESSEES TO USE SO MUCH OF THE SURFACE OF SAID LANDS, AS IS REQUIRED FOR MINING OPERATIONS, WITHOUT COMPENSATION TO THE PATENTEE FOR DAMAGES RESULTING FROM PROPER MINING OPERATIONS., ALL AS RESERVED BY THE UNITED STATES OF AMERICA IN THE PATENT RECORDED MAY 9, 1928, IN BOOK 248, PAGE 117 OF OFFICIAL RECORDS, AS DOCUMENT NO. 9080.

**PARCEL 4: APN: 069-230-07**

THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

EXCEPTING THEREFROM THAT PORTION OF SAID LAND LYING WITHIN INTERSTATE 5 AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE DEED RECORDED DECEMBER 23, 1964, IN BOOK 3797 PAGE 446, OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS, HYDROCARBONS AND MINERALS IN OR UNDER SAID LAND, WITH THE RIGHT OF ENTRY UPON THE SURFACE OF SAID LAND FOR THE PURPOSE OF DEVELOPING OR PRODUCING SAME SUBJECT TO REASONABLE COMPENSATION TO GRANTEE FOR SUCH RIGHT OF ENTRY AND/OR SURFACE USE, RESERVED IN GRANT DEED RECORDED APRIL 4, 2006 AS INSTRUMENT NO. 0206081859 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-230-20**

THE NORTHWEST QUARTER AND THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THOSE TWO CERTAIN PARCELS OF LAND CONVEYED TO MILLER & LUX INC. BY DEED RECORDED DECEMBER 28, 1915, IN BOOK 304, PAGE 166, OF DEEDS, DESCRIBED AS FOLLOWS:

PARCEL A:

BEGINNING AT THE QUARTER SECTION CORNER BETWEEN SECTIONS 33 AND 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE NORTH 1° 20' EAST A DISTANCE OF 250 FEET; THENCE SOUTH 35° 30' EAST 310 FEET TO THE QUARTER SECTION LINE OF SAID SECTION 34; THENCE NORTH 89° 40' WEST 175 FEET TO THE POINT OF BEGINNING.

PARCEL B:

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE NORTH 88° 40' EAST 1,320 FEET TO 1/8TH CORNER BEING POINT OF BEGINNING; THENCE NORTH 0° 45' WEST 570 FEET; THENCE SOUTH 27° 15' EAST 635 FEET TO THE SOUTH LINE OF SECTION 34; THENCE SOUTH 88° 40' WEST 285 FEET TO POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM ALL THE OIL AND GAS IN THE LANDS SO PATENTED, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509) AS RESERVED BY THE UNITED STATES OF AMERICA IN PATENTS RECORDED MARCH 19, 1919, IN BOOK 19, PAGE 444 AND BOOK 19, PAGE 445 OF PATENTS.

**PARCEL 6: APN: 069-230-21**

THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA BY DEED RECORDED MAY 12, 1965, IN BOOK 3839, PAGE 154, OF OFFICIAL RECORDS, AS DOCUMENT NO. 25609, DESCRIBED AS FOLLOWS:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION 34, SAID NORTHEAST CORNER BEING AT COORDINATES Y=747 159.30 FEET AND X=1 529 752.10 FEET; THENCE ALONG THE EAST LINE OF SAID SECTION SOUTH 1° 12' 15" WEST 106.17 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTES 57 (NOW ROUTE 166) TO KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW VI-KER-5) NORTH 40° 46' 00" WEST 140.76 FEET TO THE NORTH LINE OF SAID SECTION; THENCE ALONG SAID NORTH LINE SOUTH 89° 43' 20" EAST 91.15 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952 IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 7: APN: 069-230-22**

THE SOUTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 1/2% INTEREST IN FEE, IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY OR RECOVERABLE THEREON AND THEREFROM, AS RESERVED IN THE DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 8: APN: 069-230-55**

THAT PORTION OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 34, LYING EASTERLY OF THE CENTERLINE OF THE EAST SIDE CANAL, IN TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED BY JOHN CORNELIUS O'BRIEN AND LAWRENCE TERRENCE O'BRIEN IN DEED RECORDED MAY 6, 1974, IN BOOK 4839, PAGE 888, OF OFFICIAL RECORDS.

**PARCEL 9: APN: 069-230-36**

ALL THAT PORTION OF SECTION 35, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 1 IN THE DEED TO THE STATE OF CALIFORNIA RECORDED MARCH 1, 1966, IN BOOK 3923, PAGE 663, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS,

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

WAYS, PIPELINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 10: APN: 086-010-03**

THE NORTH HALF OF THE SOUTHWEST QUARTER, SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER AND THE SOUTHEAST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING TO THE STATE OF CALIFORNIA ALL OIL, SHALE, COAL, PHOSPHATE, SODIUM, GOLD, SILVER AND ALL OTHER MINERAL DEPOSITS CONTAINED IN SAID LANDS (EXCEPTING ALL OIL AND GAS) AND FURTHER RESERVING TO THE STATE OF CALIFORNIA, AND PERSONS AUTHORIZED BY THE STATE, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS OF MINERALS FROM SAID LANDS (EXCEPTING ALL OIL AND GAS), AND TO OCCUPY AND USE SO MUCH OF THE SURFACE OF SAID LANDS AS MAY BE REQUIRED THEREFORE, UPON COMPLIANCE WITH THE CONDITIONS AND

SUBJECT TO THE PROVISIONS AND LIMITATIONS OF CHAPTER 5, PART I, DIVISION 6 OF THE PUBLIC RESOURCES CODE, AS PER PATENT FROM THE STATE OF CALIFORNIA RECORDED MAY 23, 1956, IN BOOK 2611 PAGE 517 OF OFFICIAL RECORDS.

EXCEPTING TO THE UNITED STATES OF AMERICA ALL OIL AND GAS IN THE LAND, AND TO IT, OR PERSONS AUTHORIZED BY IT, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509), AS PER PATENT FROM THE STATE OF CALIFORNIA, RECORDED MAY 23, 1956, IN BOOK 2611 PAGE 517 OF OFFICIAL RECORDS.

**PARCEL 11: APN: 086-010-08**

ALL THAT PORTION OF SECTION 1, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 1 IN THE DEED TO THE STATE OF CALIFORNIA RECORDED APRIL 6, 1966, IN BOOK 3934, PAGE 572, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SURF USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLELINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES, AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 12: APN: 086-010-11**

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF SAID SECTION SAID POINT BEARS NORTH 89° 22' 40" WEST 661.32 FEET FROM THE NORTHEAST CORNER OF SAID SECTION SAID NORTHEAST CORNER BEING AT COORDINATES Y=741 794.74 FEET AND X=1 534 938.55 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTE 57 (NOW ROUTE 166) TO THE KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW 06-KER-5) SOUTH 40° 46' 00" EAST 32.14 FEET; THENCE SOUTH 82° 13' 16" WEST 313.57 FEET; THENCE NORTH 71° 25' 46" WEST 226.90 FEET TO SAID NORTH LINE; THENCE ALONG SAID NORTH LINE SOUTH 89° 22' 40" EAST 504.82 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME, AS GRANTED TO ALAN B. BOWEN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFORE AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELL, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 100 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LANDS, AS EXCEPTED IN DEED FROM MILHAM FARMS, INC., RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

**PARCEL 13: APN: 086-010-18**

PARCEL B OF LOT LINE ADJUSTMENT NO. 69-98 AS PER CERTIFICATE OF COMPLIANCE RECORDED MARCH 3, 1999, AS INSTRUMENT NO. 0199030694, OF OFFICIAL RECORDS, BEING THE EAST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER AND THE EAST HALF OF THE WEST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALLAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952 IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

## PARCEL 14: APN: 086-010-19

PARCEL A OF LOT LINE ADJUSTMENT NO. 69-98 AS PER CERTIFICATE OF COMPLIANCE RECORDED MARCH 3, 1999, AS INSTRUMENT NO. 0199030694, OF OFFICIAL RECORDS, BEING THE NORTHWEST QUARTER, THE WEST HALF OF THE NORTHEAST QUARTER, AND THE WEST HALF OF THE WEST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29, OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM AN UNDIVIDED 1/2% INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE DESCRIBED PROPERTY OR RECOVERABLE THEREON AND THEREFROM, AS

RESERVED IN THE DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 15: APN: 086-020-03**

GOVERNMENT LOTS 1 AND 2 OF THE NORTHEAST QUARTER OF FRACTIONAL SECTION 3, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST HEREAFTER UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 16: APN: 086-020-10**

ALL THAT PORTION OF THE NORTH HALF OF SECTION 3, TOWNSHIP 28 SOUTH, RANGE 22 EAST MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

PARCEL 1:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SECTION 3; THENCE SOUTH 0° 32' WEST 1,319.80 FEET TO THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 3 SAID POINT BEING THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE NORTH 89° 18' EAST A DISTANCE OF 1,320.10 FEET TO THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3; THENCE SOUTH 0° 32' WEST A DISTANCE OF 1,320.0 FEET; THENCE

NORTH 89° WEST A DISTANCE OF 857.60 FEET TO A POINT ON THE CENTERLINE OF THE EAST SIDE CANAL; THENCE ALONG SAID CENTERLINE NORTH 48° 16' WEST A DISTANCE OF 432.30 FEET; THENCE NORTH 38° 27' WEST AND CONTINUING ALONG SAID CENTERLINE OF SAID CANAL TO A POINT ON THE WEST LINE OF THE NORTHEAST QUARTER OF SECTION 3; THENCE NORTH 0° 32' EAST AND ALONG SAID WEST LINE TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 3; THENCE ALONG THE NORTHERLY BOUNDARY OF SAID SECTION SOUTH 89° 45' WEST 1,069.10 FEET TO A POINT ON THE CENTERLINE OF THE EAST SIDE CANAL; THENCE ALONG SAID CENTERLINE SOUTH 25° 27' EAST 2,290.50 FEET; THENCE CONTINUING ALONG SAID CENTERLINE IN A GENERAL SOUTHEASTERLY DIRECTION TO THE WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 3; THENCE ALONG SAID WEST LINE NORTH 0° 23' EAST TO THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3; THENCE CONTINUING NORTH 0° 32' EAST A DISTANCE OF 1,319.80 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM BOTH PARCELS 1 AND 2, 83-1/3% OF ALL MINERALS, OIL, GAS, PETROLEUM AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM: HOWEVER, THE GRANTORS HEREIN, THEIR SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT SAID GRANTORS, THEIR SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS, OIL, GAS, PETROLEUM AND HYDROCARBON SUBSTANCES FROM THE HEREIN DESCRIBED LAND BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET OR MORE BELOW THE SURFACE THEREOF, AS RESERVED IN THE QUITCLAIM DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 17: APN: 086-100-28**

ALL THAT PORTION OF PARCEL 3 OF PARCEL MAP 7799, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED AUGUST 22, 1986, IN BOOK 33, PAGE 134 OF PARCEL MAPS, KERN COUNTY RECORDS, DESCRIBED AS PARCEL A IN THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 7, 1990 IN BOOK 6344, PAGE 537, OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

BEGINNING AT THE NORTHEAST CORNER OF SAID PARCEL 3 OF PARCEL MAP 7799; THENCE SOUTH 00° 44' 00" WEST ALONG THE EASTERLY LINE OF PARCEL 3 OF SAID PARCEL MAP, 3,874.95 FEET TO THE SOUTHEAST CORNER OF THE NORTH HALF OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE SOUTH 88° 39' 59" WEST ALONG THE SOUTH LINE OF SAID NORTH HALF OF THE SOUTHEAST QUARTER 1,412.76 FEET TO A POINT ON THE CENTERLINE OF EAST SIDE CANAL AS SHOWN ON SAID PARCEL MAP 7799 RECORDED IN BOOK 33, PAGE 134 OF PARCEL MAPS, KERN COUNTY RECORDS; THENCE NORTH 28° 56' 00" WEST ALONG SAID CENTERLINE 121.85 FEET; THENCE NORTH 22° 17' 00" WEST 319.20 FEET; THENCE NORTH 16° 05' 00" WEST 1,357.20 FEET; THENCE NORTH 21° 58' 00" WEST 457 FEET; THENCE NORTH 30° 18' 00" WEST 307 FEET; THENCE NORTH 34° 10' 00" WEST 202.80 FEET; THENCE DEPARTING FROM SAID CENTERLINE SOUTH 89° 29' 00" WEST 198.30 FEET; THENCE NORTH 00° 43' 00" EAST TO A POINT ON SAID CENTERLINE 279.32 FEET; THENCE NORTH 35° 04' 00" WEST 407.94 FEET; THENCE NORTH 44° 48' 00" WEST 737.50 FEET; THENCE NORTH 70° 21' 00" WEST 503.72 FEET, MORE OR LESS, TO A POINT ON THE NORTHERLY LINE OF SAID PARCEL 3; THENCE NORTH 89° 24' 00" EAST ALONG SAID NORTHERLY LINE 3,881.13 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER THAT PORTION OF SAID LAND LYING WITHIN THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, AND THE RIGHT TO REMOVE THE SAME, AS RESERVED BY F.G. DRUMM AND D.M. DRUMM, HUSBAND AND WIFE AND M.A. BARDENSTEIN, A SINGLE WOMAN, IN DEED RECORDED MARCH 17, 1952 IN BOOK 1915, PAGE 344, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THROUGH THAT PORTION OF SAID LAND LYING WITHIN THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 11, TOWNSHIP 38 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, OR THAT MAY BE PRODUCED OR SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO REMOVE AND EXTRACT THE SAME, AS RESERVED BY ETHEL B. COOPER, A MARRIED WOMAN, IN DEED RECORDED OCTOBER 13, 1965, IN BOOK 3883, PAGE 312, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THAT PORTION OF SAID LAND LYING WITHIN THE NORTH HALF OF THE NORTHEAST QUARTER; THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLELINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM, ANY MOBILE HOME, TRAILER AND/OR MANUFACTURED HOME LOCATED THEREON.

**PARCEL 18: APN: 086-110-04**

THE NORTHEAST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION, SAID NORTHEAST CORNER BEING AT COORDINATES Y=736 446.01 FEET AND X=1 540 068.83 FEET; THENCE ALONG THE EAST LINE OF SAID SECTION SOUTH 1° 41' 47" WEST 1,325.82 FEET; THENCE ALONG A LINE PARALLEL WITH AND 110 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTE 57 (NOW ROUTE 166) TO KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW VI-KER-5) NORTH 40° 46' 00" WEST 659.14 FEET; THENCE NORTH 39° 02' 54" WEST 200.09 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM SAID CENTERLINE NORTH 40° 46' 00" WEST 915.50 FEET TO THE NORTH LINE OF SAID SECTION; THENCE ALONG SAID NORTH LINE SOUTH 88° 54' 31" EAST 1,193.72 FEET TO THE POINT OF BEGINNING, AS CONVEYED TO THE STATE OF CALIFORNIA BY DEED RECORDED FEBRUARY 28, 1966, IN BOOK 3923, PAGE 302, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR WHICH MAY BE PRODUCED AND SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, AS RESERVED IN DEED FROM FRESNO-KERN COMPANY, A CORPORATION, RECORDED JUNE 15, 1966, IN BOOK 3955, PAGE 683, OF OFFICIAL RECORDS.

**PARCEL 19: APN: 086-110-09**

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THROUGH SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO REMOVE AND EXTRACT THE SAME, AS RESERVED BY MARGARET ANNE COOPER, AN UNMARRIED WOMAN, IN DEED RECORDED OCTOBER 14, 1965, IN BOOK 3884, PAGE 27, OF OFFICIAL RECORDS.

**PARCEL 20: APN: 086-110-05**

THE NORTH HALF OF THE SOUTH HALF OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 1/2 OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED THEREFROM, AS RESERVED BY GENERAL MORTGAGE COMPANY IN DEED RECORDED SEPTEMBER 13, 1961, IN BOOK 3414, PAGE 884, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 21: APN: 086-110-03**

THE SOUTH HALF OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 90% OF ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS LYING IN AND UNDER AND WHICH MAY BE PRODUCED FROM SAID LANDS AS HEREINBEFORE DESCRIBED TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO DEVELOP AND RECOVER SAME, AS RESERVED IN DEED FROM FRANK LEPPI, ET UX, RECORDED FEBRUARY 1, 1952 IN BOOK 1894, PAGE 208, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 22: APN: 086-110-01**

THE SOUTH HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 75% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY PRODUCED AND SAVED THEREFROM, AS RESERVED BY MYRTLE C. KROESEN, A WIDOW, IN DEED RECORDED FEBRUARY 29, 1952, IN BOOK 1907, PAGE 342, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 23: APN: 086-120-05**

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 24: APN: 086-120-01**

THE NORTH HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 25: APN: 087-080-25**

PARCEL 1 OF PARCEL MAP 3773, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED MAY 20, 1977, IN BOOK 18, PAGE 108 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION, AND SAND, GRAVEL AND AGGREGATES, AND PRODUCTS DERIVED THEREFROM, TOGETHER WITH, THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OR INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

CONNECTION THEREWITH, WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPE LINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES. ALL AS CONVEYED BY SOUTHERN PACIFIC COMPANY TO BRAVO OIL COMPANY, A TEXAS CORPORATION IN THE DEED RECORDED MAY 29, 1965, IN BOOK 3906, PAGE 30 OF OFFICIAL RECORDS, AS DOCUMENT NO. 70845.

**TRACT 5:**

**PARCEL 1: APN: 069-280-18-00**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 23 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 15, 1855.

EXCEPT ALL OIL AND GAS IN SAID LAND, WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME PURSUANT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914(39 STAT. 509).

ALSO EXCEPTING THEREFROM AN UNDIVIDED 50% INTEREST IN ALL OF THE OIL, GAS AND MINERALS NOW OF HEREAFTER LYING IN AND UNDER AND THAT MAY BE PRODUCED FROM, ALL OF THE ABOVE DESCRIBED REAL ESTATE, WITH THE RIGHT TO REDUCE THE SAME TO POSSESSION, AND WITH RIGHTS OF INGRESS AND EGRESS, AND ALL RIGHTS INCIDENT TO THE DEVELOPMENT, PRODUCTION, CONSERVATION AND TRANSPORTATION THEREOF, FOREVER, AS RESERVED BY JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY IN THAT CERTAIN CORPORATION GRANT DEED RECORDED NOVEMBER 14, 1988 IN BOOK 6181, PAGE 1169, DOCUMENT NO. 056183, KERN COUNTY RECORDS.

**PARCEL 2:**

THE RIGHT TO USE AND TAKE WATER FROM THAT CERTAIN WATER WELL AND PUMPING PLANT SITE DESCRIBED AS THE SOUTH 50 FEET OF THE WEST 75 FEET OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27, SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ADEQUATE TO IRRIGATE SAID PARCEL 1, TOGETHER WITH AN EASEMENT FOR PIPELINE PURPOSES WITHIN THE SOUTHERLY 25 FEET OF SAID NORTHEAST QUARTER OF SAID NORTHWEST QUARTER TO TRANSPORT WATER FROM SAID WELL TO SAID PARCEL 1, INCLUDING THE RIGHT TO USE THE EXISTING PIPE OR ANY REPLACEMENTS THEREOF LOCATED WITHIN SAID PIPELINE EASEMENT.

**PARCEL 3: APN: 069-280-16-00, 069-280-25-00**

THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

UNINCORPORATED AREA OF COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHTS OF INGRESS AND EGRESS UPON SAID LAND AT ALL TIMES FOR THE DEVELOPMENT AND PRODUCTION OF ANY OF SUCH OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES, AS RESERVED BY GRACE R. PARR IN DEED RECORDED NOVEMBER 12, 1947 IN BOOK 1430, PAGE 475 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 069-280-26-00**

THE SOUTH 1/2 OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHTS OF INGRESS AND EGRESS UPON SAID LAND AT ALL TIMES FOR THE DEVELOPMENT AND PRODUCTION OF ANY OF SUCH OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES, AS RESERVED BY GRACE E. PARR IN DEED RECORDED NOVEMBER 12, 1947 IN BOOK 1430, PAGE 475 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-280-38-00, 069-280-39-00**

THE SOUTHEAST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951 AND RECORDED MARCH 5, 1951 IN BOOK 1779, PAGE 479 OF OFFICIAL RECORDS, WHICH DEED PROVIDED AS FOLLOW: TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORING AND DEVELOPMENT THEREOF.

ALSO EXCEPT THEREFROM THE REMAINDER OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY JESSE M. BUTLER AND ESTHER M. BUTLER, HUSBAND AND WIFE, IN DEED TO D. C. CRAWFORD AND ADDIE CRAWFORD, HUSBAND AND WIFE, AS JOINT TENANTS, DATED NOVEMBER 16, 1951 AND RECORDED JANUARY 23, 1953 IN BOOK 2029, PAGE 337, WHICH DEED PROVIDED AS FOLLOWS: TOGETHER WITH THE RIGHT OF

INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT
THEREON.

**END OF DESCRIPTION**

EXHIBIT B

FORM OF MARKETING PROCEDURES ORDER

1

2

3

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., | ) No. 1:24-cv-01102-KES-SAB ) |
| | ) **[PROPOSED] ORDER (I) APPROVING BID** |
| | ) **PROCEDURES FOR THE SALE OF REAL** |
| | ) **PROPERTY; (II) APPROVING BID** |
| | ) **PROTECTIONS FOR STALKING HORSE** |
| Plaintiffs, | ) **BIDDER; AND (III) SCHEDULING THE** |
| | ) **AUCTION AND SALE HEARING** |
| v. | ) |
| | ) Related to Dkt. No. ___ |
| ACDF, LLC; ASSEMI AND SONS, INC.; | ) |
| AVILA RANCH EA, LLC; BEAR FLAG | ) Judge:        Hon. Kirk E. Sherriff |
| FARMS, LLC; C & A FARMS, LLC; | ) |
| CANTUA ORCHARDS, LLC; DA REAL | ) Action Filed:   September 16, 2024 |
| ESTATE HOLDINGS, LLC; FAVIER | ) |
| RANCH, LLC; FG2 HOLDINGS LLC; | ) |
| GRADON FARMS, LLC; GRANVILLE | ) |
| FARMS, LLC; GRANTLAND HOLDINGS | ) |
| NO. 1, LLC; GRANTLAND HOLDINGS NO. | ) |
| 2, LLC; GRANTOR REAL ESTATE | ) |
| INVESTMENTS, LLC; GVM | ) |
| INVESTMENTS, LLC; GV AG, LLC; | ) |
| LINCOLN GRANTOR FARMS, LLC; | ) |
| MARICOPA ORCHARDS, LLC; PANOCHE | ) |
| PISTACHIOS, LLC; SAGEBERRY FARMS, | ) |
| LLC; DEREK BELL; and RACHEL MARIE | ) |
| WHITE, | ) |
| | ) |
| Defendants. | ) |

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

Before the Honorable Kirk E. Sherriff, United States District Judge, is the motion [Dkt. No. ___] (the "**Bidding Procedures Motion**")[1] filed by Lance Miller (the "**Receiver**"), solely in his capacity as Court-appointed receiver in the above-captioned case, for entry of an order approving the proposed Bidding Procedures attached hereto as **Exhibit A**; approving Bid Protections in favor of the Stalking Horse Bidder; scheduling an Auction and the date and time of the Sale Hearing, along with related deadlines; and granting related relief

The Court hereby finds that:[2] (a) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (b) it has the statutory authority to enter this Order; and (C) due and proper notice of the relief requested in the Motion and the entry of this Order was given and no other or further notice is necessary other than as set forth in the Bidding Procedures. The Court further finds that:

A.    As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Hearing, including the declarations submitted by Lance Miller and Skye Root and (ii) the representations of counsel made on the record at the Hearing, the Receiver has demonstrated good, sufficient, and sound business purpose and justifications for entry of this Order, and that the Bidding Procedures are an appropriate exercise of the Receiver's business judgment, are in the best interest of the receivership estate, and are the best available method for maximizing the value of the Property.

B.    To maximize the value of the Property, it was necessary for the Receiver to induce a third-party bidder to serve as the Stalking Horse Bidder and provide Bid Protections pursuant to the terms of this Order, and the Bid Protections are reasonable and represent a sound exercise of the Receiver's business judgment.

---

[1] Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Bidding Procedures.

[2] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Hearing, if any, are incorporated herein by reference.

C.     The dates, deadlines, and notice provisions set forth in the Bidding Procedures are reasonably calculated to provide parties with notice of, and opportunity to participate in, the Auction for the Property.

D.     The Bidding Procedures Motion and the Bidding Procedures comply with all applicable statues and the local rules of this Court.

E.     Due, sufficient, and adequate notice of the relief granted herein has been given to all parties in interest.

Accordingly, it is hereby:

**ORDERED** that all objections to the Bidding Procedures Motion and entry of the Bidding Procedures, if any, are hereby overruled and the Bidding Procedures Motion is granted.

**IT IS FURTHER ORDERED** the Bidding Procedures, which are fully incorporated herein by reference, are hereby approved in all respects and shall govern all Potential Bidders and Bids, including those that may be submitted by Qualified Bidders at the Auction.

**IT IS FURTHER ORDERED** that Potential Bidders seeking to submit Bids for the Property must do so in accordance with the terms of the Bidding Procedures and this Order.

**IT IS FURTHER ORDERED** that the Receiver' designation of the Stalking Horse Bidder and award of the Bid Protections are hereby approved.

**IT IS FURTHER ORDERED** that all dates and deadlines set forth in the Bidding Procedures are hereby approved. The failure of any objecting person or entity to timely file an objection prior to the Sale Objection Deadline may be deemed a bar to the assertion at the Sale Hearing or thereafter of any objection to the relief requested by the Receiver or the consummation and performance of the sale of the Property to the Successful Bidder, including the transfer of the Property free and clear of Interests to the fullest extent permitted by law (with such Interests attaching to the cash proceeds of the sale to the same extent and with the same priority as existed immediately prior to the sale).

**IT IS FURTHER ORDERED** that all notice and service provisions set forth in the Bidding Procedures are hereby approved as adequate and reasonable.

**IT IS FURTHER ORDERED** that the failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

**IT IS FURTHER ORDERED** that the Receiver is authorized and empowered to take such steps, expend such sums, and do such other things as may be necessary to implement and effectuate the terms and requirements established and relief granted in this Order.

**IT IS FURTHER ORDERED** that the Receiver is authorized to modify the Bidding Procedures before service to parties in order to conform to the terms of this Order, including updating dates and deadlines.

**IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any disputes arising from or related to the Property, the Bidding Procedures, or the implementation or interpretation of this Order.

Dated: _____

_____
Hon. Kirk E. Sherriff
United States District Court

# Exhibit A

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone:    (312) 902-5200
Facsimile:    (312) 902-1061

John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100
Dallas, TX 75201-2591
Telephone:    (214) 765-3600
Facsimile:    (214) 765-3602

*Attorneys for the Receiver*
Lance Miller

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>ACDF, LLC; ASSEMI AND SONS, INC.; AVILA RANCH EA, LLC; BEAR FLAG FARMS, LLC; C & A FARMS, LLC; CANTUA ORCHARDS, LLC; DA REAL ESTATE HOLDINGS, LLC; FAVIER RANCH, LLC; FG2 HOLDINGS LLC; GRADON FARMS, LLC; GRANVILLE FARMS, LLC; GRANTLAND HOLDINGS NO. 1, LLC; GRANTLAND HOLDINGS NO. 2, LLC; GRANTOR REAL ESTATE INVESTMENTS, LLC; GVM INVESTMENTS, LLC; GV AG, LLC; LINCOLN GRANTOR FARMS, LLC; MARICOPA ORCHARDS, LLC; PANOCHE PISTACHIOS, LLC; SAGEBERRY FARMS, LLC; DEREK BELL; and RACHEL MARIE WHITE,<br><br>          Defendants. | No. 1:24-cv-01102-KES-SAB<br><br>**BIDDING PROCEDURES FOR THE SALE OF RECEIVERSHIP PROPERTY MARKETED BY CAPSTONE CAPITAL MARKETS, LLC (SEMITROPIC)**<br><br>Judge:        Hon. Kirk E. Sherriff<br><br>Action Filed:  September 16, 2024 |

---

[1] Designated as counsel for service pursuant to L.R. 182(c)(1).

-1-

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

On [●], 2025, the United States District Court for the Eastern District of California (the "**Court**") entered an Order [Docket No. ●] (the "**Bidding Procedures Order**"),[2] by which the Court approved the bidding procedures set forth herein (the "**Bidding Procedures**"). These Bidding Procedures establish the process by which the Receiver is authorized to conduct a public auction (the "**Auction**") for the sale of the following real property and related assets (the "**Property**"), solely to the extent they are Receivership Property, as set forth in Section 1 of asset purchase agreement attached to these Bidding Procedures as **Exhibit 2** (the "**Stalking Horse PSA**"):

      (a)    The Land;[3]

      (b)    All structures, permanent plantings, trees, whether fructus naturales or fructus industriales, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "Improvements"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State (the "Fixtures"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; all solar panels and all infrastructure related to solar panels, including mounting systems, inverters, wiring, conduits, and related equipment (but excluding all of the foregoing solar panels and infrastructure listed on Schedule 1.1(b) [to the Stalking Horse PSA]); and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3] A list of APNs that comprise the Land is attached hereto as **Exhibit 1**.

303970350

pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or otherwise used or useful to or of benefit to the use and enjoyment of the Land or that provides drainage, irrigation and/or water to the Land;

(c)     All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "Appurtenant Rights");

(d)     Subject to the rights of Ranch 24, LLC in and to the crops growing on the Ranch 24 Premises (as defined on Schedule 5.2(i) [to the Stalking Horse PSA]), all crops and farm products, whether fructus naturales or fructus industriales (emblements), from and after the 2026 crop year (the "Crops");

(e)     All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "Oil, Gas and Mineral Rights");

(f)     All surface water rights, groundwater rights, water credits, water entitlements, water expectancies, and banked water of any kind appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications, court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and

-3-

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

1    all rights in any contracts for the sale, lease, transfer, or exchange of water generated

2    from irrigation wells or otherwise associated with the Land, but specifically excepting

3    any banked water rights held by POSO CREEK WATER COMPANY, LLC, a

4    California limited liability company ("Poso Creek"), whether or not any of the

5    members for which such water is held by Poso Creek are the fee owners of the Land

6    (collectively, "Water Rights"); and

7           (g)    Any licenses or other agreements material to the Property and

8    operations thereon as listed on Schedule 1.1(g) [to the Stalking Horse PSA] that Buyer

9    would like to have assigned to it at Closing; provided that (i) such licenses or

10   agreements are Receivership Property assignable by Seller to Buyer without any

11   liability or consideration and (ii) in the event that there are any licenses or agreements

12   that are material but not Receivership Property, Seller will use commercially

13   reasonable efforts to provide partial assignments where possible (and without any

14   liability or consideration) and enter into other agreements or arrangements that are

15   reasonably satisfactory to Buyer and approved by the Court, as necessary.

16          (h)    All crops and farm products produced from 10,011.79 acres in Fresno

17   County, California (the "Westlands Property") pursuant to the terms of the Pistachio

18   Purchase Agreement attached hereto as Exhibit H (the "Westlands PPA") (the

19   "Westlands Crops").

20   Stalking Horse PSA § 1.

21   **1.    Key Dates**

22       These Bidding Procedures provide interested parties with the opportunity to qualify for and

23   participate in the Auction to be conducted by the Receiver and to submit Bids (as defined below)

24   for the Property. The Receiver with the assistance of Capstone Capital Markets LLC ("**Capstone**")

25   and Pivot Management Group, LLC ("**Pivot**") will assist interested parties in conducting their

26   respective due diligence investigations.

27       The key dates for the sale process are as follows:

28

303970350

| Event | Deadlines[4] | Estimated Date[5] |
|---|---|---|
| Deadline to Serve Court-Approved Bidding Procedures[6] | Within one (1) business day of entry of the Bidding Procedures Order | |
| Deadline to Submit Bids (the "**Bid Deadline**") | Twenty-one (21) days after entry of Bidding Procedures Order at 5:00 p.m. (Pacific Time) | |
| Deadline for the Receiver to Either (1) Notify Bidders of Status as Qualified Bidder or (2) File Notice of Cancellation of Auction and Designating Stalking Horse as Successful Bidder ("**Notice of Auction Cancellation**")[7] | Three (3) business day after the Bid Deadline | |
| **Timeline if Competing Qualified Bids Received** | | |
| Auction | Seven (7) days after the Bid Deadline, at 10:00 a.m. (Pacific Time) | |
| Deadline to File Notice of (i) Successful Bid and Backup Bid, (ii) Identity of Successful Bidder and Backup Bidder, and (iii) Proposed form of Sale | Two (2) business days following conclusion of Auction | |

---

[4] All dates/deadlines are subject to extension or adjournment as provided for herein.

[5] The Estimated Date is given to help place the Deadlines into context. Actual dates will be calculated based on the column titled "Deadlines."

[6] A copy of the Court-approved Bidding Procedures will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property, and (d) the service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

[7] The Notice of Auction Cancellation, if applicable, will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property and (d) the master service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

| Event | Deadlines[4] | Estimated Date[5] |
|---|---|---|
| Order (the "**Notice of Successful Bidder**")[8] | | |
| Deadline to File Objections to Sale (the "**Sale Objection Deadline**") | Seven (7) days after filing of Notice of Successful Bidder | |
| Reply Deadline | Nine (9) days after the Sale Objection Deadline | |
| Sale Hearing, if Auction Held | | Monday December 1, 2025, at 1:30 p.m. (Pacific Time) |
| **Timeline if Notice of Auction Cancellation Filed** | | |
| Deadline to File Objections to Sale to the Stalking Horse Bidder if Notice of Cancellation of Auction Filed (the "**Sale Objection Deadline**") | Five (5) days after filing of Notice of Cancellation of Auction | |
| Reply Deadline | Three (3) days after the Sale Objection Deadline | |
| Sale Hearing if Notice of Cancellation of Auction Filed | | Monday November 17, 2025, at 1:30 p.m. (Pacific Time) |

**2.    Consultation Parties.**

(a)    Except as set forth in Section 2(b) below, the "**Consultation Parties**" referred to herein consist of the following entities, solely with respect to parcels subject to their respective liens or owner interests:

i.      Plaintiffs;

---

[8] The Notice of Successful Bidder, if applicable, will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property and (d) the master service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of a copy of the Notice of Successful Bidder or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service of sale-related pleadings**.

ii.     Farming Defendants (as defined in the Receivership Order); and

iii.    Any other person or entity that is participating in the sale process with respect to the Property in accordance with ¶ 2(d) of the Capstone Engagement Letter [Docket No. 157-2] and as agreed to by Receiver.

(b)     If any of the persons or entities listed in paragraph 2(a), above, submits a Bid, such person shall no longer be a Consultation Party for purposes of these Bidding Procedures.

**3.     Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "**Potential Bidder**") must deliver or have previously delivered to the Receiver the following documents:

(a)     an executed non-disclosure agreement (an "**NDA**") on terms acceptable to the Receiver;

(b)     identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

(c)     proof of an ability to close the proposed transaction in form and substance acceptable to the Receiver in his business judgment and in consultation with the Consultation Parties.

**4.     Provisions Governing Joint Bid Discussions.**

If a Potential Bidder is interested in engaging in discussions with a third party concerning a potential joint Bid ("**Joint Bid**") for the purchase of the Property, such Potential Bidder shall, prior to engaging in such discussions, (a) complete and submit a form to be supplied by Capstone requesting the Receiver's consent to engage in such discussions and identifying the third party(ies), and (b) receive the Receiver's written consent to engage in such discussions (the "**Joint Bid Discussion Protocol**").

**5.     No Collusion**

All bidders, including Potential Bidders and Qualified Bidders (defined below), are expressly prohibited from directly or indirectly colluding or taking any other action in restraint of free competitive bidding in connection with the sale process.

-7-

303970350

**6.    Qualified Bidders**

(a)    A "**Qualified Bidder**" is a Potential Bidder who satisfies these Bidding Procedures and whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale, whose Bid  is a Qualified Bid, and that the Receiver determines should be considered a Qualified Bidder, in consultation with the Consultation Parties. No later three (3) business days after the Bid Deadline, the Receiver will notify each Potential Bidder in writing (email being sufficient) whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid (unless a Consultation Party is a Qualified Bidder or participates in a Qualified Bid).

(b)    If the Receiver in his discretion determines any Potential Bidder not to be a Qualified Bidder, the Receiver will refund such Qualified Bidder's Deposit (defined below) on or within five (5) business days after the Bid Deadline.

(c)    Without the written consent of the Receiver, a Qualified Bidder may not modify or amend its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**7.    Due Diligence**

Only Potential Bidders whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale shall be eligible to receive due diligence information and access to the Receiver's electronic data room and additional non-public information regarding the Property. No Potential Bidder will be permitted to conduct due diligence without signing an NDA in a form acceptable to the Receiver. The Receiver will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders, the due diligence

-8-

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

period will end on the Bid Deadline. The Receiver shall have no obligation to furnish any due diligence information after the Bid Deadline. Neither the Receiver nor his professionals make any representations as to the completeness or accuracy of information provided to Potential Bidders in relation to the sale of the Property.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Receiver or his advisors regarding the ability of the Potential Bidder to consummate a sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Receiver to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

All due diligence requests should be directed to Capstone Capital Markets, LLC, Attn: Arnav Virmani (avirmani@capstonepartners.com) and Hunter Costello (hcostello@capstonepartners.com).

**8.    Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of the Property (each, a "**Bid**") by a bidder that is submitted in writing and satisfies each of the following requirements (the "**Bid Requirements**") as determined by the Receiver, in his discretion and in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**":

(a)    <u>Identity</u>: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Receiver's advisors should contact regarding such Bid.

(b)    <u>Purchase Price</u>. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for the Property (the "**Purchase Price**"), which must be a minimum of **$69,451,881**.[9]

---

[9] Calculated as follows: $66,943,574 (Stalking Horse Bid) + $2,008,307 (Bid Protections) + $500,000 (Minimum Overbid).

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

(c)    <u>Deposit</u>. On or before the Bid Deadline, each Bid must be accompanied by a deposit in the amount equal to 10 percent (10%) of the aggregate cash Purchase Price of the Bid, to be held together with other bidders' cash deposits in a non-interest-bearing account to be established by the Receiver or Pivot (the "**Deposit**").

(d)    <u>Assumption of Obligations</u>. Each Bid must clearly state which liabilities the Bidder agrees to assume, if any.

(e)    <u>Qualified Bid Documents</u>. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid, as well as all other material documents integral to such Bid (the "**Qualified Bid Documents**"). Such documents must be based on and marked against form documents provided by the Receiver (including a summary of each Bid as may be reasonably requested by the Receiver). Any modifications to the form of documents provided by the Receiver must be in form and substance acceptable to the Receiver, in consultation with the Consultation Parties, to be considered Qualified Bid Documents.

(f)    <u>No Material Modifications to Stalking Horse PSA</u>. Each Bid must be on the form asset purchase agreement attached hereto as **Exhibit 2** and include all material terms in the Stalking Horse PSA, including the following:

    1.    <u>Property</u>: The Bid must be for all Property, unless otherwise agreed to in writing by the Receiver in his sole discretion, in consultation with the Consultation Parties.

    2.    <u>No Representations and Warranties by the Receiver</u>: The sale will be "as is" and "with all faults," without representations or warranties, and without recourse. Each Bidder will represent that it has relied solely on its independent diligence, and not on any representations of the Receiver or his agents, in formulating and submitting its Bid.

    3.    <u>Free and Clear</u>: The sale will be free and clear of liens, claims and encumbrances, other than easements, rights of way and other encumbrances running with the land, (the "**Interests**") to the fullest extent permitted by applicable law.

(g)    <u>Committed Financing</u>. To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must

-10-

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Receiver that demonstrates that the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Receiver.

(h)    Contingencies. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

(i)    Time Frame for Closing. Closing must occur within seven (7) days of the Sale Order becoming a final, non-appealable order, unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties.

(j)    Binding and Irrevocable. A Qualified Bidder's Bid shall be binding and irrevocable unless and until the Receiver accepts a higher Bid for the Property and such Qualified Bidder is not selected as the Backup Bidder.

(k)    Expenses and Disclaimer of Fees. Apart from the Qualified Bid submitted by the Stalking Horse Bidder, each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, with the exception of the Stalking Horse Bidder, no Qualified Bidder will be permitted to request, nor be granted by the Receiver, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis.

(l)    Authorization. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Receiver) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(m)    Completed Diligence. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due

-11-

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

1   diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own

2   independent review, investigation, and/or inspection of any documents and/or the Property in

3   making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises,

4   warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise,

5   regarding the Property or the completeness of any information provided in connection therewith or

6   the Auction, except as expressly stated in the Bidder's Bid.

7          (n)    Adherence to Bidding Procedures. By submitting its Bid, each Bidder shall be deemed

8   to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit

9   a Bid not in conformity with these Bidding Procedures or seek to reopen the Auction after

10  conclusion of the Auction.

11         (o)    Regulatory Approvals and Covenants. A Bid must set forth each regulatory approval

12  required for the Bidder to consummate the sale, if any, and the time period within which the Bidder

13  expects to receive such regulatory approvals.

14         (p)    Consent to Jurisdiction. Each Qualified Bidder shall be deemed to have submitted to

15  the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes

16  relating to the Receiver's qualification of bids, the Auction, the construction and enforcement of

17  these Bidding Procedures, the sale documents, and the Closing, as applicable.

18         (q)    Joint Bids. Joint Bids are permitted, provided that the Qualified Bidders have

19  complied with the Joint Bid Discussion Protocol.

20         (r)    Bid Deadline. Each Bid must be transmitted via email (in .pdf or similar format) so as

21  to be actually received on or before twenty one (21) days after entry of thee Bidding Procedures

22  Order at 5:00 p.m. (Pacific Time) (the "**Bid Deadline**")  by: (a) Counsel to the Receiver: Katten

23  Muchin Rosenman LLP, Attn: John Mitchell (john.mitchell@katten.com) and Michaela Crocker

24  (michaela.crocker@katten.com); (b) the Receiver's investment banker, Capstone Capital Markets,

25  LLC,    Attn:    Skye    Root    (sroot@capstonepartners.com),    Arnav    Virmani

26  (avirmani@capstonepartners.com), and Hunter Costello (hcostello@capstonepartners.com); and (c)

27  Counsel for Plaintiffs: Seyfarth Shaw LLP, Attn: Jason DeJonker (JDeJonker@seyfarth.com) and

28  Nicholas Marcus (nmarcus@seyfarth.com).

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

**9.    Auction**

If the Receiver receives more than one Qualified Bid for the Property, he will conduct the Auction to determine the Successful Bidder.

No later than the commencement of the Auction, the Receiver shall notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Property, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, as applicable (the "**Baseline Bid**"). The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Receiver reasonably deems, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid, including, but not limited to: (a) the amount and nature of the total consideration payable to the Receiver; (b) the likelihood of the Qualified Bidder's ability to close the sale and the timing thereof; and (c) the net economic effect of the value to be received by the Receiver from the transaction contemplated by the Qualified Bid Documents, including in light of the effect of any Bid Protections (collectively, the "**Bid Assessment Criteria**").

The Auction shall take place seven (7) days after the Bid Deadline at 10:00 a.m. (PT), or such later date and time, and by such other means, as selected by the Receiver in consultation with the Consultation Parties. The Auction shall be conducted in a timely fashion according to these Bidding Procedures, and the Receiver shall maintain a written or recorded transcript of the Auction. Remote participation by Qualified Bidders at the Auction will be permitted in the Receiver's discretion.

(a)    **The Receiver Shall Conduct the Auction.**

The Receiver and his professionals shall direct and preside over the Auction. At the start of the Auction, the Receiver or his professionals shall describe the terms of the Baseline Bid. All incremental Bids made thereafter for the Property shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Receiver shall maintain a written or recorded transcript of the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

-13-

Only (i) Qualified Bidders and their legal and financial advisors and (ii) the members of, and advisors to, the Consultation Parties shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person or via Zoom and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction.  The Receiver may allow other parties to attend the Auction in his discretion.

(b)    **Terms of Overbid.**

"**Overbid**" means any Bid made at the Auction by a Qualified Bidder after the Receiver's announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

i.    *Minimum Initial Overbid*. The first overbid at the Auction (the "**Minimum Initial Overbid**") shall be in an amount not less than **$69,451,881** which is comprised of: (i) the purchase price set forth in the Stalking Horse PSA ($66,943,574.00) plus (ii) the Bid Protections ($2,008,307.00)  plus (iii) $500,000 (the "**Initial Overbid Amount**").

ii.    *Minimum Overbid Increment*. Any Overbid following the Minimum Initial Overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Property shall be in increments of $500,000.  The Receiver may establish different overbid increments at the Auction, as determined by the Receiver in the exercise of his business judgment, in consultation with the Consultation Parties.

iii.    *Conclusion of Each Overbid Round*. Upon the solicitation of each round of Overbids, the Receiver may announce a deadline (as he may, in his business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Receiver.

Subsequent to each Overbid Round Deadline, the Receiver shall announce whether he has identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Receiver as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Receiver shall describe to all Qualified Bidders the material terms of any new Overbid designated by him as the Prevailing

-14-

1    Highest Bid as well as the value attributable by the Receiver (after consultation with the

2    Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid

3    Assessment Criteria.

4         iv.    *Overbid Alterations*. An applicable Overbid may contain alterations,

5    modifications, additions, or deletions of any terms of the Bid no less favorable than any prior

6    Bid or Overbid, as determined in the Receiver's reasonable business judgment, in

7    consultation with the Consultation Parties, but shall otherwise comply with the terms of these

8    Bidding Procedures.

9    (c)    **Consideration of Overbids.**

10    The Receiver reserves the right, in his reasonable business judgment and in consultation

11    with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (i)

12    facilitate discussions between the Receiver and Qualified Bidders; (ii) allow Qualified Bidders to

13    consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide

14    the Receiver with such additional evidence as the Receiver, in his reasonable business judgment,

15    may require, that the Qualified Bidder has sufficient internal resources or has received sufficient

16    non-contingent debt and/or equity funding commitments to consummate the proposed transaction

17    at the prevailing Overbid amount.

18    (d)    **Closing the Auction.**

19         i.    The Auction shall continue until there is only one Qualified Bid that the

20    Receiver determines, in his reasonable business judgment, and in consultation with the

21    Consultation Parties, to be the highest or otherwise best Bid for the Property. Such Qualified

22    Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful**

23    **Bidder**" and at which point the Auction will be closed as to the Property. The Auction shall

24    not close unless and until all Qualified Bidders have been given a reasonable opportunity to

25    submit an Overbid at the Auction to the then-Prevailing Highest Bid. The Receiver's

26    acceptance of the Successful Bid is conditioned upon Court approval at the Sale Hearing.

27

28

-15-

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

ii.    The Receiver shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

iii.    No later than two (2) business days after the Auction, the Receiver shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid (defined below) to be filed with the Court.

(e)    **No Collusion; Good Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Qualified Bid is a good-faith bona fide offer, and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(f)    **Cancellation of Auction.**

If the Receiver does not receive by the Bid Deadline a Qualified Bid other than that submitted by the Stalking Horse Bidder, then the Receiver may file a notice cancelling the Auction and designating such bid as the Successful Bid.

**10.    Backup Bidder**

The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the "**Backup Bid**") for the Property at the Auction, as determined by the Receiver in the exercise of his business judgment and in consultation with the Consultation Parties, as applicable, shall be required to serve as a backup bidder (the "**Backup Bidder**"). The Receiver shall announce the identity of any Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder at the conclusion of the Auction at the same time the Receiver announces the identity of the Successful Bidder. Unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties, the Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the Successful Bidder. The Backup Bidder's Deposit shall be held by the Receiver until the closing of the transaction with the Successful Bidder. If the Successful Bidder fails to consummate its Successful Bid, the Receiver may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder

303970350

for all purposes. The Receiver will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Receiver, and the Receiver specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

**11.    Reservation of Rights.**

The Receiver reserves the right to modify these Bidding Procedures in his reasonable business judgment, and in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids.

**12.    Sale Hearing.**

(a)    **Sale Hearing if Competing Qualified Bids Received**

If Competing Qualified Bids are received and an Auction held, the hearing to approve the sale (the "**Sale Hearing**") shall take place in the courtroom of the Honorable Kirk E. Sherriff in the United States District Court for the Eastern District of California, Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, Courtroom 6, 7th Floor, Fresno, California on **December 1, 2025, at 1:30 p.m. (PT)**. Following the conclusion of the Auction, with the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

(b)    **Sale Hearing if Notice of Auction Cancellation Filed**

If the Auction is cancelled, the hearing to approve the sale (the "**Sale Hearing**") shall take place in the courtroom of the Honorable Kirk E. Sherriff in the United States District Court for the

-17-

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

Eastern District of California, Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, Courtroom 6, 7th Floor, Fresno, California on **November 17, 2025, at 1:30 p.m. (PT)**. With the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

**13.    Return of Deposit.**

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the property at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Receiver in his sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Receiver will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Receiver as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Receiver, and the Receiver shall be free to consummate the proposed transaction with the Backup Bidder without the need for an additional hearing or order of the Court.

Dated: [_____], 2025

303970350

## EXHIBIT 1 TO BIDDING PROCEDURES

### List of APNs

| Ranch | APNs | Acres |
|---|---|---|
| Ana Belle West | 047-040-08-00-7 | 10.0 |
| Ana Belle West | 047-010-01-01-6 | 438.3 |
| Ana Belle West | 047-040-03-01-1 | 160.0 |
| Ana Belle West | 047-040-06-00-1 | 55.0 |
| Ana Belle West | 047-040-07-00-4 | 15.0 |
| Ana Belle West | 047-040-09-00-0 | 80.0 |
| Ana Belle West | 047-040-13-00-1 | 220.2 |
| Gooselake | 069-230-05-01-2 | 297.0 |
| Gooselake | 069-230-07-00-9 | 159.6 |
| Gooselake | 069-230-20-00-6 | 240.0 |
| Gooselake | 069-230-21-01-8 | 159.9 |
| Gooselake | 069-230-22-01-1 | 160.0 |
| Gooselake | 069-230-36-00-3 | 269.1 |
| Gooselake | 069-230-55-00-8 | 44.6 |
| Gooselake | 086-010-03-00-8 | 278.7 |
| Gooselake | 086-010-08-00-3 | 185.2 |
| Gooselake | 086-010-11-00-1 | 0.4 |
| Gooselake | 086-010-18-00-2 | 52.0 |
| Gooselake | 086-010-19-00-5 | 258.7 |
| Gooselake | 086-020-03-00-1 | 120.0 |
| Gooselake | 086-020-10-00-1 | 56.2 |
| Gooselake | 086-100-28-00-7 | 201.8 |
| Gooselake | 086-110-01-01-0 | 20.0 |
| Gooselake | 086-110-03-01-6 | 80.0 |
| Gooselake | 086-110-04-00-0 | 141.9 |
| Gooselake | 086-110-05-01-2 | 160.0 |
| Gooselake | 086-110-09-00-5 | 40.0 |
| Gooselake | 086-120-01-00-4 | 5.0 |
| Gooselake | 086-120-05-00-6 | 1.3 |
| Gooselake | 087-080-25-00-0 | 90.7 |
| Kyte | 059-010-19-00-7 | 144.2 |
| Kyte | 059-070-01-00-2 | 79.1 |
| Ludy | 059-243-03-00-8 | 79.1 |

-19-

**EXHIBIT 1 TO BIDDING PROCEDURES**

List of APNs (Continued)

| Ranch | APNs | Acres |
|---|---|---|
| McCombs Ranch | 058-292-05-00-5 | 78.2 |
| McCombs Ranch | 058-291-40-00-9 | 80.3 |
| McCombs Ranch | 058-292-09-00-7 | 156.4 |
| McCombs Ranch | 058-292-23-00-7 | 159.1 |
| Jackson | 069-280-04-00-5 | 39.1 |
| Jackson | 069-280-16-00-0 | 40.0 |
| Jackson | 069-280-18-00-6 | 38.2 |
| Jackson | 069-280-25-00-6 | 38.2 |
| Jackson | 069-280-26-00-9 | 79.1 |
| Jackson | 069-280-38-00-4 | 77.3 |
| Jackson | 069-280-39-00-7 | 79.1 |
| Jackson | 069-310-09-00-8 | 158.2 |
| Jackson | 069-310-10-00-0 | 160.0 |
| Jackson | 069-310-11-00-3 | 158.2 |
| Jackson | 069-310-12-00-6 | 155.9 |
| Kimberlina | 069-340-02-02-4 | 314.5 |
| Kimberlina | 069-340-23-00-7 | 40.0 |
| Kimberlina | 069-340-24-00-0 | 105.4 |
| Kimberlina | 069-340-25-00-3 | 11.4 |
| Kimberlina | 069-340-26-00-6 | 41.4 |
| Kimberlina | 069-340-34-01-8 | 160.0 |
| Kimberlina | 069-340-35-01-1 | 158.2 |
| Lerdo | 087-080-46-00-1 | 211.2 |
| McCoy | 069-272-05-00-9 | 76.7 |
| McCoy | 069-272-08-00-8 | 40.0 |
| West Jackson | 069-310-21-00-2 | 40.0 |
| West Jackson | 069-320-01-00-7 | 19.5 |
| West Jackson | 069-320-02-01-9 | 19.5 |
| West Jackson | 069-320-03-00-3 | 19.5 |
| West Jackson | 069-320-04-01-5 | 19.6 |
| West Jackson | 069-320-05-01-8 | 80.0 |
| West Jackson | 069-330-02-00-3 | 20.0 |
| Total Acres | | 7176.7 |

# **EXHIBIT 2 TO BIDDING PROCEDURES**

## Stalking Horse PSA

(see attached)

303970350

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

EXHIBIT C

FORM OF SALE ORDER

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

1   Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com

2   **KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.

3   Chicago, IL 60661-3693
Telephone:   (312) 902-5200

4   Facsimile:   (312) 902-1061

5   John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)

6   **KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100

7   Dallas, TX 75201-2591
Telephone:   (214) 765-3600

8   Facsimile:   (214) 765-3602

9   *Attorneys for the Receiver*
Lance Miller

10

11              **UNITED STATES DISTRICT COURT**

12             **EASTERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., | ) No. 1:24-cv-01102-KES-SAB )<br>) **[PROPOSED] ORDER (I)** |
| Plaintiffs, | ) **AUTHORIZING SALE OF REAL** )  **ESTATE FREE AND CLEAR OF** |
| v. | ) **INTERESTS; (II) AUTHORIZING** )  **THE PAYMENT OF SALE-** |
| ACDF, LLC, et al. | ) **RELATED COSTS; AND (III)** )  **GRANTING RELATED RELIEF** |
| Defendants. | )<br>) [Related to Dkt. No. ___] |

---

[1]   Designated as counsel for service pursuant to L.R. 182(c)(1).

Before the Honorable Kirk E. Sherriff, United States District Judge, is the *Notice of Proposed Auction and Sale of Real Property* [Dkt. No. ___] (the "**Sale Notice**") filed by Lance Miller, solely in his capacity as Court-appointed receiver in the above-captioned case (the "**Receiver**") for entry of an order (a) authorizing the Receiver to sell the Property[2] free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as existed immediately prior to the Closing Date; (b) authorizing the Receiver to pay, without further order of the Court, all sale-related costs and expenses, including break-up fees (if applicable), commissions, and transaction fees (but excluding the Receiver's attorneys' fees); and (c) granting related relief. The Court hereby finds that:[3] (a) the marketing and sale of the Property was held in accordance with the order establishing auction and bid procedures [Dkt. ___] (the "**Bidding Procedures Order**"); (b) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (c) it has the statutory authority to enter this Order, including pursuant to 28 U.S.C. § 2001 and Rule 55 of the Federal Rules of Civil Procedure; and (d) due and proper notice of the Sale Notice was given and no other or further notice is necessary. The Court further finds that:

A.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Rule 54(b) of the Federal Rules of Civil Procedures, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

B.    The Court entered the Bidding Procedures Order on October ___, 2025, that, among other things, established the procedures in connection with the marketing, auction, and sale of the Property (the "**Bidding Procedures**") and granted related relief.

---

[2] Capitalized terms used herein shall have the meanings ascribed in the Purchase and Sale Agreement attached hereto as **Exhibit A** (the "**PSA**")

[3] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Sale Hearing are incorporated herein by reference.

C.     As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Sale Hearing, including the declarations submitted by Lance Miller and Sky Roote and (ii) the representations of counsel made on the record at the Sale Hearing, all aspects of the sale process, including notice thereof, have been conducted in compliance with the Bidding Procedures and Bidding Procedures Order.

D.     In compliance with the Bidding Procedure Order, the Receiver published notice of the Auction and proposed sale in the following publications: the Hartford Sentinel (Kings County), Fresno Business Journals (Fresno County), and Bakersfield Californian (Kern Count) at least one time per week for four weeks.

E.     The Receiver has demonstrated good, sufficient, and sound business purpose and justifications for the sale and other transactions contemplated in the PSA, and such actions are an appropriate exercise of the Receiver's business judgment and in the best interest of the receivership estate.

F.      The Receiver conducted the marketing and auction process in accordance with the order appointing the Receiver in this case (as amended, the "**Receivership Order**"), the Bidding Procedures, and the Bidding Procedures Order.  The marketing and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property, and Receiver afforded potential purchasers a full and fair opportunity to make higher and better offers for the Property.

G.     The Receiver conducted the sale process for the Property without engaging in any collusion and in accordance with the Bidding Procedure and the Bidding Procedures Order. Following the Bid Deadline, the Receiver determined in the sound exercise of his business judgment, in consultation with Plaintiffs, that [_____] ("**Buyer**") submitted the highest or otherwise best offer for the Property.

H.     The Receiver and Buyer have acted at arm's length and in good faith with respect to the proposed sale, and the Purchase Price represents the highest or otherwise best offer for the Property. The Receiver's determination that the PSA executed by Buyer constitutes the highest and

best offer for the Property constitutes a valid and sound exercise of the Receiver's business judgment.

I.      The purchase price for the Property constitutes (i) reasonably equivalent value under the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

J.      Except as expressly set forth in the PSA, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Defendants, or otherwise related to the Property, by reason of the transfer of the Property to the Buyer. The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the PSA.

K.      Pursuant to this Order and the Receivership Order, the Receiver has full power and authority to execute, deliver, and perform the obligations under the PSA and all other documents and transactions contemplated thereby and no consents or approvals, other than those expressly provided for herein or in the PSA, are required for the Receiver to consummate the sale transaction. As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Defendants and the Receiver in and to the Property free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the PSA.

L.      Sale of the Property other than free and clear of Interests, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Property. In addition, Plaintiffs have consented to the sale of the Property free and clear of their respective Interests. Other holders of Interests, if any, who did not object, or who withdrew their objections, to the Sale Notice are deemed to have consented. Therefore, approving of the PSA and the consummation of the sale of the Property free and clear of Interests is appropriate under 28 U.S.C. § 2001, the Receivership Order and the interests of equity, and is in the best interests of the Receivership estate, creditors, and other parties in interest.

…
DocuSign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

M.    Buyer is the designated Successful Bidder and the Buyer's PSA is designated as the Successful Bid in accordance with the Bidding Procedures.

**N.    [_____ (the "Back-up Bidder") is designated as the Back-up Bidder and Back-up Bidder's purchase and sale agreement (the "Back-up PSA"), which is attached hereto as Exhibit B, is designated as the Back-up Bid. The Back-up Bidder has compiled in all respect with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Back-up PSA.]**

O.    The Receiver's (i) publication of notice of the opportunity to purchase the Property, the Bidding Procedures, and solicitation of bids for the Property as set forth above, (ii) solicitation of bids for the Property through the Receiver's and his professionals' efforts to market the Property, and (iii) conduct of the Auction in Fresno, California, establish the Receiver's satisfaction of the public sale requirements in 28 U.S.C. §§ 2001 and 2002. To the extent the Receiver has not fully satisfied the provisions of 28 U.S.C. §§ 2001 and 2002, he is excused from compliance for cause shown.

Accordingly, it is hereby:

**ORDERED** that the Receiver's request to sell the Property is granted as set forth herein and all objections to the Sale Notice, to the extent not resolved or withdrawn on the record, are overruled on the merits. All persons and entities who received notice of the Sale Notice and/or the Sale Hearing that failed to timely object thereto as deemed to have consented to the relief sought in the Motion and set forth in this Order;

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into and consummate the transactions set forth in the PSA with Buyer or its assignee as the Successful Bidder in accordance with the Bidding Procedures Order **[or, to the extent Buyer is unwilling or unable to close under the PSA, to Back-up Bidder pursuant to the Back-up Bidder PSA]**. The Receiver is authorized to act on behalf of Defendants in connection with the sale and conveyance of title to the Property to Buyer and no other consents or approvals are necessary or required for the Receiver to carry out the sale and conveyance. All persons and entities are hereby prohibited and enjoined

from taking any action that would adversely affect or interfere with the ability of the Receiver to sell and transfer the Property in accordance with the terms of this Order or the PSA.

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property pursuant to the terms of the PSA;

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property to Buyer free and clear of Interests, with such Interests attaching to the Sale Proceeds with the same force and in the same priority as existed immediately prior to the Closing Date;

**IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court order, all sale-related costs and expenses, including closing costs, real estate taxes, title insurance, prorations, recording fees, and commissions (but specifically excluding attorneys' fees), with the net proceeds payable to Plaintiffs in partial satisfaction of their liens.

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into any documents reasonably necessary or desirable to implement the terms of this Order and effectuate the sale of the Property and to take all further actions as may reasonably be requested by Buyer for the purposes of assigning, transferring, granting and conveying to the Buyer, as may be necessary or appropriate to the performance of the Receiver's obligations hereunder. The Receiver is also authorized to execute any documents on behalf of the Defendants to the extent necessary to complete;

**IT IS FURTHER ORDERED** that Property shall be transferred on an "AS IS," "WHERE, IS," and "WITH ALL FAULTS" basis. All sale documents shall provide language substantially similar to the following: "Buyer acknowledges and agrees that Buyer is purchasing the Property 'as-is', 'where-is', and 'with all faults' as of the Closing Date, and Buyer further acknowledges and agrees that Seller hereby expressly disclaims any and all implied warranties concerning the condition, value and quality of the Property and any portions thereof, including, but not limited to, the implied warranties of habitability, merchantability, or fitness for a particular purpose. Buyer acknowledges that no warranty has arisen through trade, custom or course of dealing with Seller;"

**IT IS FURTHER ORDERED** that the holders of any Interests in the Property shall be prohibited from pursuing or asserting such Interests against Buyer, any of its assets, property, successors or assigns, or the Property.

1    **IT IS FURTHER ORDERED** that, except with prior leave of this Court, all persons or

2    entities with notice of this Order are prohibited from (i) commencing, prosecuting, continuing or

3    enforcing any action against the Receiver related to the Property or the Sale Proceeds (except that

4    such actions may be filed, but not prosecuted, to toll any statute of limitations), (ii) taking any action

5    to interfere with the Receiver's management, control or possession of the Property or the Sale

6    Proceeds, or (c) interfering in any manner with the exclusive jurisdiction of this Court over the

7    Property or the Sale Proceeds.

8    **IT IS FURTHER ORDERED** that, on and after the Closing Date, any persons holding an

9    Interest shall execute such documents and take all other actions as may be reasonably necessary to

10   further demonstrate the release of their respective Interests in the Property, as such Interests may

11   have been recorded or otherwise filed.  Buyer may, but shall not be required to, file a certified copy

12   of this Sale Order in any filing or recording office in any federal, state, county or other territory or

13   jurisdiction in which Property is located, or with any other appropriate clerk or recorded with any

14   other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to

15   release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing

16   Date.  All persons and entities that are in possession or control of any portion of the Property on the

17   Closing Date shall promptly surrender possession and control thereof to the Buyer on, or as soon as

18   reasonably practicable after, the Closing Date.

19   **IT IS FURTHER ORDERED** that the Receiver shall serve a copy of this Order on all

20   parties known to have asserted an Interest in the Property. The Receiver is authorized to file a copy

21   of this Order in any court where an action is pending involving the Property.

22   **IT IS FURTHER ORDERED** that nothing contained herein shall prevent the Receiver

23   from seeking additional relief from this Court related to the PSA, the Property, or the Sale Proceeds.

24   **[IT IS FURTHER ORDERED that, should Buyer fail to close on the sale pursuant to**

25   **and in accordance with the terms of the PSA (as may be amended by written agreement of the**

26   **Receiver and Buyer), and without further order from the Court, the Receiver is hereby**

27   **authorized and empowered to sell the Property to Back-up Bidder, execute and deliver the**

28   **Back-up Bidder PSA, and to implement and consummate all of the transactions and perform**

1  **all obligations contemplated by the Back-up Bidder PSA and this Sale Order as if the Back-**

2  **up Bidder were the Successful Bidder at Auction, and the Back-up Bidder shall be entitled to**

3  **all the findings and protections of this Sale Order provided to the Buyer. In the event of a sale**

4  **to Back-up Bidder, Back-up Bidder shall be substituted as "Buyer" as defined in this Order.]**

5       **IT IS FURTHER ORDERED** that this Order and the terms and provisions of the PSA shall

6  be binding on Defendants, all of Defendants' creditors (whether known or unknown), Buyer, **[Back-**

7  **up Bidder,]** and their respective affiliates, successors and assigns, and any affected third parties,

8  including, but not limited to, all persons asserting any interest in the Property. The provisions of this

9  Order and the terms and provisions of the PSA, and any actions taken pursuant hereto or thereto,

10  shall survive the entry of any order for relief under title 11 of the United States Code, and shall be

11  binding on Defendants and their successors and assigns, including any debtor-in-possession or any

12  trustee appointed under title 11 of the United States Code, or similar custodian or fiduciary

13  appointed over Defendants or their assets.

14       **IT IS FURTHER ORDERED** that this Order shall be effective immediately upon entry.

15       **IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any

16  disputes arising from or related to the Property, the PSA, or the implementation or interpretation of

17  this Order.

18  Dated: _____

19

20       _____
         Hon. Kirk E. Sherriff
         United States District Court

21

22

23

24

25

26

27

28

EXHIBIT D

FORM OF RELEASE

WONDERFUL NUT ORCHARDS LLC, a Delaware limited liability company ("**Buyer**"), and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for the Eastern District of California (the "**Court**") have previously entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ (as such may have been amended, prior to the date hereof, the "**Agreement**"). Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees (collectively, including Buyer, "**Releasors**"), hereby releases Seller, The Prudential Insurance Company of America, PAR U Hartford Life & Annuity Comfort Trust, PGIM Real Estate Finance, LLC, and their respective partners, professionals, agents, employees, shareholders, members, affiliates, principals, beneficiaries, subsidiaries, successors, and assigns (collectively with Seller, "**Releasees**") from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of action, whether in law or in equity, which Buyer asserts or could assert at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter, claim, occurrence, damages or injury (collectively, "**Claims**"), solely to the extent arising out of a condition or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and entities, hereby waives the protections and benefits afforded California Civil Code Section 1542, acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____

**Land Buyer's Initials**

_____

**Crop Buyer's Initials**

64

Notwithstanding anything stated to the contrary in this Agreement, the foregoing release shall not extend to (and shall expressly exclude): (i) claims arising from Seller's intentional fraud or willful misconduct; or (ii) claims for breach of Seller's express representations, warranties, covenants, or indemnities under the Agreement or any document delivered at Closing, but solely to the extent so provided for under such Agreement or document delivered at Closing.

This Release is made by Buyer for the benefit of Seller and the Releasees on _____.

**WONDERFUL NUT ORCHARDS LLC,**
a Delaware limited liability company

By:_____
Name:
Its:

**WP PISTACHIOS LLC,**
a Delaware limited liability company

By:_____
Name:
Its:

EXHIBIT E

FORM OF DEED

Recording Requested By And

**When Recorded Return To:**

**Mail Tax Statements To:**

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

**GRANT DEED**

THE UNDERSIGNED RECEIVER DECLARES:

DOCUMENTARY TRANSFER TAX IS $_____

_____Unincorporated Area        _____City of _____
_____Computed on full value of interest or property conveyed, or
_____Computed on full value less value of liens or encumbrances remaining at time of sale

Assessor's Parcel No. _____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the _____ ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al*., Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby grant, **sell and convey** to WONDERFUL NUT ORCHARDS LLC, a Delaware limited liability company ("**Grantee**")**,** the following described real property and improvements thereon, in the County of Kern, State of California, and more particularly described as follows:

See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE

Dated: _____, 202_                    _____
LANCE MILLER, solely in his capacity as Court-appointed Receiver

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

EXHIBIT F

FORM OF BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to Wonderful Nut Orchards LLC, a Delaware limited liability company ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2026 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property situated in Kern County, California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference. The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES TO THE EXTENT PROVIDED IN THE SALE ORDER.SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY AS TO THE PERSONAL PROPERTY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of _____, 202__

SELLER


_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver


[attach legal description exhibit]

EXHIBIT G

FORM OF ASSIGNMENT AGREEMENT

**ASSIGNMENT AGREEMENT**

THIS ASSIGNMENT AGREEMENT ("Assignment") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the ("**Assignor**"), pursuant to the _____ ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al*., Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and Wonderful Nut Orchards LLC, a Delaware limited liability company ("**Assignee**").

A.    Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**").

B.    Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those contracts affecting the Property as set forth on Exhibit B, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.    Assignor hereby assigns to Assignee all its the right, title, obligation, and interest as in and to the Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignor represents and warrants solely to the extent authorized under the Sale Order, and to Assignor's knowledge, that the Contracts are in effect and have not been previously assigned, and that, to Assignor's knowledge, no counterparty has asserted any material default thereunder. Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Contracts to be performed after the date hereof.

2.    Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.  This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

4.    Assignor has not previously assigned the Contracts and has, subject to the required consent of any counterparty, authority to assign the Contracts (and to the extent counterparty consent is required under any Contract and has been obtained, the consent is attached hereto as Exhibit C).

Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Contracts.

5.      Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.  Assignor shall use commercially reasonable efforts, consistent with its authority as receiver, to assist in obtaining such consents

6.      In the event of any action between the parties hereto regarding this Assignment which a court of competent jurisdiction determines was frivolous or brought in bad faith by the unsuccessful party, the unsuccessful party in such action shall pay to the prevailing party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing party in connection with such action.  The parties agree that before either institutes litigation against the other arising from this Assignment, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

7.      This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.


ASSIGNOR                                              ASSIGNEE

                                                      **WONDERFUL NUT ORCHARDS LLC,**
                                                      a Delaware limited liability company
_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver

                                                      By:_____
                                                      Name:
                                                      Its:



[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

EXHIBIT H

WESTLANDS PPA

(attached)

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

**WP PISTACHIOS LLC**
**PISTACHIO PURCHASE AGREEMENT**
**(BONUS INCENTIVE PROGRAM)**

Lance Miller, solely in his capacity as Court-appointed receiver ("Grower") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB ("Action") pending in the U.S. District Court for the Eastern District of California (the "Court") and WP Pistachios LLC, a Delaware limited liability company ("Buyer"), hereby agree as follows:

1.      Each year during the Term of this Agreement, Grower shall sell to Buyer at least 100**%** (the "Required Percentage") of the 10,011.79 acres of pistachios to be produced on Grower's pistachio orchards indicated in Exhibit A, located in Fresno County, California (the "Property").

Legal Description or A.P.N. Numbers:  See Exhibit A

2.      This Agreement shall be for a term of two (2) crop years consisting of the crops to be harvested in the Fall of 2026 and 2027 (the "Term").

3.      Buyer agrees to pay to Grower an amount equal to Buyer's final minimum price per pound for marketable, edible, dry weight, split inshell pistachios ("Split Inshell") and edible kernels from closed shell pistachios and shelling stock, plus the bonuses set forth in Section 5, Section 6, Section 7, Section 8, and Section 9 below, if applicable. Following delivery of the crop, in any year, all payments will be made pursuant to the schedule set forth below; provided the schedule may be adjusted by mutual agreement with interest being paid at prime minus ¾% for deferred payment requests or charged at prime per year for advanced payment requests:

October 31    30%;      January 31st  30%;      April 30   30%;          August 31   10%

4.      MINIMUM PRICE: The minimum prices per pound to be paid by Buyer to Grower for each of (i) Split Inshell (the "Split Inshell Minimum Price") and (ii) edible kernels from closed shell pistachios and shelling stock, for each crop delivered by Grower to Buyer during the Term shall be announced by Buyer on or before July 31 of each crop year. The Split Inshell Minimum Price shall be adjusted by the bonuses set forth herein.

5.      COMMITMENT BONUS:  In any crop year during the Term hereof, if Grower actually delivers to Buyer (a) 80% or more of the pistachios grown on the Property, the Split Inshell Minimum Price for that crop year shall be increased by $0.02 per pound; or (b) 50% to 79% of the pistachios grown on the Property, the Split Inshell Minimum Price for that year shall be increased by $0.01 per pound.  There will be no adjustment under this Section 5 to the Split Inshell Minimum Price in any crop year during the Term hereof that Grower delivers to Buyer 49% or less of the pistachios grown on the Property.

6.      CONTRACT BONUS: In consideration of Grower entering into this Pistachio Purchase Agreement, in addition to the commitment bonus described in Section 5, in any crop year during the Term hereof that Grower actually delivers to Buyer 50% or more of the pistachios grown on the Property, the Split Inshell Minimum Price for that year shall be increased by $0.01 per pound.

7.      QUANTITY BONUS: Each crop year during the Term hereof, Buyer shall pay to Grower from the Property as follows:  $0.04 per Split Inshell pound.

8.      HANDLING BONUS:  In consideration of Grower entering into this Agreement, for each year of the Term of this Agreement, Buyer shall add $0.03 to the Split Inshell Minimum Price for the applicable year.

9.      INTENTIONALLY DELETED..

10.     The "Additional Terms and Conditions" attached hereto as paragraphs 11 through 20 inclusive are expressly made a part of this Agreement.

**ACCEPTED AND AGREED:**

1

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

**"GROWER":  Lance Miller, solely in his capacity as Court-appointed receiver**

**"BUYER":  WP PISTACHIOS LLC, a Delaware limited liability company**

By: _____

By: _____

Andrew Anzaldo, Senior Vice President of Grower Relations
13646 Highway 33, Lost Hills, CA  93249-9719
PH: (661) 797-6740, FAX: (661) 797-6744

Date: _____

Date: _____

Address:

Office Phone:

Fax Number:

Cell Phone:

Email:

2

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

## ADDITIONAL
## TERMS AND CONDITIONS

11.     Unless Grower arranges for transportation of the pistachios from Grower's orchards to the Buyer's affiliated processing facility ("Processing Facility"), Buyer shall arrange for such transportation.  In the event Buyer arranges for transportation of the pistachios from Grower's orchards to Processing Facility, Buyer will deduct from Grower's second payment (as set forth in Section 3), the actual and incidental charges, as specified on the transportation charge sheet, for transportation of pistachios to Processing Facility.  In the event Buyer provides bins to Grower, Buyer will deduct the actual charges for transportation of bins to and from Processing Facility/and or a third party facility, as applicable, in addition to any third party charges incurred by Buyer that are associated with bin rentals.

12.     Title and risk of loss or damage to the pistachios will pass from Grower to Buyer when the pistachios have either been (a) loaded onto trucks arranged for by Buyer for transportation to the Processing Facility, or (b) delivered to the Processing Facility by Grower's trucks.

13.     Buyer reserves the right to not accept pistachios that exceed the Required Percentage listed in Section 1 on either a daily delivery or overall commitment basis.

14.     Promptly upon arrival at the Processing Facility, Buyer shall have each delivery weighed at a certified scale by a Licensed weigh master.  Grower or his representative may observe the arrival, unloading, sampling and testing of his pistachios. A representative sample will be taken from each load.  This sample will be hulled, dried and weighed. A portion of the sample will be fumigated, sealed in a container, and properly stored to prevent deterioration.  The remaining portion of the sample will be analyzed under the supervision of a USDA or Dried Fruit Association (DFA) inspector to determine the percentage of pistachios in various categories as reported on the standard pistachio industry sample analysis form.  These percentages will be applied to the total weight in the load sampled after deducting for foreign material, culls, insect damage, excess moisture, and other defects, to determine the pay-out weight.  Final results will be certified by USDA or DFA.  Buyer shall notify Grower of the results of such sample analyses within five (5) days of delivery. Within fourteen (14) days of Buyer's receipt of Grower's delivery date, Grower shall have the right to request a retest. The retest results will be used to determine the payout weight and grades. Buyer will deduct $250 per retest for those requests that exceed 3% of total weight delivered.

15.     Grower, solely in his capacity as Court-appointed receiver, represents and warrants that (a) Grower is authorized to enter into this Agreement; (b) Grower is the sole owner of the pistachios to be delivered to Buyer, or otherwise has full legal and equitable right to deliver the pistachios to Buyer, pursuant to the terms of this Agreement; (c) Grower will deliver to Buyer good and merchantable title to all pistachios delivered pursuant to the terms of this Agreement, free and clear of any and all liens and encumbrances, except for Grower's statutory liens; (d) Grower's performance of its obligations to Buyer will not violate any agreement between Grower and any third party or to which Grower is bound; (e) the pistachios: (i) were grown by Grower, (ii) were grown and harvested in compliance with, and the delivery thereof to Buyer shall comply with, all federal, state, and local laws and regulations including, but not limited to, laws governing terrorism, bioterrorism, homeland security, or the application of pesticides, herbicides, and other chemicals, all as adopted or amended from time-to-time; (iii) are and will not be adulterated, contaminated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, as adopted or amended from time-to-time, and are not and will not constitute an article which may not, under the provision of Section 404 or 505 of the Federal Food, Drug, and Cosmetic Act, be introduced into interstate commerce; (iv) are otherwise of good marketable quality; and (v) are and will be free and clear of any and all security interests, liens, encumbrances, and charges of any person, other than Grower's statutory liens. If any pistachios delivered to Buyer fail to meet the standards set forth above in this Section 15, (x) Processing Facility, upon its discovery thereof, shall promptly notify Grower, (y) title to such pistachios shall not pass to Buyer or will automatically revert back to Grower if title has already passed to Buyer, and (z) Processing Facility shall hold such pistachios on Grower's behalf, subject to Grower's orders; and (f) Grower has the sole right to receive any and all proceeds due under this Agreement If requested by Buyer, Grower shall provide Buyer with: (i) access to all documents and other information relating to the growing, production, and harvesting of all pistachios to be delivered by Grower to Buyer pursuant to the terms of this Agreement, including, but not limited to, all documents and other information relating to the application of pesticides, herbicides, and other chemicals to such pistachios, and (ii) access to all real property where such pistachios are or were produced for purposes of inspecting and testing any unharvested pistachios, trees, vines, soil, water, or other items, or to observe the Grower's, and its agents' and employees', practices and procedures.

16.     Notwithstanding anything to the contrary in this Agreement or any ancillary documents, Buyer acknowledges and expressly agrees that Grower is entering into this agreement solely in his capacity as Court-appointed receiver and shall have no personal liability for any claims arising under or related to this Agreement.

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

17.     Buyer acknowledges that Grower holds a valid producer's lien pursuant to California Food and Agricultural Code Sections 55631, et seq., and that nothing in this Agreement or any ancillary agreement waives or subordinates such lien.

18.     GROWER EXPRESSLY WAIVES ANY RIGHTS THAT IT MAY HAVE UNDER SECTIONS 62801 AND 62802 OF THE FOOD AND AGRICULTURE CODE OF THE STATE OF CALIFORNIA TO HAVE THIS CONTRACT STATE THE FULL PURCHASE PRICE AND A DEFINITE SUM OR TO DESCRIBE THE UNIT AND STATE THE FULL UNIT PRICE IS TO BE PAID UPON THE BASIS OF UNITS OR MEASURES.  GROWER EXPRESSLY WAIVES THE PENALTY PROVISIONS OF SECTION 62802 OF THE FOOD AND AGRICULTURAL CODE OF THE STATE OF CALIFORNIA FOR ANY FAILURE ON THE PART OF BUYER TO COMPLY WITH THE PROVISIONS OF SECTION 62801 OF SAID CODE.    GROWER UNDERSTANDS AND ACKNOWLEDGES THE SIGNIFICANCE AND CONSEQUENCES OF THE SPECIFIC WAIVER OF SECTION 62801 AND 62802 OF THE CALIFORNIA FOOD AND AGRICULTURAL CODE.

19.     Buyer and Grower shall not be obligated to perform under this Agreement, nor shall Buyer or Grower be liable for damages, in the event of interference with Buyer's or Grower's duties which is the result of labor disturbances, fire, acts of God, war, embargo, unusual weather conditions, unusual market disruptions, or any cause beyond the control of Buyer or Grower.

20.     This Agreement supersedes all oral and written agreements and understandings between the parties hereto relating to the subject matter of this Agreement, other than with respect to those Post-Closing Payments described in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____, by and between Grower, Buyer and WONDERFUL NUT ORCHARDS LLC, a Delaware limited liability company..  Any modification or amendment to this Agreement shall be of no force or effect unless made in writing and signed by Buyer. Any exhibits to this Agreement are attached hereto and incorporated herein by reference.  This Agreement shall be governed and interpreted by the laws of the State of California, and so long as the Action is pending, the Court shall have exclusive jurisdiction over any legal action brought by any party to interpret or enforce this Agreement .  To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in an appropriate state or federal court of competent jurisdiction.   Should a court of competent jurisdiction declare any portion of this Agreement invalid, the remaining portions shall be enforceable, unless the invalid portion goes to the essence of the bargained for consideration hereunder.  This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one and the same agreement.  No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of or another breach of the same or another term or provision of this Agreement.  This Agreement and all rights and duties hereunder may not be transferred, assigned or delegated without the express consent of the other party, except that (i) Buyer may do so to any affiliate, and (ii) Grower may assign, or partially assign, this Agreement to any successor owner(s) of the Property so long as any such successor owner(s) assumes, in writing, all of the rights and obligations of the Grower under this Agreement in any such assignment or partial assignment.  This Agreement shall be binding upon, and inure to the benefit of, the heirs, successors, and assigns of the parties hereto, including, in the case of Grower, any successors in interest to the Property.  All communications, notices and demands of any kind which either party may be required or desire to give to or serve upon the other party shall be made in writing and sent by facsimile transmission, overnight delivery, first-class mail or certified mail, postage prepaid, to the addresses set forth in the signature block of this Agreement..

{3544865.2}

EXHIBIT A

| Westlands Pistachio Ranches | | | |
|---|---|---|---|
| Ranch Name | APN Number | Year Planted | Assessor Acres |
| Primestar | 017-080-46s | 2012 | 41.45 |
| Primestar | 017-080-72s | 2012 | 249.87 |
| Windfall | 027-180-46s | 2013 | 160.00 |
| Kamm Avenue | 038-071-41S | 2011 | 15.64 |
| Kamm Avenue | 038-071-42S | 2011 | 57.00 |
| Kamm Avenue | 038-071-43S | 2009 | 35.23 |
| Kamm Avenue | 038-071-44S | 2009 | 41.05 |
| Kamm Avenue | 038-071-46S | 2009 | 135.78 |
| Kamm Avenue | 038-071-59 | 2009 | 2.19 |
| Kamm Avenue | 038-130-02 | 1996 | 160.00 |
| Kamm Avenue | 038-130-19S | 2009 | 160.00 |
| Kamm Avenue | 038-130-19S | 2009 | 160.00 |
| Kamm Avenue | 038-130-51s | 2009 | 78.46 |
| Kamm Avenue | 038-130-56S | 2009 | 78.45 |
| Kamm Avenue | 038-130-58S | 2009 | 78.46 |
| Kamm Avenue | 038-130-86s | 2009 | 19.91 |
| Kamm Avenue | 038-130-87s | 2009 | 18.54 |
| Kamm Avenue | 038-141-26 | 2011 | 20.00 |
| Kamm Avenue | 038-141-27S | 2011 | 20.00 |
| Kamm Avenue | 038-141-28S | 2011 | 20.00 |
| Kamm Avenue | 038-141-29 | 2011 | 60.00 |
| Kamm Avenue | 038-141-30 | 2011 | 40.00 |
| Kamm Avenue | 038-141-31 | 2011 | 55.86 |
| Kamm Avenue | 038-141-38S | 2012 | 31.44 |
| Kamm Avenue | 038-141-41S | 2012 | 158.18 |
| Kamm Avenue | 038-141-44S | 2012 | 140.29 |
| Kamm Avenue | 038-141-49S | 2012 | 158.18 |
| Kamm Avenue | 038-141-50S | 2011 | 158.18 |
| Kamm Avenue | 038-141-52 | 2009 | 40.00 |
| Kamm Avenue | 038-141-53 | 2009 | 120.00 |
| Kamm Avenue | 038-141-54S | 2009 | 38.10 |
| Kamm Avenue | 038-141-55S | 2009 | 155.00 |
| Kamm Avenue | 038-141-55S | 2009 | 45.00 |
| Kamm Avenue | 038-141-56S | 2009 | 77.88 |
| Kamm Avenue | 038-141-58S | 2011 | 100.00 |
| Kamm Avenue | 038-141-60s | 1999 | 73.49 |
| Kamm Avenue | 038-141-63S | 2012 | 53.55 |
| Kamm Avenue | 038-210-01 | 2010 | 160.00 |
| Kamm Avenue | 038-210-02S | 2010 | 160.00 |
| Kamm Avenue | 038-210-03S | 2008 | 160.00 |

| Westlands Pistachio Ranches | | | |
|---|---|---|---|
| Ranch Name | APN Number | Year Planted | Assessor Acres |
| Kamm Avenue | 038-210-06 | 2000 | 40.00 |
| Kamm Avenue | 038-210-08 | 2005 | 80.00 |
| Kamm Avenue | 038-210-09 | 2005 | 80.00 |
| Kamm Avenue | 038-210-10S | 2000 | 160.00 |
| Kamm Avenue | 038-210-14S | 2001 | 80.00 |
| Kamm Avenue | 038-210-15S | 2001 | 80.00 |
| Kamm Avenue | 038-210-26 | 2000 | 25.00 |
| Kamm Avenue | 038-210-27S | 2000 | 25.00 |
| Kamm Avenue | 038-210-30S | 2010 | 160.00 |
| Kamm Avenue | 038-210-37S | 2008 | 80.00 |
| Kamm Avenue | 038-210-38S | 2008 | 160.00 |
| Kamm Avenue | 038-210-39S | 2008 | 40.00 |
| Kamm Avenue | 038-210-41S | 2008 | 20.00 |
| Kamm Avenue | 038-210-42S | 2010 | 160.00 |
| Kamm Avenue | 038-210-43 | 2000 | 40.00 |
| Kamm Avenue | 038-210-44S | 2000 | 40.00 |
| Kamm Avenue | 038-210-44S | 2000 | 80.00 |
| Kamm Avenue | 038-210-47S | 2000 | 120.00 |
| Kamm Avenue | 038-210-54S | 2000 | 80.00 |
| Kamm Avenue | 038-210-63S | 2001 | 157.29 |
| Kamm Avenue | 038-210-68S | 1999 | 69.99 |
| Kamm Avenue | 038-210-69S | 1999 | 80.00 |
| Kamm Avenue | 038-210-70S | 1999 | 80.00 |
| Kamm Avenue | 038-210-71S | 2000 | 40.00 |
| Kamm Avenue | 038-210-74S | 2000 | 160.00 |
| Kamm Avenue | 038-210-76S | 2001 | 130.99 |
| Kamm Avenue | 038-210-77S | 1999 | 10.00 |
| Kamm Avenue | 038-210-78S | 1999 | 70.00 |
| Kamm Avenue | 038-210-79S | 1999 | 62.21 |
| Kamm Avenue | 038-210-80S | 1999 | 96.00 |
| Kamm Avenue | 038-210-80S | 1999 | 88.61 |
| Kamm Avenue | 038-270-01 | 1999 | 20.00 |
| Kamm Avenue | 038-300-18S | 2021 | 77.88 |
| Kamm Avenue | 038-300-27S | 2021 | 77.88 |
| Lassen Ranch | 068-071-06S | 2017 | 152.22 |
| Lassen Ranch | 068-071-07S | 2017 | 162.15 |
| Lassen Ranch | 068-071-09S | 2021 | 160.00 |
| Lassen Ranch | 068-071-36S | 2021 | 158.50 |
| Lassen Ranch | 068-071-38S | 2021 | 157.00 |
| Lassen Ranch | 068-071-39S | 2017 | 130.56 |
| Lassen Ranch | 068-071-41S | 2019 | 85.56 |
| Lassen Ranch | 068-071-42S | 2019 | 13.55 |

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

| Westlands Pistachio Ranches | | | |
|---|---|---|---|
| Ranch Name | APN Number | Year Planted | Assessor Acres |
| Huron | 075-050-07 | 2019 | 159.60 |
| Huron | 075-050-08S | 2015 | 160.00 |
| Huron | 075-070-43S | 2017 | 40.00 |
| Huron | 075-070-56S | 2017 | 154.18 |
| Huron | 075-070-56S | 2017 | 118.69 |
| Huron | 075-070-56S | 2017 | 158.69 |
| Huron | 078-060-02S | 2015 | 47.62 |
| Huron | 078-060-03S | 2017 | 173.68 |
| Huron | 078-060-57S | 2018 | 158.69 |
| Huron | 078-060-57S | 2018 | 158.69 |
| Huron | 078-060-57S | 2018 | 158.69 |
| Huron | 078-060-57S | 2018 | 153.70 |
| Huron | 078-060-65S | 2015 | 127.60 |
| Huron | 078-060-87S | 2017 | 86.59 |
| Huron | 078-060-88S | 2017 | 85.53 |
| Huron | 078-130-06S | 2015 | 130.00 |
| Huron | 078-130-07S | 2015 | 178.49 |
| Huron | 078-130-07S | 2015 | 37.00 |
| Huron | 078-130-11S | 2019 | 160.00 |
| Huron | 078-130-23S | 2015 | 80.00 |
| Huron | 078-140-02S | 2019 | 37.98 |
| Huron | 078-140-04S | 2019 | 40.00 |
| Huron | 078-140-05 | 2019 | 40.00 |
| Huron | 078-140-06S | 2019 | 19.40 |
| Huron | 078-140-07S | 2019 | 19.40 |
| | | | |
| | Total | | 10,011.79 |

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

**EXHIBIT A (Cont'd)**

## Legal Description or A.P.N. Numbers

| Ranch | Field | Acres | County | Variety | Rootstock | Bearing | Year Planted | APN |
|-------|-------|-------|--------|---------|-----------|---------|--------------|-----|
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |
|  |  |  |  |  |  | Yes/No |  |  |

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

## Harvest Information Sheet

Farm Manager (Name): _____

FM Company Name: _____

Address: _____

Phone: _____

Email: _____

Please include a map of the orchard/s related to this contract.

For office purposes only:

Affiliation : _____

Region : _____

Est. Yield Per Acre: _____

Harvester: _____

Harvester Type:      BIN / BULK

Delivery Type:       BIN / BULK

Preferred Carrier:   DEL / EXT / JPT / MAZ / SJS / VFT / MGM / MR / PREM / ZFT / OWN

Mileage:            _____

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

Field Representative: _____

{3544865.2}

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

| Form **W-9** | | |
|---|---|---|
| (Rev. August 2013)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | **Give Form to the<br>requester. Do not<br>send to the IRS.** |

**Print or type**
**See Specific Instructions on page 2.**

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

| **Part I** | **Taxpayer Identification Number (TIN)** |
|---|---|

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**

| | | | – | | | – | | | | |

**Employer identification number**

| | | – | | | | | | |

| **Part II** | **Certification** |
|---|---|

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of U.S. person ▶

Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X      Form **W-9** (Rev. 8-2013)

{3544865.2}



## Grower ACH Payment Form

Request Date: _____

Vendor #: _____

Payee Name: _____

Beneficiary Name on Account: _____

Bank Name: _____

Routing Number: _____

Account Number: _____

Remittance e-mail: _____

**Grower Authorization**

Signature: _____

Print Name: _____

Fax to (661) 797 - 6744 or Email to GRacct.wpa@wonderful.com

13

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

EXHIBIT I

PPA MEMO

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO

WP Pistachios LLC
11444 W. Olympic Blvd., 10th Floor
Los Angeles, California 90064
Attention:  General Counsel

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## MEMORANDUM OF PISTACHIO PURCHASE AGREEMENT – FRESNO COUNTY
### (Westlands Pistachio Crop)

THIS MEMORANDUM OF PISTACHIO PURCHASE AGREEMENT – FRESNO COUNTY (Westlands Pistachio Crop) ("Memorandum"), dated as of _____, 2025, is executed by and between Lance Miller, solely in his capacity as Court-appointed receiver in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al*., Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for the Eastern District of California, a ("Grower") and WP Pistachios LLC, a Delaware limited liability company ("Buyer").

1. Pistachio Purchase Agreement.  Grower and Buyer have entered into that certain Pistachio Purchase Agreement (Bonus Incentive Program) (the "Pistachio Purchase Agreement") with respect to that certain real property located in Fresno County, State of California, as more particularly described on Exhibit A attached hereto (the "Property").  Pursuant to the Pistachio Purchase Agreement, Grower granted to Buyer the exclusive rights to purchase 100% of the pistachios harvested from the Property for a term of two (2) crop years consisting of the crops to be harvested in the Fall of 2026 and 2027, on the terms and conditions of the Pistachio Purchase Agreement unless earlier terminated pursuant to the terms of the Pistachio Purchase Agreement.

2. Covenant Running with the Land.  The Pistachio Purchase Agreement, and the covenants and agreements contained therein, expressly "run with the land" while the Pistachio Purchase Agreement is in force and effect.  On the termination or expiration of the Pistachio Purchase Agreement, Buyer shall immediately execute, acknowledge and record a termination instrument sufficient to terminate and remove this Memorandum as a matter of record affecting the Property, in form and content designated by Grower (or the then owner of the Property).

3. Binding on Successive Owners.  The obligations set forth in the Pistachio Purchase Agreement shall be binding on successive owners of the Property and on the successors and assigns of Buyer.

71

4.    <u>Incorporation of Agreement</u>.  This Memorandum is for informational purposes only and nothing contained herein shall be deemed to in any way modify or otherwise affect any of the provisions of the Pistachio Purchase Agreement which are hereby incorporated herein.  This Memorandum is subject to all of the provisions of the Pistachio Purchase Agreement and in the event of any inconsistency between the provisions of the Pistachio Purchase Agreement on the one hand and this Memorandum on the other hand, the provisions of the Pistachio Purchase Agreement shall prevail.  The Pistachio Purchase Agreement should be referenced to review the specific provisions contained therein.

5.    <u>Counterparts</u>.  This Memorandum may be executed in any number of counterparts, each of which shall constitute an original and all of which shall constitute but one and the same document.

[Remainder of Page Intentionally Left Blank – Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**GROWER:**

_____
Lance Miller, solely in his capacity as Court-appointed receiver

**BUYER:**

**WP       PISTACHIOS       LLC**, a Delaware limited liability company

By:_____
   Name:
   Title:

> *A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA      )
                            ) ss.
COUNTY OF _____)

On _____, 2025, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Notary Public                                     (Seal)

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF _____)

On _____, 2025, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Notary Public                                    (Seal)

EXHIBIT A
Legal Description of the Property

(Fresno County)

| Map Location | APN Number | Crop | Assessor Acres |
|---|---|---|---|
| Huron | 075-050-07 | Pistachios | 159.60 |
| Huron | 075-050-08S | Pistachios | 160.00 |
| Huron | 075-070-43S | Pistachios | 40.00 |
| Huron | 075-070-56S | Pistachios | 431.56 |
| Huron | 078-060-02S | Pistachios | 47.62 |
| Huron | 078-060-03S | Pistachios | 173.68 |
| Huron | 078-060-57S | Pistachios | 629.77 |
| Huron | 078-060-65S | Pistachios | 127.60 |
| Huron | 078-060-87S | Pistachios | 86.59 |
| Huron | 078-060-88S | Pistachios | 85.53 |
| Huron | 078-130-06S | Pistachios | 130.00 |
| Huron | 078-130-07S | Pistachios | 215.49 |
| Huron | 078-130-11S | Pistachios | 160.00 |
| Huron | 078-130-23S | Pistachios | 80.00 |
| Huron | 078-140-02S | Pistachios | 37.98 |
| Huron | 078-140-04S | Pistachios | 40.00 |
| Huron | 078-140-05 | Pistachios | 40.00 |
| Huron | 078-140-06S | Pistachios | 19.40 |
| Huron | 078-140-07S | Pistachios | 19.40 |
| Kamm Avenue | 038-071-41S | Pistachios | 15.64 |
| Kamm Avenue | 038-071-42S | Pistachios | 57.00 |
| Kamm Avenue | 038-071-43S | Pistachios | 35.23 |
| Kamm Avenue | 038-071-44S | Pistachios | 41.05 |
| Kamm Avenue | 038-071-46S | Pistachios | 135.78 |
| Kamm Avenue | 038-071-59 | Pistachios | 2.19 |
| Kamm Avenue | 038-130-02 | Pistachios | 160.00 |
| Kamm Avenue | 038-130-19S | Pistachios | 320.00 |
| Kamm Avenue | 038-130-51s | Pistachios | 78.46 |
| Kamm Avenue | 038-130-56S | Pistachios | 78.45 |
| Kamm Avenue | 038-130-58S | Pistachios | 78.46 |
| Kamm Avenue | 038-130-86s | Pistachios | 19.91 |
| Kamm Avenue | 038-130-87s | Pistachios | 18.54 |
| Kamm Avenue | 038-141-26 | Pistachios | 20.00 |
| Kamm Avenue | 038-141-27S | Pistachios | 20.00 |
| Kamm Avenue | 038-141-28S | Pistachios | 20.00 |
| Kamm Avenue | 038-141-29 | Pistachios | 60.00 |

| Map Location | APN Number | Crop | Assessor Acres |
|---|---|---|---|
| Kamm Avenue | 038-141-30 | Pistachios | 40.00 |
| Kamm Avenue | 038-141-31 | Pistachios | 55.86 |
| Kamm Avenue | 038-141-38S | Pistachios | 31.44 |
| Kamm Avenue | 038-141-41S | Pistachios | 158.18 |
| Kamm Avenue | 038-141-44S | Pistachios | 140.29 |
| Kamm Avenue | 038-141-49S | Pistachios | 158.18 |
| Kamm Avenue | 038-141-50S | Pistachios | 158.18 |
| Kamm Avenue | 038-141-52 | Pistachios | 40.00 |
| Kamm Avenue | 038-141-53 | Pistachios | 120.00 |
| Kamm Avenue | 038-141-54S | Pistachios | 38.10 |
| Kamm Avenue | 038-141-55S | Pistachios | 200.00 |
| Kamm Avenue | 038-141-56S | Pistachios | 77.88 |
| Kamm Avenue | 038-141-58S | Pistachios | 100.00 |
| Kamm Avenue | 038-141-60s | Pistachios | 73.49 |
| Kamm Avenue | 038-141-63S | Pistachios | 53.55 |
| Kamm Avenue | 038-210-01 | Pistachios | 160.00 |
| Kamm Avenue | 038-210-02S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-03S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-06 | Pistachios | 40.00 |
| Kamm Avenue | 038-210-08 | Pistachios | 80.00 |
| Kamm Avenue | 038-210-09 | Pistachios | 80.00 |
| Kamm Avenue | 038-210-10S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-14S | Pistachios | 80.00 |
| Kamm Avenue | 038-210-15S | Pistachios | 80.00 |
| Kamm Avenue | 038-210-26 | Pistachios | 25.00 |
| Kamm Avenue | 038-210-27S | Pistachios | 25.00 |
| Kamm Avenue | 038-210-30S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-37S | Pistachios | 80.00 |
| Kamm Avenue | 038-210-38S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-39S | Pistachios | 40.00 |
| Kamm Avenue | 038-210-41S | Pistachios | 20.00 |
| Kamm Avenue | 038-210-42S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-43 | Pistachios | 40.00 |
| Kamm Avenue | 038-210-44S | Pistachios | 120.00 |
| Kamm Avenue | 038-210-47S | Pistachios | 120.00 |
| Kamm Avenue | 038-210-54S | Pistachios | 80.00 |
| Kamm Avenue | 038-210-63S | Pistachios | 157.29 |
| Kamm Avenue | 038-210-68S | Pistachios | 69.99 |
| Kamm Avenue | 038-210-69S | Pistachios | 80.00 |
| Kamm Avenue | 038-210-70S | Pistachios | 80.00 |

| Map Location | APN Number | Crop | Assessor Acres |
|---|---|---|---|
| Kamm Avenue | 038-210-71S | Pistachios | 40.00 |
| Kamm Avenue | 038-210-74S | Pistachios | 160.00 |
| Kamm Avenue | 038-210-76S | Pistachios | 130.99 |
| Kamm Avenue | 038-210-77S | Pistachios | 10.00 |
| Kamm Avenue | 038-210-78S | Pistachios | 70.00 |
| Kamm Avenue | 038-210-79S | Pistachios | 62.21 |
| Kamm Avenue | 038-210-80S | Pistachios | 184.61 |
| Kamm Avenue | 038-270-01 | Pistachios | 20.00 |
| Kamm Avenue | 038-300-18S | Pistachios | 77.88 |
| Kamm Avenue | 038-300-27S | Pistachios | 77.88 |
| Lassen Ranch | 068-071-06S | Pistachios | 152.22 |
| Lassen Ranch | 068-071-07S | Pistachios | 162.15 |
| Lassen Ranch | 068-071-09S | Pistachios | 160.00 |
| Lassen Ranch | 068-071-36S | Pistachios | 158.50 |
| Lassen Ranch | 068-071-38S | Pistachios | 157.00 |
| Lassen Ranch | 068-071-39S | Pistachios | 130.56 |
| Lassen Ranch | 068-071-41S | Pistachios | 85.56 |
| Lassen Ranch | 068-071-42S | Pistachios | 13.55 |
| Primestar | 017-080-46s | Pistachios | 41.45 |
| Primestar | 017-080-72s | Pistachios | 249.87 |
| Windfall | 027-180-46s | Pistachios | 160.00 |
| Total | | | 10,011.79 |

SCHEDULE 1.1(b)

Excluded Solar

All equipment parts and components related or pertaining to three solar photovoltaic system totaling approximately 1422 KWs, described as follows, whether or not located on or connected to electrical service to the Property:

1)  955 kW system located on APN 069-350-07, Kern County, California and commonly known as "Kimberlina Ranch."

2)  273 kW system located on APN 069-320-05, Kern County, California and commonly known as "Reservoir Ranch."

3)  205 kW system located on APN 069-310-12, Kern County, California and commonly known as "Mozingo Ranch,"

SCHEDULE 1.1(g)

Contract Schedule

1.      That certain Agricultural Lease dated April 1, 2020 by and between Maricopa Orchards, LLC and Ranch 24, LLC, as amended by that certain First Amendment to Agricultural Lease dated November 1, 2020, as further amended by that certain Second Amendment to Agricultural Lease dated September 24, 2021, as further amended by that certain Third Amendment to Agricultural Lease dated September 22, 2022,   further amended by that certain Fourth Amendment to Agricultural Lease dated November 20, 2023, to be further amended by that certain Fifth Amendment to Agricultural Lease (in form and substance provided to Buyer) following the execution of this Agreement.

SCHEDULE 5.2(i)

Specific Title Encumbrances

1. That certain Agricultural Lease dated April 1, 2020 by and between Maricopa Orchards, LLC and Ranch 24, LLC, as amended by that certain First Amendment to Agricultural Lease dated November 1, 2020, as further amended by that certain Second Amendment to Agricultural Lease dated September 24, 2021, as further amended by that certain Third Amendment to Agricultural Lease dated September 22, 2022, as further amended by that certain Fourth Amendment to Agricultural Lease dated November 20, 2023, to be further amended by that certain Fifth Amendment to Agricultural Lease (in form and substance provided to Buyer) following the execution of this Agreement. (the "**Ranch 24 Lease**" and the leasehold property described therein, the "**Ranch 24 Premises**").

2. Residential rental of 10200 Magnolia Ave.

3. Residential rental of 25482 W. Lerdo Highway.

4. Residential rental of 25845 Kimberline Road.

5. Residential rental of 25949 Jackson St.

SCHEDULE 6.3(g)

Water Supply Agreements

1.  Water Supply Agreement dated July 29, 2015 made by and between **FNF FARM**S, LLC, a California limited liability company (as Water User therein), and 104 PISTACHIOS, LLC a California limited liability company, et al (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 11, 2024 as Document No. 2024-0082400, (ii) the Official Records of Kern County, California on September 10, 2024 as Document No. 224109980, (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412595, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019288.

2.  Water Supply Agreement dated July 29, 2015 made by and between **KAMM SOUTH, LLC**, a California limited liability company (as Water User therein), and 104 Pistachios, LLC a California limited liability company, et al (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 11, 2024 as Document No. 2024-0082763, (ii) the Official Records of Kern County, California on September 10, 2024 as Document No. 224109979; (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412594, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019295.

3.  Water Supply Agreement dated September 28, 2025, made by and between MARICOPA ORCHARDS, LLC, a California limited liability company, et al. (as Water User therein), and 104 Pistachios, LLC a California limited liability company, et al. (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 10, 2024 as Document No. 2024-0082325, (ii) the Official Records of Kern County, California on September 13, 2024 as Document No. 224111300, (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412596, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019287

-10-

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

SCHEDULE 6.3(h)

Rights of First Refusal

1.    A right of first refusal in favor of Wegis Family Farms LLC, a California limited liability company ("Wegis"), as described in that certain Right of First Refusal Agreement dated January 23, 2020, by and between Wegis and Maricopa Orchards, LLC, a California limited liability company, as evidenced by that certain Memorandum of Right of First Refusal recorded in the Official Records of Kern County, California, on January 23, 2020, as Document Number 220009643; and

2.    A right of first refusal in favor of Wey Almond Farms, LLC, a California limited liability company ("Wey"), as described in that certain Right of First Refusal Agreement dated November 13, 2019, by and between Wey and Maricopa Orchards, LLC, a California limited liability company, as evidenced by that certain Memorandum of Right of First Refusal recorded in the Official Records of Kern County, California, on November 13, 2019, as Document Number 219151148.

SCHEDULE 7.1

Exceptions to Seller's Representations

1.   None.

Docusign Envelope ID: 029F7AB8-D75E-46BD-9289-ADE238E7ACED

SCHEDULE 10.1(c)

Permitted Exceptions to Title Policy

The following Schedule B exceptions listed on that certain Preliminary Report issued by Chicago Title Company with a Title Number of FWKN-TO2500611-MW, Amendment A, dated effective May 1, 2025:

    1 – 8 inclusive;
    9*;
    10 – 91 inclusive;
    93 – 186 inclusive;
    189 – 197 inclusive;
    198*;
    199 - 225 inclusive;
    226*;
    228 - 259 inclusive;
    260 (but subject to removal of notes regarding PG&E Easement);
    261 - 267 inclusive;
    268*
    271 – 275 inclusive;
    280 – 357 inclusive;
    362 – 489 inclusive;
    491- 526 inclusive;
    531;
    536 - 566 inclusive;
    568 - 580 inclusive;
    582 - 603 inclusive;
    605 - 610 inclusive;
    616;
    657;
    658 (but limited to named tenants on rent roll to be provided by Seller);
    659- 662 inclusive;;
    666; and
    738

* Pending Title Insurer's concurrence to remove

-13-