Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone:    (312) 902-5200
Facsimile:    (312) 902-1061

John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100
Dallas, TX 75201-2591
Telephone:    (214) 765-3600
Facsimile:    (214) 765-3602

*Attorneys for the Receiver*
Lance Miller

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ACDF, LLC; ASSEMI AND SONS, INC.; AVILA RANCH EA, LLC; BEAR FLAG FARMS, LLC; C & A FARMS, LLC; CANTUA ORCHARDS, LLC; DA REAL ESTATE HOLDINGS, LLC; FAVIER RANCH, LLC; FG2 HOLDINGS LLC; GRADON FARMS, LLC; GRANVILLE FARMS, LLC; GRANTLAND HOLDINGS NO. 1, LLC; GRANTLAND HOLDINGS NO. 2, LLC; GRANTOR REAL ESTATE INVESTMENTS, LLC; GVM INVESTMENTS, LLC; GV AG, LLC; LINCOLN GRANTOR FARMS, LLC; MARICOPA ORCHARDS, LLC; PANOCHE PISTACHIOS, LLC; SAGEBERRY FARMS, LLC; DEREK BELL; and RACHEL MARIE WHITE,<br><br>Defendants. | No. 1:24-cv-01102-KES-SAB<br><br>**RECEIVER'S NOTICE OF NON-OPPOSITION AND NON-OBJECTION TO NOTICE OF PROPOSED AUCTION AND SALE OF REAL PROPERTY (SANDRINI)**<br><br>Related to Dkt. No. 240<br><br><u>Hearing:</u><br><br>Hearing Date:  October 6, 2025<br>Hearing Time:  **3:00 P.M. PT**<br><br>Location: Robert E. Coyle U.S. Courthouse<br>            2500 Tulare Street<br>            Courtroom 6, 7th floor<br>            Fresno, CA 93721<br><br>Judge:        Hon. Kirk E. Sherriff<br><br>Action Filed:    September 16, 2024 |

On August 5, 2025, Lance Miller, solely in his capacity as Court-appointed receiver (the "**Receiver**") in the above-captioned case, filed the *Notice of Proposed Auction and Sale of Real Property (Sandrini)* [Dkt. No. 240] (the "**Notice**").

Pursuant to Rule 230(c) of the Local Rules of Practice for the United States District Court for the Eastern District of California (the "**Local Rules**"), any party wishing to object to the Notice was required to file an objection (an "**Objection**") with the Court on or before September 29, 2025. No oppositions or objections were filed or received by such date.

Accordingly, the Receiver hereby respectfully requests that the Court enter the *Order  (I) Authorizing Sale of Real Estate Free and Clear of Interest; (II) Authorizing the Payment of Sale-Related Costs; and (III) Granting Related Relief (Sandrini)* attached hereto as **Exhibit 1**.

Dated: September 30, 2025

                                       Respectfully submitted by:

                                       **KATTEN MUCHIN ROSENMAN LLP**

                                       By: */s/ Terence G. Banich*
                                       Terence G. Banich
                                       *Attorneys for the Receiver*
                                       Lance Miller

---

[1] Designated as counsel for service pursuant to L.R. 182(c)(1).

**PROOF OF SERVICE**

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, Illinois 60661. On September 30, 2025, I served the following document(s) described as:

**RECEIVER'S NOTICE OF NON-OPPOSITION AND NON-OBJECTION TO NOTICE OF PROPOSED AUCTION AND SALE OF REAL PROPERTY (SANDRINI)**

as follows:

**[ ]    BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ X ]    BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail address(es) listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

ali.mojdehi@mgr-legal.com
Jsmcnutt@kerncounty.com
jon@cavalrei.com
degan@wilkefleury.com
storigiani@youngwooldridge.com
HGrossman@cozen.com
pswain@cozen.com
RStewart@pearsonrealty.com
kstewart@pearsonrealty.com
aferdinandi@pearsonrealty.com
DKevorkian@pearsonrealty.com
sgrosz@pearsonrealty.com
jreisz@kleinlaw.com
ckay@caagproperties.com
mindynili@gmail.com

**[ ]    BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]    BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

304067534

**[X]    E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on September 30, 2025, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich

# Exhibit 1

1

2 **UNITED STATES DISTRICT COURT**

3 **EASTERN DISTRICT OF CALIFORNIA**

4

5 THE PRUDENTIAL INSURANCE          ) No. 1:24-cv-01102-KES-SAB
   COMPANY OF AMERICA, et al.,       )
6                                    ) **[PROPOSED] ORDER (I)**
             Plaintiffs,             ) **AUTHORIZING SALE OF REAL**
7                                    ) **ESTATE FREE AND CLEAR OF**
          v.                         ) **INTERESTS; (II) AUTHORIZING**
                                     ) **THE PAYMENT OF SALE-**
8  ACDF, LLC; ASSEMI AND SONS, INC.; ) **RELATED COSTS; AND (III)**
   AVILA RANCH EA, LLC; BEAR FLAG    ) **GRANTING RELATED RELIEF**
9  FARMS, LLC; C & A FARMS, LLC;     )
   CANTUA ORCHARDS, LLC; DA REAL     ) [Related to Dkt. No. 240]
10 ESTATE HOLDINGS, LLC; FAVIER      )
   RANCH, LLC; FG2 HOLDINGS LLC;     )
11 GRADON FARMS, LLC; GRANVILLE      )
   FARMS, LLC; GRANTLAND HOLDINGS    )
12 NO. 1, LLC; GRANTLAND HOLDINGS NO.)
   2, LLC; GRANTOR REAL ESTATE       )
13 INVESTMENTS, LLC; GVM             )
   INVESTMENTS, LLC; GV AG, LLC;     )
14 LINCOLN GRANTOR FARMS, LLC;       )
   MARICOPA ORCHARDS, LLC; PANOCHE   )
15 PISTACHIOS, LLC; SAGEBERRY FARMS, )
   LLC; DEREK BELL; and RACHEL MARIE )
16 WHITE,                            )
17                                   )
             Defendants.             )
18                                   )
   _____    )
19

20

21

22

23

24

25

26

27

28

Before the Honorable Kirk E. Sherriff, United States District Judge, is the *Notice of Proposed Auction and Sale of Real Property (Sandrini)* [Dkt. No. 240] (the "**Sale Notice**") filed by Lance Miller, solely in his capacity as Court-appointed receiver in the above-captioned case (the "**Receiver**") for entry of an order (a) authorizing the Receiver to sell the Property[1] free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as existed immediately prior to the Closing Date; (b) authorizing the Receiver to pay, without further order of the Court, all sale-related costs and expenses, including break-up fees (if applicable), commissions, and transaction fees (but excluding the Receiver's attorneys' fees); and (c) granting related relief. The Court hereby finds that:[2] (a) the marketing and sale of the Property was held in accordance with the *Order Establishing Marketing, Bid, and Auction Procedures for Receivership Properties* [Dkt. 204] (the "**Bidding Procedures Order**"); (b) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (c) it has the statutory authority to enter this Order, including pursuant to 28 U.S.C. § 2001 and Rule 55 of the Federal Rules of Civil Procedure; and (d) due and proper notice of the Sale Notice was given and no other or further notice is necessary. The Court further finds that:

A.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Rule 54(b) of the Federal Rules of Civil Procedures, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

---

[1] Capitalized terms used herein shall have the meanings ascribed in the Purchase and Sale Agreement attached hereto as **Exhibit A** (the "**PSA**")

[2] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Sale Hearing are incorporated herein by reference.

B.      The Court entered the Bidding Procedures Order on May 1, 2025, that, among other things, established the procedures in connection with the marketing, auction, and sale of the Property (the "**Bidding Procedures**") and granted related relief.

C.      As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Sale Hearing, including the declarations submitted by Lance Miller and Cameron Kay and (ii) the representations of counsel made on the record at the Sale Hearing, all aspects of the sale process, including notice thereof, have been conducted in compliance with the Bidding Procedures and Bidding Procedures Order.

D.      In compliance with the Bidding Procedure Order, the Receiver published notice of the Auction and proposed sale in the following publications: The Business Journal, Bakersfield Californian, Madera Tribune, Merced Sun-Star, and Visalia Times Delta, at least once weekly from approximately June 4, 2025, through June 25, 2025. *See Proof of Service by Publication* [Dt. No. 223].

E.      The Receiver has demonstrated good, sufficient, and sound business purpose and justifications for the sale and other transactions contemplated in the PSA, and such actions are an appropriate exercise of the Receiver's business judgment and in the best interest of the receivership estate.

F.       The Receiver conducted the marketing and auction process in accordance with the order appointing the Receiver in this case (as amended, the "**Receivership Order**"), the Bidding Procedures, and the Bidding Procedures Order. The marketing and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property, and Receiver afforded potential purchasers a full and fair opportunity to make higher and better offers for the Property.

G.      The Receiver conducted the sale process for the Property without engaging in any collusion and in accordance with the Bidding Procedure and the Bidding Procedures Order. Following the Bid Deadline, the Receiver determined in the sound exercise of his business judgment, in consultation with Plaintiffs, that RTS Orchards, LLC ("**Buyer**") submitted the highest or otherwise best offer for the Property.

3

H.      The Receiver and Buyer have acted at arm's length and in good faith with respect to the proposed sale, and the Purchase Price represents the highest or otherwise best offer for the Property. The Receiver's determination that the PSA executed by Buyer constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Receiver's business judgment.

I.      The purchase price for the Property constitutes (i) reasonably equivalent value under the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

J.      Except as expressly set forth in the PSA, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Defendants, or otherwise related to the Property, by reason of the transfer of the Property to the Buyer.  The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the PSA.

K.      Pursuant to this Order and the Receivership Order, the Receiver has full power and authority to execute, deliver, and perform the obligations under the PSA and all other documents and transactions contemplated thereby and no consents or approvals, other than those expressly provided for herein or in the PSA, are required for the Receiver to consummate the sale transaction. As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Defendants and the Receiver in and to the Property free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the PSA.

L.      Sale of the Property other than free and clear of Interests, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Property. In addition, Plaintiffs have consented to the sale of the Property free and clear of their respective Interests. Other holders of Interests, if any, who did not object, or who withdrew their objections, to the Sale Notice are deemed to have consented. Therefore, approving of the PSA

and the consummation of the sale of the Property free and clear of Interests is appropriate under 28 U.S.C. § 2001, the Receivership Order and the interests of equity, and is in the best interests of the Receivership estate, creditors, and other parties in interest.

M.     Buyer is the designated Successful Bidder and the Buyer's PSA is designated as the Successful Bid in accordance with the Bidding Procedures.

N.     Adam H. teVelde as Trustee of the AP teVelde Family Revocable Trust of June11, 2020 (the "**Back-up Bidder**") is designated as the Back-up Bidder and Back-up Bidder's purchase and sale agreement (the "**Back-up PSA**"), which is attached hereto as **Exhibit B**, is designated as the Back-up Bid. The Back-up Bidder has compiled in all respect with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Back-up PSA.

O.     The Receiver's (i) publication of notice of the opportunity to purchase the Property, the Bidding Procedures, and solicitation of bids for the Property as set forth above, (ii) solicitation of bids for the Property through the Receiver's and his professionals' efforts to market the Property, and (iii) conduct of the Auction in Fresno, California, establish the Receiver's satisfaction of the public sale requirements in 28 U.S.C. §§ 2001 and 2002. To the extent the Receiver has not fully satisfied the provisions of 28 U.S.C. §§ 2001 and 2002, he is excused from compliance for cause shown.

Accordingly, it is hereby:

**ORDERED** that the Receiver's request to sell the Property is granted as set forth herein and all objections to the Sale Notice, to the extent not resolved or withdrawn on the record, are overruled on the merits. All persons and entities who received notice of the Sale Notice and/or the Sale Hearing that failed to timely object thereto as deemed to have consented to the relief sought in the Motion and set forth in this Order;

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into and consummate the transactions set forth in the PSA with Buyer or its assignee as the Successful Bidder in accordance with the Bidding Procedures Order or, to the extent Buyer is unwilling or unable to close under the PSA, to Back-up Bidder pursuant to the Back-up Bidder PSA. The Receiver is authorized to act on behalf of Defendants in connection with the sale and conveyance of title to the Property to

Buyer and no other consents or approvals are necessary or required for the Receiver to carry out the sale and conveyance. All persons and entities are hereby prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Receiver to sell and transfer the Property in accordance with the terms of this Order or the PSA.

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property pursuant to the terms of the PSA;

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property to Buyer free and clear of Interests, with such Interests attaching to the Sale Proceeds with the same force and in the same priority as existed immediately prior to the Closing Date;

**IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court order, all sale-related costs and expenses, including closing costs, real estate taxes, title insurance, prorations, recording fees, and commissions (but specifically excluding attorneys' fees) with the net proceeds of the sale to be paid to Plaintiffs in partial satisfaction of their liens;

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into any documents reasonably necessary or desirable to implement the terms of this Order and effectuate the sale of the Property and to take all further actions as may reasonably be requested by Buyer for the purposes of assigning, transferring, granting and conveying to the Buyer, as may be necessary or appropriate to the performance of the Receiver's obligations hereunder. The Receiver is also authorized to execute any documents on behalf of the Defendants to the extent necessary to complete;

**IT IS FURTHER ORDERED** that Property shall be transferred on an "AS IS," "WHERE, IS," and "WITH ALL FAULTS" basis. All sale documents shall provide language substantially similar to the following:  "Buyer acknowledges and agrees that Buyer is purchasing the Property 'as-is', 'where-is', and 'with all faults' as of the Closing Date, and Buyer further acknowledges and agrees that Seller hereby expressly disclaims any and all implied warranties concerning the condition, value and quality of the Property and any portions thereof, including, but not limited to, the implied warranties of habitability, merchantability, or fitness for a particular purpose.  Buyer acknowledges that no warranty has arisen through trade, custom or course of dealing with Seller;"

1    **IT IS FURTHER ORDERED** that the holders of any Interests in the Property shall be

2    prohibited from pursuing or asserting such Interests against Buyer, any of its assets, property,

3    successors or assigns, or the Property.

4    **IT IS FURTHER ORDERED** that, except with prior leave of this Court, all persons or

5    entities with notice of this Order are prohibited from (i) commencing, prosecuting, continuing or

6    enforcing any action against the Receiver related to the Property or the Sale Proceeds (except that

7    such actions may be filed, but not prosecuted, to toll any statute of limitations), (ii) taking any action

8    to interfere with the Receiver's management, control or possession of the Property or the Sale

9    Proceeds, or (c) interfering in any manner with the exclusive jurisdiction of this Court over the

10    Property or the Sale Proceeds.

11    **IT IS FURTHER ORDERED** that, on and after the Closing Date, any persons holding an

12    Interest shall execute such documents and take all other actions as may be reasonably necessary to

13    further demonstrate the release of their respective Interests in the Property, as such Interests may

14    have been recorded or otherwise filed.  Buyer may, but shall not be required to, file a certified copy

15    of this Sale Order in any filing or recording office in any federal, state, county or other territory or

16    jurisdiction in which Property is located, or with any other appropriate clerk or recorded with any

17    other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to

18    release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing

19    Date.  All persons and entities that are in possession or control of any portion of the Property on the

20    Closing Date shall promptly surrender possession and control thereof to the Buyer on, or as soon as

21    reasonably practicable after, the Closing Date.

22    **IT IS FURTHER ORDERED** that the Receiver shall serve a copy of this Order on all

23    parties known to have asserted an Interest in the Property. The Receiver is authorized to file a copy

24    of this Order in any court where an action is pending involving the Property.

25    **IT IS FURTHER ORDERED** that nothing contained herein shall prevent the Receiver

26    from seeking additional relief from this Court related to the PSA, the Property, or the Sale Proceeds.

27    **IT IS FURTHER ORDERED** that, should Buyer fail to close on the sale pursuant to and

28    in accordance with the terms of the PSA (as may be amended by written agreement of the Receiver

7

and Buyer), and without further order from the Court, the Receiver is hereby authorized and empowered to sell the Property to Back-up Bidder, execute and deliver the Back-up Bidder PSA, and to implement and consummate all of the transactions and perform all obligations contemplated by the Back-up Bidder PSA and this Sale Order as if the Back-up Bidder were the Successful Bidder at Auction, and the Back-up Bidder shall be entitled to all the findings and protections of this Sale Order provided to the Buyer. In the event of a sale to Back-up Bidder, Back-up Bidder shall be substituted as "Buyer" as defined in this Order.

**IT IS FURTHER ORDERED** that this Order and the terms and provisions of the PSA shall be binding on Defendants, all of Defendants' creditors (whether known or unknown), Buyer, Back-up Bidder, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting any interest in the Property. The provisions of this Order and the terms and provisions of the PSA, and any actions taken pursuant hereto or thereto, shall survive the entry of any order for relief under title 11 of the United States Code, and shall be binding on Defendants and their successors and assigns, including any debtor-in-possession or any trustee appointed under title 11 of the United States Code, or similar custodian or fiduciary appointed over Defendants or their assets.

**IT IS FURTHER ORDERED** that this Order shall be effective immediately upon entry.

**IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any disputes arising from or related to the Property, the PSA, or the implementation or interpretation of this Order.

Dated: _____

_____
Hon. Kirk E. Sherriff
United States District Court

# Exhibit A

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

## PURCHASE AND SALE AGREEMENT
## AND
## JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated September 19, 2025, to be effective on the date when all parties have executed it, which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") and RTS ORCHARDS, LLC, a California limited liability company (the "**Buyer**").  For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**." This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A.      Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property consisting of approximately 867.51 assessed acres of land, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

B.      Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

C.      The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order entered by the Court at Dkt. No. 204 (the "**Marketing Procedures Order**") and attached hereto as **Exhibit B** and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially in the form attached hereto as **Exhibit C** ("**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1.      **Purchase and Sale**

1.1     Purchase and Sale of Property.  Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following solely to the extent it is Receivership Property (as defined in the Receivership Order):

(a)      The Land;

(b)    All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State of California (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or that provides drainage, irrigation and/or water to the Land;

(c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of-way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

(d)    All crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), for the 2025-2026 crop year and thereafter generated by the Land (the "**Crops**") (for clarity, a "crop year" herein refers to cultivation of crops starting in the first listed year and harvested in the second listed year; for example "2025-2026 crop year" refers to the cultivation of crops in 2025 and 2026 for harvest in 2026);

(e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land, before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)    All surface water rights, groundwater rights and other water rights or water credits appurtenant to the Land, which are held by the Seller, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications or other court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale of water generated from irrigation wells located on the Land, which is held by the Seller (collectively, "**Water Rights**"); and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on Schedule 1.1(g) that Buyer elects to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer

without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

      1.2     <u>As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures</u>.

      (a)     Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY.  BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY.**

      (b)     Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller, unless expressly set forth in this Agreement, or any representations or warranties (oral or written) of any Lenders (as defined below) or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders.  **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF.**

(c)     **EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS:  (i) EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.**

(d)     **SUBJECT TO SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH AT <u>SECTION 7.1</u>, BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS <u>SECTION 1.2</u>, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS.**

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**



**Buyer's Initials**

1.3    <u>Release</u>.  At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and The Prudential Insurance Company of America ("**Prudential**"), PAR U Hartford Life & Annuity Comfort Trust ("**PAR U**"), and PGIM Real Estate Finance, LLC (together with Prudential and PAR U, collectively, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

1.4    <u>Not a Residential Purchase</u>.  Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Property, Buyer represents and warrants:  (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's residence.  To the fullest extent permitted by applicable law, Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

1.5    <u>Bid Deposit</u>.  Concurrently with Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Buyer shall deposit into a non-interest-bearing receiver account with Pivot Management Group LLC (the "**Deposit Holder**") an amount equal to **One Million Seven Hundred Fifty Thousand and 00/100ths Dollars ($1,750,000.00)** (the "**Bid Deposit**") in immediately available, goods funds of the United States of America.  If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.

**2.**    **<u>Escrow</u>**.  Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA 93711 (Attention: Sue Meyer) who shall act as "**Escrow Holder**," in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**").  The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct, violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

3.    **Close of Escrow**.  Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before **5:00 p.m., Pacific Time, on the later to occur of (i) a date no later than five (5) days following the date the Sale Order becomes final and non-appealable which is mutually acceptable to the Parties, or (ii) September 8, 2025** (the "**Closing Date**"), or such other date as agreed to by the Parties; provided that the Closing Date shall in no event occur later than the Outside Date (as set forth in <u>Section 6.4</u>).

3.1    <u>Purchase Price.</u>  The Purchase Price of the Property ("**Purchase Price**") is **Nineteen Million Five Hundred Fifty Thousand and 00/100ths Dollars ($19,550,000.00) United States currency**.  The Purchase Price shall be payable as follows:

(a)    Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred 00/100ths Dollars ($100.00)** from the Bid Deposit (the "**Independent Consideration**") as independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof.  The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under <u>Section 6.3</u>, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

(b)    Within two (2) business days of opening of the Escrow, the Deposit Holder shall transfer the Bid Deposit to the Escrow for application to the Purchase Price.

(c)    The balance of the Purchase Price (the "**Balance**") shall be deposited by Buyer into Escrow no later than one (1) business day prior to the Closing and paid to Seller in cash, by cashier's check or wire transfer of immediately available good funds, at the Close of Escrow.

4.    **LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN <u>SECTION 1.5</u> AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF**

THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN <u>SECTION 1.5</u> REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY.

ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION



Seller
Lance Miller, solely in his capacity
as Court-appointed Receiver

Buyer

5.    <u>Seller's Deliveries; Condition of Title</u>.

5.1    <u>Seller's Deliveries</u>. Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land.  Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other disclosures that are required in connection with the conveyance of the property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above.  As used in this Agreement, "**Disclosure Statutes**" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property.  Buyer hereby agrees as follows with

respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

        (a)      Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

        (b)      The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

        5.2      <u>Condition of Title</u>. Seller agrees to convey fee simple title in and to the Property to Buyer. Title shall be conveyed by Seller to Buyer by receiver's deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject to the items enumerated in this Section. Buyer shall accept title to the Property subject to the following exceptions:

        (a)      any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due;

        (b)      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

        (c)      easements, covenants, restrictions, defects, encumbrances (other than any monetary encumbrance(s) in favor of the Lenders), and other matters of record on the Effective Date, except to the extent Seller has agreed in writing to terminate or remove;

        (d)      physical matters and conditions, if any, that exist at the Property on the Effective Date and that would be disclosed by a current survey or inspection of the Property;

        (e)      laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

        (f)      any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

        (g)      all recorded covenants, conditions, restrictions, easements, and agreements affecting the Property, except to the extent Seller has agreed in writing to terminate or remove;

        (h)      the printed standard exceptions listed in the Preliminary Report (as defined below); and

        (i)      such other matters as Buyer either waives, assumes, or consents to in writing, including the leasehold and other rights listed in <u>Schedule 5.2(i)</u>.

        5.3      <u>No Liens</u>. The Property shall be sold free and clear of any and all financial liens, liabilities, obligations, encumbrances, or claims (except for any such liens, encumbrances, claims or interests set forth and described in <u>Section 5.2</u> above) effective upon the Closing. As directed by

Buyer, Seller shall have caused or obtained, to Buyer's reasonable satisfaction, prior to the Closing a release of all liens in and to the Crops that appear in the public record by any persons having an interest therein.

        5.4    <u>Buyer's Indemnification of Seller</u>. Any damage caused to the Property in connection with Buyer's Inspection shall be promptly and fully repaired by Buyer and the Property returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement. Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's Agent's activities, which obligation shall survive any termination of this Agreement. Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's Agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses reasonably incurred by Seller Parties in connection therewith. The indemnity provided herein shall survive the Close of Escrow and any termination of this Agreement.

        5.5    <u>SGMA Disclosure.</u> The Sustainable Groundwater Management Act ("**SGMA**") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. Seller and its agents and representatives make no representation on water rights or the effect of SGMA on the Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future. In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property. Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property.

        **6.**    **Conditions Precedent; Termination**.

        6.1    <u>Conditions to Obligations of all Parties</u>. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

        (a)    the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Owner, Lenders,

and all parties of interest in the Action, and Title Company agrees to insure title to the Property without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order or the Lender Agreement Approval (defined below) will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination;

(b)     no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement; and

(c)     Lenders shall have provided their written approval of this Agreement.

6.2     <u>Seller's Conditions Precedent</u>.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)     Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in <u>Section 9</u> below), and the Buyer's share of the Closing Costs (as defined in <u>Section 12</u> below) and Prorations (as defined in <u>Section 13</u> below) into the Escrow by the Closing Date.

(b)     Each of Buyer's representations and warranties set forth in <u>Section 8</u> hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3     <u>Buyer's Conditions Precedent</u>.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)     Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed.

(b)     Except as listed in <u>Schedule 5.2(i)</u>, Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)      Seller shall have obtained a commercially-reasonable perpetual easement(s), recorded or to be recorded at the Closing, appurtenant to and running with ownership of that portion of the Land identified as Parcel 7 on Exhibit A (APN 521-110-08) (as the "**Dominant Tenement**" for said easement) providing the current and future owner(s) of the Dominant Tenement with pedestrian and vehicular ingress and egress, including commercial agricultural vehicle operations, reasonably necessary for access to the Dominant Tenement from either (i) an existing public roadway or (B) a portion of the Land acquired by Buyer other than the Dominant Tenement (the "**Access Easement**").

(d)      Each of the representations and warranties of Seller contained in Section 7 or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4      Termination.  This Agreement may be terminated in accordance with this Section 6.4 at any time prior to the Closing:

(a)      By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes a final, non-appealable order, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Outside Date; provided, however, that the Outside Date may be extended by Seller and Buyer upon mutual agreement;

(b)      By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this Section 6.4(b) shall not be available to a Party if such order resulted from, or could have been avoided but for, the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)      By written notice of either Buyer or Seller if any Seller closes or consummates an alternative transaction or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 6.4(c) until the alternative transaction closes;

(d)      By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.3 to be satisfied, and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the

Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in <u>Section 6.3</u> shall become incapable of being satisfied by the Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this <u>Section 6.4(d)</u> will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or;

(e)     by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in <u>Section 6.2</u> to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in <u>Section 6.2</u> shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this <u>Section 6.4(e)</u> will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder; and

(f)     by the mutual written consent of Seller and Buyer.

6.5     <u>Effect of Termination</u>

(a)     In the event of the termination of this Agreement as provided in <u>Section 6.4</u>, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to <u>Section 6.4(e)</u> and Sellers are not then in material breach of Sellers' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit and (y) for any reason other than pursuant to <u>Section 6.4(e)</u>, Buyer shall be entitled to return of the Bid Deposit as set forth in this Agreement. Notwithstanding the foregoing, nothing in this <u>Article 6</u> will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to <u>Section 6.4</u>, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement.

(b)     In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to <u>Sections 6.4(c)</u>, and an alternative transaction is consummated, Seller shall pay to Buyer a break-up fee in an amount equal to $350,000.00 (the "**Breakup Fee**"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an alternative transaction, to an account designated by Buyer in writing to Seller.

(c)     In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate this Agreement in accordance with <u>Section 6.4</u> and, if applicable, to receive the Breakup Fee or return of the Bid Deposit in accordance with <u>Section 6.5</u>, if payable thereunder.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this <u>Section 6.5</u> are an integral part of this Agreement and that the Breakup Fee is not a penalty, but rather represents liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Breakup Fee is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision.

**7.    <u>Seller's Representations and Warranties</u>.**

7.1    <u>Seller's Representations and Warranties</u>.  Except as set forth on <u>Schedule 7.1</u>, attached hereto, if any, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)    <u>Court-Appointed Receiver</u>.  Seller is the Court-appointed receiver over the Receivership Property.

(b)    <u>Authority</u>.  Subject to entry of the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which any Seller is a party or by which any Seller is otherwise bound, or any judicial order to which any Seller is a party or to which any Seller is subject.  All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by such Seller, (ii) be legal, valid and binding obligations of such Seller, and (iii) not violate, to such Seller's knowledge, any provision of any agreement or judicial order to which such Seller is a party or to which such Seller is subject.

(c)    <u>OFAC Compliance</u>.    Seller (which, for the purposes of this <u>Section 7.1(c)</u>, shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    <u>Foreign Person and Withholding</u>.  Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to such Seller or the Property.  Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code, or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008.  A Seller may

be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

        (e)   <u>Organic Trees or Vines</u>.  The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties.  Seller makes no representations or warranties in this regard.

        7.2   <u>Survival</u>.  The express representations and warranties made in this Article by Seller will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3) months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

## 8.    <u>Buyer's Representations and Warranties; Covenant</u>.

        8.1   <u>Buyer's Representations and Warranties</u>. Buyer hereby warrants, represents, convents and certifies to Seller and agrees that as of the Close of Escrow:

        (a)   <u>Good Standing</u>.  Buyer is a limited liability company that is properly and duly formed, validly existing and in good standing under the laws of the State of California.

        (b)   <u>Authority</u>.  Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of Buyer herein, and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject.  All documents to be executed by Buyer which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Buyer, (ii) be legal, valid and binding obligations of Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which Buyer is subject.

        (c)   <u>OFAC Compliance</u>.  Buyer or its Authorized Assignee (which, for the purposes of this <u>Section 8(c)</u>, shall include its members, officers, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental

action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    <u>Bankruptcy</u>.  Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e)    <u>No Collusion</u>.  Buyer represents and warrants that it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder.

8.2    <u>Survival</u>.  The express representations and warranties made in Section 8.1 by Buyer will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3) months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

8.3    <u>Debts, Liens, and Encumbrance</u>.  Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that relate in any manner to any of Buyer's activities relating to the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.  This provision shall survive the Closing or any termination of the Agreement.

## 9.    **Cultural Cost Reimbursement; Post-Closing Harvest**.

9.1    <u>Cultural Cost Reimbursement</u>.  Seller is retaining the 2024-2025 almond and pistachio crops produced on the Property, and as such there will be no reimbursement for cultural costs for the 2024-2025 almond and pistachio crops at the Closing.  However, in the event that the Closing occurs after the harvest of either the 2024-2025  almond or pistachio crops, and Seller has expended funds for cultivation of the 2025-2026 almond or pistachio crops, then at the Closing, through the Escrow,  Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Property for the 2025-2026 crop year (the "**Cultural Costs Reimbursement**"), from the conclusion of Sanitation, as defined below.  Upon written request from Buyer, Seller shall provide Buyer with statements reflecting the amount of cultural costs incurred for the Property for the 2025-2026 crop year to the extent actual invoices for such costs are not reasonably available.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement, if any (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**").  If applicable, Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1)

business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2025-2026 crop year, if any, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2025-2026 crop year. For the purpose of this Agreement, "**Sanitation**" means the removal of the crop for 2024-2025 crop year, together with orchard floor cleanup and post-cleanup irrigation.

9.2    <u>Post-Closing Harvest by Seller</u>. In the event that the Closing shall occur prior to the completion of the 2024-2025 almond and pistachio harvest (whether such has commenced or not), at the Closing, Buyer will enter into a short term lease with Seller in the form set forth as Exhibit H (the "**Holdover Lease**").

**10.    <u>Closing</u>.**

10.1    <u>Closing Date</u>. Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein. Closing shall occur on or before the Closing Date. Closing shall be conditioned upon:

(a)    <u>Full Performance</u>. Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)    <u>Conditions</u>. The conditions precedent set forth in <u>Section 6.1, 6.2, and 6.3</u> have been satisfied or waived by the Party for whose benefit the condition exists.

(c)    <u>Title Policies</u>. Title Company shall be ready, willing, and able to issue upon the Closing and following recordation of the Deed to Buyer, a current Owner's CLTA Standard Coverage Policy of title insurance (or ALTA Extended Coverage Policy, if Buyer shall elect to obtain an ALTA Survey), at no more than the insurer's standard rates ("**Buyer's Title Policy**"). Buyer's Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Buyer, subject (1) the lien of real property taxes for the current fiscal year not yet due and payable, (2) those Schedule B standard exceptions listed in the title commitment for the Buyer's Title Policy (except to the extent Seller and/or Escrow Holder has agreed in writing to remove), and (3) the following Schedule B numbered exceptions (the "**Permitted Exceptions**"):

(i)    Sandrini North: Schedule B Exceptions 1 – 5, 7 – 18, 21 – 23, 25 – 46, 48, 49, 51 – 66, 68 – 75, 77 – 80, 82 – 94, 96 – 109, 115 - 121, all as shown in that certain Preliminary Report, title order number FWKN-TO25000617-MW, Amendment C, dated April 7, 2025, issued by Chicago Title Company (the "**Sandrini North Preliminary Report**").

(i)    Sandrini South: Schedule B Exceptions 1 – 3, 5 – 13, and 18 – 23, all as shown in that certain Preliminary Report, title order number FWKN-TO25000621-MW, Amendment B, dated July 14, 2025, issued by Chicago Title Company (the "**Sandrini South Preliminary Report**", and together with the Sandrini North Preliminary Report, the "Preliminary Report").

The premium for such title policy shall be paid as required under <u>Section 12</u>.

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

(d)      <u>Delivery</u>.  Possession of the Property shall be delivered to Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property.

10.2    <u>Seller's Closing Obligations</u>.   On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)      The Deed, executed by Seller.

(b)      A bill of sale for the Crops in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)      To the extent required, duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements material to the Property and operations thereon that are Receivership Property and that Buyer informs the Seller in writing that Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability).

(d)      An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(e)      Seller's counterpart of the Holdover Lease, if applicable.

(f)      Unless previously recorded, the fully executed Access Easement, suitable for immediate recording.

(g)      The Closing Statement (as defined below) executed by Seller.

(h)      To the extent they are then in Seller's possession, comprise Receivership Property, and not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(i)      Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(j)      Seller's California Form 593, if required.

(k)      Seller's IRS Form 1099-S if required by Escrow.

(l)      All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(m)     Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

(n)     A copy of the Sale Order entered by the Court.

10.3     <u>Buyer's Closing Obligations</u>.     On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)     The Balance of the Purchase Price and Buyer's share of the Closing Costs and Prorations.

(b)     Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)     A Preliminary Change of Ownership Report in the form specified by Kern County (the "**PCOR**").

(d)     To the extent required, duplicate counterparts of the Assignment Agreement.

(e)     Buyer's counterpart of the Holdover Lease, if applicable.

(f)     The Closing Statement (as defined below) executed by Buyer.

(g)     Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

10.4     **Escrow Holder Closing Obligations**.     The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to <u>Section 10.2</u>, and all of the items to be deposited by Buyer pursuant to <u>Section 10.3</u>, and (ii) the Title Company is prepared to issue Buyer's Title Policy in the condition required in <u>Section 10.1(c)</u> above.  The Escrow Holder shall close escrow by:

(a)     Recording the Deed in the Official Records of Kern County, California, and return the recorded Deed to Buyer with a conformed copy to Seller, and file the PCOR in Kern County, California;

(b)     Issuing the Buyer's Title Policy (within fifteen (15) days after the Closing);

(c)     Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(d)      Delivering to Buyer, Seller's certification that it is not a "foreign person;"

(e)      Delivering to Buyer the items deposited into Escrow by Seller for delivery to Buyer, including the Bill of Sale;

(f)      If applicable, delivering to each of Buyer and Seller, a fully executed counterpart of the Assignment Agreement; and

(g)      Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

**11.**      **Like-Kind Exchange**.  Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

**12.**      **Closing Costs**.  All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

(a)      Buyer and Seller shall pay their respective:  (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)      Seller shall pay (i) the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) the premium for a CLTA Standard Coverage Owner's Title Policy and (iii) one-half of the escrow fees.

(c)      Buyer shall pay (i) one-half of the escrow fees, (ii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, (iii) the premium for Buyer's Title Policy in excess of the premium for a CLTA Standard Coverage Owner's Title Policy, if any, including all endorsements that Buyer shall require, and (iv) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)      Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.**      **Prorations**.  Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1      Utility Charges.  The Parties agree that utility and water charges (other than assessments collected with real property assessments by the county tax assessor) shall not be prorated in Escrow.  Seller shall be liable for all such charges incurred prior to the Closing and Buyer shall be liable for all such charges incurred after the Closing.

13.2     Other Apportionments.     Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest bills or assessments.  Rent or income under all farm related, hunting and mineral leases, if any, shall be prorated as of the Close of Escrow.  Such prorations and apportionments shall be made in the manner customary in the County in which the Land is located for the sale of agricultural land.

13.3     Survival.  The provisions of this Section 13 shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this Section 13 must be made in writing to the other Party within six months after the Closing Date.

14.     **Risk of Loss**.  Risk of physical loss to the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof.  In the event of the loss or destruction of a material part of the Property prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, both Parties may be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property, within thirty (30) days of receipt of notice and has fully paid all costs thereof and cleared any potential liens associated therewith or Buyer and Seller agree to reduce the Purchase Price by the value of the lost or destroyed portion of the Property.

Notwithstanding the foregoing, or anything in this Agreement to the contrary, the Parties acknowledge that Seller may be requested to remove up to one full row of permanent plantings on the parcel of the Land described as Parcel 7 on Exhibit A in order to obtain the Access Easement, and Buyer agrees to allow the removal, at Seller's cost, of such full row if required to do so to obtain the Access Easement, without adjustment of the Purchase Price, and without Buyer asserting such removal as a default by Seller under this Agreement.

15.     **Assignment**.  Buyer may assign to an entity owned or controlled by Buyer, any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of such assignment at least three (3) days prior to the Close of Escrow, containing the name of the assignee ("**Authorized Assignee**") and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement.  Any other proposed assignment shall require the written consent of Seller, which may be withheld at his sole discretion.  Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee.

16.     **Receivership Matters.**  Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Sellers and Buyer shall use

commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Marketing Procedures Order and Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

   **17.**  **Backup Bidder**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the Marketing Procedures, Buyer will serve as the Back-up Bidder. If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the closing of the sale to the Successful Bidder. If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

   **18.**  **Brokers**. Buyer and Seller each represent and warrant to the other that, except for **Ca Ag Properties** ("**Seller's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the imposition of liability for the payment of any other real estate brokerage commission, finder's fee or otherwise in connection with the transaction described herein. Seller shall be responsible for the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith. Buyer shall be responsible for the payment of a commission or fee to Buyer's Broker in accordance with its separate agreement therewith. In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

   **19.**  **Attorney's Fees; Pre-litigation Dispute Resolution**. Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement. In the event of any action between the Parties hereto for breach of or to enforce any provision or right hereunder, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action. The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

   **20.**  **Notices**. All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery; provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice. All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail

shall be deemed delivered three (3) business days after deposit in the United States Mails, and any notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

| | |
|---|---|
| If to Buyer: | RTS Orchards, LLC<br>9530 Hageman Road, Suite B #322<br>Bakersfield, CA 93312<br>Attn: Rod Stiefvater<br>Telephone: 661-809-7610<br>Email: nugentag@gmail.com |
| With a copy to: | Law Office of Christopher Finberg. P.C.<br>5100 California Avenue, Suite 105<br>Bakersfield, CA 93309<br>Attn: Chris Finberg<br>Telephone: 661-600-1275<br>Email: chris@finberg-law.com |
| If to Seller: | Lance Miller, Receiver<br>c/o Pivot Group<br>1230 Rosecrans Avenue<br>Suite 300 – PMB928<br>Manhattan Beach, CA 90266<br>Attn: Lance Miller or Matt Covington<br>Telephone: 424-363-0599<br>Email: lance.miller@pivotgrp.com and<br>matt.covington@pivotgrp.com |
| With a copy to: | Katten Muchin Rosenman LLP<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201-2591<br>Attn: John Mitchell and Michaela Crocker<br>Telephone: 214-765-3600<br>Email: john.mitchell@katten.com and<br>michaela.crocker@katten.com |
| And | Cutts Law, PC<br>5088 N. Fruit Ave, Ste 101<br>Fresno, CA 93711<br>Attn: Lisa A. Cutts<br>Telephone: 559-226-8177<br>Email: lac@cutts-law.com |

21.   **Waivers**.  Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver.  Any such

waiver shall be in writing and delivered to the other Party and the Escrow Holder. No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

22. **Governing Law**. This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles. The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement. To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

23. **Business Days**. In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed. Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24. **WAIVER OF JURY TRIAL**. TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "DISPUTE", AND COLLECTIVELY, ANY OR ALL, THE "DISPUTES") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

25. **Entire Agreement**. This Agreement and the Confidentiality and Nondisclosure Agreement (if any) entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto. The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement. This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged.

26. **Pending Receivership**. Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his

capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Property, or otherwise.

27.    **Bidding Procedures**.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order.  Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order.

28.    **Validity**.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

29.    **Facsimile Electronic Signatures**.  For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

30.    **Time**.  Time is of the essence of this Agreement.

31.    **Counterparts**.  This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

32.    **Binding Offer**.  Buyer agrees that, upon written notice to Buyer by Seller that this Agreement as executed by Buyer only (the "Offer") is the subject of a Sale Notice (as defined in the Marketing Procedures Order) filed with the Court, this Agreement (as may be amended by written agreement of Seller and Buyer) shall be irrevocable for a period of 60 days from the date of such Sale Notice or such other period as agreed to by the Parties in writing (the "Irrevocable Period"). If the Court enters a Sale Order approving this Agreement (as may be amended by written agreement of the Seller and Buyer), then a binding agreement of purchase and sale (without any conditions whatsoever for the benefit of the Buyer, including any conditions for review or approval by third party advisors of the Buyer, financial, planning, banking, legal or otherwise) comes into existence immediately upon the Seller's acceptance.  Buyer acknowledges that this Section 32 obligates the Buyer to complete the purchase of the Property in accordance with the terms of this Agreement (as may be amended by written agreement of Seller and Buyer) upon Seller's acceptance.  Notwithstanding the foregoing, the provisions of Section 14 of this Agreement shall apply during the Irrevocable Period in the event of a casualty or condemnation affecting the Property.

33.    **Supersedes Prior Agreement.**   This Agreement supersedes and replaces in its entirety that certain Purchase and Sale Agreement and Joint Escrow Instructions dated August 20, 2025, made by and between the Parties as to the Property.

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER

By: _Lance Miller_
Lance Miller, solely in his capacity as
Court-appointed Receiver

Date of Execution: _9/19/2025_____

BUYER

RTS ORCHARDS, LLC,
a California limited liability company

By: _Rodney T. Stiefvater_
Rodney T. Stiefvater, Manager

By: _Paul G. Nugent_
Paul G. Nugent, Manager

Date of Execution: _9/19/2025_____

Effective Date:_9/19/2025_____

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

ACCEPTANCE BY ESCROW HOLDER


      CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.


CHICAGO TITLE COMPANY,
a California corporation

By: _____

Name: _____

Title: _____

Escrow Number: _____

Dated: _____

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

**SANDRINI NORTH**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1: (APN: 520-170-15-00)**

THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES OF LYING BELOW THE SURFACE OF SAID LAND, AS PROVIDED IN DEEDS OF RECORD.

**PARCEL 2: (APN: 520-170-16-01)**

THE SOUTH HALF OF THE NORTHEAST QUARTER AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 3: (APN: 520-170-17-01)**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 4: (APN: 520-170-18-00)**

THE SOUTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ONE-HALF ALL GAS, OIL AND OTHER HYDRO-CARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO THEIR HEIRS, SUCCESSORS AND ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEES, AS RESERVED

BY JOHN H. ALCOCK AND MARY F. ALCOCK IN DEED RECORDED DECEMBER 20, 1944 IN BOOK 1221, PAGE 187 OF OFFICIAL RECORDS.

**PARCEL 5: (APN: 520-170-19-05)**

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE GRANT DEED FROM RANDELL LARSON AND CROCKER- ANGLO NATIONAL BANK, AS CO-TRUSTEES UNDER THE WILL OF ROBERT B. BURROUGHS, DECEASED, AND THE DECREE OF DISTRIBUTION OF HIS ESTATE, RECORDED OCTOBER 31, 1963, INSTRUMENT NO. 68217, IN BOOK 3658, PAGE 500, OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE DEED FROM JOSEPHINE POETT STETSON AND CROCKER- ANGLO NATIONAL BANK (FORMERLY CROCKER FIRST NATIONAL BANK OF SAN FRANCISCO), AS CO- TRUSTEES UNDER THE WILL OF HARRY N. STETSON, DECEASED, AND THE DECREE OF DISTRIBUTION OF HIS ESTATE, RECORDED

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

OCTOBER 31, 1963, INSTRUMENT NO. 68218, IN BOOK 3658, PAGE 503, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE DEED FROM RUTH PETERS AND LOUISE WINSLOW PETERS, RECORDED OCTOBER 31, 1963, INSTRUMENT NO. 68219, IN BOOK 3658, PAGE 506, OFFICIAL RECORDS.

**PARCEL 6: (APN: 520-170-20-00)**

THE WEST HALF OF THE SOUTHWEST QUARTER AND THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA.

**PARCEL 7: (APN: 521-110-08-00)**

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 20, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 3/4 OF ALL OIL, GAS, PETROLEUM OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING THE EAST HALF OF THE NORTHEAST QUARTER OR THAT MAY BE PRODUCED AND SAVED THEREFROM, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SAME AS RESERVED IN THE DEED RECORDED OCTOBER 4, 1949, IN BOOK 1266, PAGE 310, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 50% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, OR UNDER THE WEST HALF OF THE NORTHEAST QUARTER, AS RESERVED IN THE DEED RECORDED JUNE 21, 1955, IN BOOK 2444, PAGE 258, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 25% OF ALL OIL, PETROLEUM, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING THE WEST HALF

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

OF THE NORTHEAST QUARTER, AS RESERVED IN THE DEED RECORDED FEBRUARY 17, 1960, IN BOOK 3239, PAGE 762, OFFICIAL RECORDS.

THE ABOVE LEGAL DESCRIPTION IS PURSUANT TO CERTIFICATE OF COMPLIANCE, PARCEL MAP WAIVER NO. 238, RECORDED APRIL 2, 1981, INSTRUMENT NO. 033598, IN BOOK 5364, PAGE 419, OFFICIAL RECORDS.


**SANDRINI SOUTH**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL A OF LOT LINE ADJUSTMENT NO. 62-00 AS EVIDENCED BY A CERTIFICATE OF COMPLIANCE, RECORDED NOVEMBER 8, 1999, INSTRUMENT NO. 0199161190, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PORTION OF THE SOUTHEAST QUARTER OF SECTION 19, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, KERN COUNTY OF CALIFORNIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL OF SAID SOUTHEAST QUARTER EXCEPTING THE SOUTH 341.65 FEET OF THE EAST 255.00 FEET THEREFROM.

EXCEPTING THEREFROM 1/2 OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES TOGETHER WITH THE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE AND TAKE AWAY THE SAME WITH THE RIGHT TO ENTER UPON SAID LAND FOR SAID PURPOSES AS RESERVED IN THE DEED FROM H.L. SCHUSTER AND PEARL M. SCHUSTER, HIS WIFE, DATED JANUARY 10, 1948, RECORDED FEBRUARY 18, 1948, IN BOOK 1477, PAGE 293, OFFICIAL RECORDS.

APN 521-110-13-00

**END OF DESCRIPTION**

EXHIBIT B

MARKETING PROCEDURES ORDER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, et al.,

        Plaintiffs,

   v.

ACDF, LLC, et al.,

        Defendants.

No. 1:24-cv-01102-KES-SAB

**ORDER ESTABLISHING MARKETING,
BID, AND AUCTION PROCEDURES FOR
RECEIVERSHIP PROPERTIES**

(Doc. 190)

On March 31, 2025, Receiver Lance Miller filed a Motion for Order Establishing Marketing, Bid, and Auction Procedures for Receivership Properties, Doc. 190 (the "**Motion**"), and calendared the Motion for hearing on May 5, 2025. On April 29, 2025, Receiver filed a Notice of Non-Opposition and Non-Objection to the Motion, noting that the only response to the Motion had been withdrawn.[1] Doc. 203. The Motion is unopposed and the deadline to oppose the Motion has passed.[2] Accordingly, the Motion is SUBMITTED without oral argument

---

[1] American Equity Investment Life Insurance Company filed a response, Doc. 198, then withdrew the response, Doc. 201. No other responses were filed.

[2] Prior to the date on which the Motion was filed, defendants filed a separate Motion to Implement Procedures Coordinating Receivership Sale Processes. Doc. 173. The Court denied defendants' motion at a hearing on March 31, 2025, for the reasons stated on the record. Doc.

DocuSign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

1   pursuant to Local Rule 230(g), and the hearing currently set for May 5, 2025, is VACATED.  The

2   Court issues the following written order.

3         Having read and considered the Motion and the evidence submitted therewith, the now-

4   withdrawn response thereto, and good cause appearing therefor, the Court finds that notice of the

5   Motion was adequate under the circumstances and that the below Sale Procedures meet all

6   statutory requirements for sales of real property by receivers within this district.  Accordingly, it

7   is hereby **ORDERED THAT**:

8         The Motion is granted, and the Court hereby approves the below sale procedures

9   (the "**Sale Procedures**") with respect to the Properties being marketed by Ca Ag Properties

10   ("**Broker**"):

11                        **Sale Procedures**

12     1.     **Marketing:**

13          a.     **Listing Services.** The Broker will publish the listing of the Properties on

14   commercially reasonable sites and databases and take commercially reasonable actions to show

15   the Properties.

16          b.     **Publication of Sale.** The Broker will list each proposed sale in the Fresno

17   Bee or other local newspaper at least once per week for four weeks from the date of entry of this

18   Order (the "**Publication Period**") in compliance with 28 U.S.C. § 2002.  Any Auction of or Sale

19   Hearing (each as defined below) regarding a Property shall not occur before the conclusion of the

20   Publication Period.  The publication of the sale shall include a short description of the

21   Property(ies) and contact information for the Broker (phone number and/or website link) and state

22   that the sale is subject to Court approval.  The date of the Auction or Sale Hearing may be

23   undetermined at the time of publication.

24          c.     **Overbidding.** If the Broker receives a bid, the Broker will continue to

25   market the subject Property for higher and better bids until the deadline to submit bids for

26   Auction, as set forth in the Sale Notice (defined below), has passed.

27   ─────────────────────

28   192; *see* Doc. 194.  Defendants did not file an opposition to the present Motion.

2. **Auction and Sale Hearing.** If more than one bidder becomes qualified to bid for the purchase of a Property, an auction will be held by the Receiver or his designee at Ca Ag's office, 740 W. Alluvial, Suite 102, Fresno, CA 93711, at a date to be determined by the Receiver and noticed, which shall not be before the conclusion of the Publication Period (the "**Auction**"). The Receiver shall also set a hearing date before the Court for consideration of the confirmation of the terms of any sale to the successful bidder (the "**Sale Hearing**"). The Sale Hearing shall be set on a date at least three (3) days after the date of the Auction. At the Sale Hearing, the Receiver may seek confirmation of the sale to the successful bidder and entry of an order authorizing the Receiver to sell the Properties on an "as is" basis free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other senior encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests, if any, attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as currently exists. If only one bidder timely submits a qualified bid, then the Receiver will request entry of an order at the Sale Hearing without holding an Auction. For the avoidance of doubt, nothing in this Order authorizes the Receiver to sell property free and clear of Interests. Sales of properties free and clear of Interests will only occur upon further notice and order of this Court and parties' rights to object to such sale are preserved.

3. **Qualification to Bid.** To submit a qualified bid, a prospective purchaser must submit its bid in writing by a date noticed by the Receiver in the applicable Sale Notice and such bid must clearly include the following terms or information (a "**Qualified Bid**" and a "**Qualified Bidder**"):

a. **Deposit.** A deposit of 10% of the purchase price which must be delivered to the Receiver with the Qualified Bid (the "**Deposit**"). The Receiver will hold the Deposit in trust or escrow pending approval of the Court. The Deposit shall be nonrefundable unless:

i. Another bidder is the successful bidder at Auction and the Qualified Bidder does not wish to be deemed a backup bidder; or

ii. The Court does not approve the sale through no fault of the Qualified Bidder.

3

   b. **Contingencies.** As of the date of the Auction or Sale Hearing, as applicable, there will be no outstanding contingencies other than Court approval.

   c. **Subject to Overbid at Auction and Court Approval.** The sale is subject to overbidding at Auction, if applicable, and Court approval.

   d. **No Liability of Receiver.** The Receiver shall have no liability under any circumstances, and the Qualified Bidder's only recourse in the event of alleged breach by Receiver is return of its Deposit.

   e. **Good Faith.** The Qualified Bidder must submit with its Qualified Bid a declaration signed under penalty of perjury disclosing any connections such bidder has to the Receiver, the Broker, any owner, borrower, or insider thereof, any creditor, or other interested party, and that it has not, and will not, collude with any other potential purchasers or anyone else with respect to the sale.

   f. **Ability to Close.** A Qualified Bid must be accompanied by evidence of the bidder's financial ability to close unconditionally in form and substance satisfactory to the Receiver in his discretion in consultation with Plaintiffs.

   g. **Purchase and Sale Agreement.** The Qualified Bid shall include a signed Purchase and Sale Agreement in form and content satisfactory to the Receiver in his discretion, in consultation with Plaintiffs, indicating a readiness to immediately enter escrow. The Broker will provide a form of Purchase and Sale Agreement, and the Qualified Bidder must provide a redline with the Qualified Bid reflecting any revisions to such form.

  4. **Stalking Horse Terms.** The Receiver may, in his sole discretion and in consultation with Plaintiffs, offer incentives to initial bidders who submit Qualified Bids as defined above to serve as a "**Stalking Horse Bidder,**" meaning that such bidder will submit an initial offer subject to overbid at Auction. Such Stalking Horse bids may include the following term in addition to other terms determined by the Receiver in the Receiver's discretion, in consultation with Plaintiffs:

   a. **Breakup Fee.** The Receiver may offer a breakup fee of up to 2% of the initial bid amount to a Stalking Horse Bidder that will be paid if, and only if, an overbidder other

than the Stalking Horse Bidder is the successful purchaser of the Property after Auction, Court approval, and closing of such sale.

5.     **Dates and Deadlines.** The Receiver may schedule, reschedule, continue, adjourn, extend or modify any dates and deadlines or other terms relating to any provisions of these Sale Procedures in the Receiver's discretion, in consultation with Plaintiffs, including the Auction or Sale Hearing.

6.     **Notice of Sale Hearing and Auction.** The Auction or Sale Hearing will be held after the conclusion of the Publication Period.  The Receiver will give not less than 21 days' written notice of any Auction or Sale Hearing (the "**Sale Notice**") to the parties entitled to notice in this case and to parties who have submitted a Qualified Bid.  The Sale Notice will include the initial overbid amount and initial minimum bidding increments and any other details the Receiver deems appropriate including the Plaintiffs' estimated secured loan payoff amount and the payoff amount of any junior lienholders.  The initial overbid amount must be enough to pay the breakup fee, if any, plus an increase in value, taking account of any applicable commissions, in the Receiver's discretion in consultation with Plaintiffs.  Creditors may file objections to a proposed sale not less than 7 days before the Sale Hearing.  The Receiver may file any reply not less than 2 days before the Sale Hearing.

7.     **Sale Free and Clear of Interests**. The Receiver is seeking to sell the Property(ies) free and clear of all Interests, with such Interests to attach to the Sale Proceeds to the same extent and with the same priority as existed immediately prior to the sale.  The Sale Notice filed with the Court in advance of the hearing will set forth estimated Sale Proceeds and the proposed distribution of net proceeds to occur upon closing of the proposed sale. For the avoidance of doubt, nothing in this Order authorizes the Receiver to sell property free and clear of Interests. Sales of properties free and clear of Interests will only occur upon further notice and order of this Court and parties' rights to object to such sale are preserved.

8.     **Amendments or Modifications.**  The Receiver may amend, modify, supplement, or change these Sale Procedures in the Receiver's discretion, in consultation with Plaintiffs, as necessary or appropriate to run this sales process, with all terms ultimately being subject to

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

1    Court approval at the conclusion of the Sale Hearing.

2        9.    **Credit Bidding.**  Plaintiffs have the option to credit bid the full amount of its

3    secured claims without any premium to be paid therefor.  Junior lienholders may credit bid the

4    full amount of their secured claims; however, such credit bid will only be considered a Qualified

5    Bid if accompanied by amounts sufficient to satisfy all senior liens in full at sale closing.

6        10.    **Sale Order.**  Promptly upon the conclusion of the Sale Hearing contemplated

7    herein, the Receiver will submit a sale order confirming the sale to the successful bidder free and

8    clear of all Interests, designating any backup bidders, making such other appropriate findings

9    and rulings as may be requested by the Receiver at or before the hearing, including findings

10   regarding the good faith of any Qualified Bidder, and providing that the sale shall close by such

11   date determined by the Receiver (the "**Sale Order**").  If the Receiver complies with these Sale

12   Procedures, which are consistent with 28 U.S.C. § 2001, no further motion must be filed before

13   entry of the Sale Order.

14       11.    **Compliance with Receivership Order.** Nothing in this Order is intended to, nor

15   shall, override any notice, veto, consultation or consent rights held by Plaintiffs pursuant to the

16   Receivership Order.

17

18

19   IT IS SO ORDERED.

20       Dated:   May 1, 2025

                                    _____
21                                   UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT C

FORM OF SALE ORDER

Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone:    (312) 902-5200
Facsimile:    (312) 902-1061

John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100
Dallas, TX 75201-2591
Telephone:    (214) 765-3600
Facsimile:    (214) 765-3602

*Attorneys for the Receiver*
Lance Miller

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., | ) No. 1:24-cv-01102-KES-SAB ) |
| Plaintiffs, | ) **[PROPOSED] ORDER (I)** ) **AUTHORIZING SALE OF REAL** ) **ESTATE FREE AND CLEAR OF** |
| v. | ) **INTERESTS; (II) AUTHORIZING** ) **THE PAYMENT OF SALE-** ) **RELATED COSTS; AND (III)** |
| ACDF, LLC, et al. | ) **GRANTING RELATED RELIEF** ) |
| Defendants. | ) [Related to Dkt. No. ____] ) |

---

[1]    Designated as counsel for service pursuant to L.R. 182(c)(1).

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

Before the Honorable Kirk E. Sherriff, United States District Judge, is the *Notice of Proposed Auction and Sale of Real Property* [Dkt. No. ___] (the "**Sale Notice**") filed by Lance Miller, solely in his capacity as Court-appointed receiver in the above-captioned case (the "**Receiver**") for entry of an order (a) authorizing the Receiver to sell the Property[2] free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as existed immediately prior to the Closing Date; (b) authorizing the Receiver to pay, without further order of the Court, all sale-related costs and expenses, including break-up fees (if applicable), commissions, and transaction fees (but excluding the Receiver's attorneys' fees); and (c) granting related relief. The Court hereby finds that:[3] (a) the marketing and sale of the Property was held in accordance with the *Order Establishing Marketing, Bid, and Auction Procedures for Receivership Properties* [Dkt. 204] (the "**Bidding Procedures Order**"); (b) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (c) it has the statutory authority to enter this Order, including pursuant to 28 U.S.C. § 2001 and Rule 55 of the Federal Rules of Civil Procedure; and (d) due and proper notice of the Sale Notice was given  and no other or further notice is necessary. The Court further finds that:

A.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Rule 54(b) of the Federal Rules of Civil Procedures, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

---

[2] Capitalized terms used herein shall have the meanings ascribed in the Purchase and Sale Agreement attached hereto as **Exhibit A** (the "**PSA**")

[3] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Sale Hearing are incorporated herein by reference.

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

B.      The Court entered the Bidding Procedures Order on May 1, 2025, that, among other things, established the procedures in connection with the marketing, auction, and sale of the Property (the "**Bidding Procedures**") and granted related relief.

C.      As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Sale Hearing, including the declarations submitted by Lance Miller and Cameron Kay and (ii) the representations of counsel made on the record at the Sale Hearing, all aspects of the sale process, including notice thereof, have been conducted in compliance with the Bidding Procedures and Bidding Procedures Order.

D.      In compliance with the Bidding Procedure Order, the Receiver published notice of the Auction and proposed sale in the following publications: The Business Journal, Bakersfield Californian, Madera Tribune, Merced Sun-Star, and the Visalia Times Delta, at least once weekly from approximately June 4, 2025, through June 25, 2025.

E.      The Receiver has demonstrated good, sufficient, and sound business purpose and justifications for the sale and other transactions contemplated in the PSA, and such actions are an appropriate exercise of the Receiver's business judgment and in the best interest of the receivership estate.

F.      The Receiver conducted the marketing and auction process in accordance with the order appointing the Receiver in this case (as amended, the "**Receivership Order**"), the Bidding Procedures, and the Bidding Procedures Order. The marketing and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property, and Receiver afforded potential purchasers a full and fair opportunity to make higher and better offers for the Property.

G.      The Receiver conducted the sale process for the Property without engaging in any collusion and in accordance with the Bidding Procedure and the Bidding Procedures Order. Following the Bid Deadline, the Receiver determined in the sound exercise of his business judgment, in consultation with Plaintiffs, that RTS Orchards, LLC("**Buyer**") submitted the highest or otherwise best offer for the Property.

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

H.      The Receiver and Buyer have acted at arm's length and in good faith with respect to the proposed sale, and the Purchase Price represents the highest or otherwise best offer for the Property. The Receiver's determination that the PSA executed by Buyer constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Receiver's business judgment.

I.      The purchase price for the Property constitutes (i) reasonably equivalent value under the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

J.      Except as expressly set forth in the PSA, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Defendants, or otherwise related to the Property, by reason of the transfer of the Property to the Buyer.  The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the PSA.

K.      Pursuant to this Order and the Receivership Order, the Receiver has full power and authority to execute, deliver, and perform the obligations under the PSA and all other documents and transactions contemplated thereby and no consents or approvals, other than those expressly provided for herein or in the PSA, are required for the Receiver to consummate the sale transaction. As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Defendants and the Receiver in and to the Property free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the PSA.

L.      Sale of the Property other than free and clear of Interests, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Property. In addition, Plaintiffs have consented to the sale of the Property free and clear of their respective Interests. Other holders of Interests, if any, who did not object, or who withdrew their objections, to the Sale Notice are deemed to have consented. Therefore, approving of the PSA

4

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

1   and the consummation of the sale of the Property free and clear of Interests is appropriate under 28

2   U.S.C. § 2001, the Receivership Order and the interests of equity, and is in the best interests of the

3   Receivership estate, creditors, and other parties in interest.

4        M.    Buyer is the designated Successful Bidder and the Buyer's PSA is designated as the

5   Successful Bid in accordance with the Bidding Procedures.

6        **N.    [_____ (the "Back-up Bidder") is designated as the Back-up Bidder and**

7   **Back-up Bidder's purchase and sale agreement (the "Back-up PSA"), which is attached hereto**

8   **as Exhibit B, is designated as the Back-up Bid. The Back-up Bidder has compiled in all respect**

9   **with the Bidding Procedures Order and all other applicable orders of this Court in negotiating**

10  **and entering into the Back-up PSA.]**

11       O.    The Receiver's (i) publication of notice of the opportunity to purchase the Property,

12  the Bidding Procedures, and solicitation of bids for the Property as set forth above, (ii) solicitation

13  of bids for the Property through the Receiver's and his professionals' efforts to market the Property,

14  and (iii) conduct of the Auction in Fresno, California, establish the Receiver's satisfaction of the

15  public sale requirements in 28 U.S.C. §§ 2001 and 2002. To the extent the Receiver has not fully

16  satisfied the provisions of 28 U.S.C. §§ 2001 and 2002, he is excused from compliance for cause

17  shown.

18       Accordingly, it is hereby:

19       **ORDERED** that the Receiver's request to sell the Property is granted as set forth herein and

20  all objections to the Sale Notice, to the extent not resolved or withdrawn on the record, are overruled

21  on the merits. All persons and entities who received notice of the Sale Notice and/or the Sale Hearing

22  that failed to timely object thereto as deemed to have consented to the relief sought in the Motion

23  and set forth in this Order;

24       **IT IS FURTHER ORDERED** that the Receiver is authorized to enter into and consummate

25  the transactions set forth in the PSA with Buyer or its assignee as the Successful Bidder in

26  accordance with the Bidding Procedures Order **[or, to the extent Buyer is unwilling or unable to**

27  **close under the PSA, to Back-up Bidder pursuant to the Back-up Bidder PSA]**. The Receiver

28  is authorized to act on behalf of Defendants in connection with the sale and conveyance of title to

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

the Property to Buyer and no other consents or approvals are necessary or required for the Receiver to carry out the sale and conveyance. All persons and entities are hereby prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Receiver to sell and transfer the Property in accordance with the terms of this Order or the PSA.

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property pursuant to the terms of the PSA;

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property to Buyer free and clear of Interests, with such Interests attaching to the Sale Proceeds with the same force and in the same priority as existed immediately prior to the Closing Date;

**IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court order, all sale-related costs and expenses, including closing costs, real estate taxes, title insurance, prorations, recording fees, and commissions (but specifically excluding attorneys' fees);

**IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court order, the net proceeds of the sale, as follows:

- 
- 
- 

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into any documents reasonably necessary or desirable to implement the terms of this Order and effectuate the sale of the Property and to take all further actions as may reasonably be requested by Buyer for the purposes of assigning, transferring, granting and conveying to the Buyer, as may be necessary or appropriate to the performance of the Receiver's obligations hereunder. The Receiver is also authorized to execute any documents on behalf of the Defendants to the extent necessary to complete;

**IT IS FURTHER ORDERED** that Property shall be transferred on an "AS IS," "WHERE, IS," and "WITH ALL FAULTS" basis. All sale documents shall provide language substantially similar to the following: "Buyer acknowledges and agrees that Buyer is purchasing the Property 'as-is', 'where-is', and 'with all faults' as of the Closing Date, and Buyer further acknowledges and agrees that Seller hereby expressly disclaims any and all implied warranties concerning the

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

1   condition, value and quality of the Property and any portions thereof, including, but not limited to,

2   the implied warranties of habitability, merchantability, or fitness for a particular purpose.  Buyer

3   acknowledges that no warranty has arisen through trade, custom or course of dealing with Seller;"

4       **IT IS FURTHER ORDERED** that the holders of any Interests in the Property shall be

5   prohibited from pursuing or asserting such Interests against Buyer, any of its assets, property,

6   successors or assigns, or the Property.

7       **IT IS FURTHER ORDERED** that, except with prior leave of this Court, all persons or

8   entities with notice of this Order are prohibited from (i) commencing, prosecuting, continuing or

9   enforcing any action against the Receiver related to the Property or the Sale Proceeds (except that

10  such actions may be filed, but not prosecuted, to toll any statute of limitations), (ii) taking any action

11  to interfere with the Receiver's management, control or possession of the Property or the Sale

12  Proceeds, or (c) interfering in any manner with the exclusive jurisdiction of this Court over the

13  Property or the Sale Proceeds.

14      **IT IS FURTHER ORDERED** that, on and after the Closing Date, any persons holding an

15  Interest shall execute such documents and take all other actions as may be reasonably necessary to

16  further demonstrate the release of their respective Interests in the Property, as such Interests may

17  have been recorded or otherwise filed.  Buyer may, but shall not be required to, file a certified copy

18  of this Sale Order in any filing or recording office in any federal, state, county or other territory or

19  jurisdiction in which Property is located, or with any other appropriate clerk or recorded with any

20  other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to

21  release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing

22  Date.  All persons and entities that are in possession or control of any portion of the Property on the

23  Closing Date shall promptly surrender possession and control thereof to the Buyer on, or as soon as

24  reasonably practicable after, the Closing Date.

25      **IT IS FURTHER ORDERED** that the Receiver shall serve a copy of this Order on all

26  parties known to have asserted an Interest in the Property. The Receiver is authorized to file a copy

27  of this Order in any court where an action is pending involving the Property.

28

1    **IT IS FURTHER ORDERED** that nothing contained herein shall prevent the Receiver

2    from seeking additional relief from this Court related to the PSA, the Property, or the Sale Proceeds.

3    **[IT IS FURTHER ORDERED that, should Buyer fail to close on the sale pursuant to**

4    **and in accordance with the terms of the PSA (as may be amended by written agreement of the**

5    **Receiver and Buyer), and without further order from the Court, the Receiver is hereby**

6    **authorized and empowered to sell the Property to Back-up Bidder, execute and deliver the**

7    **Back-up Bidder PSA, and to implement and consummate all of the transactions and perform**

8    **all obligations contemplated by the Back-up Bidder PSA and this Sale Order as if the Back-**

9    **up Bidder were the Successful Bidder at Auction, and the Back-up Bidder shall be entitled to**

10   **all the findings and protections of this Sale Order provided to the Buyer. In the event of a sale**

11   **to Back-up Bidder, Back-up Bidder shall be substituted as "Buyer" as defined in this Order.]**

12   **IT IS FURTHER ORDERED** that this Order and the terms and provisions of the PSA shall

13   be binding on Defendants, all of Defendants' creditors (whether known or unknown), Buyer, **[Back-**

14   **up Bidder,]** and their respective affiliates, successors and assigns, and any affected third parties,

15   including, but not limited to, all persons asserting any interest in the Property. The provisions of this

16   Order and the terms and provisions of the PSA, and any actions taken pursuant hereto or thereto,

17   shall survive the entry of any order for relief under title 11 of the United States Code, and shall be

18   binding on Defendants and their successors and assigns, including any debtor-in-possession or any

19   trustee appointed under title 11 of the United States Code, or similar custodian or fiduciary

20   appointed over Defendants or their assets.

21   **IT IS FURTHER ORDERED** that this Order shall be effective immediately upon entry.

22   **IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any

23   disputes arising from or related to the Property, the PSA, or the implementation or interpretation of

24   this Order.

25   Dated: _____

26

27   _____
     Hon. Kirk E. Sherriff

28   United States District Court

EXHIBIT D

FORM OF RELEASE

_____ ("**Buyer**"), [as successor by assignment to _____], and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for the Eastern District of California (the "**Court**") have previously entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ (as such may have been amended, prior to the date hereof, the "**Agreement**"). Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees (collectively, including Buyer, "**Releasors**"), hereby releases Seller, The Prudential Insurance Company of America, PAR U Hartford Life & Annuity Comfort Trust, PGIM Real Estate Finance, LLC, and their respective partners, professionals, agents, employees, shareholders, members, affiliates, principals, beneficiaries, subsidiaries, successors, and assigns (collectively with Seller, "**Releasees**") from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of action, whether in law or in equity, which Buyer asserts or could assert at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter, claim, occurrence, damages or injury (collectively, "**Claims**"), to the extent arising out of a condition or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and entities, hereby waives the protections and benefits afforded California Civil Coe Section 1542, acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

Notwithstanding anything stated to the contrary in this Agreement, the foregoing release shall not extend to (and shall expressly exclude) claims arising from Seller's intentional fraud.

This Release is made by Buyer for the benefit of Seller and the Releasees on _____.

[Buyer Signature Block]

EXHIBIT E

Form of Deed

**Recording Requested By And**
**When Recorded Return To:**

**Mail Tax Statements To:**

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

## GRANT DEED

THE UNDERSIGNED GRANTOR DECLARES:

DOCUMENTARY TRANSFER TAX IS $_____

    ____Unincorporated Area       ____City of _____
    ___Computed on full value of interest or property conveyed, or
    ___Computed on full value less value of liens or encumbrances remaining at time of sale

Assessor's Parcel No. _____

    FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the _____("**Sale Order**") entered in the case styled _The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al._, Case No. 1:24-cv-01102-01455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby **grant, sell and convey** to _____ ("**Grantee**")**,** the following described real property in the County of Kern, State of California, and more particularly described as follows:

    See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE

Dated: _____, 202_

                                                 _____
                                               LANCE MILLER, solely in his
                                               capacity as Court-appointed Receiver

[attach legal description exhibit and notary ack]

EXHIBIT F

Form of Bill of Sale

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to _____ ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2026 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property situated in Kern County, California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference. The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OTHER THAN THE WARRANTY OF TITLE SET FORTH ABOVE, AS TO THE PERSONAL PROPERTY INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of _____, 202__

SELLER


_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver


[attach legal description exhibit]

EXHIBIT G

Form of Assignment Agreement

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT ("**Assignment**") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Assignor**"), pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and _____("**Assignee**").

A.    Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**").

B.    Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those contracts affecting the Property as set forth on Exhibit B, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.    Assignor hereby assigns to Assignee all its the right, title, obligation, and interest as in and to the Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Contracts to be performed after the date hereof.

2.    Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.

4.    Assignor has not previously assigned the Contracts and has, subject to the required consent of any counterparty, authority to assign the Contracts (and to the extent counterparty consent is required under any Contract and has been obtained, the consent is attached hereto as Exhibit C). Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Contracts.

5.    Each party will, at any time and from time to time upon written request therefor, execute and

-36-`

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.

6.      In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.

ASSIGNOR                                        ASSIGNEE

                                                **[assignee sig blocks]**

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver

[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

EXHIBIT H

Form of Holdover Lease

**HOLDOVER LEASE**

THIS HOLDOVER LEASE (the "**Lease**") is entered into effective as of _____, 2025, by and between RTS ORCHARDS, LLC, a California limited liability company ("**Landlord**") and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") ("**Tenant**").

A.     Landlord has, as of the date of this Lease, acquired the property designated as Assessor's Parcel Numbers 520-170-15, 520-170-16, 520-170-17, 520-170-18, 520-170-19, 520-170-20, 521-110-08 AND 521-110-13, in the County of Kern, State of California (the "**Property**") from Tenant, subject to Tenant's retention of the 2024-2025 almond and pistachio crops thereof.

B.     As a condition to the acquisition of the Property, Landlord has agreed to enter into this Lease with Tenant to allow it to complete the harvest of the 2024-2025 almond and pistachio crops on the Property.

NOW, THEREFORE, Landlord and Tenant, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.     <u>Leased Premises</u>. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Property (the "**Premises**") for the purposes of farming and harvesting the 2024-2025 almond and pistachio crops currently growing thereon and to perform post-harvest clean-up and irrigation. Tenant shall have the normal use of any ground, surface or contract water available to the Premises in connection with the foregoing uses, at Tenant's cost.

2.     <u>Term</u>. Unless terminated earlier as hereinafter provided, the term of this Lease shall commence on the date set forth above, and shall terminate upon the completion of the 2024-2025 almond and pistachio crops harvest and post-harvest clean-up and irrigation, but in no event later than November 1, 2025.

3.     <u>Rental</u>. Tenant shall pay to Landlord at the commencement of this Lease the sum of $100.00 as rental hereunder.

4.     <u>Taxes and Assessments</u>. Landlord shall be responsible for county real property taxes, assessments or similar levies of any kind levied or assessed against the Premises during the term of this Lease, prorated as of the date of termination of the Lease. Landlord shall also pay all land based water taxes and assessments levied, and shall further pay for all water charges for water delivered to the Premises during the term hereof for the use by parties other than Tenant. Tenant shall pay all taxes and assessments levied or assessed against Tenant's personal property and improvements placed upon the Premises by the Tenant, and charges for all water used by Tenant. If either party fails to pay any taxes or assessments for which he is responsible before delinquency, the other party shall have

-38-`

the option to pay such taxes or assessments and hold the non-paying party liable for indemnification of all such payments.

5.      Utilities.  Tenant shall pay for all water, gas, heat, light, telephone services, power, including stand-by or demand charges, and for all other services supplied to the Premises except as otherwise specifically provided for in this Lease.  To the extent such charges are for services provided to both the Premises and any property other than the Premises owned by Landlord, such charges shall be prorated by acreage and the prorated amount paid to Landlord within ten (10) days of invoicing thereof.

6.      Right of Entry.  Tenant shall permit Landlord, and Landlord's agents and assigns, at all reasonable times, to enter the Premises, and to use the roads established on the Premises now and in the future, for the purposes of inspection, compliance with the terms of this Lease, exercise of all rights under this Lease, posting notices, and all other lawful purposes.

7.      Husbandry.  Tenant hereby promises and agrees to farm the Premises in a good and farmer-like manner in accordance with the most approved farming practices in the vicinity for similar crops.

8.      Ownership of Improvements.  Any and all personal property, provided and placed upon the Premises by Tenant may be removed by Tenant prior to the termination of this Lease.  If not removed within that period, they shall become the property of Landlord free of cost to Landlord.

9.      Maintenance and Repair.  Tenant shall care for and maintain the Premises and all appurtenances thereto, including but not limited to, all fences, wells, pumps, pipes, ditches, and roadways, in a good condition, and reasonably free from noxious weeds and grasses, but shall have no liability for capital repairs to any improvements unless required to repair damage which is attributable to the negligent or intentional act of Tenant.

10.     Crops; Crop Insurance.  Landlord has no interest in the 2024-2025 almond and pistachio crops. All expenses necessary to farm and harvest the 2024-2025 almond and pisatchio crops shall be the sole responsibility of Tenant, and Landlord shall have no liability therefor. In the event that any of the 2024-2025 almond and pistachio crops planted upon or harvested from the Premises shall be damaged or destroyed, and Tenant shall receive payment of damages or insurance proceeds in compensation thereof, Tenant shall be solely entitled to such damages or proceeds.

11.     Indemnity by Tenant.  Tenant, solely in his capacity as Court-appointed Receiver, indemnifies, defends, and holds Landlord, its officers, directors, shareholders, assigns, attorneys and agents, harmless from all liability and claim for damages, including attorneys fees and costs, arising from any death or injury from any cause to any person including Landlord's agents, servants and employees, or the property of any kind belonging to anyone, including Landlord, while in, upon or in any way connected with the Premises or with any of the improvements or personal property on said Premises, except to the extent arising from the acts of Landlord.

12.     No Liens.  Tenant agrees that it shall not permit any mechanics or other liens to be filed against the Premises absent the prior written approval of Landlord, and further agrees to notify Landlord at least ten (10) days prior to commencement of any improvement upon the Premises.  Landlord may post and keep posted on the Premises notices of non-responsibility.

13.     Use.  The Premises are leased to Tenant for agricultural and related purposes only.

14.   <u>Waste</u>.  Tenant shall not commit, or permit others to commit, on the Premises waste or a nuisance.

15.   <u>Violations of Law</u>.  Tenant shall not do or suffer to be done on or about the Premises anything which would or does violate or conflict with any law, ordinance, rule or regulation which is now in force or effect, or which may hereinafter be enacted, promulgated or adopted by Federal, State or local authority.  Tenant shall, at Tenant's cost, comply with all laws, ordinances, rules or regulations applicable to the Premises or to Tenant's crops and operations thereon.

16.   <u>Water</u>.  Landlord assumes no responsibility for and does not warrant the quality, quantity or cost of the water supplied to the Premises, nor the eligibility of Tenant to obtain water.  The cost of water, together with any water stand-by or other charges, necessary for the irrigation of the crops shall be borne by Tenant.  Tenant shall not transfer or use groundwater from the Property on other than the Premises.

17.   <u>Surrender; No Holdover</u>.  Tenant agrees that it will peacefully surrender possession of the Premises to Landlord at the expiration of this Lease, free and clear of all liens and encumbrances made, done, or suffered by the Tenant, in as good condition as reasonable wear and tear will permit; provided that damage by fire, acts of God, the elements, the exploration and development of oil, gas, or other minerals, and other causes beyond the reasonable control of the Tenant are excepted.  Tenant shall have no right to holdover on the Premises at the termination of this Lease.

18.   <u>Relationship of the Parties</u>. The relationship of the Landlord and Tenant under this Lease is strictly that of a lessor and a lessee. Nothing in this Lease shall be interpreted to constitute Landlord and Tenant as partners or joint venturers of any kind.

19.   <u>Default</u>.  It is agreed that if Tenant shall default in any of the terms, covenants and conditions of this Lease on its part to be paid, observed or performed, then and in such event, Landlord may, if the Tenant fails to perform such covenant within thirty (30) days after written notice is given to Tenant to perform such covenant, reenter the Premises without further demand or notice and remove all persons therefrom, or at its option, cancel and terminate this Lease.

20.   <u>Insurance</u>.  Tenant shall carry such fire and casualty insurance on Tenant's own property as Tenant deems necessary, and Landlord shall have no obligation to Tenant with respect to any loss or damages suffered by Tenant with regard to Tenant's own property.  Landlord shall carry such fire and casualty insurance upon the existing improvements on the Premises as Landlord deems advisable.  Tenant, at its expense, shall carry (a) worker's compensation insurance, unless Tenant has no employees, (b) general liability insurance with minimum coverage of $1,000,000 per occurrence and $2,000,000 in the aggregate.  Upon written request of Landlord, Tenant shall furnish to Landlord evidence that Landlord has been named an additional insured on such policies, together with certificates from the insurance carrier stating that the insurance is in full force and effect, and that the insurance carrier will give Landlord at least ten (10) days prior written notice before cancellation of such insurance.

21.   <u>Attorneys' Fees on Default</u>.  In any action or proceeding by either party to enforce or interpret this Lease or any provisions thereof, the prevailing party shall be entitled to all costs incurred and to reasonable attorneys' fees.

22.    <u>Notices</u>.  Any notice to be given to either party by the other shall be in writing and shall be served either personally or by prepaid mail certified, return receipt requested, addressed as set forth below their signatures.  Service by mail shall be deemed made two (2) days following the date of mailing.

23.    <u>Binding Effect; No Assignment</u>.  The provisions of this Lease shall benefit and bind the heirs, successors, executors, administrators and assigns of all parties to this Lease; and all parties to this Lease shall be jointly and severally liable under it.  Notwithstanding the foregoing, Tenant shall not assign this Lease, or any rights hereunder, without the prior written consent of Landlord.

24.    <u>Pending Receivership</u>. Notwithstanding anything to the contrary in this Lease or any ancillary documents, Landlord acknowledges and expressly agrees that Tenant is entering into this Lease solely in his capacity as Court-appointed receiver and shall have no personal liability for any claims arising under or related to this Lease.

25.    <u>Titles</u>.  Titles or headings to the paragraphs of this Lease are not a part of this Lease and shall have no effect on the construction or interpretation of any part of this Lease.

26.    <u>Governing Law</u>.  This Lease shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement.  To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

27.    <u>Counterparts</u>.  This Lease may be executed in multiple counterparts and each such counterpart shall be deemed to be an original instrument.

*SIGNATURES FOLLOW NEXT PAGE*

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

TENANT

By: _____
Lance Miller, solely in his capacity as
Court-appointed Receiver

LANDLORD

RTS ORCHARDS, LLC,
a California limited liability company


By: _____
    Rodney T. Stiefvater, Manager


By: _____
    Paul G. Nugent, Manager

SCHEDULE 1.1(g)

Contract Schedule

1.   None.

Docusign Envelope ID: 434C011D-E3F9-43DA-B3D5-DC96F8A1D5AC

SCHEDULE 5.2(i)

Specific Title Encumbrances

1. Residential rental of 10889 Casey Ave.

SCHEDULE 7.1

Exceptions to Seller's Representations

None.

# EXHIBIT B

# PURCHASE AND SALE AGREEMENT
# AND
# JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated September 19, 2025, to be effective on the date when all parties have executed it after entry of the Sale Order (defined below), which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") and ADAM H. teVELDE AS TRUSTEE OF THE AP teVELDE FAMILY REVOCABLE TRUST OF JUNE 11, 2020 (the "**Buyer**"). For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**." This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A.     Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property consisting of approximately 867.51 assessed acres of land, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

B.     Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

C.     The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order entered by the Court at Dkt. No. 204 (the "**Marketing Procedures Order**") and attached hereto as **Exhibit B** and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially in the form attached hereto as **Exhibit C** ("**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1.     <u>Purchase and Sale</u>

1.1     <u>Purchase and Sale of Property</u>. Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following solely to the extent it is Receivership Property (as defined in the Receivership Order):

(a)     The Land;

(b)    All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State of California (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or that provides drainage, irrigation and/or water to the Land;

(c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of-way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

(d)    All crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), for the 2025-2026 crop year and thereafter generated by the Land (the "**Crops**") (for clarity, a "crop year" herein refers to cultivation of crops starting in the first listed year and harvested in the second listed year; for example "2025-2026 crop year" refers to the cultivation of crops in 2025 and 2026 for harvest in 2026);

(e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land, before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)    All surface water rights, groundwater rights and other water rights or water credits appurtenant to the Land, which are held by the Seller, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications or other court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale of water generated from irrigation wells located on the Land, which is held by the Seller (collectively, "**Water Rights**"); and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on <u>Schedule 1.1(g)</u> that Buyer elects to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer

without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

        1.2     As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures.

        (a)     Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY. BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY.**

        (b)     Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller, unless expressly set forth in this Agreement, or any representations or warranties (oral or written) of any Lenders (as defined below) or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders. **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF.**

(c)    **EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS: (i) EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.**

(d)    **BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS SECTION 1.2, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS.**

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

1.3    <u>Release</u>.  At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and The Prudential Insurance Company of America ("**Prudential**"), PAR U Hartford Life & Annuity Comfort Trust ("**PAR U**"), and PGIM Real Estate Finance, LLC (together with Prudential and PAR U, collectively, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

1.4    <u>Not a Residential Purchase</u>.  Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Property, Buyer represents and warrants:  (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's residence.  To the fullest extent permitted by applicable law, Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

1.5    <u>Bid Deposit</u>.  Concurrently with Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Buyer shall deposit into a non-interest-bearing receiver account with Pivot Management Group LLC (the "**Deposit Holder**") an amount equal to **One Million Eight Hundred Ten Thousand and 00/100ths Dollars ($1,810,000.00)** (the "**Bid Deposit**") in immediately available, goods funds of the United States of America.  If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.

**2.**    **Escrow**.  Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA  93711 (Attention: Sue Meyer) who shall act as "**Escrow Holder,**" in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**").  The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct, violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

3.    **Close of Escrow**.  Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before **5:00 p.m., Pacific Time, on a date no later than five (5) days following the date the Sale Order becomes final and non-appealable which is mutually acceptable to the Parties** (the "**Closing Date**"), or such other date as agreed to by the Parties; provided that the Closing Date shall in no event occur later than the Outside Date (as set forth in <u>Section 6.4</u>).

3.1    <u>Purchase Price.</u>  The Purchase Price of the Property ("**Purchase Price**") is **NINETEEN MILLION SEVEN HUNDRED THOUSAND and 00/100ths Dollars ($19,700,000.00) United States currency**.  The Purchase Price shall be payable as follows:

(a)    Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred 00/100ths Dollars ($100.00)** from the Bid Deposit  (the "**Independent Consideration**") as independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof.  The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under <u>Section 6.3</u>, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

(b)    Within two (2) business days of opening of the Escrow, the Deposit Holder shall transfer the Bid Deposit to the Escrow for application to the Purchase Price.

(c)    The balance of the Purchase Price (the **"Balance"**) shall be deposited by Buyer into Escrow no later than one (1) business day prior to the Closing and paid to Seller in cash, by cashier's check or wire transfer of immediately available good funds, at the Close of Escrow.

4.    **LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN <u>SECTION 1.5</u> AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF**

THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN <u>SECTION 1.5</u> REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY.

ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION

_____          _____
Seller                                            Buyer
Lance Miller, solely in his capacity
as Court-appointed Receiver

5.    <u>Seller's Deliveries; Condition of Title</u>.

5.1    <u>Seller's Deliveries</u>. Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land.  Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other disclosures that are required in connection with the conveyance of the property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above.  As used in this Agreement, "**Disclosure Statutes**" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property.  Buyer hereby agrees as follows with

respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

> (a)     Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

> (b)     The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

> 5.2     Condition of Title. Seller agrees to convey fee simple title in and to the Property to Buyer.  Title shall be conveyed by Seller to Buyer by receiver's deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject to the items enumerated in this Section.  Buyer shall accept title to the Property subject to the following exceptions:

> (a)     any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due;

> (b)     any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

> (c)     easements, covenants, restrictions, defects, encumbrances, and other matters of record on the Effective Date;

> (d)     physical matters and conditions, if any, that exist at the Property on the Effective Date and that would be disclosed by a current survey or inspection of the Property;

> (e)     laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

> (f)     any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

> (g)     all recorded covenants, conditions, restrictions, easements, and agreements affecting the Property, except to the extent Seller has agreed in writing to terminate or remove;

> (h)     the printed standard exceptions listed in the Preliminary Report (as defined below); and

> (i)     such other matters as Buyer either waives, assumes, or consents to in writing, including the leasehold and other rights listed in Schedule 5.2(i).

> 5.3     No Liens.  The Property shall be sold free and clear of any and all financial liens, liabilities, obligations, encumbrances, or claims (except for any such liens, encumbrances, claims or interests set forth and described in Section 5.2 above) effective upon the Closing.  As directed by Buyer, Seller shall have caused or obtained, to Buyer's reasonable satisfaction, prior to the Closing a

-8-

release of all liens in and to the Crops that appear in the public record by any persons having an interest therein.

5.4    <u>Buyer's Indemnification of Seller</u>. Any damage caused to the Property in connection with Buyer's Inspection shall be promptly and fully repaired by Buyer and the Property returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement.  Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's Agent's activities, which obligation shall survive any termination of this Agreement.  Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's Agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses reasonably incurred by Seller Parties in connection therewith.  The indemnity provided herein shall survive the Close of Escrow and any termination of this Agreement.

5.5    <u>SGMA Disclosure</u>.    The Sustainable Groundwater Management Act ("**SGMA**") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  Seller and its agents and representatives make no representation on water rights or the effect of SGMA on the Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future.  In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property.  Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property.

6.    **Conditions Precedent; Termination**.

6.1    <u>Conditions to Obligations of all Parties</u>. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

(a)    the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Owner, Lenders, and all parties of interest in the Action, and Title Company agrees to insure title to the Property

without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order or the Lender Agreement Approval (defined below) will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination;

(b)    no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement; and

(c)    Lenders shall have provided their written approval of this Agreement.

6.2    <u>Seller's Conditions Precedent</u>.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in <u>Section 9</u> below), and the Buyer's share of the Closing Costs (as defined in <u>Section 12</u> below) and Prorations (as defined in <u>Section 13</u> below) into the Escrow by the Closing Date.

(b)    Each of Buyer's representations and warranties set forth in <u>Section 8</u> hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3    <u>Buyer's Conditions Precedent</u>.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)    Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed.

(b)    Except as listed in <u>Schedule 5.2(i)</u>, Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)    Seller shall have obtained a commercially-reasonable perpetual easement(s), recorded or to be recorded at the Closing, appurtenant to and running with ownership

-10-

of that portion of the Land identified as Parcel 7 on Exhibit A (APN 521-110-08) (as the "**Dominant Tenement**" for said easement) providing the current and future owner(s) of the Dominant Tenement with pedestrian and vehicular ingress and egress, including commercial agricultural vehicle operations, reasonably necessary for access to the Dominant Tenement from either (i) an existing public roadway or (B) a portion of the Land acquired by Buyer other than the Dominant Tenement (the "**Access Easement**").

(d)    Each of the representations and warranties of Seller contained in Section 7 or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4    Termination.  This Agreement may be terminated in accordance with this Section 6.4 at any time prior to the Closing:

(a)    By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes a final, non-appealable order, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Outside Date; provided, however, that the Outside Date may be extended by Seller and Buyer upon mutual agreement;

(b)    By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this Section 6.4(b) shall not be available to a Party if such order resulted from, or could have been avoided but for, the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)    By written notice of either Buyer or Seller if any Seller closes or consummates an alternative transaction or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 6.4(c) until the alternative transaction closes;

(d)    By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.3 to be satisfied, and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in Section 6.3 shall become incapable of being satisfied by

the Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this Section 6.4(d) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or;

(e)      by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.2 to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 6.2 shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this Section 6.4(e) will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder; and

(f)      by the mutual written consent of Seller and Buyer.

6.5      Effect of Termination

(a)      In the event of the termination of this Agreement as provided in Section 6.4, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to Section 6.4(e) and Sellers are not then in material breach of Sellers' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit and (y) for any reason other than pursuant to Section 6.4(e), Buyer shall be entitled to return of the Bid Deposit as set forth in this Agreement. Notwithstanding the foregoing, nothing in this Article 6 will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to Section 6.4, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement.

(b)      In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate this Agreement in accordance with Section 6.4 and, if applicable, to receive a return of the Bid Deposit.

## 7.      **Seller's Representations and Warranties**.

7.1      Seller's Representations and Warranties.  Except as set forth on Schedule 7.1, attached hereto, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)      Court-Appointed Receiver.  Seller is the Court-appointed receiver over the Receivership Property.

-12-

(b)    <u>Authority</u>.  Subject to entry of the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which any Seller is a party or by which any Seller is otherwise bound, or any judicial order to which any Seller is a party or to which any Seller is subject.  All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by such Seller, (ii) be legal, valid and binding obligations of such Seller, and (iii) not violate, to such Seller's knowledge, any provision of any agreement or judicial order to which such Seller is a party or to which such Seller is subject.

(c)    <u>OFAC Compliance</u>.    Seller (which, for the purposes of this <u>Section 7.1(c),</u> shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    <u>Foreign Person and Withholding</u>.  Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to such Seller or the Property.  Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code, or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008.  A Seller may be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

(e)    <u>Organic Trees or Vines</u>.  The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties.  Seller makes no representations or warranties in this regard.

7.2    <u>Survival</u>.  The express representations and warranties made in this Article by Seller will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3) months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

## 8.    <u>Buyer's Representations and Warranties; Covenant</u>.

8.1    <u>Buyer's Representations and Warranties</u>.  Buyer hereby warrants, represents, convents and certifies to Seller and agrees that as of the Close of Escrow::

(a)    <u>Reserved.</u>

(b)    <u>Authority</u>.    Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of Buyer herein, and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject.  All documents to be executed by Buyer which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Buyer, (ii) be legal, valid and binding obligations of Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which Buyer is subject.

(c)    <u>OFAC Compliance</u>.  Buyer or its Authorized Assignee (which, for the purposes of this <u>Section 8(c)</u>, shall include its members, officers, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    <u>Bankruptcy</u>.  Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e)    <u>No Collusion</u>.  Buyer represents and warrants that it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder.

8.2    <u>Survival</u>.  The express representations and warranties made in Section 8.1 by Buyer will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3)

months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

8.3    Debts, Liens, and Encumbrance.  Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that relate in any manner to any of Buyer's activities relating to the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.  This provision shall survive the Closing or any termination of the Agreement.

## 9.    **Cultural Reimbursement; Post-Closing Harvest**.

9.1    Cultural Cost Reimbursement.  Seller is retaining the 2024-2025 almond and pistachio crops produced on the Property, and as such there will be no reimbursement for cultural costs for the 2024-2025 almond and pistachio crops at the Closing.  However, in the event that the Closing occurs after the harvest of either the 2024-2025  almond or pistachio crops, and Seller has expended funds for cultivation of the 2025-2026 almond or pistachio crops, then at the Closing, through the Escrow,  Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Property for the 2025-2026 crop year (the "**Cultural Costs Reimbursement**"), from the conclusion of Sanitation, as defined below.  Upon written request from Buyer, Seller shall provide Buyer with statements reflecting the amount of cultural costs incurred for the Property for the 2025-2026 crop year to the extent actual invoices for such costs are not reasonably available.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement, if any (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**").  If applicable, Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date.  Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2025-2026 crop year, if any, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2025-2026 crop year.  For the purpose of this Agreement, "**Sanitation**" means the removal of the crop for 2024-2025 crop year, together with orchard floor cleanup and post-cleanup irrigation.

9.2    Post-Closing Harvest by Seller.  In the event that the Closing shall occur prior to the completion of the 2024-2025 almond and pistachio harvest (whether such has commenced or not), at the Closing, Buyer will enter into a short term lease with Seller in the form set forth as Exhibit H (the "**Holdover Lease**").

## 10.    **Closing**.

10.1    Closing Date.  Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein.  Closing shall occur on or before the Closing Date.  Closing shall be conditioned upon:

(a)     <u>Full Performance</u>.  Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)     <u>Conditions</u>.  The conditions precedent set forth in <u>Section  6.1, 6.2, and 6.3</u> have been satisfied or waived by the Party for whose benefit the condition exists.

(c)     <u>Title Policies</u>.  Title Company shall be ready, willing, and able to issue upon the Closing and following recordation of the Deed to Buyer, a current Owner's CLTA Standard Coverage Policy of title insurance (or ALTA Extended Coverage Policy, if Buyer shall elect to obtain an ALTA Survey), at no more than the insurer's standard rates ("**Buyer's Title Policy"**).  Buyer's Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Buyer, subject (1) the lien of real property taxes for the current fiscal year not yet due and payable, (2) those Schedule B standard exceptions listed in the title commitment for the Buyer's Title Policy (except to the extent Seller and/or Escrow Holder has agreed in writing to remove), and (3) the following Schedule B numbered exceptions (the "**Permitted Exceptions**"):

(i)     Sandrini North:  Schedule B Exceptions 1 – 5, 7 – 18, 21 – 23, 25 – 46, 48, 49, 51 – 66, 68 – 75,  77 – 80, 82 – 94, 96 – 109, 115 - 121,  all as shown in that certain Preliminary Report, title order number FWKN-TO25000617-MW, Amendment C, dated April 7, 2025, issued by Chicago Title Company (the "**Sandrini North Preliminary Report**").

(i)     Sandrini South:  Schedule B Exceptions 1 – 3, 5 – 13, and 18 – 23, all as shown in that certain Preliminary Report, title order number FWKN-TO25000621-MW, Amendment B, dated July 14, 2025,  issued by Chicago Title Company (the "**Sandrini South Preliminary Report**", and together with the Sandrini North Preliminary Report, the "Preliminary Report").

The premium for such title policy shall be paid as required under <u>Section 12.</u>

(d)     <u>Delivery</u>.  Possession of the Property shall be delivered to Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property.

10.2     <u>Seller's Closing Obligations</u>.  On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)     The Deed, executed by Seller.

(b)     A bill of sale for the Crops in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)     To the extent required, duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements material to the Property and operations thereon that are Receivership Property and that Buyer informs the Seller in writing that

Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability).

(d)    An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(e)    Seller's counterpart of the Holdover Lease, if applicable.

(f)    Unless previously recorded, the fully executed Access Easement, suitable for immediate recording.

(g)    The Closing Statement (as defined below) executed by Seller.

(h)    To the extent they are then in Seller's possession, comprise Receivership Property, and not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(i)    Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(j)    Seller's California Form 593, if required.

(k)    Seller's IRS Form 1099-S if required by Escrow.

(l)    All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(m)    Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

(n)    A copy of the Sale Order entered by the Court.

10.3    <u>Buyer's Closing Obligations</u>.    On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)    The Balance of the Purchase Price and Buyer's share of the Closing Costs and Prorations.

(b)    Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)    A Preliminary Change of Ownership Report in the form specified by Kern County (the "**PCOR**").

-17-

(d)     To the extent required, duplicate counterparts of the Assignment Agreement.

(e)     Buyer's counterpart of the Holdover Lease, if applicable.

(f)     The Closing Statement (as defined below) executed by Buyer.

(g)     Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

10.4    **Escrow Holder Closing Obligations.**  The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to <u>Section 10.2</u>, and all of the items to be deposited by Buyer pursuant to <u>Section 10.3</u>, and (ii) the Title Company is prepared to issue Buyer's Title Policy in the condition required in <u>Section 10.1(c)</u> above.  The Escrow Holder shall close escrow by:

(a)     Recording the Deed in the Official Records of Kern County, California, and return the recorded Deed to Buyer with a conformed copy to Seller, and file the PCOR in Kern County, California;

(b)     Issuing the Buyer's Title Policy (within fifteen (15) days after the Closing);

(c)     Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(d)     Delivering to Buyer, Seller's certification that it is not a "foreign person;"

(e)     Delivering to Buyer the items deposited into Escrow by Seller for delivery to Buyer, including the Bill of Sale;

(f)     If applicable, delivering to each of Buyer and Seller, a fully executed counterpart of the Assignment Agreement; and

(g)     Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

11.    **Like-Kind Exchange**.  Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

12.    **Closing Costs**.  All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

(a)     Buyer and Seller shall pay their respective:  (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)     Seller shall pay (i) the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) the premium for a CLTA Standard Coverage Owner's Title Policy and (iii) one-half of the escrow fees.

(c)     Buyer shall pay (i) one-half of the escrow fees, (ii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, (iii) the premium for Buyer's Title Policy in excess of the premium for a CLTA Standard Coverage Owner's Title Policy, if any, including all endorsements that Buyer shall require, and (iv) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)     Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.**    **Prorations**.  Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1    Utility Charges.  The Parties agree that utility and water charges (other than assessments collected with real property assessments by the county tax assessor) shall not be prorated in Escrow.  Seller shall be liable for all such charges incurred prior to the Closing and Buyer shall be liable for all such charges incurred after the Closing.

13.2    Other Apportionments.    Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest bills or assessments.  Rent or income under all farm related, hunting and mineral leases, if any, shall be prorated as of the Close of Escrow.  Such prorations and apportionments shall be made in the manner customary in the County in which the Land is located for the sale of agricultural land.

13.3    Survival.  The provisions of this Section 13 shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this Section 13 must be made in writing to the other Party within six months after the Closing Date.

**14.**    **Risk of Loss**.  Risk of physical loss to the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof.  In the event of the loss or destruction of a material part of the Property prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, both Parties may be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property, within thirty (30) days of receipt of notice and has fully paid all

costs thereof and cleared any potential liens associated therewith or Buyer and Seller agree to reduce the Purchase Price by the value of the lost or destroyed portion of the Property.

Notwithstanding the foregoing, or anything in this Agreement to the contrary, the Parties acknowledge that Seller may be requested to remove up to one full row of permanent plantings on the parcel of the Land described as Parcel 7 on Exhibit A in order to obtain the Access Easement, and Buyer agrees to allow the removal, at Seller's cost, of such full row if required to do so to obtain the Access Easement, without adjustment of the Purchase Price, and without Buyer asserting such removal as a default by Seller under this Agreement.

15.    **Assignment**.  Buyer may assign to an entity owned or controlled by Buyer, any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of such assignment at least three (3) days prior to the Close of Escrow, containing the name of the assignee ("**Authorized Assignee**") and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement.  Any other proposed assignment shall require the written consent of Seller, which may be withheld at his sole discretion.  Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee.

16.    **Receivership Matters.** Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Sellers and Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Marketing Procedures Order and Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

17.    **Backup Bidder**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the Marketing Procedures, Buyer will serve as the Back-up Bidder.  If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the closing of the sale to the Successful Bidder.  If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

18.    **Brokers**.  Buyer and Seller each represent and warrant to the other that, except for **Ca Ag Properties** ("**Seller's Broker**") and SCHUIL AG REAL ESTATE, INC. ("**Buyer's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the

imposition of liability for the payment of any other real estate brokerage commission, finder's fee or otherwise in connection with the transaction described herein. Seller shall be responsible for the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith. Buyer shall be responsible for the payment of a commission or fee to Buyer's Broker in accordance with its separate agreement therewith. In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

19.    **Attorney's Fees; Pre-litigation Dispute Resolution**. Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement. In the event of any action between the Parties hereto for breach of or to enforce any provision or right hereunder, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action. The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

20.    **Notices**. All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery; provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice. All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail shall be deemed delivered three (3) business days after deposit in the United States Mails, and any notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

If to Buyer:            Adam H. teVelde
                       2911 Hanford Armona Road
                       Hanford, CA 93230
                       Attn: Adam H. teVelde
                       Telephone:    (559) 410-3456
                       Email: tevelde45@gmail.com

If to Seller:                        Lance Miller, Receiver
                                    c/o Pivot Group
                                    1230 Rosecrans Avenue
                                    Suite 300 – PMB928
                                    Manhattan Beach, CA 90266
                                    Attn:  Lance Miller or Matt Covington
                                    Telephone:    424-363-0599
                                    Email:  lance.miller@pivotgrp.com and
                                    matt.covington@pivotgrp.com

With a copy to:                Katten Muchin Rosenman LLP
                                    2121 North Pearl Street, Suite 1100
                                    Dallas, TX 75201-2591
                                    Attn:  John Mitchell and Michaela Crocker
                                    Telephone:    214-765-3600
                                    Email:  john.mitchell@katten.com and
                                    michaela.crocker@katten.com

              And            Cutts Law, PC
                                    5088 N. Fruit Ave, Ste 101
                                    Fresno, CA 93711
                                    Attn:  Lisa A. Cutts
                                    Telephone:    559-226-8177
                                    Email: lac@cutts-law.com

       **21.**      **Waivers**.  Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver.  Any such waiver shall be in writing and delivered to the other Party and the Escrow Holder.  No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

       **22.**      **Governing Law**.  This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement.  To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

       **23.**      **Business Days**.  In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed.  Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24.    **WAIVER OF JURY TRIAL**.  TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "DISPUTE", AND COLLECTIVELY, ANY OR ALL, THE "DISPUTES") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS.  THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

25.    **Entire Agreement**.    This Agreement and the Confidentiality and Nondisclosure Agreement (if any) entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto.  The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement. This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged.

26.    **Pending Receivership**.  Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Property, or otherwise.

27.    **Bidding Procedures**.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order.  Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order.

28.    **Validity**.    Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

29.    **Facsimile Electronic Signatures**.  For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has

assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

30.    **Time**.  Time is of the essence of this Agreement.

31.    **Counterparts**.  This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

32.    **Binding Offer**.  Buyer agrees that, upon written notice to Buyer by Seller that this Agreement as executed by Buyer only (the "Offer") is the subject of a Sale Notice (as defined in the Marketing Procedures Order) filed with the Court, this Agreement (as may be amended by written agreement of Seller and Buyer) shall be irrevocable for a period of 60 days from the date of such Sale Notice or such other period as agreed to by the Parties in writing (the "Irrevocable Period"). If the Court enters a Sale Order approving this Agreement (as may be amended by written agreement of the Seller and Buyer), then a binding agreement of purchase and sale (without any conditions whatsoever for the benefit of the Buyer, including any conditions for review or approval by third party advisors of the Buyer, financial, planning, banking, legal or otherwise) comes into existence immediately upon the Seller's acceptance.  Buyer acknowledges that this Section 32 obligates the Buyer to complete the purchase of the Property in accordance with the terms of this Agreement (as may be amended by written agreement of Seller and Buyer) upon Seller's acceptance.  Notwithstanding the foregoing, the provisions of Section 14 of this Agreement shall apply during the Irrevocable Period in the event of a casualty or condemnation affecting the Property.

33.    **Supersedes Prior Agreement.**   This Agreement supersedes and replaces in its entirety that certain Purchase and Sale Agreement and Joint Escrow Instructions dated September 12, 2025, made by and between the Parties as to the Property.

*SIGNATURES FOLLOW NEXT PAGE*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER                                                    BUYER

By: _____
Lance Miller, solely in his capacity as                   _____
Court-appointed Receiver                                  ADAM H. teVELDE AS TRUSTEE OF THE
                                                          AP   teVELDE   FAMILY   REVOCABLE
Date of Execution: _____                      TRUST OF JUNE 11, 2020


                                                          Date of Execution: _____


                        Effective Date:_____

-25-

ACCEPTANCE BY ESCROW HOLDER


CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.


CHICAGO TITLE COMPANY,
a California corporation

By: _____
Name: _____
Title: _____

Escrow Number: _____

Dated: _____

-26-

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

## SANDRINI NORTH

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1: (APN: 520-170-15-00)**

THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES OF LYING BELOW THE SURFACE OF SAID LAND, AS PROVIDED IN DEEDS OF RECORD.

**PARCEL 2: (APN: 520-170-16-01)**

THE SOUTH HALF OF THE NORTHEAST QUARTER AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 3: (APN: 520-170-17-01)**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 4: (APN: 520-170-18-00)**

THE SOUTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ONE-HALF ALL GAS, OIL AND OTHER HYDRO-CARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO THEIR HEIRS, SUCCESSORS AND ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEES, AS RESERVED

-27-

BY JOHN H. ALCOCK AND MARY F. ALCOCK IN DEED RECORDED DECEMBER 20, 1944 IN BOOK 1221, PAGE 187 OF OFFICIAL RECORDS.

**PARCEL 5: (APN: 520-170-19-05)**

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE GRANT DEED FROM RANDELL LARSON AND CROCKER- ANGLO NATIONAL BANK, AS CO-TRUSTEES UNDER THE WILL OF ROBERT B. BURROUGHS, DECEASED, AND THE DECREE OF DISTRIBUTION OF HIS ESTATE, RECORDED OCTOBER 31, 1963, INSTRUMENT NO. 68217, IN BOOK 3658, PAGE 500, OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE DEED FROM JOSEPHINE POETT STETSON AND CROCKER- ANGLO NATIONAL BANK (FORMERLY CROCKER FIRST NATIONAL BANK OF SAN FRANCISCO), AS CO- TRUSTEES UNDER THE WILL OF HARRY N. STETSON, DECEASED, AND THE DECREE OF DISTRIBUTION OF HIS ESTATE, RECORDED

OCTOBER 31, 1963, INSTRUMENT NO. 68218, IN BOOK 3658, PAGE 503, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS CONTAINED WITHIN THE PROPERTY HEREINABOVE REFERRED TO, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERAL RIGHTS BELONG TO OR APPERTAINING TO SAID PROPERTY, THE EXCLUSIVE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE, MINE, EXTRACT AND REMOVE OIL, GAS, HYDROCARBON SUBSTANCES AND OTHER MINERALS UPON AND FROM SAID PROPERTY, TOGETHER WITH THE RIGHT TO DRILL AND OPERATE WHATEVER WELLS, CONSTRUCT, INSTALL, OPERATE, MAINTAIN AND REMOVE WHATEVER OTHER FACILITIES AND DO WHATEVER ELSE MAY BE REASONABLY NECESSARY ON AND IN SAID PROPERTY FOR THE FULL ENJOYMENT AND EXERCISE OF THE RIGHTS SO EXCEPTED, EXCLUDED AND RESERVED, AND THE UNRESTRICTED RIGHT OF INGRESS AND EGRESS TO AND FROM SAID PROPERTY FOR ALL SUCH PURPOSES, AS RESERVED IN THE DEED FROM RUTH PETERS AND LOUISE WINSLOW PETERS, RECORDED OCTOBER 31, 1963, INSTRUMENT NO. 68219, IN BOOK 3658, PAGE 506, OFFICIAL RECORDS.

**PARCEL 6: (APN: 520-170-20-00)**

THE WEST HALF OF THE SOUTHWEST QUARTER AND THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA.

**PARCEL 7: (APN: 521-110-08-00)**

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 20, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 3/4 OF ALL OIL, GAS, PETROLEUM OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING THE EAST HALF OF THE NORTHEAST QUARTER OR THAT MAY BE PRODUCED AND SAVED THEREFROM, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SAME AS RESERVED IN THE DEED RECORDED OCTOBER 4, 1949, IN BOOK 1266, PAGE 310, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 50% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, OR UNDER THE WEST HALF OF THE NORTHEAST QUARTER, AS RESERVED IN THE DEED RECORDED JUNE 21, 1955, IN BOOK 2444, PAGE 258, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 25% OF ALL OIL, PETROLEUM, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING THE WEST HALF

OF THE NORTHEAST QUARTER, AS RESERVED IN THE DEED RECORDED FEBRUARY 17, 1960, IN BOOK 3239, PAGE 762, OFFICIAL RECORDS.

THE ABOVE LEGAL DESCRIPTION IS PURSUANT TO CERTIFICATE OF COMPLIANCE, PARCEL MAP WAIVER NO. 238, RECORDED APRIL 2, 1981, INSTRUMENT NO. 033598, IN BOOK 5364, PAGE 419, OFFICIAL RECORDS.


## SANDRINI SOUTH

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL A OF LOT LINE ADJUSTMENT NO. 62-00 AS EVIDENCED BY A CERTIFICATE OF COMPLIANCE, RECORDED NOVEMBER 8, 1999, INSTRUMENT NO. 0199161190, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PORTION OF THE SOUTHEAST QUARTER OF SECTION 19, TOWNSHIP 25 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, KERN COUNTY OF CALIFORNIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL OF SAID SOUTHEAST QUARTER EXCEPTING THE SOUTH 341.65 FEET OF THE EAST 255.00 FEET THEREFROM.

EXCEPTING THEREFROM 1/2 OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES TOGETHER WITH THE RIGHT TO PROSPECT FOR, DRILL FOR, PRODUCE AND TAKE AWAY THE SAME WITH THE RIGHT TO ENTER UPON SAID LAND FOR SAID PURPOSES AS RESERVED IN THE DEED FROM H.L. SCHUSTER AND PEARL M. SCHUSTER, HIS WIFE, DATED JANUARY 10, 1948, RECORDED FEBRUARY 18, 1948, IN BOOK 1477, PAGE 293, OFFICIAL RECORDS.

APN 521-110-13-00

## END OF DESCRIPTION

EXHIBIT B

MARKETING PROCEDURES ORDER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, et al.,

Plaintiffs,

v.

ACDF, LLC, et al.,

Defendants.

No.  1:24-cv-01102-KES-SAB

**ORDER ESTABLISHING MARKETING,
BID, AND AUCTION PROCEDURES FOR
RECEIVERSHIP PROPERTIES**

(Doc. 190)

On March 31, 2025, Receiver Lance Miller filed a Motion for Order Establishing Marketing, Bid, and Auction Procedures for Receivership Properties, Doc. 190 (the "**Motion**"), and calendared the Motion for hearing on May 5, 2025.  On April 29, 2025, Receiver filed a Notice of Non-Opposition and Non-Objection to the Motion, noting that the only response to the Motion had been withdrawn.[1]  Doc. 203.  The Motion is unopposed and the deadline to oppose the Motion has passed.[2]  Accordingly, the Motion is SUBMITTED without oral argument

---

[1]  American Equity Investment Life Insurance Company filed a response, Doc. 198, then withdrew the response, Doc. 201.  No other responses were filed.

[2]  Prior to the date on which the Motion was filed, defendants filed a separate Motion to Implement Procedures Coordinating Receivership Sale Processes.  Doc. 173.  The Court denied defendants' motion at a hearing on March 31, 2025, for the reasons stated on the record.  Doc.

1

1    pursuant to Local Rule 230(g), and the hearing currently set for May 5, 2025, is VACATED.  The

2    Court issues the following written order.

3         Having read and considered the Motion and the evidence submitted therewith, the now-

4    withdrawn response thereto, and good cause appearing therefor, the Court finds that notice of the

5    Motion was adequate under the circumstances and that the below Sale Procedures meet all

6    statutory requirements for sales of real property by receivers within this district.  Accordingly, it

7    is hereby **ORDERED THAT**:

8         The Motion is granted, and the Court hereby approves the below sale procedures

9    (the "**Sale Procedures**") with respect to the Properties being marketed by Ca Ag Properties

10   ("**Broker**"):

**Sale Procedures**

11

12   1.        **Marketing:**

13        a.        **Listing Services.** The Broker will publish the listing of the Properties on

14   commercially reasonable sites and databases and take commercially reasonable actions to show

15   the Properties.

16        b.        **Publication of Sale.** The Broker will list each proposed sale in the Fresno

17   Bee or other local newspaper at least once per week for four weeks from the date of entry of this

18   Order (the "**Publication Period**") in compliance with 28 U.S.C. § 2002.  Any Auction of or Sale

19   Hearing (each as defined below) regarding a Property shall not occur before the conclusion of the

20   Publication Period.  The publication of the sale shall include a short description of the

21   Property(ies) and contact information for the Broker (phone number and/or website link) and state

22   that the sale is subject to Court approval.  The date of the Auction or Sale Hearing may be

23   undetermined at the time of publication.

24        c.        **Overbidding.** If the Broker receives a bid, the Broker will continue to

25   market the subject Property for higher and better bids until the deadline to submit bids for

26   Auction, as set forth in the Sale Notice (defined below), has passed.

27   _____

     192; *see* Doc. 194.  Defendants did not file an opposition to the present Motion.
28

2. **Auction and Sale Hearing.** If more than one bidder becomes qualified to bid for the purchase of a Property, an auction will be held by the Receiver or his designee at Ca Ag's office, 740 W. Alluvial, Suite 102, Fresno, CA  93711, at a date to be determined by the Receiver and noticed, which shall not be before the conclusion of the Publication Period (the "**Auction**").  The Receiver shall also set a hearing date before the Court for consideration of the confirmation of the terms of any sale to the successful bidder (the "**Sale Hearing**").  The Sale Hearing shall be set on a date at least three (3) days after the date of the Auction.  At the Sale Hearing, the Receiver may seek confirmation of the sale to the successful bidder and entry of an order authorizing the Receiver to sell the Properties on an "as is" basis free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other senior encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests, if any, attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as currently exists.  If only one bidder timely submits a qualified bid, then the Receiver will request entry of an order at the Sale Hearing without holding an Auction. For the avoidance of doubt, nothing in this Order authorizes the Receiver to sell property free and clear of Interests. Sales of properties free and clear of Interests will only occur upon further notice and order of this Court and parties' rights to object to such sale are preserved.

3. **Qualification to Bid.** To submit a qualified bid, a prospective purchaser must submit its bid in writing by a date noticed by the Receiver in the applicable Sale Notice and such bid must clearly include the following terms or information (a "**Qualified Bid**" and a "**Qualified Bidder**"):

a. **Deposit.** A deposit of 10% of the purchase price which must be delivered to the Receiver with the Qualified Bid (the "**Deposit**").  The Receiver will hold the Deposit in trust or escrow pending approval of the Court.  The Deposit shall be nonrefundable unless:

i. Another bidder is the successful bidder at Auction and the Qualified Bidder does not wish to be deemed a backup bidder; or

ii. The Court does not approve the sale through no fault of the Qualified Bidder.

b.     **Contingencies.** As of the date of the Auction or Sale Hearing, as applicable, there will be no outstanding contingencies other than Court approval.

c.     **Subject to Overbid at Auction and Court Approval.** The sale is subject to overbidding at Auction, if applicable, and Court approval.

d.     **No Liability of Receiver.** The Receiver shall have no liability under any circumstances, and the Qualified Bidder's only recourse in the event of alleged breach by Receiver is return of its Deposit.

e.     **Good Faith.** The Qualified Bidder must submit with its Qualified Bid a declaration signed under penalty of perjury disclosing any connections such bidder has to the Receiver, the Broker, any owner, borrower, or insider thereof, any creditor, or other interested party, and that it has not, and will not, collude with any other potential purchasers or anyone else with respect to the sale.

f.     **Ability to Close.** A Qualified Bid must be accompanied by evidence of the bidder's financial ability to close unconditionally in form and substance satisfactory to the Receiver in his discretion in consultation with Plaintiffs.

g.     **Purchase and Sale Agreement.** The Qualified Bid shall include a signed Purchase and Sale Agreement in form and content satisfactory to the Receiver in his discretion, in consultation with Plaintiffs, indicating a readiness to immediately enter escrow. The Broker will provide a form of Purchase and Sale Agreement, and the Qualified Bidder must provide a redline with the Qualified Bid reflecting any revisions to such form.

4.     **Stalking Horse Terms.** The Receiver may, in his sole discretion and in consultation with Plaintiffs, offer incentives to initial bidders who submit Qualified Bids as defined above to serve as a "**Stalking Horse Bidder**," meaning that such bidder will submit an initial offer subject to overbid at Auction. Such Stalking Horse bids may include the following term in addition to other terms determined by the Receiver in the Receiver's discretion, in consultation with Plaintiffs:

a.     **Breakup Fee.** The Receiver may offer a breakup fee of up to 2% of the initial bid amount to a Stalking Horse Bidder that will be paid if, and only if, an overbidder other

than the Stalking Horse Bidder is the successful purchaser of the Property after Auction, Court approval, and closing of such sale.

5. **Dates and Deadlines.** The Receiver may schedule, reschedule, continue, adjourn, extend or modify any dates and deadlines or other terms relating to any provisions of these Sale Procedures in the Receiver's discretion, in consultation with Plaintiffs, including the Auction or Sale Hearing.

6. **Notice of Sale Hearing and Auction.** The Auction or Sale Hearing will be held after the conclusion of the Publication Period. The Receiver will give not less than 21 days' written notice of any Auction or Sale Hearing (the "**Sale Notice**") to the parties entitled to notice in this case and to parties who have submitted a Qualified Bid. The Sale Notice will include the initial overbid amount and initial minimum bidding increments and any other details the Receiver deems appropriate including the Plaintiffs' estimated secured loan payoff amount and the payoff amount of any junior lienholders. The initial overbid amount must be enough to pay the breakup fee, if any, plus an increase in value, taking account of any applicable commissions, in the Receiver's discretion in consultation with Plaintiffs. Creditors may file objections to a proposed sale not less than 7 days before the Sale Hearing. The Receiver may file any reply not less than 2 days before the Sale Hearing.

7. **Sale Free and Clear of Interests**. The Receiver is seeking to sell the Property(ies) free and clear of all Interests, with such Interests to attach to the Sale Proceeds to the same extent and with the same priority as existed immediately prior to the sale. The Sale Notice filed with the Court in advance of the hearing will set forth estimated Sale Proceeds and the proposed distribution of net proceeds to occur upon closing of the proposed sale. For the avoidance of doubt, nothing in this Order authorizes the Receiver to sell property free and clear of Interests. Sales of properties free and clear of Interests will only occur upon further notice and order of this Court and parties' rights to object to such sale are preserved.

8. **Amendments or Modifications.** The Receiver may amend, modify, supplement, or change these Sale Procedures in the Receiver's discretion, in consultation with Plaintiffs, as necessary or appropriate to run this sales process, with all terms ultimately being subject to

5

1   Court approval at the conclusion of the Sale Hearing.

2        9.     **Credit Bidding.**  Plaintiffs have the option to credit bid the full amount of its

3   secured claims without any premium to be paid therefor.  Junior lienholders may credit bid the

4   full amount of their secured claims; however, such credit bid will only be considered a Qualified

5   Bid if accompanied by amounts sufficient to satisfy all senior liens in full at sale closing.

6        10.     **Sale Order.**  Promptly upon the conclusion of the Sale Hearing contemplated

7   herein, the Receiver will submit a sale order confirming the sale to the successful bidder free and

8   clear of all Interests, designating any backup bidders, making such other appropriate findings

9   and rulings as may be requested by the Receiver at or before the hearing, including findings

10   regarding the good faith of any Qualified Bidder, and providing that the sale shall close by such

11   date determined by the Receiver (the "**Sale Order**").  If the Receiver complies with these Sale

12   Procedures, which are consistent with 28 U.S.C. § 2001, no further motion must be filed before

13   entry of the Sale Order.

14        11.     **Compliance with Receivership Order.** Nothing in this Order is intended to, nor

15   shall, override any notice, veto, consultation or consent rights held by Plaintiffs pursuant to the

16   Receivership Order.

17

18

19   IT IS SO ORDERED.

20      Dated:   May 1, 2025

21                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT C

FORM OF SALE ORDER

1    Terence G. Banich (SBN 212173)[1]
     terence.banich@katten.com
2    **KATTEN MUCHIN ROSENMAN LLP**
     525 W. Monroe St.
3    Chicago, IL 60661-3693
     Telephone:    (312) 902-5200
4    Facsimile:    (312) 902-1061

5    John E. Mitchell (*pro hac vice*)
     Michaela C. Crocker (*pro hac vice*)
6    **KATTEN MUCHIN ROSENMAN LLP**
     2121 North Pearl St., Ste. 1100
7    Dallas, TX 75201-2591
     Telephone:    (214) 765-3600
8    Facsimile:    (214) 765-3602

9    *Attorneys for the Receiver*
     Lance Miller
10

11                    **UNITED STATES DISTRICT COURT**

12                    **EASTERN DISTRICT OF CALIFORNIA**

13
     THE PRUDENTIAL INSURANCE            )    No. 1:24-cv-01102-KES-SAB
14   COMPANY OF AMERICA, et al.,         )
                                         )    **[PROPOSED] ORDER (I)**
15            Plaintiffs,                )    **AUTHORIZING SALE OF REAL**
                                         )    **ESTATE FREE AND CLEAR OF**
16       v.                             )    **INTERESTS; (II) AUTHORIZING**
                                         )    **THE PAYMENT OF SALE-**
17   ACDF, LLC, et al.                   )    **RELATED COSTS; AND (III)**
                                         )    **GRANTING RELATED RELIEF**
18            Defendants.                )    **(SANDRINI)**
                                         )
19   _____)    [Related to Dkt. No. ____]
20
21
22
23
24
25
26
27
28
     _____
     [1]    Designated as counsel for service pursuant to L.R. 182(c)(1).

Before the Honorable Kirk E. Sherriff, United States District Judge, is the *Notice of Proposed Auction and Sale of Real Property (Sandrini)* [Dkt. No. ___] (the "**Sale Notice**") filed by Lance Miller, solely in his capacity as Court-appointed receiver in the above-captioned case (the "**Receiver**") for entry of an order (a) authorizing the Receiver to sell the Property[2] free and clear of liens, claims, and encumbrances, other than easements, rights of way, and other encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as existed immediately prior to the Closing Date; (b) authorizing the Receiver to pay, without further order of the Court, all sale-related costs and expenses, including break-up fees (if applicable), commissions, and transaction fees (but excluding the Receiver's attorneys' fees); and (c) granting related relief. The Court hereby finds that:[3] (a) the marketing and sale of the Property was held in accordance with the *Order Establishing Marketing, Bid, and Auction Procedures for Receivership Properties* [Dkt. 204] (the "**Bidding Procedures Order**"); (b) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (c) it has the statutory authority to enter this Order, including pursuant to 28 U.S.C. § 2001 and Rule 55 of the Federal Rules of Civil Procedure; and (d) due and proper notice of the Sale Notice was given  and no other or further notice is necessary. The Court further finds that:

A.    This Order constitutes a final order. Notwithstanding Rule 54(b) of the Federal Rules of Civil Procedures, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

---

[2] Capitalized terms used herein shall have the meanings ascribed in the Purchase and Sale Agreement attached hereto as **Exhibit A** (the "**PSA**")

[3] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Sale Hearing are incorporated herein by reference.

B.      The Court entered the Bidding Procedures Order on May 1, 2025, that, among other things, established the procedures in connection with the marketing, auction, and sale of the Property (the "**Bidding Procedures**") and granted related relief.

C.      As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Sale Hearing, including the declarations submitted by Lance Miller and Cameron Kay and (ii) the representations of counsel made on the record at the Sale Hearing, all aspects of the sale process, including notice thereof, have been conducted in compliance with the Bidding Procedures and Bidding Procedures Order.

D.      In compliance with the Bidding Procedure Order, the Receiver published notice of the proposed sale in the following publications: The Business Journal, Bakersfield Californian, Madera Tribune, Merced Sun-Star, and the Visalia Times Delta, at least once weekly from approximately June 4, 2025, through June 25, 2025. *See Proof of Service by Publication* [Dkt. No. 223].

E.      The Receiver has demonstrated good, sufficient, and sound business purpose and justifications for the sale and other transactions contemplated in the PSA, and such actions are an appropriate exercise of the Receiver's business judgment and in the best interest of the receivership estate.

F.       The Receiver conducted the marketing and auction process in accordance with the order appointing the Receiver in this case (as amended, the "**Receivership Order**"), the Bidding Procedures, and the Bidding Procedures Order.  The marketing and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property, and Receiver afforded potential purchasers a full and fair opportunity to make higher and better offers for the Property.

G.      The Receiver conducted the sale process for the Property without engaging in any collusion and in accordance with the Bidding Procedure and the Bidding Procedures Order. Following the Bid Deadline, the Receiver determined in the sound exercise of his business judgment, in consultation with Plaintiffs, that ADAM H. teVELDE AS TRUSTEE OF THE AP teVELDE FAMILY REVOCABLE  TRUST OF JUNE 11, 2020 ("**Buyer**") submitted the highest or otherwise best offer for the Property.

H.    The Receiver and Buyer have acted at arm's length and in good faith with respect to the proposed sale, and the Purchase Price represents the highest or otherwise best offer for the Property. The Receiver's determination that the PSA executed by Buyer constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Receiver's business judgment.

I.    The purchase price for the Property constitutes (i) reasonably equivalent value under the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

J.    Except as expressly set forth in the PSA, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Defendants, or otherwise related to the Property, by reason of the transfer of the Property to the Buyer.  The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the PSA.

K.    Pursuant to this Order and the Receivership Order, the Receiver has full power and authority to execute, deliver, and perform the obligations under the PSA and all other documents and transactions contemplated thereby and no consents or approvals, other than those expressly provided for herein or in the PSA, are required for the Receiver to consummate the sale transaction. As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Defendants and the Receiver in and to the Property free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the PSA.

L.    Sale of the Property other than free and clear of Interests, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Property. In addition, Plaintiffs have consented to the sale of the Property free and clear of their respective Interests. Other holders of Interests, if any, who did not object, or who withdrew their objections, to the Sale Notice are deemed to have consented. Therefore, approving of the PSA

4

1    and the consummation of the sale of the Property free and clear of Interests is appropriate under 28

2    U.S.C. § 2001, the Receivership Order and the interests of equity, and is in the best interests of the

3    Receivership estate, creditors, and other parties in interest.

4         M.    Buyer is the designated Successful Bidder and the Buyer's PSA is designated as the

5    Successful Bid in accordance with the Bidding Procedures.

6         N.    The Receiver's (i) publication of notice of the opportunity to purchase the Property,

7    the Bidding Procedures, and solicitation of bids for the Property as set forth above and (ii)

8    solicitation of bids for the Property through the Receiver's and his professionals' efforts to market

9    the Property establish the Receiver's satisfaction of the public sale requirements in 28 U.S.C.

10   §§ 2001 and 2002. To the extent the Receiver has not fully satisfied the provisions of 28 U.S.C.

11   §§ 2001 and 2002, he is excused from compliance for cause shown.

12        Accordingly, it is hereby:

13        **ORDERED** that the Receiver's request to sell the Property is granted as set forth herein and

14   all objections to the Sale Notice, to the extent not resolved or withdrawn on the record, are overruled

15   on the merits. All persons and entities who received notice of the Sale Notice and/or the Sale Hearing

16   that failed to timely object thereto as deemed to have consented to the relief sought in the Motion

17   and set forth in this Order;

18        **IT IS FURTHER ORDERED** that the Receiver is authorized to enter into and consummate

19   the transactions set forth in the PSA with Buyer or its assignee as the Successful Bidder in

20   accordance with the Bidding Procedures Order. The Receiver is authorized to act on behalf of

21   Defendants in connection with the sale and conveyance of title to the Property to Buyer and no other

22   consents or approvals are necessary or required for the Receiver to carry out the sale and

23   conveyance. All persons and entities are hereby prohibited and enjoined from taking any action that

24   would adversely affect or interfere with the ability of the Receiver to sell and transfer the Property

25   in accordance with the terms of this Order or the PSA.

26        **IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property pursuant

27   to the terms of the PSA;

28

1   **IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property to Buyer

2   free and clear of Interests, with such Interests attaching to the Sale Proceeds with the same force

3   and in the same priority as existed immediately prior to the Closing Date;

4   **IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court

5   order, all sale-related costs and expenses, including closing costs, real estate taxes, title insurance,

6   prorations, recording fees, and commissions (but specifically excluding attorneys' fees);

7   **IT IS FURTHER ORDERED** that, after satisfying all senior Interests, if any, the Receiver

8   is authorized to pay, without further Court order, the net proceeds of the sale to Plaintiffs in partial

9   satisfaction of their liens.

10  **IT IS FURTHER ORDERED** that the Receiver is authorized to enter into any documents

11  reasonably necessary or desirable to implement the terms of this Order and effectuate the sale of the

12  Property and to take all further actions as may reasonably be requested by Buyer for the purposes

13  of assigning, transferring, granting and conveying to the Buyer, as may be necessary or appropriate

14  to the performance of the Receiver's obligations hereunder. The Receiver is also authorized to

15  execute any documents on behalf of the Defendants to the extent necessary to complete;

16  **IT IS FURTHER ORDERED** that Property shall be transferred on an "AS IS," "WHERE,

17  IS," and "WITH ALL FAULTS" basis. All sale documents shall provide language substantially

18  similar to the following:  "Buyer acknowledges and agrees that Buyer is purchasing the Property

19  'as-is', 'where-is', and 'with all faults' as of the Closing Date, and Buyer further acknowledges and

20  agrees that Seller hereby expressly disclaims any and all implied warranties concerning the

21  condition, value and quality of the Property and any portions thereof, including, but not limited to,

22  the implied warranties of habitability, merchantability, or fitness for a particular purpose.  Buyer

23  acknowledges that no warranty has arisen through trade, custom or course of dealing with Seller;"

24  **IT IS FURTHER ORDERED** that the holders of any Interests in the Property shall be

25  prohibited from pursuing or asserting such Interests against Buyer, any of its assets, property,

26  successors or assigns, or the Property.

27  **IT IS FURTHER ORDERED** that, except with prior leave of this Court, all persons or

28  entities with notice of this Order are prohibited from (a) commencing, prosecuting, continuing or

enforcing any action against the Receiver related to the Property or the Sale Proceeds (except that such actions may be filed, but not prosecuted, to toll any statute of limitations), (b) taking any action to interfere with the Receiver's management, control or possession of the Property or the Sale Proceeds, or (c) interfering in any manner with the exclusive jurisdiction of this Court over the Property or the Sale Proceeds.

**IT IS FURTHER ORDERED** that, on and after the Closing Date, any persons holding an Interest shall execute such documents and take all other actions as may be reasonably necessary to further demonstrate the release of their respective Interests in the Property, as such Interests may have been recorded or otherwise filed. Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county or other territory or jurisdiction in which Property is located, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing Date. All persons and entities that are in possession or control of any portion of the Property on the Closing Date shall promptly surrender possession and control thereof to the Buyer on, or as soon as reasonably practicable after, the Closing Date.

**IT IS FURTHER ORDERED** that the Receiver shall serve a copy of this Order on all parties known to have asserted an Interest in the Property. The Receiver is authorized to file a copy of this Order in any court where an action is pending involving the Property.

**IT IS FURTHER ORDERED** that nothing contained herein shall prevent the Receiver from seeking additional relief from this Court related to the PSA, the Property, or the Sale Proceeds.

**IT IS FURTHER ORDERED** that this Order and the terms and provisions of the PSA shall be binding on Defendants, all of Defendants' creditors (whether known or unknown), Buyer, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting any interest in the Property. The provisions of this Order and the terms and provisions of the PSA, and any actions taken pursuant hereto or thereto, shall survive the entry of any order for relief under title 11 of the United States Code, and shall be binding on Defendants and their successors and assigns, including any debtor-in-possession or any trustee

appointed under title 11 of the United States Code, or similar custodian or fiduciary appointed over Defendants or their assets.

**IT IS FURTHER ORDERED** that this Order shall be effective immediately upon entry.

**IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any disputes arising from or related to the Property, the PSA, or the implementation or interpretation of this Order.

Dated: _____

_____
Hon. Kirk E. Sherriff
United States District Court

8

EXHIBIT D

FORM OF RELEASE

_____ ("**Buyer**"), [as successor by assignment to
_____], and LANCE MILLER, solely in his capacity as court-appointed receiver (the
"**Seller**") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance,*
*LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for
the Eastern District of California (the "**Court**") have previously entered into that certain Purchase
and Sale Agreement and Joint Escrow Instructions dated _____ (as such may have
been amended, prior to the date hereof, the "**Agreement**").  Unless otherwise indicated, capitalized
terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing
Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees
(collectively, including Buyer, "**Releasors**"), hereby releases Seller, The Prudential Insurance
Company of America, PAR U Hartford Life & Annuity Comfort Trust, PGIM Real Estate Finance,
LLC, and their respective partners, professionals, agents, employees, shareholders, members, affiliates,
principals, beneficiaries, subsidiaries, successors, and assigns (collectively with Seller, "**Releasees**")
from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of
action, whether in law or in equity, which Buyer asserts or could assert at common law or under any
statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever,
whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter,
claim, occurrence, damages or injury (collectively, "**Claims**"), to the extent arising out of a condition
or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and
entities, hereby waives the protections and benefits afforded California Civil Coe Section 1542,
acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel
and with full knowledge and understanding of the consequences and effects of such waivers and
releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR
OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY
HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

Notwithstanding anything stated to the contrary in this Agreement, the foregoing release shall not
extend to (and shall expressly exclude) claims arising from Seller's intentional fraud.

This Release is made by Buyer for the benefit of Seller and the Releasees on _____.

[Buyer Signature Block]

EXHIBIT E

Form of Deed

**Recording Requested By And
When Recorded Return To:**

**Mail Tax Statements To:**

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

## GRANT DEED

THE UNDERSIGNED GRANTOR DECLARES:

DOCUMENTARY TRANSFER TAX IS $_____

    ____Unincorporated Area        ____City of _____
    ___Computed on full value of interest or property conveyed, or
    ___Computed on full value less value of liens or encumbrances remaining at time of sale

    Assessor's Parcel No. _____

    FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-01455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby **grant, sell and convey** to _____ ("**Grantee**")**,** the following described real property in the County of Kern, State of California, and more particularly described as follows:

    See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE

Dated: _____, 202_           _____

                                      LANCE MILLER, solely in his capacity as Court-appointed Receiver

[attach legal description exhibit and notary ack]

EXHIBIT F

Form of Bill of Sale

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to _____ ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2026 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property situated in Kern County, California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference.  The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OTHER THAN THE WARRANTY OF TITLE SET FORTH ABOVE, AS TO THE PERSONAL PROPERTY INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of _____, 202__

SELLER


_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver


[attach legal description exhibit]

EXHIBIT G

Form of Assignment Agreement

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT ("Assignment") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the ("**Assignor**"), pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and _____("**Assignee**").

A.     Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**").

B.     Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those contracts affecting the Property as set forth on Exhibit B, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.     Assignor hereby assigns to Assignee all its the right, title, obligation, and interest as in and to the Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Contracts to be performed after the date hereof.

2.     Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.

4.     Assignor has not previously assigned the Contracts and has, subject to the required consent of any counterparty, authority to assign the Contracts (and to the extent counterparty consent is required under any Contract and has been obtained, the consent is attached hereto as Exhibit C). Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Contracts.

5.     Each party will, at any time and from time to time upon written request therefor, execute and

-36-

deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.

6.      In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.


ASSIGNOR                                          ASSIGNEE

                                                  **[assignee sig blocks]**

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver




[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

EXHIBIT F

Form of Holdover Lease

## HOLDOVER LEASE

THIS HOLDOVER LEASE (the "**Lease**") is entered into effective as of _____, 2025, by and between _____ ("**Landlord**") and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") ("**Tenant**").

A.      Landlord has, as of the date of this Lease, acquired the property designated as Assessor's Parcel Numbers 520-170-15, 520-170-16, 520-170-17, 520-170-18, 520-170-19, 520-170-20, 521-110-08 AND 521-110-13, in the County of Kern, State of California (the "**Property**") from Tenant, subject to Tenant's retention of the 2024-2025 almond and pistachio crops thereof.

B.      As a condition to the acquisition of the Property, Landlord has agreed to enter into this Lease with Tenant to allow it to complete the harvest of the 2024-2025 almond and pistachio crops on the Property.

NOW, THEREFORE, Landlord and Tenant, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.      Leased Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Property (the "**Premises**") for the purposes of farming and harvesting the 2024-2025 almond and pistachio crops currently growing  thereon and to perform post-harvest clean-up and irrigation. Tenant shall have the normal use of any ground, surface or contract water available to the Premises in connection with the foregoing uses, at Tenant's cost.

2.      Term.   Unless terminated earlier as hereinafter provided, the term of this Lease shall commence on the date set forth above, and shall terminate upon the completion of the 2024-2025 almond and pistachio crops harvest and post-harvest clean-up and irrigation, but in no event later than November 1, 2025.

3.      Rental.  Tenant shall pay to Landlord at the commencement of this Lease the sum of $100.00 as rental hereunder.

4.      Taxes and Assessments. Landlord shall be responsible for county real property taxes, assessments or similar levies of any kind levied or assessed against the Premises during the term of this Lease, prorated as of the date of termination of the Lease.  Landlord shall also pay all land based water taxes and assessments levied, and shall further pay for all water charges for water delivered to the Premises during the term hereof for the use by parties other than Tenant.  Tenant shall pay all taxes and assessments levied or assessed against Tenant's personal property and improvements placed upon the Premises by the Tenant, and charges for all water used by Tenant.  If either party fails to pay any taxes or assessments for which he is responsible before delinquency, the other party shall have

the option to pay such taxes or assessments and hold the non-paying party liable for indemnification of all such payments.

5.    <u>Utilities</u>.  Tenant shall pay for all water, gas, heat, light, telephone services, power, including stand-by or demand charges, and for all other services supplied to the Premises except as otherwise specifically provided for in this Lease.  To the extent such charges are for services provided to both the Premises and any property other than the Premises owned by Landlord, such charges shall be prorated by acreage and the prorated amount paid to Landlord within ten (10) days of invoicing thereof.

6.    <u>Right of Entry</u>.  Tenant shall permit Landlord, and Landlord's agents and assigns, at all reasonable times, to enter the Premises, and to use the roads established on the Premises now and in the future, for the purposes of inspection, compliance with the terms of this Lease, exercise of all rights under this Lease, posting notices, and all other lawful purposes.

7.    <u>Husbandry</u>.  Tenant hereby promises and agrees to farm the Premises in a good and farmer-like manner in accordance with the most approved farming practices in the vicinity for similar crops.

8.    <u>Ownership of Improvements</u>.  Any and all personal property, provided and placed upon the Premises by Tenant may be removed by Tenant prior to the termination of this Lease.  If not removed within that period, they shall become the property of Landlord free of cost to Landlord.

9.    <u>Maintenance and Repair</u>.  Tenant shall care for and maintain the Premises and all appurtenances thereto, including but not limited to, all fences, wells, pumps, pipes, ditches, and roadways, in a good condition, and reasonably free from noxious weeds and grasses, but shall have no liability for capital repairs to any improvements unless required to repair damage which is attributable to the negligent or intentional act of Tenant.

10.    <u>Crops; Crop Insurance</u>.  Landlord has no interest in the 2024-2025 almond and pistachio crops. All expenses necessary to farm and harvest the 2024-2025 almond and pisatchio crops shall be the sole responsibility of Tenant, and Landlord shall have no liability therefor. In the event that any of the 2024-2025 almond and pistachio crops planted upon or harvested from the Premises shall be damaged or destroyed, and Tenant shall receive payment of damages or insurance proceeds in compensation thereof, Tenant shall be solely entitled to such damages or proceeds.

11.    <u>Indemnity by Tenant</u>.  Tenant, solely in his capacity as Court-appointed Receiver, indemnifies, defends, and holds Landlord, its officers, directors, shareholders, assigns, attorneys and agents, harmless from all liability and claim for damages, including attorneys fees and costs, arising from any death or injury from any cause to any person including Landlord's agents, servants and employees, or the property of any kind belonging to anyone, including Landlord, while in, upon or in any way connected with the Premises or with any of the improvements or personal property on said Premises, except to the extent arising from the acts of Landlord.

12.    <u>No Liens</u>.  Tenant agrees that it shall not permit any mechanics or other liens to be filed against the Premises absent the prior written approval of Landlord, and further agrees to notify Landlord at least ten (10) days prior to commencement of any improvement upon the Premises.  Landlord may post and keep posted on the Premises notices of non-responsibility.

13.    <u>Use</u>.  The Premises are leased to Tenant for agricultural and related purposes only.

14.     <u>Waste</u>.  Tenant shall not commit, or permit others to commit, on the Premises waste or a nuisance.

15.     <u>Violations of Law</u>.  Tenant shall not do or suffer to be done on or about the Premises anything which would or does violate or conflict with any law, ordinance, rule or regulation which is now in force or effect, or which may hereinafter be enacted, promulgated or adopted by Federal, State or local authority.  Tenant shall, at Tenant's cost, comply with all laws, ordinances, rules or regulations applicable to the Premises or to Tenant's crops and operations thereon.

16.     <u>Water</u>.  Landlord assumes no responsibility for and does not warrant the quality, quantity or cost of the water supplied to the Premises, nor the eligibility of Tenant to obtain water.  The cost of water, together with any water stand-by or other charges, necessary for the irrigation of the crops shall be borne by Tenant.  Tenant shall not transfer or use groundwater from the Property on other than the Premises.

17.     <u>Surrender; No Holdover</u>.  Tenant agrees that it will peacefully surrender possession of the Premises to Landlord at the expiration of this Lease, free and clear of all liens and encumbrances made, done, or suffered by the Tenant, in as good condition as reasonable wear and tear will permit; provided that damage by fire, acts of God, the elements, the exploration and development of oil, gas, or other minerals, and other causes beyond the reasonable control of the Tenant are excepted.  Tenant shall have no right to holdover on the Premises at the termination of this Lease.

18.     <u>Relationship of the Parties</u>. The relationship of the Landlord and Tenant under this Lease is strictly that of a lessor and a lessee. Nothing in this Lease shall be interpreted to constitute Landlord and Tenant as partners or joint venturers of any kind.

19.     <u>Default</u>.  It is agreed that if Tenant shall default in any of the terms, covenants and conditions of this Lease on its part to be paid, observed or performed, then and in such event, Landlord may, if the Tenant fails to perform such covenant within thirty (30) days after written notice is given to Tenant to perform such covenant, reenter the Premises without further demand or notice and remove all persons therefrom, or at its option, cancel and terminate this Lease.

20.     <u>Insurance</u>.  Tenant shall carry such fire and casualty insurance on Tenant's own property as Tenant deems necessary, and Landlord shall have no obligation to Tenant with respect to any loss or damages suffered by Tenant with regard to Tenant's own property.  Landlord shall carry such fire and casualty insurance upon the existing improvements on the Premises as Landlord deems advisable. Tenant, at its expense, shall carry (a) worker's compensation insurance, unless Tenant has no employees, (b) general liability insurance with minimum coverage of $1,000,000 per occurrence and $2,000,000 in the aggregate.  Upon written request of Landlord, Tenant shall furnish to Landlord evidence that Landlord has been named an additional insured on such policies, together with certificates from the insurance carrier stating that the insurance is in full force and effect, and that the insurance carrier will give Landlord at least ten (10) days prior written notice before cancellation of such insurance.

21.     <u>Attorneys' Fees on Default</u>.  In any action or proceeding by either party to enforce or interpret this Lease or any provisions thereof, the prevailing party shall be entitled to all costs incurred and to reasonable attorneys' fees.

22.    <u>Notices</u>.  Any notice to be given to either party by the other shall be in writing and shall be served either personally or by prepaid mail certified, return receipt requested, addressed as set forth below their signatures.  Service by mail shall be deemed made two (2) days following the date of mailing.

23.    <u>Binding Effect; No Assignment</u>.  The provisions of this Lease shall benefit and bind the heirs, successors, executors, administrators and assigns of all parties to this Lease; and all parties to this Lease shall be jointly and severally liable under it.  Notwithstanding the foregoing, Tenant shall not assign this Lease, or any rights hereunder, without the prior written consent of Landlord.

24.    <u>Pending Receivership</u>. Notwithstanding anything to the contrary in this Lease or any ancillary documents, Landlord acknowledges and expressly agrees that Tenant is entering into this Lease solely in his capacity as Court-appointed receiver and shall have no personal liability for any claims arising under or related to this Lease.

25.    <u>Titles</u>.  Titles or headings to the paragraphs of this Lease are not a part of this Lease and shall have no effect on the construction or interpretation of any part of this Lease.

26.    <u>Governing Law</u>.  This Lease shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement.  To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

27.    <u>Counterparts</u>.  This Lease may be executed in multiple counterparts and each such counterpart shall be deemed to be an original instrument.

*SIGNATURES FOLLOW NEXT PAGE*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

TENANT                                      LANDLORD

By: _____         [enter buyer signature block]
Lance Miller, solely in his capacity as
Court-appointed Receiver

-42-

SCHEDULE 1.1(g)

Contract Schedule

1.  None.

SCHEDULE 5.2(i)

Specific Title Encumbrances

1.  Residential rental of 10889 Casey Ave.

SCHEDULE 7.1

Exceptions to Seller's Representations

None.