# Exhibit B

# PURCHASE AND SALE AGREEMENT

## AND

## JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated November 3, 2025, to be effective on the date when all parties have executed it, which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al*., Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**"), and (ii) CORE FARMLAND FUND LLC, a Delaware limited liability company ("**Buyer**"). For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**." This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

        A.     Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property located in Kern County, California, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

        B.     Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

        C.     The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order of the Court entered in the Proceeding on October 6, 2025 as Docket Entry #308 (the "**Marketing Procedures Order**") and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially in the form attached hereto as **Exhibit C** ("**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1.    <u>Purchase and Sale</u>

1.1    <u>Purchase and Sale of Property</u>. Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following to the extent it is "**Receivership Property**" (as defined in the Receivership Order):

(a)    The Land;

(b)    All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; all solar panels and all infrastructure related to solar panels, including mounting systems, inverters, wiring, conduits, and related equipment (but excluding all of the foregoing solar panels and infrastructure listed on <u>Schedule 1.1(b)</u>); and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or otherwise used or useful to or of benefit to the use and enjoyment of the Land or that provides drainage, irrigation and/or water to the Land;

(c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

(d)    Subject to the rights of Ranch 24, LLC in and to the crops growing on the Ranch 24 Premises (as defined on <u>Schedule 1.1(g)</u>), all crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), from and after the 2026 crop year (the "**Crops**");

(e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)    All surface water rights, groundwater rights, water credits, water entitlements, water expectancies, and banked water of any kind appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications, court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale, lease, transfer, or exchange of water generated from irrigation wells or otherwise associated with the Land (but specifically excepting any banked water rights held by POSO CREEK WATER COMPANY, LLC, a California limited liability company ("**Poso Creek**"), whether or not any of the members for which such water is held by Poso Creek are the fee owners of the Land) (collectively, "**Water Rights**"); and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on Schedule 1.1(g) that Buyer would like to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property and assignable by Seller to Buyer without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material to the Property and operations thereon, but are not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

       1.2    As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures.

(a)    Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY. BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING**

**THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 1.2 SHALL RELIEVE SELLER FROM (I) OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY DOCUMENTS DELIVERED AT THE CLOSING PER SECTION 10.2, AND (II) LIABILITY FOR SELLER'S INTENTIONAL FRAUD OR WILLFUL MISCONDUCT. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER IS NOT WAIVING ANY RIGHTS OR CLAIMS AGAINST THIRD PARTIES (FOR THE AVOIDANCE OF DOUBT, "THIRD PARTIES" REFERENCED IN THIS SECTION SHALL NOT INCLUDE SELLER OR LENDERS).**

(b)      Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller unless expressly set forth in this Agreement or any representations or warranties (oral or written) of any Lenders (as defined below), or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders. **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF, EXCEPT TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT.**

(c)      **EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT  OR ANY DOCUMENT DELIVERED BY SELLER AT CLOSING PURSUANT TO SECTION 10.2 HEREIN (COLLECTIVELY, THE "EXPRESS WARRANTIES"), SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT FOR THE EXPRESS WARRANTIES, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS: (i) EXCEPT AS EXPRESSLY SET FORTH IN THE EXPRESS WARRANTIES, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR**

AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.

(d)    BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS SECTION 1.2, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS, EXCEPT THAT BUYER DOES NOT WAIVE AND EXPRESSLY RESERVES (A) CLAIMS FOR SELLER'S INTENTIONAL FRAUD OR WILLFUL MISCONDUCT, AND (B) CLAIMS ARISING FROM SELLER'S FAILURE TO PERFORM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE DOCUMENTS DELIVERED AT THE CLOSING PER SECTION 10.2. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER IS NOT WAIVING ANY RIGHTS OR CLAIMS AGAINST THIRD PARTIES (FOR THE AVOIDANCE OF DOUBT, "THIRD PARTIES" REFERENCED IN THIS SECTION SHALL NOT INCLUDE SELLER OR LENDERS).

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived by Buyer solely to the extent such claims do not involve (i) Seller's intentional fraud or willful misconduct, (ii) Seller's obligations expressly set forth in this Agreement or any document delivered at the Closing per Section 10.2, or (iii) any claims arising out of or related to personal injury, death or property damage caused by Seller:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

_____
**Buyer's Initials**

     1.3    <u>Release</u>. At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and The Prudential Insurance Company of America ("**Prudential**"), PAR U Hartford Life & Annuity Comfort Trust ("**PAR U**"), and PGIM Real Estate Finance, LLC (together with Prudential and PAR U, collectively, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

     1.4    <u>Not a Residential Purchase</u>. Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence. As a material inducement to Seller to sell the Property, Buyer represents and warrants: (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's primary residence. To the fullest extent permitted by applicable law, Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

     1.5    <u>No Assumption of Liabilities</u>. Other than (i) the obligations of Seller that arise after the Closing under the contracts, if any, assigned to Buyer pursuant to the Assignment Agreement, or otherwise arising following the Closing solely relating to the Property, and (ii) the obligations set forth in <u>Section 32</u> herein, Buyer shall not assume, pay, perform, discharge or otherwise be responsible for, any liabilities of Seller or the defendants in the Proceeding whether or not arising out of or relating to the Property or any other business of Seller or such defendants to the extent arising from events occurring or required to be performed prior to the Closing, all of which liabilities shall remain the exclusive responsibility of Seller or such defendants, as applicable. Seller shall not assume, pay, perform, discharge or otherwise be responsible for any liabilities related to or arising from the Property arising after the Closing, except to the extent arising solely out of the Express Warranties.

     **2.**    **Escrow**. Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA 93711 (Attention: Sue Meyer),who shall act as "**Escrow Holder**," in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**"). The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct, violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

     **3.**    **Close of Escrow**. Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, and subject to <u>Section 6.4</u> herein, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before 5:00

p.m., Pacific Time, on **the date which is ten (10) days following the date on which the Sale Order becomes final and non-appealable** (the "**Closing Date**") or such other date as agreed to by the Parties in writing.

        3.1    <u>Purchase Price.</u> The Purchase Price of the Property ("**Purchase Price**") is **Eighty Million, Five Hundred Thousand and 00/100ths Dollars ($80,500,000.00)** United States currency. The Purchase Price shall be paid to Seller in installments as follows:

        (a)    <u>Independent Consideration</u>. Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred and 00/100ths Dollars ($100.00)** from the Bid Deposit (the "**Independent Consideration**") as independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof. The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under <u>Section 6.3</u>, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

        (b)    <u>Bid Deposit</u>. Concurrently with Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Buyer shall deposit into an interest-bearing receiver account with Pivot Management Group LLC (the "**Deposit Holder**") an amount equal to **Six Million Nine Hundred Forty-Five Thousand One Hundred Eighty-Eight Dollars and 10/100ths ($6,945,188.10)** (the "**Bid Deposit**") in immediately available, good funds of the United States of America. If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.

        (c)    <u>Closing Payment</u>. **Seventy-Three Million Five Hundred Fifty Four Thousand Eight Hundred Eleven and 90/100ths Dollars ($73,554,811.90)** (the "**Closing Payment**") shall be deposited by Buyer into Escrow no later than one (1) business day prior to the Closing and shall be released to Seller in cash, by cashier's check or wire transfer of immediately available funds, at the Close of Escrow.

        **4.**    **<u>LIQUIDATED DAMAGES</u>. IN THE EVENT CLOSE OF ESCROW DOES NOT TIMELY OCCUR DUE TO BUYER'S BREACH OR DEFAULT OF THIS AGREEMENT, SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN <u>SECTION 1.5</u> AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PAYMENT OF SUCH AMOUNT AS**

LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN <u>SECTION 1.5</u> REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY WHEN REQUIRED TO DO SO BY THIS AGREEMENT. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. THE PAYMENT OF THE LIQUIDATED DAMAGES PURSUANT TO THIS SECTION 4 IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT INSTEAD, IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676, AND 1677 OF THE CALIFORNIA CIVIL CODE. IN CONSIDERATION OF THE PAYMENT OF THE LIQUIDATED DAMAGES, SELLER WILL BE DEEMED TO HAVE WAIVED ALL OTHER CLAIMS FOR DAMAGES OR RELIEF AT LAW OR IN EQUITY (INCLUDING, WITHOUT LIMITATION, SPECIFIC PERFORMANCE) INCLUDING ANY RIGHTS SELLER MAY HAVE PURSUANT TO SECTION 1680 OR SECTION 3389 OF THE CALIFORNIA CIVIL CODE RELATING TO BUYER'S DEFAULT RESULTING IN ESCROW NOT CLOSING AS PROVIDED UNDER THIS AGREEMENT. BY INITIALING THIS PROVISION IN THE SPACES BELOW, SELLER AND BUYER EACH SPECIFICALLY AFFIRM THEIR RESPECTIVE AGREEMENTS CONTAINED IN THIS AGREEMENT AND AGREE THAT SUCH SUM IS A REASONABLE SUM CONSIDERING THE CIRCUMSTANCES AS THEY EXIST ON THE DATE OF THIS AGREEMENT. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY WHEN REQUIRED TO DO SO PURSUANT TO THIS AGREEMENT.

ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION

| | |
|---|---|
| _____ | _____ |
| Seller | Buyer |
| Lance Miller, solely in his capacity | |
| as Court-appointed receiver | |

### 5. Seller's Deliveries; Condition of Title.

5.1 <u>Seller's Deliveries</u>.

Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land. Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents

evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other statutory disclosures that are required in connection with the conveyance of the Property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above. As used in this Agreement, "Disclosure Statutes" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property. Buyer hereby agrees as follows with respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

(a)      Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

(b)      The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

5.2      Condition of Title. Seller agrees to convey fee simple title in and to the Property to Buyer. Subject to Section 32 herein, title to the Property shall be conveyed by Seller to Buyer by grant deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject only to the items enumerated in this Section (such items, collectively, the "**Permitted Exceptions**"). Buyer shall accept title to the Property subject only to the Permitted Exceptions; provided, however, that nothing herein shall limit or restrict Buyer's right to (i) negotiate with the Title Company to remove or modify any such exceptions, or (ii) obtain title endorsements at Buyer's expense to insure over any such exceptions:

(a)      any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due or payable, subject to any applicable Prorations in accordance with Section 13 hereof;

(b)      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

(c)      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Effective Date, except as provided in Section 5.3 below;

(d)      physical matters and conditions, if any, that exist at the Property on the Effective Date and are disclosed by a current survey or inspection of the Property;

(e)    laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

(f)    any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

(g)    all recorded covenants, conditions, restrictions, easements, and agreements affecting the Property on the Effective Date, including without limitation the Commitment Exceptions (as defined in Section 10.1(c) below), except to the extent Seller has agreed in writing to terminate or remove any one or more such matters of title;

(h)    the printed standard exceptions listed in the title commitment for the Title Policy;

(i)    the leases listed in Schedule 5.2(i); and

(j)    such other matters as Buyer either waives, assumes, or consents to in writing.

5.3    No Liens. Notwithstanding the foregoing, the Property shall be sold free and clear of any and all monetary liens, deeds of trust, mortgages, security interests, tax liens (except those for taxes not yet due or payable subject to Prorations in accordance with Section 13), mechanics' liens, crop liens, and other financial encumbrances securing the payment of money, including any claims of tenants, contractors, or others with potential rights to the crops or improvements effective upon the Closing (collectively, the "**Pre-Closing Liens**"), other than the Permitted Exceptions. Seller shall have caused or obtained, to Buyer's reasonable satisfaction, prior to the Closing, a full release of all liens, claims, or encumbrances in and to the Crops that appear in the public record or that are known to Seller by any persons having an interest therein.

5.4    Buyer's Indemnification of Seller. Any damage caused to the Property by Buyer or Buyer's agents in connection with Buyer's inspection of the Property shall be promptly and fully repaired by Buyer and the Property returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement; provided, however, that Buyer shall not be responsible for pre-existing conditions or defaults, including hazardous or toxic materials, not caused or exacerbated by Buyer or Buyer's agents. Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's agent's activities, which obligation shall survive any termination of this Agreement. Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses

reasonably incurred by Seller Parties in connection therewith. The indemnity provided herein shall not extend to indirect, consequential, punitive or speculative damages and shall survive the Close of Escrow and any termination of this Agreement.

5.5    <u>SGMA Disclosure.</u> The Sustainable Groundwater Management Act ("**SGMA**") is a California state law enacted in the year 2014. SGMA may limit the amount of groundwater that may be pumped from underground aquifers. Applicable plans, rules and regulations are in place implementing SGMA. Seller and its agents and representatives make no representation on the effect of SGMA on the Property now or in the future, except that Seller shall disclose to Buyer any notices, orders, judicial decrees, violations, or regulatory actions relating to the implementation of SGMA or the extraction, use or transfer of groundwater on or from the Property, including groundwater credits or allocations, of which Seller has actual knowledge, and shall further disclose to Buyer, and deliver true and complete copies of, any contracts, agreements, or understandings (whether written or oral) with third parties relating to SGMA or the pumping, diversion, use, sharing or transfer of groundwater, banked water, surface water, recharged water, water rights or pumping allocations affecting the Property, whether or not of record, of which Seller has actual knowledge (provided that any such document which is included in the Preliminary Report is deemed delivered). Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future. In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property. Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property, provided this release shall not apply to any liability arising from Seller's failure to provide all materials required by this <u>Section 5.5</u> or Seller's or any Seller Parties' fraud or intentional misrepresentations in connection with SGMA or water rights information provided to Buyer.

Notwithstanding anything to the contrary in this <u>Section 5.5</u> or elsewhere in this Agreement, Buyer shall not assume, and Seller shall remain solely responsible for, any fees, charges, penalties, assessments, or other liabilities imposed by the Semitropic Water District or any other governmental or quasi-governmental authority arising out of or relating to groundwater, surface water, irrigation water deliveries or allocation overages attributable to use of the Property prior to the Closing Date, including without limitation, any SGMA allocation overages for the 2025 water year (January 1, 2025 – December 31, 2025), regardless of whether such amounts are invoiced, assessed, or become due after Closing. Any such liability shall remain the sole responsibility of Seller, and Seller shall indemnify, defend, and hold Buyer harmless from and against the same. This carve-out shall survive Closing and delivery of the Deed and Leased Parcels Deed.

**6.    <u>Conditions Precedent; Termination.</u>**

6.1    <u>Conditions to Obligations of all Parties</u>. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

(a)      the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Lenders, and all parties of interest in the Proceeding, and Title Company agrees to insure title to the Property without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order or the Lender Agreement Approval (defined below) will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit, plus all interest accrued thereon, shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination;

(b)      no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement; and

(c)      Lenders shall have provided their written approval of this Agreement.

6.2      <u>Seller's Conditions Precedent</u>. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)      Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in <u>Section 9</u> below), and the Buyer's share of the Closing Costs (as defined in <u>Section 12</u> below) and Prorations (as defined in <u>Section 13</u> below) into the Escrow by the Closing Date.

(b)      All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Seller in its sole discretion, including without limitation, the Buyer Leased Parcels Documents.

(c)      Each of Buyer's representations and warranties set forth in <u>Section 8</u> hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3    <u>Buyer's Conditions Precedent</u>. Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)    Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed and Seller Leased Parcels Documents (defined in <u>Section 32</u> herein).

(b)    Except as listed in <u>Schedule 5.2(i)</u>, Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)    Each of the representations and warranties of Seller contained in <u>Section 7</u> or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(d)    All Pre-Closing Liens shall have been fully paid, released, and reconveyed (or other arrangements reasonably satisfactory to Buyer shall have been made for their release concurrently with Closing), so that title to the Property is conveyed to Buyer free and clear of all Pre-Closing Liens.

(e)    All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Buyer in its sole discretion.

(f)    Any and all past due or delinquent water bills or charges relating to the Property shall have been paid in full by Seller prior to the Close of Escrow or, if not paid, shall be satisfied from Seller's proceeds at Closing through escrow as a proration.

(g)    Seller has obtained the termination of, or the Court has ordered the sale of the Property free and clear of, the Water Supply Agreements listed on <u>Schedule 6.3(g)</u> as to the Property to Buyer's reasonable satisfaction, provided that failure of this condition shall not be a default of Seller under this Agreement.

(h)    Seller has obtained the termination of, or the Court has ordered the sale of the Property free and clear of, the Rights of First Refusal listed on <u>Schedule 6.3(h)</u> (the "**ROFRs**") as to the Property to Buyer's reasonable satisfaction, or that the Court has entered a finding that the ROFRs are not enforceable against Seller or the Property, provided that failure of this condition shall not be a default of Seller under this Agreement.

(i)    Buyer has completed its diligence review of all water matters, not later than 12:00 p.m., Pacific Time, on October 27, 2025 (the "**Diligence Deadline**").

(j)    Title Company shall unconditionally be committed to issue upon the Closing and following recordation of the Deed to Buyer, the Title Policy (as defined below, subject only to the Permitted Exceptions).

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4    Termination. This Agreement may be terminated in accordance with this Section 6.4 at any time prior to the Closing:

(a)    By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes final and non-appealable, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Buyer Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Buyer Outside Date; provided, however, that the Buyer Outside Date may be extended (i) by Seller and Buyer upon mutual agreement, (ii) by Seller for no more than an additional fifteen (15) days if, despite Seller's commercially reasonable efforts prior to such extension, additional time is required to obtain releases of title matters to be removed by Seller hereunder at the Closing.

(b)    By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this Section 6.4(b) shall not be available to a Party if such order resulted from, or could have been avoided but for, the intentional breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)    By written notice of either Buyer or Seller if Seller closes or consummates an alternative transaction or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder and the alternative transaction is with the Successful Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 6.4(c) until the earlier of the date (i) the alternative transaction closes, and (ii) sixty (60) days following the entry of the Sale Order;

(d)    By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any material respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.3 to be satisfied, and (2) (A) is not capable of being cured by the Buyer Outside Date or (B) if capable of being cured by the Buyer Outside Date, is not cured by the earlier of the Buyer Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in Section 6.3 shall become incapable of being satisfied by the Buyer Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this Section 6.4(d) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or

(e)    By Buyer by giving written notice to Seller if the Sale Order is: (i) modified or otherwise altered in a manner materially adverse to Buyer not otherwise agreed to by

Buyer, in writing, or (ii) stayed or vacated by the Court or a court of competent jurisdiction and such stay or vacatur shall not have been removed prior to the earlier of (x) ten (10) days following the implementation of such stay or vacatur, or (y) the Buyer Outside Date;

(f)    By Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a material breach of, or material inaccuracy in, any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any material respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.2 to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and forty-five (45) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 6.2 shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this Section 6.4(f) will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder;

(g)    By Buyer by giving written notice to Seller not later than the Diligence Deadline;

(h)    By the mutual written consent of Seller and Buyer;

(i)    By Buyer, as provided in Section 14; and

(j)    By Seller by giving written notice to Buyer if Closing shall not have occurred on or before ten (10) days after the Sale Order becomes final and non-appealable (the "**Seller Outside Date**") and Seller has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Seller Outside Date; provided, however, the Seller Outside Date may be extended by Seller, in writing, in its reasonable discretion.

6.5    Effect of Termination

(a)    In the event of the termination of this Agreement as provided in Section 6.4, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to Section 6.4(f) or (j), and Sellers are not then in breach of Sellers' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit and (y) for any reason other than pursuant to Section 6.4(f), Buyer shall be entitled to return of the Bid Deposit as set forth in this Agreement. Notwithstanding the foregoing, nothing in this Article 6 will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to Section 6.4, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement, and in the case of any Seller breach constituting fraud or willful misconduct by Seller, Buyer shall, be entitled to pursue specific performance.

(b)    [Reserved].

(c)    In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate this Agreement in accordance with Section 6.4 and to receive a refund of the Bid Deposit, provided that, notwithstanding the foregoing, in the case of any fraud or willful misconduct by Seller, Buyer shall additionally have the right to pursue specific performance if applicable.

**7.    Seller's Representations and Warranties.**

7.1    Seller's Representations and Warranties. Except as set forth on Schedule 7.1, attached hereto, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)    Court-Appointed Receiver. Seller is the Court-appointed receiver over the Property, duly appointed and acting within the scope of authority granted by the Court, and has not received any written notice of challenge or appeal to such appointment that remains unresolved.

(b)    Authority. Subject to entry of the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which any Seller is a party or by which any Seller is otherwise bound, or any judicial order to which any Seller is a party or to which any Seller is subject. Subject to entry of the Sale Order, Seller has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of the Seller executing such documents and instruments herein, and to perform its obligations hereunder. All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by such Seller, (ii) be legal, valid and binding obligations of such Seller, and (iii) not violate, to such Seller's knowledge, any provision of any agreement or judicial order to which such Seller is a party or to which such Seller is subject.

(c)    OFAC Compliance. Seller (which, for the purposes of this Section 7.1(c), shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    Foreign Person and Withholding. Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986,

as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to such Seller or the Property. Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008. Seller may be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

        (e)    <u>Organic Trees or Vines</u>. The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties, except that Seller shall disclose to Buyer any known certifications, contracts, or royalty obligations of which Seller has actual knowledge. Seller makes no representations or warranties in this regard.

        (f)    <u>Contracts</u>. Except as disclosed to Buyer in writing or set forth on <u>Schedule 7.1</u>, <u>Schedule 5.2(i)</u>, or which are Permitted Exceptions or otherwise set forth in the Preliminary Report, Seller has not entered into, and to Seller's Knowledge (as defined below) there are no, contracts, agreements, leases, licenses, management agreements, service contracts, maintenance agreements, construction contracts, or other similar arrangements, including, without limitation, agreements with third parties related to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property that will be binding on Buyer or the Property after the Close of Escrow. Seller shall, on or before Closing, terminate all un-recorded leases affecting the Property as of the Effective Date, other than those leases identified on <u>Schedule 5.2(i).</u>

        (g)    <u>Taxes and Assessments</u>. To Seller's Knowledge, all general real property taxes, water assessments, and regular assessments currently due and payable with respect to the Property have been paid or will be prorated at Closing. To Seller's Knowledge, there are no pending or threatened special assessments, impact fees, or similar charges affecting the Property other than those disclosed to Buyer in writing or that are matters of public record.

        (h)    <u>Litigation</u>. To Seller's Knowledge, there are no actions, suits, or proceedings pending or threatened against Seller relating to the Property, other than those disclosed to Buyer in writing or matters of public record.

        (i)    <u>Knowledge Definition</u>. As used in this Agreement, the term "Seller's Knowledge" means the current actual (and not constructive or imputed) knowledge of LANCE MILLER, solely in his capacity as court-appointed receiver, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other person, including Seller's agents, employees, consultants, or representatives. Any disclosure required hereunder shall be deemed made if such matter is listed in the Preliminary Report.

        7.2    <u>Survival</u>. The express representations and warranties made in this Article by Seller will not merge into any instrument of conveyance delivered at the Closing; <u>provided</u>, <u>however</u>, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

8. **Buyer's Representations and Warranties**. Buyer hereby warrants, represents, convents and certifies to Seller and agrees that as of the Close of Escrow:

(a) Good Standing. Buyer is a limited liability company that is properly and duly formed, validly existing and in good standing under the laws of the state of Delaware, registered to transact business in the State of California, and is in good standing under the laws of the State of California.

(b) Authority. Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of the Buyer executing such documents and instruments herein, and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, to the best of Buyer's knowledge, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject. All documents to be executed by Buyer and delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by the Buyer executing such documents, (ii) be legal, valid and binding obligations of such Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which such Buyer is subject.

(c) OFAC Compliance. Buyer or its Authorized Assignee (which, for the purposes of this Section 8(c), shall include its members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d) Bankruptcy. Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e) Debts, Liens, and Encumbrance. Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense

contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that directly arise from any of Buyer's activities on the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.

   (f) <u>No Collusion; Negotiations with Third-Party Owners</u>. Buyer represents and warrants that (i) it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder, and (ii), in the event that the transactions contemplated by this Agreement are intended by Buyer to be made concurrently with the proposed purchase by Buyer of other real property related to or associated with the farming and other operations of the Property (the "**Concurrent Sale**" of the "**Concurrent Sale Property**") pursuant to one or more separate Purchase and Sale Agreements and Joint Escrow Instructions between Buyer and the third-party owner(s) of such property (the "**Third-Party Owner(s)**"), absent Seller's express written consent, which consent may be withheld in Seller's sole discretion, any and all discussions and negotiations by Buyer regarding a Concurrent Sale or the purchase of a Concurrent Sale Property shall be conducted through Seller and that Buyer shall have no direct or indirect communications with a Third-Party Owner regarding a Concurrent Sale or a Concurrent Sale Property. Notwithstanding anything in this Agreement to the contrary, the closing of a Concurrent Sale shall not be a condition precedent to the binding nature or effectiveness of this Agreement.

   **9.** **Cultural Costs; Crop Management**. Seller shall pay all cultural costs for the 2025 crop, and any prior years now due and owing, on the Property, including related crop insurance premiums. At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Property for the 2026 crop year (the "**Cultural Costs Reimbursement**"). Buyer acknowledges that it has been advised of, and agrees that the Cultural Cost Reimbursement shall include the actual cost of, 2026 post-harvest irrigation of the almond and pistachio ranches on the Land through the auction date, as directed by the stalking horse bidder pursuant to Section 9 of the Stalking Horse PSA (as defined in the Marketing Procedures Order), using non-contract water available for purchase at $172/per AF. At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2026 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2026 crop year. Buyer shall also have the exclusive right to direct, in writing, reasonable farming operations for the 2026 crop on the Property, and Seller shall comply with such reasonable directions so long as they are consistent with standard agricultural practices.

   **10.** **Closing.**

10.1    <u>Closing Date</u>. Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein. Closing shall occur on or before the Closing Date. Closing shall be conditioned upon:

(a)    <u>Full Performance</u>. Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)    <u>Conditions</u>. The conditions precedent set forth in <u>Section 6.1, 6.2, and 6.3</u> have been satisfied or waived by the Party for whose benefit the condition exists.

(c)    <u>Title Policies</u>. Title Company shall be ready, willing, and committed to issue upon the Closing and following recordation of the Deed to Buyer, a current ALTA Extended Coverage Policy of title insurance, at no more than the insurer's standard rates (the "**Title Policy**"). The Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Buyer (less and except any Post-Closing Lease Termination Parcels), subject only to the lien of real property taxes for the current fiscal year not yet due and payable, those Schedule B exceptions listed on the title commitment for the Title Policy included the exceptions listed on <u>Schedule 10.1(c)</u> attached hereto and incorporated herein by reference (the "**Commitment Exceptions**") (for clarity, the Commitment Exceptions shall not include any Pre-Closing Liens), except to the extent Seller and/or Escrow Holder has agreed in writing to remove. The premium for such Title Policy shall be paid as required under <u>Section 12</u>.

(d)    <u>Delivery</u>. Possession of the Property shall be delivered to Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property. For the avoidance of doubt, title to the Post-Closing Lease Termination Parcels shall not convey to Buyer, or its designee, until the Leased Parcels Deed is recorded pursuant to <u>Section 32</u> herein, provided that Buyer shall be granted access to the Post-Closing Lease Termination Parcels, if any, at the time of Closing and during the period ending on the Leased Parcels Recording Date (defined below), pursuant to an early occupancy lease in form and substance reasonably acceptable to the Parties (the "**Early Occupancy Lease**") for a rental of $1.00 and payment of all real estate taxes and assessments, utilities, repair and maintenance expenses and customary farming and irrigation expenses to maintain and operate the Post-Closing Lease Termination Parcels, if any, in the same condition in which they were delivered to Buyer through the term of the Early Occupancy Lease, and other customary lease terms (for clarity, during such period and other than with respect to the payment of any lease termination payments as set forth in <u>Section 32</u> hereof, Buyer is not assuming any obligations under any Residential Leases affecting the Post-Closing Lease Termination Parcels).

10.2    <u>Seller's Closing Obligations</u>. On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)    The Deed, describing the Land less and except the Post-Closing Lease Termination Parcels.

(b)      A bill of sale in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)      To the extent required, duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements identified on <u>Schedule 1.1(g)</u> (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability and is required to assign the same to Buyer pursuant to Section 1.1(g) of this Agreement).

(d)      An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(e)      A general assignment, without representation or warranty, of Seller's right, title and interest in (i) any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities that comprise Receivership Property but are not then in Seller's possession, and (ii) subject to receipt of the consent of the preparing consultant thereof to such assignment, the Phase 1 environmental assessments of the Property ("**Phase 1s**") identified on <u>Schedule 10.2(e)</u> attached hereto and incorporated herein by reference, in the form set forth on Exhibit H (the "**General Assignment**").

(f)      The Closing Statement (as defined below).

(g)      To the extent they are then in Seller's possession, comprise, Receivership Property and are not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(h)      Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(i)      Seller's California Form 593, if required.

(j)      Seller's IRS Form 1099-S if required by Escrow.

(k)      All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(l)      Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement including, without limitation, as reasonably necessary for the issuance of the Title Policy.

(m)      A copy of the Sale Order entered by the Court.

(n)      The Seller Leased Parcels Documents (defined in <u>Section 32</u> below).

10.3    <u>Buyer's Closing Obligations</u>. On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)    The Closing Balance of the Purchase Price and Buyer's share of the Closing Costs and Prorations.

(b)    Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)    A Preliminary Change of Ownership Report in the form specified by Kern County (the "**PCOR**").

(d)    To the extent required, duplicate counterparts of the Assignment Agreement.

(e)    The Buyer Leased Parcels Documents (defined in <u>Section 32</u> below).

(f)    The Closing Statement (as defined below).

(g)    Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement including, without limitation, as reasonably necessary for the issuance of the Title Policy.

10.4    <u>Escrow Holder Closing Obligations</u>. The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to <u>Section 10.2</u>, and all of the items to be deposited by Buyer pursuant to <u>Section 10.3,</u> and (ii) the Title Company is prepared to issue the Title Policy in the condition required in <u>Section 10.1(c)</u> above. The Escrow Holder shall close escrow by:

(a)    Recording the Deed in the Official Records of Kern County, California, and returning the recorded Deed to Buyer with a conformed copy to Seller, and filing the PCOR in Kern County, California;

(b)    Intentionally omitted;

(c)    Issuing to Buyer the Title Policy (within fifteen (15) days after the Closing);

(d)    Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(e)    Delivering to Buyer Seller's certification that it is not a "foreign person";

(f)     Delivering to Buyer the items deposited into Escrow by Seller for delivery to Buyer, including the Bill of Sale;

(g)     Intentionally omitted;

(h)     If applicable, delivering to each of Buyer and Seller, a fully executed counterpart of the Assignment Agreement; and

(i)     Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

In addition to the obligations contained in this <u>Section 10.4</u>, Escrow Agent shall accept, deliver, and record the Leased Parcels Deed in accordance with <u>Section 32</u> herein.

**11.**    <u>**Like-Kind Exchange**</u>. Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

**12.**    <u>**Closing Costs**</u>. All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

(a)     Buyer and Seller shall pay their respective: (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)     Seller shall pay (i) one-half of the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, and (ii) one-half of the escrow fees.

(c)     Buyer shall pay (i) one-half of the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) one-half of the escrow fees, (iii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, (iv) the premium for Buyer's Title Policy, and (v) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)     Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.**    <u>**Prorations**</u>. Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1   <u>Utility Charges</u>. The Parties agree that utility and water charges (other than assessments collected with real property assessments by the Kern County tax assessor) shall not be prorated in Escrow. Seller shall be liable for all such charges incurred prior to and on the date of Closing and Buyer shall be liable for all such charges incurred after the Closing.

13.2    <u>Other Apportionments</u>.  Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest tax bills. Such prorations and apportionments shall be made in the manner customary in Kern County for the sale of agricultural land. If any such taxes, assessments, or charges relate to periods prior to the Close of Escrow but are billed or become due after the Close of Escrow, Seller shall remain liable for (and promptly reimburse Buyer for) the portion allocable to the period prior to the Close of Escrow. Buyer shall be responsible only for its allocable share accruing from and after the Close of Escrow.

13.3    <u>Survival</u>. The provisions of this <u>Section 13</u> shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this <u>Section 13</u> must be made in writing to the other Party within three (3) months after the Closing Date.

14.    **Risk of Loss**. Risk of physical loss to the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof. In the event of the loss or destruction of a material part of the Property prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, Buyer shall have the option of (a) accepting the Property in its lost or destroyed condition in which event Buyer shall be entitled to the proceeds of any insurance or other proceeds payable with respect to such loss or destruction, and the full Purchase Price shall be paid for the Property, or (b) terminating this Agreement at which event both Parties will be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be promptly returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property to substantially the same condition existing prior to such loss or destruction within thirty (30) days of receipt of notice and has fully paid all costs thereof and cleared any potential liens associated therewith or Buyer and Seller agree to reduce the Purchase Price by the value of the lost or destroyed portion of the Property.

15.    **Assignment**. Buyer may assign to one or more affiliates of Buyer any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of any such assignment at least three (3) days prior to the Close of Escrow, containing the name of the assignee ("**Authorized Assignee**") and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement. Any assignment other than to an Authorized Assignee shall require the written consent of Seller, which may be withheld at his sole discretion. Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee. Seller shall have the right, upon written notice to Buyer, to assign its rights to receive any payments or other sums due from Buyer to Seller after Closing, if any, to any one or more Lenders at any time following the Closing.

16.    **Receivership Matters.** Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the

Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Seller and, if Buyer is the Successful Bidder, Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

17.    **Backup Bidder**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the Marketing Procedures, Buyer will serve as the Back-up Bidder. If Buyer is chosen as the Backup Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of (i) sixty (60) days following the entry of the Sale Order, or (ii) the closing of the sale to the Successful Bidder. If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement within such sixty (60) day period, Buyer will be deemed to be the Successful Bidder and shall consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

18.    **Brokers**. Buyer and Seller each represent and warrant to the other that, except for Capstone Capital Markets, LLC ("**Seller's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the imposition of liability for the payment of any other real estate brokerage commission, finder's fee or otherwise in connection with the transaction described herein. Seller shall be responsible for the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith. In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

19.    **Attorney's Fees; Pre-litigation Dispute Resolution**. Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement. In the event of any action between the Parties hereto which a court of competent jurisdiction determines was frivolous or brought in bad faith by the unsuccessful Party, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action. The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

20.    **Notices**. All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery;

provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice. All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail shall be deemed delivered three (3) business days after deposit in the United States Mails, and any notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

| If to Buyer: | Core Farmland Fund LLC<br>c/o International Farming Corporation<br>1318 Dale Street<br>Raleigh, North Carolina 27605<br>Attn: Ralph Isenrich<br>Telephone: 252-523-0800<br>Email: risenrich@intlfarming.com | With a copy to:<br><br>Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP<br>150 Fayetteville Street, Suite 2300<br>Raleigh, North Carolina 27601<br>Attn: Sharita Whitaker<br>Telephone: 919-821-6781 |
|---|---|---|
| If to Seller: | Lance Miller, Receiver<br>c/o Pivot Group<br>1230 Rosecrans Avenue<br>Suite 300 – PMB928<br>Manhattan Beach, CA 90266<br>Attn: Lance Miller or Matt Covington<br>Telephone: 424-363-0599<br>Email: lance.miller@pivotgrp.com and matt.covington@pivotgrp.com | With a copy to:<br><br>Katten Muchin Rosenman LLP 2121 North Pearl Street, Suite 1100 Dallas, TX 75201-2591<br>Attn: John Mitchell and Michaela Crocker<br>Telephone: 214-765-3600<br>Email: john.mitchell@katten.com and michaela.crocker@katten.com<br><br>AND<br><br>Cutts Law, PC<br>5088 N. Fruit Ave, Ste 101<br>Fresno, CA 93711<br>Attn: Lisa A. Cutts<br>Telephone:    559-226-8177<br>Email: lac@cutts-law.com |

    **21.**   **Waivers**. Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver. Any such waiver shall be in writing and delivered to the other Party and the Escrow Holder. No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

    **22.**   **Governing Law**. This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles. The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this

Agreement. To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Kern, California.

23. **Business Days**. In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed. Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24. **WAIVER OF JURY TRIAL**. TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY MUTUALLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "**DISPUTE**", AND COLLECTIVELY, ANY OR ALL, THE "**DISPUTES**") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT EACH PARTY HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

25. **Entire Agreement**. This Agreement and the Confidentiality and Nondisclosure Agreement entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto. The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement. This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged. In addition to the foregoing, Seller and Buyer waive the effect of California Civil Code Section 1654 which interprets uncertainties in a contract against the party who drafted the contract.

26. **Pending Receivership**. Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Properties, or otherwise.

27. **Bidding Procedures**. The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order. Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third

parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order.

28. **Validity**. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

29. **Facsimile Electronic Signatures**. For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

30. **Time**. Time is of the essence of this Agreement.

31. **Counterparts**. This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

32. **Residential Leases; Lease Termination Parcels**. Buyer and Seller acknowledge and agree that certain parcels of the Land, described in further detail on Schedule 32 attached hereto and incorporated by reference (collectively, the "**Lease Termination Parcels**"), are encumbered by unrecorded residential leases (collectively, the "**Residential Leases**") as of the Effective Date. If Buyer is the Successful Bidder, commencing on the date that the Sale Order is entered, and continuing thereafter until the earlier of (i) the date on which all Residential Leases have been terminated and the tenants under all such Residential Leases have vacated the Lease Termination Parcels, and (ii) the date that is ninety (90) days after the Close of Escrow (such later date, the "**Leased Parcels Recording Date**"), Seller shall reasonably cooperate with Buyer to terminate the Residential Leases and obtain exclusive possession of the Lease Termination Parcels, free of any tenants under the Residential Leases, but shall have no obligation to initiate unlawful detainer actions against any tenant who fails to vacate the Lease Termination Parcels. Buyer shall be responsible for the documentation of such termination with respect to the Residential Leases and any termination payments associated therewith (provided that any such termination payments shall require Buyer's prior consent) shall be the responsibility of Buyer. Buyer shall also be responsible for the reasonable expenses of Seller incurred in pursuing the termination of the Residential Leases and for the reasonable carrying costs of the Lease Termination Parcels. Any such termination payments and payment of related costs and expenses shall be made at Buyer's sole risk and shall not be subject to reimbursement by Seller if this Agreement is terminated for any reason.

Any Lease Termination Parcels for which the Residential Leases have been terminated and are free of tenants prior to the Close of Escrow shall be conveyed to Buyer at the Closing, and the remaining Lease Termination Parcels (the "**Post-Closing Lease Termination Parcels**") shall be subject to the following:

(a)     At or before the Close of Escrow, Seller shall fully execute and deposit into Escrow (i) a deed in the form attached hereto as <u>Exhibit E</u>, conveying any Post-Closing Lease Termination Parcels to Buyer or, at Buyer's direction, an affiliate of Buyer (the "**Leased Parcels Deed**"), (ii) a bill of sale in substantially the form attached hereto as <u>Exhibit F</u> with respect to any personal property located on the Post-Closing Lease Termination Parcels (the "**Leased Parcels Bill of Sale**"), and (c) such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid conveyance of the Post-Closing Lease Termination Parcels to Buyer, or its designee, including, without limitation, as reasonably necessary for the modification of the Title Policy to include the Post-Closing Lease Termination Parcels or, alternatively, the issuance of an owner's policy of title insurance subject only to the Permitted Exceptions  (collectively, the "**Seller Leased Parcels Documents**").

(b)     At or before the Close of Escrow, Buyer shall fully execute and deposit into Escrow (i) a Preliminary Change of Ownership Report for the Post-Closing Lease Termination Parcels in the form specified by Kern County (the "**Leased Parcels PCOR**"), and (ii) such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid conveyance of the Post-Closing Lease Termination Parcels to Buyer, or its designee, including, without limitation, as reasonably necessary for the modification of the Title Policy to include the Post-Closing Lease Termination Parcels or, alternatively, the issuance of an owner's policy of title insurance subject only to the Permitted Exceptions (collectively, the "**Buyer Leased Parcels Documents**"), together with cash in the amounts of such additional closing and recording costs estimated by Escrow Holder related to the post-closing conveyance of the Post-Closing Lease Termination Parcels.

(c)     On or before the Leased Parcels Recording Date, Buyer shall deposit with Escrow Holder, those amounts due Seller as reimbursement for costs incurred in effecting the termination of the Residential Leases which amounts have not been previously reimbursed to Seller.

(d)     Within one (1) Business Day of the Leased Parcels Recording Date, Escrow Agent shall (x) record the Leased Parcels Deed in the Official Records of Kern County and file the Leased Parcels PCOR in Kern County and return the recorded Leased Parcels Deed to Buyer, or its designee, with a conformed copy to Seller, and (y) deliver the Seller Leased Parcels Documents to Buyer, and any Buyer Leased Parcels Documents to Seller, consistent with the instructions as to similar documents in <u>Section 10.4 above</u>.  Buyer shall be responsible for all escrow charges associated with Escrow Agent's obligations under this <u>Section 32</u>.

The Parties' obligations pursuant to this <u>Section 32</u> shall survive Closing and the recording of the Deed through the recording of the Leased Parcels Deed.

**33.     <u>Supersedes Prior Agreement.</u>**    This Agreement supersedes and replaces in its entirety that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 27, 2025, made by and between the Parties as to the Property.

*SIGNATURES FOLLOW NEXT PAGE*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER:                                    BUYER:

By:_____          **CORE FARMLAND FUND LLC**
Lance Miller, solely in his capacity as    a Delaware limited liability company
Court-appointed Receiver

                                           By:  IFC Core Farmland Fund, LP
Date of Execution:_____                    a Delaware limited partnership
                                                its Sole Member

                                                By:  IFC Core Farmland Fund GP LLC
                                                     a Delaware general partnership
                                                     its general partner


                                                     By: _____
                                                          Charles F.H. McNairy, Manager


                                           Date of Execution:_____



                                           Effective Date:_____

ACCEPTANCE BY ESCROW HOLDER


CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.

CHICAGO TITLE COMPANY,
a California corporation


By:_____
Name:_____
Title:_____

Escrow Number: _____

Dated:_____

# EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**TRACT 1:**

**PARCEL 1: APN: 047-010-01**

ALL THAT PORTION OF SECTION 2, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING WESTERLY OF THE WESTERLY RIGHT OF WAY OF THE AT&SF RAILROAD.

EXCEPTING THEREFROM 1/2 OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND AS RESERVED BY JOHN F. POOLE AND GERTRUDE REINHARD POOLE, AS JOINT TENANTS, IN DEED RECORDED MARCH 21, 1960 IN BOOK 3250, PAGE 624 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING INTEREST IN AND TO ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS IN AND UNDER SAID LAND AS RESERVED BY CORNELIUS VANDER DUSSEN, A MARRIED MAN, IN DEED RECORDED FEBRUARY 18, 1981 IN BOOK 5352, PAGE 1894 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 047-040-06**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER AND THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE SOUTH HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES OR UNDERLYING SAID LAND, AS RESERVED BY JAMES P. GEORGE, ET UX, RECORDED SEPTEMBER 4, 1980 IN BOOK 5311 PAGE 1382 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 047-040-09**

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE

UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES OR UNDERLYING SAID LAND, AS RESERVED BY CALLON PETROLEUM, A CALIFORNIA CORPORATION, IN DEED RECORDED SEPTEMBER 4, 1980 IN BOOK 5311 PAGE 1381 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 047-040-13**

THE WEST HALF OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTHERLY ONE HUNDRED ACRES OF THE WEST HALF OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, AS GRANTED TO JEAN W. COFFMAN BY DEED RECORDED FEBRUARY 27, 1970 IN BOOK 4371 PAGE 968 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL MINERALS, OIL, GAS, MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY CARL W. COFFMAN IN DEED RECORDED FEBRUARY 5, 1980 IN BOOK 5262 PAGE 1993 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 047-040-03**

THE SOUTHEAST QUARTER OF SECTION 4, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 50% IN AND TO ALL OIL, GAS AND HYDROCARBON AND ALL GAS, OIL AND OTHER HYDROCARBON RIGHTS UPON AND UNDER SAID LAND, AS RESERVED BY R. W. GROBER AND S. VIRGINIA GROBER, HIS WIFE, IN DEED DATED JUNE 25, 1952 AND RECORDED OCTOBER 27, 1952 IN BOOK 1998 PAGE 1 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 45% INTEREST IN AND TO ALL OIL, GAS AND HYDROCARBONS AND ALL GAS, OIL AND OTHER HYDROCARBON RIGHTS UPON AND UNDER SAID LAND, TOGETHER WITH ALL RIGHTS TO ENTER THEREON AND TO USE SO MUCH OF THE SURFACE THAT MAY BE REASONABLE FOR THE PURPOSE OF EXTRACTING THE SAME, AS RESERVED BY RALPH E. CARPENTER AND JAN H. CARPENTER, IN DEED RECORDED SEPTEMBER 21, 1978 IN BOOK 5141, PAGE 298 OF OFFICIAL RECORDS.

**PARCEL 6:**

AN EASEMENT FOR INGRESS AND EGRESS OVER AND ACROSS THE EAST 20 FEET OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 7: APN: 047-040-07**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE NORTH HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL MAP OR PLAT THEREOF.

**TRACT 2:**

**PARCEL 1: APN: 069-320-04**

LOTS 41 TO 48, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM ALBERT DAINI AND SYLVIA DAINI, HUSBAND AND WIFE, RECORDED MAY 16, 1956, IN BOOK 2608, PAGE 73 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 069-320-03**

LOTS 49 TO 56, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT $^1/_2$ OF ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM A. F. HILDING, EXECUTOR OF THE LAST WILL AND TESTAMENT OF DAVID G. BROWN, ALIAS, DECEASED, RECORDED MAY 27, 1955, IN BOOK 2431 PAGE 148 OF OFFICIAL RECORDS.

ALSO EXCEPT AN UNDIVIDED 1/4TH INTEREST IN AND TO ALL OIL, HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED IN DEED DATED DECEMBER 3, 1968, FROM HARLEY BARLING, ET AL, TO THE SUPERIOR OIL COMPANY.

ALSO EXCEPT 1/8TH OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR WHICH MAY BE PRODUCED, SAVED OR SOLD FROM SAID LAND, AS RESERVED BY THE SUPERIOR OIL

COMPANY, A NEVADA CORPORATION, IN DEED RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 360 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 069-320-02**

LOTS 73 TO 80, BOTH INCLUSIVE OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL MINERALS, OIL AND GAS RIGHTS, AS EXCEPTED IN DEED FROM E. M. ALEXANDER AND VIOLET C. ALEXANDER, HIS WIFE, RECORDED JANUARY 3, 1955, IN BOOK 2345, PAGE 155 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 069-320-01**

LOTS 81 TO 88, BOTH INCLUSIVE, OF TRACT NO. 1219 IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5, PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT $^1/_2$ OF ALL MINERALS, OIL AND GAS RIGHTS AS EXCEPTED IN DEED FROM RAYMOND L. KING, RECORDED JANUARY 27, 1955, IN BOOK 2359 PAGE 88 OF OFFICIAL RECORDS.

ALSO EXCEPT AN UNDIVIDED 1/4TH INTEREST IN AND TO ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED IN DEED DATED DECEMBER 3, 1968, FROM HARLEY BARLING, ET AL, TO THE SUPERIOR OIL COMPANY, RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 377 OF OFFICIAL RECORDS.

ALSO EXCEPT 1/8TH OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR WHICH MAY BE PRODUCED, SAVED OR SOLD FROM SAID LAND, AS RESERVED BY THE SUPERIOR OIL COMPANY, A NEVADA CORPORATION, IN DEED RECORDED DECEMBER 20, 1968, IN BOOK 4227, PAGE 360 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-310-09**

THE NORTHWEST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBONS, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN, OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205 OF OFFICIAL RECORDS.

**PARCEL 6: APN: 069-310-12**

THE SOUTHWEST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND ALL OTHER MINERALS, WHETHER SIMILAR TO THESE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION, IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205, OF OFFICIAL RECORDS.

**PARCEL 7: APN: 069-310-11**

THE SOUTHEAST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252 PAGE 205 OF OFFICIAL RECORDS, UPON THE TERMS AND PROVISIONS THEREIN CONTAINED.

**PARCEL 8: APN: 069-310-10**

THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL PETROLEUM, OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES, AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE THEREIN SPECIFIED OR NOT, IN, WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY VICA COMPANY, A CORPORATION, IN DEED DATED APRIL 6, 1945, RECORDED MAY 7, 1945, IN BOOK 1252, PAGE 205, OF OFFICIAL RECORDS.

**PARCEL 9: APN: 069-340-35**

THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LANDS, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND

CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

**PARCEL 10: APN: 069-340-34**

THE SOUTHWEST QUARTER OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

**PARCEL 11: APN: 069-340-23**

THAT PORTION OF THE NORTHWEST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 34; THENCE WESTERLY ALONG THE NORTH LINE OF SAID SECTION A DISTANCE OF 1160.00 FEET; THENCE SOUTHERLY PARALLEL WITH THE EAST LINE OF THE WEST HALF OF SAID SECTION, A DISTANCE OF 1502.07 FEET; THENCE EASTERLY PARALLEL WITH THE NORTH LINE OF SAID SECTION, A DISTANCE OF 1160.00 FEET; THENCE NORTHERLY ALONG THE EAST LINE OF THE WEST HALF OF SAID SECTION, A DISTANCE OF 1502.07 FEET TO THE POINT OF BEGINNING.

**PARCEL 12: APN: 069-340-24**

THE NORTH HALF OF THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THE SOUTH 12 ACRES OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION.

ALSO EXCEPT AN UNDIVIDED ONE-HALF OF ALL PETROLEUM, OIL, GAS, MINERALS, COAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TITLE INSURANCE AND TRUST COMPANY, A

CORPORATION, IN THE DEED RECORDED NOVEMBER 13, 1953, IN BOOK 2149, PAGE 430 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 49% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON AS RESERVED IN DEED RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

**PARCEL 13: APN: 069-340-02**

THE EAST HALF OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

ALSO EXCEPTING THEREFROM 4% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON, AS RESERVED IN DEED RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM, ANY MOBILE HOME, TRAILER AND/OR MANUFACTURED HOME LOCATED THEREON.

**PARCEL 14: APN: 069-340-25**

THE SOUTH 12 ACRES OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED IN DEED OF RECORD.

**PARCEL 15: APN: 069-272-08**

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH ANY AND ALL EASEMENTS, RIGHTS OF WAY AND SERVITUDES IN, UNDER, AND UPON SAID LAND, NECESSARY OR CONVENIENT (A) TO EXPLORE, TEST, OR SURVEY SAID LAND BY GEOPHYSICAL OR OTHER METHODS, WHETHER SIMILAR TO THOSE SPECIFIED OR NOT AND WHETHER NOW KNOWN OR NOT, INCLUDING THE DRILLING OF SHALLOW HOLES THEREON, FOR THE PURPOSES OF DETERMINING SUBSURFACE GEOLOGICAL CONDITIONS UNDERLYING SAID LAND, (B) TO DRILL FOR, MINE FOR, PRODUCE, EXTRACT AND TAKE ANY OF SAID MINERALS FROM SAID LAND AND FROM ADJACENT PROPERTIES, (C) TO TREAT AND STORE ANY OF SAID MINERALS ON SAID LAND, WHETHER PRODUCED FROM SAID LAND OR FROM ADJACENT PROPERTY, (D) TO CONSTRUCT, USE, MAINTAIN, ERECT, REPLACE, CHANGE THE LOCATION OF , INCREASE THE NUMBER OF AND REMOVE IN, UNDER, ON AND FROM SAID LAND, ALL PIPE LINES, POWER LINES, TELEPHONE AND TELEGRAPH LINES, ROADS, TANKS, MACHINERY, DERRICKS, PLANTS, BUILDINGS, AND OTHER STRUCTURES AND EQUIPMENT WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DESIRE IN CARRYING ON ANY OF SAID OPERATIONS WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DEEM NECESSARY IN THE EXERCISE OF THE RIGHTS HEREIN RESERVED, (E) TO TAKE AND USE ON SAID LAND WATER APPURTENANT TO OR DEVELOPED BY GRANTOR, ITS SUCCESSORS AND ASSIGNS, ON SAID LAND, NECESSARY FOR SUCH OPERATIONS, AS RESERVED BY FULLERTON OIL COMPANY, IN DEED RECORDED MARCH 4, 1944, IN BOOK 1186, PAGE 226 OF OFFICIAL RECORDS.

**PARCEL 16A: APN: 069-280-04 (PORTION)**

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPT THEREFROM THE WEST 425 FEET OF THE SOUTH 325 FEET THEREOF.

ALSO EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951, RECORDED MARCH 5, 1951, IN BOOK 1779 PAGE 479, OF OFFICIAL RECORDS.

ALSO EXCEPT THE REMAINDER OF OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY JESSE M. BUTLER, ET UX, IN DEED TO VERYL G. BOWLES, ET UX, DATED NOVEMBER 16, 1951, RECORDED JANUARY 23, 1953, IN BOOK 2029 PAGE 335 OF OFFICIAL RECORDS.

**PARCEL 16B: APN: 069-280-04 (PORTION)**

THE WEST 425 FEET OF THE SOUTH 325 FEET OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

ALSO EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH ELIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951, RECORDED MARCH 5, 1951, IN BOOK 1779 PAGE 479, OF OFFICIAL RECORDS.

ALSO EXCEPT THE REMAINDER OF OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY JESSE M. BUTLER, ET UX, IN DEED TO VERYL G. BOWLES, ET UX, DATED NOVEMBER 16, 1951, RECORDED JANUARY 23, 1953, IN BOOK 2029 PAGE 335 OF OFFICIAL RECORDS.

**PARCEL 17: APN: 069-310-21**

THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 20, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND AS RESERVED BY L. & B. PRODUCING AND DRILLING COMPANY, INCORPORATED, IN DEED RECORDED APRIL 11, 1957, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND AS RESERVED BY BOOKLAND FARMS, A GENERAL PARTNERSHIP, IN DEED RECORDED SEPTEMBER 16, 1986, IN BOOK 5916, PAGE 94, OF OFFICIAL RECORDS.

**PARCEL 18: APN: 069-320-05**

LOTS 33 TO 40, INCLUSIVE, LOTS 57 TO 72, INCLUSIVE, AND LOTS 89 TO 96, INCLUSIVE, OF TRACT NO. 1219, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JUNE 30, 1942, IN BOOK 5 PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, AS EXCEPTED AND RESERVED IN THE DEED FROM PACIFIC OIL AND GAS DEVELOPMENT CORPORATION, A CORPORATION, DATED MAY 04, 1960, AND RECORDED MAY 12, 1960, IN BOOK 3266 PAGE 626 OF OFFICIAL RECORDS.

**PARCEL 19: APN: 069-330-02**

LOTS 17 THROUGH 24, INCLUSIVE, OF TRACT 1219, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP FILED JUNE 30, 1942, IN BOOK 5 PAGE 62 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS, OTHER HYDROCARBONS SUBSTANCES AND MINERALS LYING IN AND UNDER SAID LAND AS RESERVED BY CALLON PETROLEUM COMPANY, SUCCESSOR BY MERGER TO PACIFIC OIL AND GAS DEVELOPMENT CORPORATION, A FORMER CALIFORNIA CORPORATION IN DEED RECORDED OCTOBER 02, 1986, IN BOOK 5922, PAGE 915, INSTRUMENT NO. 042158, KERN COUNTY OFFICIAL RECORDS.

**PARCEL 20: APN: 069-340-26**

THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPT 50% OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL OTHER MINERALS AS RESERVED IN PREVIOUS DEED OF RECORD.

EXCEPTING THEREFROM 49% OF ALL REMAINING OIL, GAS AND OTHER MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, PROVIDING THAT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND, BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT THE GRANTOR, HIS SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND, SO AS NOT TO DISTURB THE SURFACE THEREOF OR ANY IMPROVEMENTS THEREON, AS RESERVED IN DEEDS RECORDED AUGUST 29, 1979, IN BOOK 5224, PAGES 2478, 2482 AND 2487 OF OFFICIAL RECORDS.

**PARCEL 21: APN: 087-080-46**

THE SOUTHEAST QUARTER AND THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 28 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLATS THEREOF.

EXCEPTING THEREFROM PARCEL 1 OF PARCEL MAP NO. 11231, RECORDED APRIL 4, 2006, IN BOOK 54 AT PAGES 178 AND 179 OF PARCEL MAPS, IN THE OFFICE OF THE KERN COUNTY RECORDER.

SAID LAND IS ALSO SHOWN AS THE "DESIGNATED REMAINDER", ON SAID PARCEL MAP NO. 11231, AND WAS APPROVED AND DESCRIBED IN THE CONDITIONAL CERTIFICATE OF COMPLIANCE NO. 2270, RECORDED APRIL 4, 2006, AS DOCUMENT NO. 0206082470, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER AND THAT MAY BE PRODUCED FROM SAID LAND AS CONVEYED TO CHARLES FLOYD WHITAKER, ET AL, BY DEED RECORDED MARCH 20, 1970, IN BOOK 4382 PAGE 528 OF OFFICIAL RECORDS AND BY DEED RECORDED MAY 7, 1962 IN BOOK 3489 PAGE 344 OF OFFICIAL RECORDS.

**PARCEL 22: APN: 069-272-05**

THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA IN THE DEED RECORDED NOVEMBER 30, 1990, IN BOOK 6459, PAGE 1035 OF OFFICIAL RECORDS, AS DOCUMENT NO. 073509, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION;

THENCE (1), ALONG THE NORTH LINE OF SAID SECTION, SOUTH 89° 09' 35" EAST, 1320.80 FEET TO THE EAST LINE OF THE WEST HALF OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE (2), ALONG SAID EAST LINE, SOUTH 1° 26' 15" WEST, 50.00 FEET TO THE SOUTH LINE OF THE NORTH 50 FEET OF SAID SECTION;

THENCE (3), ALONG SAID SOUTH LINE, NORTH 89° 09' 35" WEST, 1274.74 FEET;

THENCE (4), SOUTH 58° 59' 14" WEST, 18.95 FEET TO THE EAST LINE OF WEST 30 FEET OF SAID SECTION;

THENCE (5), ALONG THE EAST LINE OF THE WEST 30 FEET OF SAID SECTION SOUTH 1° 22' 37" WEST, 50.46 FEET;

THENCE (6), NORTH 88° 37' 23" WEST, 30.00 FEET TO THE WEST LINE OF SAID SECTION;

THENCE (7), ALONG SAID WEST LINE, NORTH 1° 22' 37" EAST, 110.18 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL PETROLEUM, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH ANY AND ALL EASEMENTS, RIGHTS OF WAY AND SERVITUDES IN, UNDER, AND UPON SAID LAND, NECESSARY OR CONVENIENT (A) TO EXPLORE, TEST, OR SURVEY SAID LAND BY GEOPHYSICAL OR OTHER METHODS, WHETHER SIMILAR TO THOSE SPECIFIED OR NOT AND WHETHER NOW KNOWN OR NOT, INCLUDING THE DRILLING OF SHALLOW HOLES THEREON, FOR THE PURPOSES OF DETERMINING SUBSURFACE GEOLOGICAL CONDITIONS UNDERLYING SAID LAND, (B) TO DRILL FOR, MINE FOR, PRODUCE, EXTRACT AND TAKE ANY OF SAID MINERALS FROM SAID LAND AND FROM ADJACENT PROPERTIES, (C) TO TREAT AND STORE ANY OF SAID MINERALS ON SAID LAND, WHETHER PRODUCED FROM SAID LAND OR FROM ADJACENT PROPERTY, (D) TO CONSTRUCT, USE, MAINTAIN, ERECT, REPLACE, CHANGE THE LOCATION OF, INCREASE THE NUMBER OF AND REMOVE IN, UNDER, ON AND FROM SAID LAND, ALL PIPE LINES, POWER LINES, TELEPHONE AND TELEGRAPH LINES, ROADS, TANKS, MACHINERY, DERRICKS, PLANTS, BUILDINGS, AND OTHER STRUCTURES AND EQUIPMENT WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DESIRE IN CARRYING ON ANY OF SAID OPERATIONS WHICH GRANTOR, ITS SUCCESSORS AND ASSIGNS, MAY DEEM NECESSARY IN THE EXERCISE OF THE RIGHTS HEREIN RESERVED, (E) TO TAKE AND USE ON SAID LAND WATER APPURTENANT TO OR DEVELOPED BY GRANTOR, ITS SUCCESSORS AND ASSIGNS, ON SAID LAND, NECESSARY FOR SUCH OPERATIONS, AS RESERVED BY FULLERTON OIL COMPANY, IN DEED RECORDED MARCH 4, 1944, IN BOOK 1186, PAGE 226 OF OFFICIAL RECORDS.

ALL RIGHT TO ENTER UPON THE SURFACE OR ANY PORTION TO A DEPTH OF 100 FEET FROM THE SURFACE FOR THE PURPOSE OF EXPLORING FOR, EXTRACTING, REMOVING, MINING FOR OR IN ANY WAY OBTAINING ANY MINERALS OR OTHER SUBSTANCES WAS RELINQUISHED BY DEED RECORDED NOVEMBER 30, 1990, IN BOOK 6459, PAGE 1035 OF OFFICIAL RECORDS.

**TRACT 3:**

**PARCEL 1: APN: 058-292-05**

PARCEL A OF PARCEL MAP WAIVER NO. 5-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED AUGUST 28, 2017 AS DOCUMENT NO. 217115585 OF OFFICIAL RECORDS OF KERN COUNTY, BEING A PORTION OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE WEST HALF OF SAID NORTHWEST QUARTER.

EXCEPTING THEREFROM THE INTEREST IN THE WEST 30 FEET THEREOF AS CONVEYED TO THE COUNTY OF KERN, STATE OF CALIFORNIA, FOR THE USE AND PURPOSE OF A PUBLIC HIGHWAY BY DEED RECORDED OCTOBER 25, 1921 IN BOOK 370, PAGE 483 OF DEEDS.

ALSO EXCEPTING THEREFROM ALL OF THE MINERALS INCLUDING OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES IN OR UNDERLYING SAID PREMISES, WHETHER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, AND RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME, WITH FULL POWER OF INGRESS AND EGRESS FOR THESE PURPOSES, AND RIGHT TO DO ON AND IN PROPERTY ABOVE DESCRIBED, WHATEVER MAY BE REASONABLY NECESSARY FOR FULL ENJOYMENT AND EXERCISE OF PROPERTY AND RIGHTS AS RESERVED BY ARTHUR S. CRITES AND NELLIE L. CRITES, HIS WIFE, AND CHARLES B. WEBSTER AND HAZEL E. WEBSTER, HIS WIFE, IN DEED RECORDED MARCH 4, 1962 IN BOOK 1909, PAGE 344 AS DOCUMENT NO. 10863 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 058-291-40**

PARCEL 2 OF PARCEL MAP WAIVER NO. 1-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED JULY 5, 2017 AS DOCUMENT NO. 217086341 OF OFFICIAL RECORDS OF KERN COUNTY, BEING THE NORTH HALF OF THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY REGINA M. WATROUS, ET AL, IN DEED RECORDED JULY 20, 1977, IN BOOK 5042, PAGE 50 AS DOCUMENT NO. 05579 OF OFFICIAL RECORDS.

**PARCEL 3: APN: 058-292-23**

PARCEL 2 OF PARCEL MAP WAIVER NO. 3-17 AS PER THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED AUGUST 16, 2017 AS DOCUMENT NO. 217107678 OF OFFICIAL RECORDS OF KERN COUNTY, BEING THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL MINERALS AND MINERAL RIGHTS OF ANY KIND AND DESCRIPTION INCLUDING, BUT NOT LIMITED TO OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBON SUBSTANCES BY WHATSOEVER NAME KNOWN WITHIN OR BENEATH THE LANDS ABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT TO DRILL, MINE, EXPLORE, PRODUCE AND REMOVE SAID MINERALS FROM, OR TO INJECT AND STORE SAID MINERALS IN, SAID LAND OR OTHER LANDS, TO WHIPSTOCK OR DIRECTIONALLY DRILL, BORE AND MINE FROM OTHER LAND INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, ADITS, TUNNELS AND SHAFTS UNDER OR BEYOND THE BOUNDARIES OF SAID LAND AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES AND TO INJECT, STORE, AND REMOVE MINERALS AND WATER NOT PRODUCED FROM SAID LAND INTO OR FROM THE SUBSURFACE OF SAID LAND AND OTHER LANDS, AS RESERVED BY GETTY OIL COMPANY IN DEED RECORDED NOVEMBER 23, 1973 IN BOOK 4813, PAGE 2220 AS DOCUMENT NO. 36888 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 058-292-09**

THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 26 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST IN THE WEST 30 FEET THEREOF AS CONVEYED TO THE COUNTY OF KERN, STATE OF CALIFORNIA, FOR THE USE AND PURPOSE OF A PUBLIC HIGHWAY BY DEED RECORDED OCTOBER 25, 1921 IN BOOK 370, PAGE 483 OF DEEDS.

ALSO EXCEPTING THEREFROM FROM THE WEST HALF THEREOF, ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY AUSTIN WALDRON AND SARAH WALDRON, HIS WIFE, IN DEED RECORDED NOVEMBER 4, 1948 IN BOOK 1529, PAGE 236 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM FROM THE EAST HALF THEREOF ALL OF THE MINERALS, INCLUDING OIL, GAS, ASPHALTUM AND OTHER HYDROCARBON SUBSTANCES IN OR UNDERLYING SAID PREMISES, AS RESERVED BY ARTHUR S.

CRITES, ET AL, IN DEED RECORDED MARCH 4, 1952 IN BOOK 1909, PAGE 342 AS DOCUMENT NO. 10862 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 059-243-03**

THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 4, TOWNSHIP 26 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES, AS CONVEYED TO FIVE POINTS PROPERTIES, A GENERAL PARTNERSHIP, IN DEED RECORDED APRIL 5, 1968 IN BOOK 4147, PAGE 731 AS DOCUMENT NO. 19760 OFFICIAL RECORDS.

**TRACT 4:**

**PARCEL 1: APN: 059-010-19**

THE SOUTHWEST QUARTER OF SECTION 10, TOWNSHIP 26 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTH 200 FEET THEREOF, AS CONVEYED TO THE COUNTY OF KERN IN THE DEEDS RECORDED FEBRUARY 1, 1963, IN BOOK 3571, PAGES 309, 310, 311, 312 & 313 OF OFFICIAL RECORDS, AS DOCUMENT NOS. 7362, 7363, 7364, 7365 & 7366.

EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL MINERALS, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY KENDALL W. KNIGHTS, TRUSTEE UNDER THE WILL OF BEVERLY BOYLE KNIGHT IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 539, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY LOUIS M. BOYLE, JR., IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 541, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY MARION E. JENKS, A MARRIED MAN, IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 542, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 INTEREST OF ALL MINERAL, OIL AND GAS RIGHTS IN AND UNDER SAID LAND WITHOUT RIGHT OF SURFACE ENTRY AS RESERVED BY JONATHAN E. BOYLE, A MARRIED MAN, IN DEED RECORDED OCTOBER 9, 1981, IN BOOK 5410, PAGE 544, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED 1/6 OF ALL OIL, GAS AND OTHER MINERALS IN THE MINERAL DEED RECORDED AUGUST 10, 2011, INSTRUMENT NO. 0211101761, OFFICIAL RECORDS.

**PARCEL 2: APN: 059-070-01**

THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 15, TOWNSHIP 26 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER SAID LAND, AS RESERVED IN DEED RECORDED OCTOBER 2, 1986 IN BOOK 5922, PAGE 915 OF OFFICIAL RECORDS OF SAID COUNTY.

**PARCEL 3: APN: 069-230-05**

THE NORTH HALF OF SECTION 26, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTHERLY 190 FEET OF SAID LAND, AS CONVEYED TO BUTTONWILLOW IMPROVEMENT DISTRICT OF SEMITROPIC WATER STORAGE DISTRICT, IN THE FINAL ORDER OF CONDEMNATION, RECORDED APRIL 3, 1975, IN BOOK 4889, PAGE 1591, OF OFFICIAL RECORDS, AS DOCUMENT NO. 22532.

ALSO EXCEPTING THEREFROM ALL OIL AND GAS IN THE LANDS SO PATENTED, AND TO IT, OR PERSONS AUTHORIZED BY IT, THE RIGHT TO PROSPECT FOR, MINE, AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509) THIS ENTRY IS MADE UNDER SECTION 29 OF THE ACT OF FEBRUARY 25, 1920 (41 STAT., 437) AND THE PATENT IS ISSUED SUBJECT TO THE RIGHTS OF PRIOR PERMITTEES OR LESSEES TO USE SO MUCH OF THE SURFACE OF SAID LANDS, AS IS REQUIRED FOR MINING OPERATIONS, WITHOUT COMPENSATION TO THE PATENTEE FOR DAMAGES RESULTING FROM PROPER MINING OPERATIONS., ALL AS RESERVED BY THE UNITED STATES OF AMERICA IN THE PATENT RECORDED MAY 9, 1928, IN BOOK 248, PAGE 117 OF OFFICIAL RECORDS, AS DOCUMENT NO. 9080.

**PARCEL 4: APN: 069-230-07**

THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM THAT PORTION OF SAID LAND LYING WITHIN INTERSTATE 5 AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE DEED RECORDED DECEMBER 23, 1964, IN BOOK 3797 PAGE 446, OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS, HYDROCARBONS AND MINERALS IN OR UNDER SAID LAND, WITH THE RIGHT OF ENTRY UPON THE SURFACE OF SAID LAND FOR THE PURPOSE OF DEVELOPING OR PRODUCING SAME SUBJECT TO REASONABLE COMPENSATION TO GRANTEE FOR SUCH RIGHT OF ENTRY AND/OR SURFACE USE, RESERVED IN GRANT DEED RECORDED APRIL 4, 2006 AS INSTRUMENT NO. 0206081859 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-230-20**

THE NORTHWEST QUARTER AND THE EAST HALF OF THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THOSE TWO CERTAIN PARCELS OF LAND CONVEYED TO MILLER & LUX INC. BY DEED RECORDED DECEMBER 28, 1915, IN BOOK 304, PAGE 166, OF DEEDS, DESCRIBED AS FOLLOWS:

PARCEL A:

BEGINNING AT THE QUARTER SECTION CORNER BETWEEN SECTIONS 33 AND 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE NORTH 1° 20' EAST A DISTANCE OF 250 FEET; THENCE SOUTH 35° 30' EAST 310 FEET TO THE QUARTER SECTION LINE OF SAID SECTION 34; THENCE NORTH 89° 40' WEST 175 FEET TO THE POINT OF BEGINNING.

PARCEL B:

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE NORTH 88° 40' EAST 1,320 FEET TO 1/8TH CORNER BEING POINT OF BEGINNING; THENCE NORTH 0° 45' WEST 570 FEET; THENCE SOUTH 27° 15' EAST 635 FEET TO THE SOUTH LINE OF SECTION 34; THENCE SOUTH 88° 40' WEST 285 FEET TO POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM ALL THE OIL AND GAS IN THE LANDS SO PATENTED, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509) AS RESERVED BY THE UNITED STATES OF AMERICA IN PATENTS RECORDED MARCH 19, 1919, IN BOOK 19, PAGE 444 AND BOOK 19, PAGE 445 OF PATENTS.

**PARCEL 6: APN: 069-230-21**

THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA BY DEED RECORDED MAY 12, 1965, IN BOOK 3839, PAGE 154, OF

OFFICIAL RECORDS, AS DOCUMENT NO. 25609, DESCRIBED AS FOLLOWS:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION 34, SAID NORTHEAST CORNER BEING AT COORDINATES Y=747 159.30 FEET AND X=1 529 752.10 FEET; THENCE ALONG THE EAST LINE OF SAID SECTION SOUTH 1° 12' 15" WEST 106.17 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTES 57 (NOW ROUTE 166) TO KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW VI-KER-5) NORTH 40° 46' 00" WEST 140.76 FEET TO THE NORTH LINE OF SAID SECTION; THENCE ALONG SAID NORTH LINE SOUTH 89° 43' 20" EAST 91.15 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952 IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 7: APN: 069-230-22**

THE SOUTHEAST QUARTER OF SECTION 34, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 1/2% INTEREST IN FEE, IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY OR RECOVERABLE THEREON AND THEREFROM, AS RESERVED IN THE DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 8: APN: 069-230-55**

THAT PORTION OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 34, LYING EASTERLY OF THE CENTERLINE OF THE EAST SIDE CANAL, IN TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED BY JOHN CORNELIUS O'BRIEN AND LAWRENCE TERRENCE O'BRIEN IN DEED RECORDED MAY 6, 1974, IN BOOK 4839, PAGE 888, OF OFFICIAL RECORDS.

**PARCEL 9: APN: 069-230-36**

ALL THAT PORTION OF SECTION 35, TOWNSHIP 27 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 1 IN THE DEED TO THE STATE OF CALIFORNIA RECORDED MARCH 1, 1966, IN BOOK 3923, PAGE 663, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED

THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 10: APN: 086-010-03**

THE NORTH HALF OF THE SOUTHWEST QUARTER, SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER AND THE SOUTHEAST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING TO THE STATE OF CALIFORNIA ALL OIL, SHALE, COAL, PHOSPHATE, SODIUM, GOLD, SILVER AND ALL OTHER MINERAL DEPOSITS CONTAINED IN SAID LANDS (EXCEPTING ALL OIL AND GAS) AND FURTHER RESERVING TO THE STATE OF CALIFORNIA, AND PERSONS AUTHORIZED BY THE STATE, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS OF MINERALS FROM SAID LANDS (EXCEPTING ALL OIL AND GAS), AND TO OCCUPY AND USE SO MUCH OF THE SURFACE OF SAID LANDS AS MAY BE REQUIRED THEREFORE, UPON COMPLIANCE WITH THE CONDITIONS AND

SUBJECT TO THE PROVISIONS AND LIMITATIONS OF CHAPTER 5, PART I, DIVISION 6 OF THE PUBLIC RESOURCES CODE, AS PER PATENT FROM THE STATE OF CALIFORNIA RECORDED MAY 23, 1956, IN BOOK 2611 PAGE 517 OF OFFICIAL RECORDS.

EXCEPTING TO THE UNITED STATES OF AMERICA ALL OIL AND GAS IN THE LAND, AND TO IT, OR PERSONS AUTHORIZED BY IT, THE RIGHT TO PROSPECT FOR, MINE AND REMOVE SUCH DEPOSITS FROM THE SAME UPON COMPLIANCE WITH THE CONDITIONS AND SUBJECT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914 (38 STAT. 509), AS PER PATENT FROM THE STATE OF CALIFORNIA, RECORDED MAY 23, 1956, IN BOOK 2611 PAGE 517 OF OFFICIAL RECORDS.

**PARCEL 11: APN: 086-010-08**

ALL THAT PORTION OF SECTION 1, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN

PARCEL OF LAND DESCRIBED AS PARCEL 1 IN THE DEED TO THE STATE OF CALIFORNIA RECORDED APRIL 6, 1966, IN BOOK 3934, PAGE 572, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SURF USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLELINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES, AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 12: APN: 086-010-11**

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF SAID SECTION SAID POINT BEARS NORTH 89° 22' 40" WEST 661.32 FEET FROM THE NORTHEAST CORNER OF SAID SECTION SAID NORTHEAST CORNER BEING AT COORDINATES Y=741 794.74 FEET AND X=1 534 938.55 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTE 57 (NOW ROUTE 166) TO THE KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW 06-KER-5) SOUTH 40° 46' 00" EAST 32.14 FEET; THENCE SOUTH 82° 13' 16" WEST 313.57 FEET; THENCE NORTH 71° 25' 46" WEST 226.90 FEET TO SAID NORTH LINE; THENCE ALONG SAID NORTH LINE SOUTH 89° 22' 40" EAST 504.82 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME, AS GRANTED TO ALAN B. BOWEN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFORE AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELL, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 100 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LANDS, AS EXCEPTED IN DEED FROM MILHAM FARMS, INC., RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

**PARCEL 13: APN: 086-010-18**

PARCEL B OF LOT LINE ADJUSTMENT NO. 69-98 AS PER CERTIFICATE OF COMPLIANCE RECORDED MARCH 3, 1999, AS INSTRUMENT NO. 0199030694, OF OFFICIAL RECORDS, BEING THE EAST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER AND THE EAST HALF OF THE WEST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALLAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952 IN BOOK 1897, PAGE 256, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 14: APN: 086-010-19**

PARCEL A OF LOT LINE ADJUSTMENT NO. 69-98 AS PER CERTIFICATE OF COMPLIANCE RECORDED MARCH 3, 1999, AS INSTRUMENT NO. 0199030694, OF OFFICIAL RECORDS, BEING THE NORTHWEST QUARTER, THE WEST HALF OF THE NORTHEAST QUARTER, AND THE WEST HALF OF THE WEST HALF OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED JUNE 4, 1965, IN BOOK 3846, PAGE 219, OF OFFICIAL RECORDS.

EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 3% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE ABOVE DESCRIBED PROPERTY, AS RESERVED BY MERCHANTS HOLDING CORPORATION LTD. IN DEED RECORDED APRIL 17, 1945 IN BOOK 1252, PAGE 29, OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM

WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING THE SAME AS GRANTED TO ALAN B. BOWEN BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

ALSO EXCEPTING FROM THE NORTHEAST QUARTER OF SECTION 2, 23 1/2% OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF DEVELOPING AND REMOVING SAME, AS RESERVED BY OSCAR J. ROHDE, AN UNMARRIED MAN, BY DEED RECORDED FEBRUARY 8, 1952, IN BOOK 1897, PAGE 257, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM AN UNDIVIDED 1/2% INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER THE DESCRIBED PROPERTY OR RECOVERABLE THEREON AND THEREFROM, AS RESERVED IN THE DEED RECORDED APRIL 17, 1945, IN BOOK 1252, PAGE 28, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 15: APN: 086-020-03**

GOVERNMENT LOTS 1 AND 2 OF THE NORTHEAST QUARTER OF FRACTIONAL SECTION 3, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST HEREAFTER UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS

CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

**PARCEL 16: APN: 086-020-10**

ALL THAT PORTION OF THE NORTH HALF OF SECTION 3, TOWNSHIP 28 SOUTH, RANGE 22 EAST MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

PARCEL 1:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SECTION 3; THENCE SOUTH 0° 32' WEST 1,319.80 FEET TO THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 3 SAID POINT BEING THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE NORTH 89° 18' EAST A DISTANCE OF 1,320.10 FEET TO THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3; THENCE SOUTH 0° 32' WEST A DISTANCE OF 1,320.0 FEET; THENCE NORTH 89° WEST A DISTANCE OF 857.60 FEET TO A POINT ON THE CENTERLINE OF THE EAST SIDE CANAL; THENCE ALONG SAID CENTERLINE NORTH 48° 16' WEST A DISTANCE OF 432.30 FEET; THENCE NORTH 38° 27' WEST AND CONTINUING ALONG SAID CENTERLINE OF SAID CANAL TO A POINT ON THE WEST LINE OF THE NORTHEAST QUARTER OF SECTION 3; THENCE NORTH 0° 32' EAST AND ALONG SAID WEST LINE TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 3; THENCE ALONG THE NORTHERLY BOUNDARY OF SAID SECTION SOUTH 89° 45' WEST 1,069.10 FEET TO A POINT ON THE CENTERLINE OF THE EAST SIDE CANAL; THENCE ALONG SAID CENTERLINE SOUTH 25° 27' EAST 2,290.50 FEET; THENCE CONTINUING ALONG SAID CENTERLINE IN A GENERAL SOUTHEASTERLY DIRECTION TO THE WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 3; THENCE ALONG SAID WEST LINE NORTH 0° 23' EAST TO THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 3; THENCE CONTINUING NORTH 0° 32' EAST A DISTANCE OF 1,319.80 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM BOTH PARCELS 1 AND 2, 83-1/3% OF ALL MINERALS, OIL, GAS, PETROLEUM AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM: HOWEVER, THE GRANTORS HEREIN, THEIR SUCCESSORS AND ASSIGNS SHALL NOT CONDUCT DRILLING OR OTHER OPERATIONS UPON THE SURFACE OF SAID LAND BUT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO PREVENT SAID GRANTORS, THEIR SUCCESSORS AND ASSIGNS FROM EXTRACTING OR CAPTURING SAID MINERALS, OIL, GAS, PETROLEUM AND HYDROCARBON SUBSTANCES FROM THE

HEREIN DESCRIBED LAND BY DRILLING ON ADJACENT OR NEIGHBORING LANDS AND/OR FROM CONDUCTING SUBSURFACE DRILLING OPERATIONS UNDER SAID LANDS AT A DEPTH OF 500 FEET OR MORE BELOW THE SURFACE THEREOF, AS RESERVED IN THE QUITCLAIM DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 17: APN: 086-100-28**

ALL THAT PORTION OF PARCEL 3 OF PARCEL MAP 7799, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED AUGUST 22, 1986, IN BOOK 33, PAGE 134 OF PARCEL MAPS, KERN COUNTY RECORDS, DESCRIBED AS PARCEL A IN THAT CERTAIN CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 7, 1990 IN BOOK 6344, PAGE 537, OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID PARCEL 3 OF PARCEL MAP 7799; THENCE SOUTH 00° 44' 00" WEST ALONG THE EASTERLY LINE OF PARCEL 3 OF SAID PARCEL MAP, 3,874.95 FEET TO THE SOUTHEAST CORNER OF THE NORTH HALF OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN; THENCE SOUTH 88° 39' 59" WEST ALONG THE SOUTH LINE OF SAID NORTH HALF OF THE SOUTHEAST QUARTER 1,412.76 FEET TO A POINT ON THE CENTERLINE OF EAST SIDE CANAL AS SHOWN ON SAID PARCEL MAP 7799 RECORDED IN BOOK 33, PAGE 134 OF PARCEL MAPS, KERN COUNTY RECORDS; THENCE NORTH 28° 56' 00" WEST ALONG SAID CENTERLINE 121.85 FEET; THENCE NORTH 22° 17' 00" WEST 319.20 FEET; THENCE NORTH 16° 05' 00" WEST 1,357.20 FEET; THENCE NORTH 21° 58' 00" WEST 457 FEET; THENCE NORTH 30° 18' 00" WEST 307 FEET; THENCE NORTH 34° 10' 00" WEST 202.80 FEET; THENCE DEPARTING FROM SAID CENTERLINE SOUTH 89° 29' 00" WEST 198.30 FEET; THENCE NORTH 00° 43' 00" EAST TO A POINT ON SAID CENTERLINE 279.32 FEET; THENCE NORTH 35° 04' 00" WEST 407.94 FEET; THENCE NORTH 44° 48' 00" WEST 737.50 FEET; THENCE NORTH 70° 21' 00" WEST 503.72 FEET, MORE OR LESS, TO A POINT ON THE NORTHERLY LINE OF SAID PARCEL 3; THENCE NORTH 89° 24' 00" EAST ALONG SAID NORTHERLY LINE 3,881.13 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER THAT PORTION OF SAID LAND LYING WITHIN THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, AND THE RIGHT TO REMOVE THE SAME, AS RESERVED BY F.G. DRUMM AND D.M. DRUMM, HUSBAND AND WIFE AND M.A. BARDENSTEIN, A SINGLE WOMAN, IN DEED RECORDED MARCH 17, 1952 IN BOOK 1915, PAGE 344, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THROUGH THAT PORTION OF SAID LAND LYING WITHIN THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 11, TOWNSHIP 38 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, OR THAT MAY BE PRODUCED OR SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO REMOVE AND EXTRACT THE SAME, AS RESERVED BY ETHEL B. COOPER, A MARRIED WOMAN, IN DEED RECORDED OCTOBER 13, 1965, IN BOOK 3883, PAGE 312, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OF THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THAT PORTION OF SAID LAND LYING WITHIN THE NORTH HALF OF THE NORTHEAST QUARTER; THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER AND THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 11, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, OR THAT MAY BE PRODUCED THEREFROM, INCLUDING, WITHIN LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, GAS, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION AND SAND, GRAVEL AND AGGREGATES AND PRODUCTS DERIVED THEREFROM TOGETHER WITH THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OF INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPELINES, POLELINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES AS CONVEYED TO BRAVO OIL COMPANY IN DEED RECORDED DECEMBER 29, 1965, IN BOOK 3906, PAGE 30, OF OFFICIAL RECORDS.

EXCEPTING THEREFROM, ANY MOBILE HOME, TRAILER AND/OR MANUFACTURED HOME LOCATED THEREON.

**PARCEL 18: APN: 086-110-04**

THE NORTHEAST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION, SAID NORTHEAST CORNER BEING AT COORDINATES Y=736 446.01 FEET AND X=1 540 068.83 FEET; THENCE ALONG THE EAST LINE OF SAID SECTION SOUTH 1° 41' 47" WEST 1,325.82

FEET; THENCE ALONG A LINE PARALLEL WITH AND 110 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE DEPARTMENT OF PUBLIC WORKS SURVEY FROM ROUTE 57 (NOW ROUTE 166) TO KINGS COUNTY LINE, ROAD VI-KER-238-B (NOW VI-KER-5) NORTH 40° 46' 00" WEST 659.14 FEET; THENCE NORTH 39° 02' 54" WEST 200.09 FEET; THENCE ALONG A LINE PARALLEL WITH AND 104 FEET SOUTHWESTERLY MEASURED AT RIGHT ANGLES FROM SAID CENTERLINE NORTH 40° 46' 00" WEST 915.50 FEET TO THE NORTH LINE OF SAID SECTION; THENCE ALONG SAID NORTH LINE SOUTH 88° 54' 31" EAST 1,193.72 FEET TO THE POINT OF BEGINNING, AS CONVEYED TO THE STATE OF CALIFORNIA BY DEED RECORDED FEBRUARY 28, 1966, IN BOOK 3923, PAGE 302, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR WHICH MAY BE PRODUCED AND SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, AS RESERVED IN DEED FROM FRESNO-KERN COMPANY, A CORPORATION, RECORDED JUNE 15, 1966, IN BOOK 3955, PAGE 683, OF OFFICIAL RECORDS.

**PARCEL 19: APN: 086-110-09**

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THROUGH SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO REMOVE AND EXTRACT THE SAME, AS RESERVED BY MARGARET ANNE COOPER, AN UNMARRIED WOMAN, IN DEED RECORDED OCTOBER 14, 1965, IN BOOK 3884, PAGE 27, OF OFFICIAL RECORDS.

**PARCEL 20: APN: 086-110-05**

THE NORTH HALF OF THE SOUTH HALF OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 1/2 OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED THEREFROM, AS RESERVED BY GENERAL MORTGAGE COMPANY IN DEED RECORDED SEPTEMBER 13, 1961, IN BOOK 3414, PAGE 884, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS

RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 21: APN: 086-110-03**

THE SOUTH HALF OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 90% OF ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS LYING IN AND UNDER AND WHICH MAY BE PRODUCED FROM SAID LANDS AS HEREINBEFORE DESCRIBED TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS TO DEVELOP AND RECOVER SAME, AS RESERVED IN DEED FROM FRANK LEPPI, ET UX, RECORDED FEBRUARY 1, 1952 IN BOOK 1894, PAGE 208, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 22: APN: 086-110-01**

THE SOUTH HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 75% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY PRODUCED AND SAVED THEREFROM, AS RESERVED BY MYRTLE C. KROESEN, A WIDOW, IN DEED RECORDED FEBRUARY 29, 1952, IN BOOK 1907, PAGE 342, OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES WITHIN AND UNDERLYING SAID LAND, AS RESERVED BY MILHAM FARMS, INC., A CALIFORNIA CORPORATION, IN DEED RECORDED JANUARY 16, 1974, IN BOOK 4821, PAGE 1223, OF OFFICIAL RECORDS.

**PARCEL 23: APN: 086-120-05**

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 24: APN: 086-120-01**

THE NORTH HALF OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 28 SOUTH, RANGE 22 EAST, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 25: APN: 087-080-25**

PARCEL 1 OF PARCEL MAP 3773, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED MAY 20, 1977, IN BOOK 18, PAGE 108 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION, AND SAND, GRAVEL AND AGGREGATES, AND PRODUCTS DERIVED THEREFROM, TOGETHER WITH, THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OR INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS NECESSARY OR USEFUL IN CONNECTION THEREWITH, WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPE LINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES. ALL AS CONVEYED BY SOUTHERN PACIFIC COMPANY TO BRAVO OIL COMPANY, A TEXAS CORPORATION IN THE DEED RECORDED MAY 29, 1965, IN BOOK 3906, PAGE 30 OF OFFICIAL RECORDS, AS DOCUMENT NO. 70845.

**TRACT 5:**

**PARCEL 1: APN: 069-280-18-00**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 15, 1855.

EXCEPT ALL OIL AND GAS IN SAID LAND, WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME PURSUANT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914(39 STAT. 509).

ALSO EXCEPTING THEREFROM AN UNDIVIDED 50% INTEREST IN ALL OF THE OIL, GAS AND MINERALS NOW OF HEREAFTER LYING IN AND UNDER AND THAT MAY BE PRODUCED FROM, ALL OF THE ABOVE DESCRIBED REAL ESTATE, WITH THE RIGHT TO REDUCE THE SAME TO POSSESSION, AND WITH RIGHTS OF INGRESS AND EGRESS, AND ALL RIGHTS INCIDENT TO THE DEVELOPMENT, PRODUCTION, CONSERVATION AND TRANSPORTATION THEREOF, FOREVER, AS RESERVED BY JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY IN THAT CERTAIN CORPORATION GRANT DEED RECORDED NOVEMBER 14, 1988 IN BOOK 6181, PAGE 1169, DOCUMENT NO. 056183, KERN COUNTY RECORDS.

**PARCEL 2:**

THE RIGHT TO USE AND TAKE WATER FROM THAT CERTAIN WATER WELL AND PUMPING PLANT SITE DESCRIBED AS THE SOUTH 50 FEET OF THE WEST 75 FEET OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27, SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ADEQUATE TO IRRIGATE SAID PARCEL 1, TOGETHER WITH AN EASEMENT FOR PIPELINE PURPOSES WITHIN THE SOUTHERLY 25 FEET OF SAID NORTHEAST QUARTER OF SAID NORTHWEST QUARTER TO TRANSPORT WATER FROM SAID WELL TO SAID PARCEL 1, INCLUDING THE RIGHT TO USE THE EXISTING PIPE OR ANY REPLACEMENTS THEREOF LOCATED WITHIN SAID PIPELINE EASEMENT.

**PARCEL 3: APN: 069-280-16-00, 069-280-25-00**

THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHTS OF INGRESS AND EGRESS UPON SAID LAND AT ALL TIMES FOR THE DEVELOPMENT AND PRODUCTION OF ANY OF SUCH OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES, AS RESERVED BY GRACE R. PARR IN DEED RECORDED NOVEMBER 12, 1947 IN BOOK 1430, PAGE 475 OF OFFICIAL RECORDS.

**PARCEL 4: APN: 069-280-26-00**

THE SOUTH 1/2 OF THE NORTHWEST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE SURVEYOR GENERAL.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR WHICH MAY BE

PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHTS OF INGRESS AND EGRESS UPON SAID LAND AT ALL TIMES FOR THE DEVELOPMENT AND PRODUCTION OF ANY OF SUCH OIL, GAS AND OTHER MINERALS AND HYDROCARBON SUBSTANCES, AS RESERVED BY GRACE E. PARR IN DEED RECORDED NOVEMBER 12, 1947 IN BOOK 1430, PAGE 475 OF OFFICIAL RECORDS.

**PARCEL 5: APN: 069-280-38-00, 069-280-39-00**

THE SOUTHEAST QUARTER OF SECTION 15, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, ET AL, IN DEED TO HARLEY BARLING, ET UX, DATED JANUARY 30, 1951 AND RECORDED MARCH 5, 1951 IN BOOK 1779, PAGE 479 OF OFFICIAL RECORDS, WHICH DEED PROVIDED AS FOLLOW: TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORING AND DEVELOPMENT THEREOF.

ALSO EXCEPT THEREFROM THE REMAINDER OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY JESSE M. BUTLER AND ESTHER M. BUTLER, HUSBAND AND WIFE, IN DEED TO D. C. CRAWFORD AND ADDIE CRAWFORD, HUSBAND AND WIFE, AS JOINT TENANTS, DATED NOVEMBER 16, 1951 AND RECORDED JANUARY 23, 1953 IN BOOK 2029, PAGE 337, WHICH DEED PROVIDED AS FOLLOWS: TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF EXPLORATION AND DEVELOPMENT THEREON.

**END OF DESCRIPTION**

**EXHIBIT B**

[Intentionally Omitted]

**EXHIBIT C**

**FORM OF SALE ORDER**

[Attached]

**EXHIBIT D**

**FORM OF RELEASE**

[_____], a [_____] ("**Buyer**"), and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et al.*, Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for the Eastern District of California (the "**Court**") have previously entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 27, 2025 (as such may have been amended, prior to the date hereof, the "**Agreement**"). Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees (collectively, including Buyer, "**Releasors**"), hereby releases Seller, The Prudential Insurance Company of America, PAR U Hartford Life & Annuity Comfort Trust, PGIM Real Estate Finance, LLC, and their respective partners, professionals, agents, employees, shareholders, members, affiliates, principals, beneficiaries, subsidiaries, successors and assigns (collectively, with Seller, "**Releasees**") from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of action, whether in law or in equity, which Buyer asserts or could assert at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter, claim, occurrence, damages or injury (collectively, "**Claims**"), solely arising out of a condition or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and entities, hereby waives the protections and benefits afforded California Civil Code Section 1542, acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

Notwithstanding anything stated to the contrary in the Agreement, the foregoing release shall not extend to (and shall expressly exclude): (i) claims arising from Seller's intentional fraud or willful misconduct; or (ii) claims for breach of Seller's express representations, warranties, covenants, or indemnities under the Agreement or any document delivered at Closing, but solely to the extent so provided for under the Agreement or such document delivered at Closing.

The foregoing release is made by Buyer for the benefit of Seller and the Releasees on [_____].

**BUYER:**

[_____],
a [_____]

By:    _____

Name:  _____

Title:  _____

# EXHIBIT E

# FORM OF DEED

Recording Requested By And

**When Recorded Return To:**

**Mail Tax Statements To:**

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

# GRANT DEED

THE UNDERSIGNED RECEIVER DECLARES:

DOCUMENTARY TRANSFER TAX IS $____

   ___Unincorporated Area       City of_____
   ___Computed on full value of interest or property conveyed, or
   ___Computed on full value less value of liens or encumbrances remaining at time of sale

   Assessor's Parcel No. _____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the [_____] ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby grant, **sell and convey** to [_____], a [_____] ("**Grantee**"), the following described real property and improvements thereon, in the County of Kern, State of California, and more particularly described as follows:

   See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of-way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE.

Dated: _____, 2025.

_____
LANCE MILLER, solely in his capacity as Court-appointed Receiver

## EXHIBIT F

## FORM OF BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the [_____] ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to [_____], a [_____] ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2026 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 27, 2025, by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property located in Kern County, California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference. The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Purchase Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES TO THE EXTENT PROVIDED IN THE SALE ORDER. SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY AS TO THE PERSONAL PROPERTY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of [_____], 2025.

SELLER:

_____

LANCE MILLER, solely in his capacity as Court-appointed Receiver

[attach legal description exhibit]

**EXHIBIT G**

**FORM OF ASSIGNMENT AGREEMENT**

THIS ASSIGNMENT AGREEMENT ("**Assignment**") is entered into effective as of [_____], 2025 ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Assignor**") pursuant to the [_____] ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and [_____], a [_____] ("**Assignee**").

A.    Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated October 27, 2025 (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in <u>Exhibit A</u>, attached hereto and incorporated by reference (the "**Property**").

B.    Assignor and Assignee closed the purchase and sale of the Property as of the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title, and interest under those contracts affecting the Property as set forth on <u>Exhibit B</u>, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.    Assignor hereby assigns to Assignee all of its right, title, obligation, and interest in and to the Assigned Contracts, from and after the Effective Date; provided that such assignment is made subject to the receipt of any consents of the counterparties required thereunder not received as of the Effective Date. Assignor represents and warrants solely to the extent authorized under the Sale Order, and to Assignor's knowledge, that the Assigned Contracts are in effect and have not been previously assigned and that, to Assignor's knowledge, no counterparty has asserted any material default thereunder. Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Assigned Contracts to be performed after the date hereof.

2.    Assignee shall indemnify, defend and hold Assignor harmless from all obligations on the part of Assignee arising under the Assigned Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith from and after the Effective Date. This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

3.    Assignee has not previously assigned the Assigned Contracts and has, subject to the required consent of any counterparty not received prior to the Effective Date, all necessary authority to assign the Assigned Contracts (and to the extent counterparty consent is required under any Assigned Contract and has been obtained, the consent is attached hereto as <u>Exhibit C</u>). Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any

and all, express or implied warranties concerning the condition, value and quality of the property and any portions of the Assigned Contracts.

4.      Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Assigned Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the Effective Date. Assignor shall use commercially reasonable effects, consistent with its authority as receiver, to assist in obtaining such consents.

5.      In the event of any action between the parties hereto regarding this Assignment which a court of competent jurisdiction determines was frivolous or brought in bad faith by the unsuccessful party, the unsuccessful party in such action shall pay to the prevailing party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing party in connection with such action. The parties agree that before either institutes litigation against the other arising from this Assignment, it will make a good faith attempt to meet with the other party first and attempt to resolve the dispute.

6.      This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California. This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, taken together, shall constitute but one agreement. This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the Effective Date.

ASSIGNOR:                                            ASSIGNEE:

_____              [_____]
LANCE MILLER, solely in his capacity         a [_____]
as Court-appointed Receiver

                                                     By:    _____

                                                     Name:  _____

                                                     Title: _____

[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

Exhibit A to Assignment Agreement

[Legal Description Attached]

Exhibit B to Assignment Agreement

Assigned Contracts

<u>Exhibit C to Assignment Agreement</u>

Third-Party Consents

[TBD]

**EXHIBIT H**

**FORM OF GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT ("**Assignment**") is entered into effective as of [_____], 2025 ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Assignor**") pursuant to the [_____] ("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and [_____], a [_____] ("**Assignee**").

A.      Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated October 27, 2025 (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**"). Capitalized terms used but not expressly defined herein shall have the meaning given to them in the Purchase Agreement.

B.      Assignor and Assignee closed the purchase and sale of the Property as of the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title, and interest under (i) those any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities that comprise Receivership Property but are not now in Seller's possession, [***subject to receipt of consent of preparing consultant]*** and (ii) the Phase 1 environmental assessments of the Property ("**Phase 1s**") identified on Exhibit B attached hereto and incorporated herein by reference.

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows:

1.      Assignor hereby assigns to Assignee, **without representation or warranty**, all of its right, title, obligation, and interest in and to any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities that comprise Receivership Property but are not now in Seller's possession, and (ii) the Phase 1s.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under such licenses and permits arising after the Effective Date, and further agrees to abide by the terms of use of the Phase 1s.

2.      Assignee shall indemnify, defend and hold Assignor harmless from all obligations on the part of Assignee arising under the licenses and permits from and after the Effective Date, and all claims of misuse of the Phase 1s by Assignee or any party obtaining the Phase 1s from Assignee, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith from and after the Effective Date. This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

3.      In the event of any action between the parties hereto regarding this Assignment which a court of competent jurisdiction determines was frivolous or brought in bad faith by the unsuccessful party, the unsuccessful party in such action shall pay to the prevailing party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing party in connection with such action. The parties agree that before either institutes litigation against the other arising from this Assignment, it will make a good faith attempt to meet with the other party first and attempt to resolve the dispute.

4.      This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California. This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, taken together, shall constitute but one agreement. This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the Effective Date.

ASSIGNOR:                                             ASSIGNEE:

_____          [_____]
LANCE MILLER, solely in his capacity         a [_____]
as Court-appointed Receiver

                                                              By:      _____

                                                              Name:  _____

                                                              Title:    _____

<u>Exhibit A</u>
<u>to</u>
<u>General Assignment</u>

Legal Description of Property

[Legal Description to be Attached]

Exhibit B
to
General Assignment

Phase 1 Environmental Assessments

1.  Phase I Environmental Site Assessment for Ana Balle West Ranch 978.51 acres, 10200 Magnolia Avenue, Kern County, Delano, California, dated as of August 19, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

2.  Phase I Environmental Site Assessment for Gooselake Ranch 3,065.49 acres, 24582 and 25000 W. Lerdo Highway, Kern County, Buttonwillow, California, dated as of July 8, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

3.  Phase I Environmental Site Assessment for Kyte Ranch 223.31 acres, East of Bell Road and Bisected by Sherwood Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

4.  Phase I Environmental Site Assessment for Ludy Ranch 79.09 acres, 27798 Elmo Highway, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

5.  Phase I Environmental Site Assessment for McCombs Ranch 473.02 acres, 23746 McCombs Road and 14490 Corcoran Road, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

6.  Phase I Environmental Site Assessment for Wegis-Dresser Ranch 79.09 acres, North of Dresser Avenue and 0.5 miles East of Rowlee Road, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

7.  Phase I Environmental Site Assessment for Wegis-Jackson Ranch 1,025.62 acres, 25544 & 25949 Jackson Avenue and 15889 Rowlee Road, Kern County, Wasco, California, dated as of August 19, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

8.  Phase I Environmental Site Assessment for Wegis-Kimberlina Ranch 830.90 acres, 16611 Rowlee Road and 25791 & 25845 Kimberlina Road, Kern County, Wasco, California, dated as of July 9, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

9.  Phase I Environmental Site Assessment for Wegis-Lerdo Ranch 211.21 acres, North of W. Lerdo Highway and West of Gun Club Road, Kern County, Buttonwillow, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

10. Phase I Environmental Site Assessment for Wegis-McCoy Ranch 116.68 acres, 15206 McCoy Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

11. Phase I Environmental Site Assessment for Wegis-West Jackson Ranch 218.05 acres, South of Jackson Avenue and East of McCoy Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

SCHEDULE 1.1(b)

Excluded Solar

All equipment parts and components related or pertaining to three (3) solar photovoltaic systems totally approximately 1422 kWs, described as follows, whether or not located on or connected to electrical service to the Property:

1)  955 kW system located on APN 069-350-07, Kern County, California and commonly known as "Kimberlina Ranch."

2)  273 kW system located on APN 069-320-05, Kern County, California and commonly known as "Reservoir Ranch."

3)  205 kW system located on APN 069-310-12, Kern County, California and commonly known as "Mozingo Ranch."

SCHEDULE 1.1(g)

Contract Schedule

1. Agricultural Lease dated April 1, 2020, as amended by that certain First Amendment to Agricultural Lease dated November 1, 2020, as amended by that certain Second Amendment to Agricultural Lease dated September 24, 2021, as amended by that certain Third Amendment to Agricultural Lease dated September 22, 2022, as amended by that certain Fourth Amendment to Agricultural Lease dated November 20, 2023, by and between Maricopa Orchards, LLC, a California limited liability company as Landlord, and Ranch 24, LLC a California limited liability company as Tenant (as amended, the "Ranch 24 Lease"), for certain real property consisting of approximately 24 gross acres identified as follows (the "Ranch 24 Premises"):

   Those certain 24+/- acres planted to table grapes which are more or less the middle third of the North half of the Northeast quarter of Section 34, Township 27 South, Range 23 Est, Mount Diablo Base and Meridian, located in the County of Kern, State of California.

2. Undated lease agreement between Goose Lake Ranch, as owner, and Communication Systems Development, Inc., evidenced by that certain Memorandum of Lease Agreement recorded as Document Number 0198048937 in the Kern County official records on April 16, 1998, as assigned by that certain Assignment to American Towers LLC recorded as Document Number 218022351 in the Kern County official records on February 28, 2018, as modified by that certain Schedule – Tower Space License effective as of March 23, 2009 by and between ATS/PCS, LLC, a Delaware limited liability company, and MetroPCS California, LLC, a Delaware limited liability company, all with respect to the cellular tower affecting Tract 4 – Parcel 25 (APN: 087-080-25/087-080-25-00-0).

3. Subsurface Recharge System Use and Easement Agreement effective as of January 23, 2020 by and between Maricopa Orchards, LLC, a California limited liability company, as Grantor, and Wegis Family Farms LLC, a California limited liability company, as Grantee, recorded on January 23, 2020 as Document Number 220009513 in the Kern County Official Records.

SCHEDULE 5.2(i)

Leases

1. The Ranch 24 Lease.

2. Any well sharing agreements for the benefit of Seller which are not recorded in the public records.

3. Residential rental of 10200 Magnolia Ave.

4. Residential rental of 25482 W. Lerdo Highway.

5. Residential rental of 25845 Kimberlina Road.

6. Residential rental of 25949 Jackson St.

SCHEDULE 6.3(g)

Water Supply Agreements

1.  Water Supply Agreement dated July 29, 2015 made by and between **FNF FARM**S, LLC, a California limited liability company (as Water User therein), and 104 PISTACHIOS, LLC a California limited liability company, et al (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 11, 2024 as Document No. 2024-0082400, (ii) the Official Records of Kern County, California on September 10, 2024 as Document No. 224109980, (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412595, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019288.

2.  Water Supply Agreement dated July 29, 2015 made by and between **KAMM SOUTH, LLC**, a California limited liability company (as Water User therein), and 104 Pistachios, LLC a California limited liability company, et al (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 11, 2024 as Document No. 2024-0082763, (ii) the Official Records of Kern County, California on September 10, 2024 as Document No. 224109979; (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412594, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019295.

3.  Water Supply Agreement dated September 28, 2025, made by and between MARICOPA ORCHARDS, LLC, a California limited liability company, et al. (as Water User therein), and 104 Pistachios, LLC a California limited liability company, et al. (as Water Providers therein), recorded in (i) the Official Records of Fresno County, California on September 10, 2024 as Document No. 2024-0082325, (ii) the Official Records of Kern County, California on September 13, 2024 as Document No. 224111300, (iii) the Official Records of Kings County, California on September 10, 2024 as Document No. 2412596, and (iv) the Official Records of Madera County, California on September 11, 2024 as Document No. 2024019287

SCHEDULE 6.3(h)

Rights of First Refusal

1.  A right of first refusal in favor of Wegis Family Farms LLC, a California limited liability company ("Wegis"), as described in that certain Right of First Refusal Agreement dated January 23, 2020, by and between Wegis and Maricopa Orchards, LLC, a California limited liability company, as evidenced by that certain Memorandum of Right of First Refusal recorded in the Official Records of Kern County, California, on January 23, 2020, as Document Number 220009643; and

2.  A right of first refusal in favor of Wey Almond Farms, LLC, a California limited liability company ("Wey"), as described in that certain Right of First Refusal Agreement dated November 13, 2019, by and between Wey and Maricopa Orchards, LLC, a California limited liability company, as evidenced by that certain Memorandum of Right of First Refusal recorded in the Official Records of Kern County, California, on November 13, 2019, as Document Number 219151148.

SCHEDULE 7.1

Exceptions to Seller's Representations

1.  None.

SCHEDULE 10.1(c)

COMMITMENT EXCEPTIONS

The following Schedule B exceptions listed on that certain Preliminary Report issued by Chicago Title Company with a Title Number of FWKN-TO2500611-MW, Amendment A, dated effective May 1, 2025:

1 – 8 inclusive
9*
10 – 83 inclusive
84* (pending removal with respect to Tract 2, Parcel 7)
85
86* (pending removal with respect to Tract 2, Parcel 8)
87 - 91 inclusive
93 – 118
119* (pending removal with respect to Tract 2, Parcels 11 and 12)
120 - 196 inclusive
189 – 197 inclusive
198*
199 – 225 inclusive
226*
228 – 238 inclusive
239 – 240* inclusive
241 – 258 inclusive
260 (but subject to removal of notes regarding PG&E Easement)
261 – 267 inclusive
268*
271 – 275 inclusive
280 – 301
302 - 304* inclusive
305 – 319 inclusive
320-321* inclusive
322-332 inclusive
333*
334 - 357 inclusive
362 – 489 inclusive
491 – 526 inclusive
531
536 – 566 inclusive
568 – 580 inclusive
582 – 603 inclusive
605 – 610 inclusive
616
657
658 (but limited to named tenants on rent roll to be provided by Seller)

659 – 662 inclusive
666
738

Exceptions marked with * are pending Title Insurer's consent to remove.

SCHEDULE 10.2(e)

Phase 1 Environmental Assessments

1.  Phase I Environmental Site Assessment for Ana Balle West Ranch 978.51 acres, 10200 Magnolia Avenue, Kern County, Delano, California, dated as of August 19, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

2.  Phase I Environmental Site Assessment for Gooselake Ranch 3,065.49 acres, 24582 and 25000 W. Lerdo Highway, Kern County, Buttonwillow, California, dated as of July 8, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

3.  Phase I Environmental Site Assessment for Kyte Ranch 223.31 acres, East of Bell Road and Bisected by Sherwood Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

4.  Phase I Environmental Site Assessment for Ludy Ranch 79.09 acres, 27798 Elmo Highway, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

5.  Phase I Environmental Site Assessment for McCombs Ranch 473.02 acres, 23746 McCombs Road and 14490 Corcoran Road, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

6.  Phase I Environmental Site Assessment for Wegis-Dresser Ranch 79.09 acres, North of Dresser Avenue and 0.5 miles East of Rowlee Road, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

7.  Phase I Environmental Site Assessment for Wegis-Jackson Ranch 1,025.62 acres, 25544 & 25949 Jackson Avenue and 15889 Rowlee Road, Kern County, Wasco, California, dated as of August 19, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

8.  Phase I Environmental Site Assessment for Wegis-Kimberlina Ranch 830.90 acres, 16611 Rowlee Road and 25791 & 25845 Kimberlina Road, Kern County, Wasco, California, dated as of July 9, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

9.  Phase I Environmental Site Assessment for Wegis-Lerdo Ranch 211.21 acres, North of W. Lerdo Highway and West of Gun Club Road, Kern County, Buttonwillow, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

10. Phase I Environmental Site Assessment for Wegis-McCoy Ranch 116.68 acres, 15206 McCoy Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

11. Phase I Environmental Site Assessment for Wegis-West Jackson Ranch 218.05 acres, South of Jackson Avenue and East of McCoy Avenue, Kern County, Wasco, California, dated as of July 1, 2025, prepared by Advanced Environmental Concepts, Inc. for Seller.

SCHEDULE 32

Legal Description of Lease Termination Parcels

1. **TRACT 1, PARCEL 1: APN: 047-010-01 (Affected by Residential Lease for 10200 Magnolia Avenue)**

ALL THAT PORTION OF SECTION 2, TOWNSHIP 25 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING WESTERLY OF THE WESTERLY RIGHT OF WAY OF THE AT&SF RAILROAD.

EXCEPTING THEREFROM 1/2 OF ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS UNDER AND IN SAID LAND AS RESERVED BY JOHN F. POOLE AND GERTRUDE REINHARD POOLE, AS JOINT TENANTS, IN DEED RECORDED MARCH 21, 1960 IN BOOK 3250, PAGE 624 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL REMAINING INTEREST IN AND TO ALL CRUDE OIL, PETROLEUM, GAS, BREA, ASPHALTUM AND ALL KINDRED SUBSTANCES AND OTHER MINERALS IN AND UNDER SAID LAND AS RESERVED BY CORNELIUS VANDER DUSSEN, A MARRIED MAN, IN DEED RECORDED FEBRUARY 18, 1981 IN BOOK 5352, PAGE 1894 OF OFFICIAL RECORDS.

2. **TRACT 4, PARCEL 25: APN: 087-080-25 (Affected by Residential Lease for 25482 W. Lerdo Highway)**

PARCEL 1 OF PARCEL MAP 3773, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED MAY 20, 1977, IN BOOK 18, PAGE 108 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL THE MINERALS AND MINERAL ORES OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED UPON, WITHIN OR UNDERLYING THE HEREINAFTER DESCRIBED PROPERTY OR THAT MAY BE PRODUCED THEREFROM, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL OIL, NATURAL GAS AND HYDROCARBON SUBSTANCES, GEOTHERMAL STEAM, BRINES AND MINERALS IN SOLUTION, AND SAND, GRAVEL AND AGGREGATES, AND PRODUCTS DERIVED THEREFROM, TOGETHER WITH, THE EXCLUSIVE AND PERPETUAL RIGHT OF SAID GRANTEE, ITS SUCCESSORS AND ASSIGNS, OR INGRESS AND EGRESS IN, UPON OR OVER SAID PROPERTY TO EXPLORE AND PROSPECT FOR, EXTRACT, DEVELOP, SAVE, CONVEY, STORE, REFINE, PROCESS AND REMOVE THE SAME AND TO MAKE SUCH USE OF SAID PROPERTY AND THE SURFACE THEREOF AS IS

NECESSARY OR USEFUL IN CONNECTION THEREWITH, WHICH USE MAY INCLUDE THE SINKING, BORING, DIGGING OR DRILLING OF WELLS, SHAFTS OR TUNNELS, EXCAVATING, OPEN PIT MINING AND CONSTRUCTING, MAINTAINING AND REMOVING ROADS, WAYS, PIPE LINES, POLE LINES, TANKS, BUILDINGS, STRUCTURES AND FACILITIES. ALL AS CONVEYED BY SOUTHERN PACIFIC COMPANY TO BRAVO OIL COMPANY, A TEXAS CORPORATION IN THE DEED RECORDED MAY 29, 1965, IN BOOK 3906, PAGE 30 OF OFFICIAL RECORDS, AS DOCUMENT NO. 70845.

3. **TRACT 2, PARCEL 9: APN: 069-340-35 (Affected by Residential Lease for 25845 Kimberlina Road)**

THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT 95% OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LANDS, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSES OF EXPLORATION AND DEVELOPMENT THEREON, AS RESERVED BY ELIZABETH GLIDE WILLIAMS, A WIDOW, EULA GLIDE ELLIOTT, A MARRIED WOMAN, DEALING WITH HER SEPARATE PROPERTY AND CHARLES MATHIAS GOETHE, AN UNMARRIED MAN, IN DEED DATED DECEMBER 9, 1950, RECORDED JANUARY 12, 1951, IN BOOK 1762, PAGE 110 OF OFFICIAL RECORDS, UPON TERMS, COVENANTS AND PROVISIONS SHOWN ELSEWHERE HEREIN.

4. **TRACT 5, PARCEL 1: APN: 069-280-18-00 (Affected by Residential Lease for 25949 Jackson St.)**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 27 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 15, 1855.

EXCEPT ALL OIL AND GAS IN SAID LAND, WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME PURSUANT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF JULY 17, 1914(39 STAT. 509).

ALSO EXCEPTING THEREFROM AN UNDIVIDED 50% INTEREST IN ALL OF THE OIL, GAS AND MINERALS NOW OF HEREAFTER LYING IN AND UNDER AND THAT MAY BE PRODUCED FROM, ALL OF THE ABOVE DESCRIBED REAL ESTATE, WITH THE RIGHT TO REDUCE THE SAME TO POSSESSION, AND WITH RIGHTS OF INGRESS AND EGRESS, AND ALL RIGHTS INCIDENT TO THE DEVELOPMENT, PRODUCTION, CONSERVATION AND TRANSPORTATION THEREOF, FOREVER, AS RESERVED BY JOHN HANCOCK MUTUAL LIFE

INSURANCE COMPANY IN THAT CERTAIN CORPORATION GRANT DEED RECORDED NOVEMBER 14, 1988 IN BOOK 6181, PAGE 1169, DOCUMENT NO. 056183, KERN COUNTY RECORDS.