# Exhibit B

*SUBJECT TO ONGOING REVIEW AND COMMENT*

DISCLAIMER:    THIS DRAFT IS SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENT YOU ENTERED INTO WITH SELLER (AS DEFINED HEREIN).    THIS IS A PROPOSED FORM PURCHASE AGREEMENT ONLY, AND NOT AN OFFER THAT CAN BE ACCEPTED. UNTIL SELLER AGREES TO AND EXECUTES A DEFINITIVE AGREEMENT, SELLER HAS NO OBLIGATION (LEGAL OR OTHERWISE) TO CONCLUDE A TRANSACTION. UNLESS INCLUDED IN A DEFINITIVE AGREEMENT, COMMUNICATIONS (WRITTEN OR ORAL) SHALL NOT CREATE ANY OBLIGATIONS WHATSOEVER ON SELLER AND NO PERSON, INCLUDING ANY RECIPIENT OF THIS PROPOSED FORM, MAY RELY ON THEM AS THE BASIS FOR TAKING OR FOREGOING ANY ACTION OR OPPORTUNITY OR FOR INCURRING ANY COSTS. SELLER RESERVES THE RIGHT TO REJECT ANY OR ALL PROPOSALS FOR ANY REASON WHATSOEVER AND TO ACCEPT ANY ONE OR MORE PROPOSALS FOR ANY REASON, AND TO NEGOTIATE SUCH PROPOSALS IN ANY MATTER HE DEEMS APPROPRIATE, AND FURTHER RESERVES THE RIGHT TO REVISE AND COMMENT UPON THIS PROPOSED FORM AFTER THE DATE HEREOF

## PURCHASE AND SALE AGREEMENT
## AND
## JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated [date], to be effective on the date when all parties have executed it after entry of the Sale Order (defined below), which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Expanding Receivership and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") and (ii) [_____] ("**Buyer**").  For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**."  This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A.    Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property consisting of approximately 31,556.73 assessed acres of land, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

B.    Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

C.    The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order of the Court to be entered in the Proceeding substantially in the form attached hereto as **Exhibit B** (the

-1-

20039.001/Westlands Alt OB PSA (5)

"**Marketing Procedures Order**") and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially in the form attached hereto as **Exhibit C** ("**Sale Order**").

D.    The transactions contemplated by this Agreement are intended by Buyer to be made concurrently with the proposed purchase by Buyer of other real property related to or associated with the farming and other operations of the Property (the "**Concurrent Sale**" of the "**Concurrent Sale Property**")  pursuant to one or more separate Purchase and Sale Agreements and Joint Escrow Instructions between Buyer and the third-party owner(s) of such property (the "**Third-Party Owner(s)**"); provided, however, that closing of a Concurrent Sale shall not be a condition precedent to the binding nature or effectiveness of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1.    **Purchase and Sale**

1.1    Purchase and Sale of Property.  Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following solely to the extent it is Receivership Property (as defined in the Receivership Order):

(a)    The Land;

(b)    All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State of California (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or that provides drainage, irrigation and/or water to the Land;

(c)    All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation

-2-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

(d)    All crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), for the 2027 crop year and thereafter generated by the Land (the "**Crops**") subject to the provisions of Section 1.6 below;

(e)    All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)    All surface water rights, groundwater rights and other water rights or water credits appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications or other court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale of water generated from irrigation wells located on the Land, together with the Poso Creek Water, as defined below (collectively, "**Water Rights**"), subject to the provisions of Section 1.7 below;

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on Schedule 1.1(g) that Buyer would like to have assigned to it at Closing, subject to the provisions of Section 1.6 below; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary;

(h)    All of Seller's right title and interest in and to, as a member of, POSO CREEK WATER COMPANY, LLC, a California limited liability company ("**Poso Creek**"), as such interests are identified on Schedule 1.1(h), attached hereto, and all right title and interest of Seller in and to its share of stored water inventory as set forth on Schedule 1.1(h) (the "**Poso Creek Water**"), and water storage rights held by Poso Creek for the benefit of Seller; and

1.2    As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures.

(a)    Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF**

-3-

**HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY. BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY, PROVIDED, HOWEVER, THAT NOTHING IN THIS <u>SECTION 1.2(a)</u> SHALL RELIEVE SELLER FROM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY CLOSING DOCUMENTS DELIVERED PURSUANT TO <u>SECTION 10.2</u> OF THIS AGREEMENT.**

(b)     Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller unless expressly set forth in this Agreement, the documents delivered at Closing pursuant to <u>Section 10.2</u> of this Agreement, or any representations or warranties (oral or written) of any Lenders (as defined below) or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders. **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE DOCUMENTS DELIVERED AT CLOSING PURSUANT TO <u>SECTION 10.2</u> OF THIS AGREEMENT, SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF.**

(c)     **EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE DOCUMENTS DELIVERED AT CLOSING PURSUANT TO <u>SECTION 10.2</u> OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS: (i) EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION**

-4-

THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.

(d) BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS SECTION 1.2, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS; PROVIDED, IN EACH CASE THE FOREGOING WAIVER AND RELEASE DOES NOT EXTEND TO (AND SHALL EXPRESSLY EXCLUDE) (A) CLAIMS ARISING FROM SELLER'S FRAUD OR WILLFUL BREACH OF THIS AGREEMENT, AND (B) CLAIMS ARISING FROM SELLER'S FAILURE TO PERFORM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS TO BE DELIVERED PURSUANT TO SECTION 10.2 OF THE AGREEMENT.

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived by Buyer solely to the extent such claims do not involve (i) Seller's fraud or willful breach of this Agreement and (ii) Seller's obligations expressly set forth in the Agreement:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE

-5-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

**AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

1.3     Release.  At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and The Prudential Insurance Company of America ("**Prudential**"), PAR U Hartford Life & Annuity Comfort Trust ("**PAR U**"), and PGIM Real Estate Finance, LLC (together with Prudential and PAR U, collectively, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

1.4     Not a Residential Purchase.  Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Property, Buyer represents and warrants:  (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's residence.  To the fullest extent permitted by applicable law, Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

1.5     Bid Deposit.  Concurrently with Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Buyer shall deposit into a non-interest-bearing receiver account with Pivot Management Group LLC (the "**Deposit Holder**") an amount equal to 2% of the Purchase Price (the "**Bid Deposit**") in immediately available, good funds of the United States of America.  If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.

1.6     Pistachio Crop Contracts.  Buyer acknowledges that Seller has entered into that certain contract for the sale or marketing of 100% of the pistachio crops purchased from the Land for the 2026 and 2027 crop years, a copy of which is attached hereto under Schedule 1.6 (the "**Pistachio Contract**"), and further that Seller has authorized the recording of a memorandum of the Pistachio Contract as a covenant burdening those parcels of the Land which are currently planted to pistachios (the "**Pistachio Memoranda**"), a copy of which is attached hereto under Schedule 1.6, which memoranda is and shall be a Permitted Exception with respect to the condition of title at the Closing.  Buyer agrees to expressly assume the obligations of grower under the Pistachio Contract at the Closing, in the form set forth on **Exhibit H**, attached hereto (the "**Pistachio Contract Assumption**").  Seller shall not amend, modify or terminate the Pistachio Contract without Buyer's prior written approval.

1.7     Surface Water/Water Credits.  Except for the maximum amount of surface water that can be carried over pursuant to Westland's Water District rules or direction of Westland's Water District, in either case in effect at the earlier of the Closing or the end of the 2025 Water Year (the "**2025 Carryover Allowance**"), which Seller shall cause to be carried over to the next water year,

-6-

Seller shall have the unrestricted right to sell any unused 2025 water year surface water allocations for the Property ("**2025 SWA**") which are not required to irrigate the Property during the period in which they can be used, and shall retain all proceeds thereof. In the event that Seller cannot reasonably use or sell the 2025 SWA in excess of the 2025 Carryover Allowance, Seller shall have the right to convert such unused 2025 SWA to groundwater credits through recharge, and the costs of such recharge fees shall be reimbursed by Buyer to Seller at the closing as part of the Cultural Cost Reimbursement. Seller shall not sell any groundwater credits of record as of November 1, 2025, or accruing thereafter through recharge of 2025 SWA for which Seller is reimbursed at the Closing, and such shall be conveyed to Buyer at the Closing.

1.8　**Poso Note Adjustment**. At the Closing, Buyer shall reimburse Seller for any portion of the obligations of that certain loan made to Poso Creek from Semitropic Improvement District of Semitropic Water Storage District in the original principal amount of $18,000,000.00 (the "**Water Loan**"), evidenced by an Agreement dated April 23, 2007 between Poso Creek and the Semitropic Water Storage District and Semitropic Improvement District, Buttonwillow Improvement District and Pond-Poso Improvement District of the Semitropic Water Storage District (the "**Water Loan Agreement**"), actually paid by Seller prior to the Closing in respect of the Poso Interests which are due and payable in 2026 (but which shall not include the December Water Loan Payment, as defined in Section 6.3(c) below)(such amounts paid by Seller, if any, the "**Poso Note Adjustment**").

1.9　**Concurrent/Ancillary Sales.**

(a)　Concurrent Sale. Buyer agrees that it will purchase (from the party legally entitled to sell said property) the property described on Schedule 1.11(a), for a price of $13,153,257.00 and on other commercially reasonable terms, pursuant to a transaction to be closed, at Seller's sole option and as a condition to Closing for the benefit of Seller, concurrently with the Closing hereof (the "**Concurrent Sale**").

(b)　Ancillary Sales. Buyer agrees that it will purchase (from the parties legally entitled to sell said property) the property described on Schedule 1.11(b), for the price set forth for such property on Schedule 1.11(b), and on other commercially reasonable terms negotiated in good faith, subject to the agreement of the counterparties for each such property to enter into a purchase agreement therefor (each an "**Ancillary Sale**" and collectively, the "**Ancillary Sales**"). In the event that the required counterparties for a specific tract will not agree to transact at the listed price, or on commercially reasonable terms negotiated in good faith, Buyer shall have no further obligation to purchase such tract. For clarity, the closing of the Ancillary Sales, or any of them, shall not be a condition to either Buyer's or Seller's obligations hereunder, and Seller makes no representation, and expressly disclaims any representation, that Buyer will be able to negotiate a purchase of the property described and for the price listed on Schedule 1.11(b).

2.　**Escrow**. Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA 93711 (Attention: Sue Meyer) who shall act as "**Escrow Holder**," in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**"). The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct,

-7-

violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

**3.** **Close of Escrow**. Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before **5:00 p.m., Pacific Time, on a date no later than the later to occur of (i) \_\_\_\_ (\_\_) business days following the date the Sale Order becomes final and non-appealable, or (ii) [October 30, 2026]** (the "**Closing Date**") or such other date as agreed to by the Parties; provided that the Closing Date shall in no event occur later than the Outside Date (as set forth in <u>Section 6.4</u>).

3.1   <u>Purchase Price.</u>  The Purchase Price of the Property ("**Purchase Price**") is **_____ and 00/100ths Dollars (\$_____.00) United States currency**.  The Purchase Price shall be payable as follows:

(a)   Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred and 00/100ths Dollars (\$100.00)** from the Bid Deposit (the "**Independent Consideration**") as independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof.  The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under <u>Section 6.3</u>, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

(b)   Within two (2) business days of opening of the Escrow, the Deposit Holder shall transfer the Bid Deposit to the Escrow for application to the Purchase Price.

(c)   The balance of the Purchase Price shall be deposited by Buyer into Escrow no later than one (1) business day prior to the Closing and paid to Seller in cash, by cashier's check or wire transfer of immediately available good funds, at the Close of Escrow.

**4.** **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIFTEEN (15) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIFTEEN (15) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIFTEEN (15) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF FORTY FIVE (45) DAYS, THEN SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN <u>SECTION 1.5</u> AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY, AND AS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR**

**OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN SECTION 1.5 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY.**

**ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION**

_____          _____

Seller                                           Buyer
Lance Miller, solely in his capacity
as Court-appointed Receiver

**5.      Seller's Deliveries; Condition of Title**.

5.1      Seller's Deliveries.

Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land. Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other disclosures that are required in connection with the conveyance of the property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the

-9-

Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above. As used in this Agreement, "Disclosure Statutes" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property. Buyer hereby agrees as follows with respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

(a)     Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

(b)     The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

5.2     Condition of Title. Seller agrees to convey fee simple title in and to the Property to Buyer. Title shall be conveyed by Seller to Buyer by receiver's deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject to the items enumerated in this Section. Buyer shall accept title to the Property subject to the following exceptions, provided, however, that nothing herein shall limit or restrict Buyer's right to (i) negotiate with the Title Company to remove or modify any such exceptions, or (ii) obtain title endorsements at Buyer's expense to insure over any such exceptions:

(a)     any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due;

(b)     any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

(c)     all covenants, conditions, restrictions, easements, agreements, defects, encumbrances, other than financial liens not created by Buyer, and other matters of record, including without limitation, the Permitted Exceptions, except to the extent Seller has agreed in writing to terminate or remove;

(d)     physical matters and conditions, if any, that exist at the Property on the Effective Date and that would be disclosed by a current survey or inspection of the Property;

(e)     laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

(f)     any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

-10-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(g)        the printed standard exceptions listed in the Preliminary Report issued by Chicago Title Company with a Title Number of 45006152-MW, Amendment F, dated effective June 3, 2026 (the "**Preliminary Report**"); and

(h)        such other matters as Buyer either waives, assumes, or consents to in writing, which shall include the leaseholds and other rights listed in <u>Schedule 5.2(h)</u>.

5.3        <u>No Liens</u>.  The Property shall be sold free and clear of any and all financial liens, liabilities, obligations, encumbrances, or claims (except for any such liens, encumbrances, claims or interests set forth and described in <u>Section 5.2</u> above) effective upon the Closing.

5.4        <u>Buyer's Indemnification of Seller</u>.  Any damage caused to the Property in connection with Buyer's Inspection shall be promptly and fully repaired by Buyer and the Property returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement; provided, however, that Buyer shall not be responsible for pre-existing conditions or defaults, including hazardous or toxic materials, not caused or exacerbated by Buyer or Buyer's Agents.  Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's Agent's activities, which obligation shall survive any termination of this Agreement.  Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's Agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses reasonably incurred by Seller Parties in connection therewith.  The indemnity provided herein shall not extend to indirect, consequential, punitive or speculative damages and shall survive the Close of Escrow and any termination of this Agreement.

5.5        <u>SGMA Disclosure.</u>  The Sustainable Groundwater Management Act ("**SGMA**") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped from underground aquifers.  Applicable rules and regulations are in place implementing SGMA. Seller and its agents and representatives make no representation on water rights or the effect of SGMA on the Property now or in the future,  except that Seller shall disclose to Buyer any notices, violations, or regulatory actions of which Seller has actual knowledge, and shall further disclose to Buyer, and deliver true and complete copies of, any contracts, agreements, or understandings (whether written or oral) with third parties relating to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property, whether or not of record, of which Seller has actual knowledge (provided that any such document which is included in the Preliminary Report is deemed delivered).  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future.  In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon

-11-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property. Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property, provided this release shall not apply to any liability arising from Seller's or any Seller Parties' fraud or intentional misrepresentations in connection with SGMA or water rights information provided to Buyer.

## 6. Conditions Precedent; Termination.

6.1 <u>Conditions to Obligations of all Parties</u>. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

(a) the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Owner, Lenders, and all parties of interest in the Action, and Title Company agrees to insure title to the Property without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order or the Lender Agreement Approval (defined below) will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit plus any interest thereon, if any, shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination; and

(b) no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect, and no legal proceeding, bankruptcy , insolvency or automatic stay is pending, and no law shall have been adopted that, in the case of any of the foregoing, remains in effect or be effective, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement.

(c) Lenders shall have provided their written approval of this Agreement.

6.2 <u>Seller's Conditions Precedent</u>. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a) Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in <u>Section 9</u> below), and the Buyer's share of the Closing Costs (as defined in <u>Section 12</u> below) and Prorations (as defined in <u>Section 13</u> below) into the Escrow by the Closing Date.

-12-

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(b)        Each of Buyer's representations and warranties set forth in <u>Section 7.3</u> hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(c)        The Closing shall occur simultaneously with the closing of the Concurrent Sale.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3        <u>Buyer's Conditions Precedent</u>.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)        Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed.

(b)        Except as listed in Schedule 5.2(h), Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)        That certain loan made to Poso Creek from Semitropic Improvement District of Semitropic Water Storage District in the original principal amount of $18,000,000.00 (the "**Water Loan**"), evidenced by an Agreement dated April 23, 2007 between Poso Creek and the Semitropic Water Storage District and Semitropic Improvement District, Buttonwillow Improvement District and Pond-Poso Improvement District of the Semitropic Water Storage District (the "**Water Loan Agreement**"), shall be in good standing, free from default, and Seller shall have caused Poso Creek to make the payment on the Water Loans due on December 1, 2025 in the amount of $728,522.78 (the "**December Water Loan Payment**"), and June 1, 2026 in the amount of $728,522.78 (the "**June Water Loan Payment**").

(d)        Each of the representations and warranties of Seller contained in <u>Section 7</u> or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(e)        All monetary liens, deeds of trust, mortgages, security interests, tax liens, mechanics' liens, crop liens, and other financial encumbrances securing the payment of money against the Property which Seller is obligated to remove or cause the removal pursuant to this Agreement shall have been fully paid, released, and reconveyed (or other arrangements reasonably satisfactory to Buyer shall have been made for their release concurrently with Closing), so that title to the Property is conveyed to Buyer free and clear of all such monetary liens, subject only to the Permitted Exceptions (as defined below).

(f)        All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Buyer in its sole discretion.

*SUBJECT TO ONGOING REVIEW AND COMMENT*

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4    <u>Termination</u>.  This Agreement may be terminated in accordance with this <u>Section 6.4</u> at any time prior to the Closing:

(a)    By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes final and non-appealable, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Outside Date; provided, however, that the Outside Date may be extended by Seller and Buyer upon mutual agreement;

(b)    By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this <u>Section 6.4(b)</u> shall not be available to a Party if such order resulted from, or could have been avoided but for, the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)    By written notice of either Buyer or Seller if Seller closes or consummates an alternative transaction pursuant to order of the Court or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 6.4(c)</u> until the earlier of (i) the date the alternative transaction closes or (ii) sixty (60) days following the date the Sale Order becomes final and non-appealable;

(d)    By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in <u>Section 6.3</u> to be satisfied, and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in <u>Section 6.3</u> shall not be satisfied by the Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this <u>Section 6.4(d)</u> will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or;

(e)    by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has materially breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in <u>Section 6.2</u> to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier

-14-

of the Outside Date and forty-five (45) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 6.2 shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this Section 6.4(e) will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder; and

(f)    by the mutual written consent of Seller and Buyer;

(g)    By Seller, by giving written notice to Buyer if the Sale Order is subject to an appeal;

(h)    By Buyer by giving written notice to Seller if the Sale Order is: (i) modified or otherwise altered in a manner materially adverse to Buyer not otherwise agreed to by Buyer, in writing, or (ii) vacated by the Court or a court of competent jurisdiction.

6.5    Effect of Termination

(a)    In the event of the termination of this Agreement as provided in Section 6.4, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to Section 6.4(e) and Sellers are not then in material breach of Sellers' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit and (y) for any reason other than pursuant to Section 6.4(e), Buyer shall be entitled to return of the Bid Deposit as set forth in this Agreement. Notwithstanding the foregoing, nothing in this Article 6 will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to Section 6.4, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement; provided this sentence shall not include breach of Buyer due to failure to close, for which liability is governed by Section 4 hereof.

(b)    In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate this Agreement in accordance with Section 6.4 and, if applicable, to receive the Breakup Fee in accordance with Section 6.5, if payable thereunder; provided that in the case of any fraud or willful misconduct by Seller, Buyer shall have the right to pursue specific performance, if applicable.

(c)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 6.5 are an integral part of this Agreement and that the Breakup Fee is not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Breakup Fee is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision.

*SUBJECT TO ONGOING REVIEW AND COMMENT*

### 7. Seller's Representations and Warranties; Covenants.

7.1   Seller's Representations and Warranties. Except as set forth on Schedule 7.1, attached hereto, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)   Court-Appointed Receiver. Seller is the Court-appointed receiver over the Receivership Property, duly appointed and acting within the scope of authority granted by the Court, and has not received any written notice of challenge or appeal to such appointment that remains unresolved.

(b)   Authority. Subject to entry of the Marketing Procedures Order and the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Seller is a party or by which Seller is otherwise bound, or any judicial order to which Seller is a party or to which Seller is subject. All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Seller, (ii) be legal, valid and binding obligations of Seller, and (iii) not violate, to Seller's Knowledge, any provision of any agreement or judicial order to which Seller is a party or to which Seller is subject.

(c)   OFAC Compliance. Seller (which, for the purposes of this Section 7.1(c), shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)   Foreign Person and Withholding. Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to Seller or the Property. Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code, or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008. A Seller may be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

(e)   Organic Trees or Vines. The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties. Seller makes no representations or warranties in this regard.

-16-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(f)     Contracts. Except as disclosed to Buyer in writing or set forth on Schedule 7.1, Schedule 5.2(h), or which are Permitted Exceptions or otherwise set forth in the Preliminary Report, Seller has not entered into, and to Seller's Knowledge (as defined below) there are no, contracts, agreements, leases, licenses, management agreements, service contracts, maintenance agreements, construction contracts, or other similar arrangements, including, without limitation, agreements with third parties related to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property that will be binding on Buyer after the Close of Escrow. To Seller's Knowledge, (i) Seller has delivered complete copies of such documents comprising the Contracts listed in Schedule 1.1(g) attached hereto which are in Seller's possession, (ii) Seller has not delivered any notice of default to any counterparty under any Contract, and (iii) Seller has not received any notice of default from any counterparty under any Contract.

(g)     Options. To Seller's Knowledge, other than the Contracts, the Permitted Exceptions, or other items set forth in the Preliminary Report (whether a Permitted Exception or otherwise), there are no purchase options, rights of first offer, rights of first refusal or any similar options applicable to the transaction contemplated by this Agreement or that would be binding on the Property or Buyer following Closing.

(h)     Poso Creek. To Seller's Knowledge, the parties set forth on Schedule 1.1(h) are the named owners and holders of 50.796% of the issued and outstanding interests (legal, beneficial voting and economic) in Poso Creek, as set forth on Schedule 1.1(h), which interests are Receivership Property and may be conveyed by Seller to Buyer at the Closing, subject to the Sale Order.

(i)     Taxes and Assessments. To Seller's Knowledge, all general real property taxes and regular assessments currently due and payable with respect to the Property have been paid or will be prorated at Closing. To Seller's Knowledge, there are no pending or threatened special assessments, impact fees, or similar charges affecting the Property other than those disclosed to Buyer in writing or that are matters of public record.

(j)     Litigation. To Seller's Knowledge, there are no actions, suits, or proceedings pending or threatened against Seller relating solely to the Property, other than those disclosed to Buyer in writing or matters of public record.

(k)     Insurance. To Seller's Knowledge, Seller has, or will as such policies are acquired for the 2027 crop year, if any, provided Buyer with true, correct and complete copies of all insurance policies with respect to the Property, including without limitation the multi-peril crop insurance in place with respect to the Land.

(l)     Violation of Law. To Seller's Knowledge, Seller has not received any written notice from any governmental authority alleging that the Property is in violation of any applicable law (including, without limitation, laws related to the environment or public health or safety) which violation remains uncured.

(m)     Employees. To Seller's Knowledge, there are no employees of the Receiver or Pivot Management Group for which Buyer shall have responsibility for after Closing.

-17-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(n)      Water Loan. To Seller's knowledge, the December Water Loan Payment and June Water Loan Payment have been paid, and there is one   final payment in the amount of $728,522.78 due on December 1, 2026 remaining.

(o)      Knowledge Definition. As used in this Agreement, the term "Seller's Knowledge" means the current actual (and not constructive or imputed) knowledge of LANCE MILLER, solely in his capacity as court-appointed receiver, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other person, including Seller's agents, employees, consultants, or representatives. Any disclosure required hereunder shall be deemed made if such matter is listed in the Preliminary Report.

7.2      Survival.  The express representations and warranties made in this Article by Buyer or Seller will not merge into any instrument of conveyance delivered at the Closing; provided, however, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3) months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

7.3      Covenants. Seller hereby covenants and agrees with Buyer as to the following matters.

(a)      Seller shall maintain and farm the Property in a commercially reasonable manner until the Closing; provided that, if Seller takes any action requested by Buyer, or refrains from taking an action at the request of Buyer, pursuant to the provisions of Section 9 allowing Buyer to direct cultural activities, or otherwise, such action or inaction shall not be a breach of this covenant.

(b)      Seller shall maintain in effect all insurance policies in each case that are in effect on the Effective Date.

(c)      Seller shall not enter into any new lease or contract affecting the Property or any part thereof, or modify, extend or terminate any Contract without the prior written consent of Buyer, except that Seller shall have the right, without Buyer's consent but with prior notice to and consultation with Buyer, to enter into such new leases or contracts, or modify, extend or terminate any Contracts which:

(i)      in connection with entry into or extension of Contracts, are entered or extended pursuant to valid written options pursuant to Contracts listed on Schedule 1.1(g) in favor of the counterparty thereof (or an eligible assignee), or

(ii)      will terminate prior to the Closing, or

(iii)      will extend beyond the Closing, but only if such are on commercially reasonable terms and are required to provide for ongoing operations and maintenance on the Property, in Seller's reasonable discretion, and shall not extend beyond the Closing more than is required on a commercially reasonable basis to address the need therefor; provided, however, for the avoidance of doubt, Buyer shall have the right to not assume any such lease or contract and the

-18-

same shall not encumber the Land or be binding on Buyer beyond the Closing and shall solely be the responsibility of Seller.

Seller shall provide Buyer with true, correct and complete copies of any agreements entered into after the Effective Date.

(d)     Without Buyer's prior written consent or as otherwise provided herein, Seller shall not remove, sell or otherwise transfer the Property  (including, without limitation, the equity interests in Poso Creek) or any portion thereof or any interest therein, except to the Successful Bidder, or grant any new option, pledge, offer, right, right of first refusal or right of first offer with respect to the Property or any part thereof or any direct or indirect interest therein.

(e)     Seller shall promptly advise Buyer of and provide complete copies of (i) any written notices that Seller receives from any governmental authority, including notices of violations or regarding condemnation, and (ii) any notices of default given or received by Seller under any Contracts. Seller will promptly advise Buyer of any litigation, arbitration proceeding or administrative hearing which is instituted against Seller after the Effective Date and which concerns or affects Seller.  Seller shall promptly advise Buyer of any material casualty that affects the Property which it has Knowledge thereof.

**8.     Buyer's Representations and Warranties**.    Buyer hereby warrants, represents, covenants and certifies to Seller and agrees that as of the Close of Escrow:

(a)     Good Standing.  [if an entity buyer; if not used, replace header with Reserved] _____ is a _____ that is properly and duly formed, validly existing and in good standing under the laws of the _____, registered to transact business in the State of California, and is in good standing under the laws of the State of California.  [use yellow highlighted if formed in other than California]

(b)     Authority.  Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of Buyer herein, and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject.  All documents to be executed by Buyer which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Buyer, (ii) be legal, valid and binding obligations of Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which Buyer is subject.

(c)     OFAC Compliance.  Buyer or its Authorized Assignee (which, for the purposes of this Section 8(c), shall include its members, officers, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most

-19-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)    Bankruptcy.  Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e)    Debts, Liens, and Encumbrance.  Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that relate in any manner to any of Buyer's activities relating to the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.

(f)    No Collusion; Negotiations with Third-Party Owners.  Buyer represents and warrants that (i) it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder and (ii) absent Seller's express written consent, which consent may be withheld in Seller's sole discretion, any and all discussions and negotiations by Buyer regarding a Concurrent Sale or the purchase of a Concurrent Sale Property shall be conducted through Seller and that Buyer shall have no direct or indirect communications with a Third-Party Owner regarding a Concurrent Sale or a Concurrent Sale Property.

**9.    Cultural Cost Reimbursement.**  At the Closing, through the Escrow, and expressly conditioned on the Crops being vested in Seller and fully transferable to Buyer free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims, Buyer shall reimburse Seller for all 2027 Cultural Costs (defined below) incurred by Seller after the completion of the 2026 harvest on each block of the Property, and for which Seller retains responsibility to pay following Closing, in connection with the Property (the "**Cultural Costs Reimbursement**").  Upon written request from Buyer, Seller shall provide Buyer with statements reflecting the amount of 2027 Cultural Costs incurred by Seller for the Property through the anticipated Closing and for which Seller retains responsibility to pay following Closing, based on the Seller's estimates and historical data (to the extent available) to the extent actual invoices for such costs are not reasonably available.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the final amount of the Cultural Costs Reimbursement (including an estimate of all 2027 Cultural Costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**") and any backup reasonably requested by Buyer.  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of

-20-

all 2027 Cultural Costs, to the extent estimable, to be incurred between the date of the Statement and the Closing Date, if any, and for which Seller retains responsibility to pay following Closing) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date.  The Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2027 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2027 crop year.  Following the date on which the Sale Order is entered, if Buyer is the Successful Bidder, Buyer shall also have the exclusive right to direct, in writing, reasonable farming operations for the 2027 crop on the Property, and Seller shall comply with such reasonable directions so long as they are consistent with standard agricultural practices, provided that Seller shall have no liability under Section 7.3(a) for the results of complying with any direction of Buyer and Buyer shall have no recourse against Seller therefor.

No later than 45 days after Closing, Seller shall provide Buyer with its actual, documented, 2027 Cultural Costs incurred prior to Closing and paid by Seller following the Statement date (the "**True-Up Cultural Costs**"). If Buyer accepts the True-Up Cultural Costs, or if Buyer fails to give notice to Seller of any objection within 15 days after receipt of the True-Up Cultural Costs, the True-Up Cultural Costs shall be the final and binding calculation of the 2027 Cultural Costs for purpose of the Cultural Costs Reimbursement.  If Buyer gives notice to the Seller of an objection to the True-Up Cultural Costs within 15 days after receipt of the True-Up Cultural Costs, the Seller and Buyer shall attempt in good faith to resolve their differences in writing.  If the Seller and Buyer are able to resolve their differences in writing, the True-Up Cultural Costs, as modified to reflect the resolution of the difference between the Seller and Buyer, shall be the final and binding calculation of the Cultural Costs Reimbursement, and the Seller shall refund any overage or Buyer shall pay any shortfall (as compared to the amounts paid at the Closing) within five (5) business days.  If, however, the Seller and Buyer are unable to resolve their differences within 15 days of the Buyer's objection, then (i) Seller shall refund any overage or Buyer shall pay any shortfall on the undisputed amounts (as compared to the amounts paid at the Closing) within five (5) business days, and (ii) such disputed amounts shall be submitted to the Court for resolution, or if the Court declines jurisdiction, the Parties shall attempt to resolve the differences pursuant to mediation with a mediator reasonably acceptable to both Parties, the cost of which shall be borne equally by each Party.

As used herein, "**2027 Cultural Costs**" means all out of pocket cultural costs paid by Seller for the 2027 crop year, and shall include, without limitation, all third party management fees, inputs, services, farm labor, water charges, and irrigation pumping and distribution costs (including electrical and/or fuel costs), and harvesting and hauling charges, necessary or desirable for the production, harvest and transportation of the 2027 crops generated by the Land.

The provisions of this Section 9 shall survive the Closing.

**10.     Closing**.

10.1     Closing Date.  Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein.  Closing shall occur on or before the Closing Date. Closing shall be conditioned upon:

-21-

(a)    <u>Full Performance</u>.  Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)    <u>Conditions</u>.  The conditions precedent set forth in <u>Section 6.1, 6.2, and 6.3</u> have been satisfied or waived by the Party for whose benefit the condition exists.

(c)    <u>Title Policies</u>.  Title Company shall be ready, willing, and able to issue upon the Closing and following recordation of the Deed to Buyer, a current Owner's CLTA Standard Coverage Policy of title insurance (or ALTA Extended Coverage Policy, if Buyer shall elect to obtain an ALTA Survey), at no more than the insurer's standard rates ("**Buyer's Title Policy"**).  Buyer's Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Buyer, subject only to the lien of real property taxes for the current fiscal year not yet due and payable, those Schedule B exceptions listed in the title commitment for the Buyer's Title Policy (except to the extent Seller and/or Escrow Holder has agreed in writing to remove), and those exceptions listed on <u>Schedule 10.1(c)</u>, attached hereto and incorporated by reference (the "**Permitted Exceptions**").  The premium for such title policy shall be paid as required under <u>Section 12</u>.

(d)    <u>Delivery</u>.  Possession of the Property shall be delivered to Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property.

10.2    <u>Seller's Closing Obligations</u>.  On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)    The Deed, executed by Seller.

(b)    A bill of sale for the Crops, and the Improvements, Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)    The Pistachio Contract Assumption, executed by Seller.

(d)    Duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements material to the Property and operations thereon that are Receivership Property and that Buyer informs the Seller in writing that Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability).

(e)    An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(f)    An assignment of the Seller's membership interests in Poso Creek, executed by Seller and conveying such equity interest in Poso Creek to Buyer (the "**Poso Assignment**").

-22-

(g)        The Closing Statement (as defined below) executed by Seller.

(h)        To the extent they are then in Seller's possession, comprise Receivership Property, and not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(i)        Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(j)        Seller's California Form 593, if required.

(k)        Seller's IRS Form 1099-S if required by Escrow.

(l)        All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(m)        Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement, including without limitation any such affidavits and other documents reasonably required by the Title Company to issue the Buyer's Title Policy.

(n)        A copy of the Sale Order entered by the Court.

10.3    <u>Buyer's Closing Obligations</u>.  On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)        The balance of the Purchase Price, the Cultural Cost Reimbursement, the Poso Note Adjustment, and Buyer's share of the Closing Costs and Prorations.

(b)        Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)        A Preliminary Change of Ownership Report in the forms specified by Fresno and Kings County(ies) (the "**PCOR**").

(d)        The Pistachio Contract Assumption, executed by Buyer.

(e)        Duplicate counterparts of the Assignment Agreement.

(f)        Buyer's executed counterpart of the Poso Assignment.

(g)        The Closing Statement (as defined below) executed by Buyer.

-23-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(h)      Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

10.4    **Escrow Holder Closing Obligations.**   The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to Section 10.2, and all of the items to be deposited by Buyer pursuant to Section 10.3, and (ii) the Title Company is prepared to issue Buyer's Title Policy in the condition required in Section 10.1(c) above.  The Escrow Holder shall close escrow by:

(a)      Recording the Deed in the Official Records of Fresno and Kings County(ies), California, and return the recorded Deed to Buyer with a conformed copy to Seller, and file the PCOR in Fresno and Kings County(ies), California;

(b)      Issuing the Buyer's Title Policy (within fifteen (15) days after the Closing);

(c)      Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(d)      Delivering to Buyer, Seller's certification that it is not a "foreign person;"

(e)      Delivering to Buyer the items deposited into Escrow by Seller for delivery to Buyer, including the Bill of Sale;

(f)      Delivering to each of Buyer and Seller, a fully executed counterpart of the Assignment Agreement; and

(g)      Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

11.     **Like-Kind Exchange**.   Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

12.     **Closing Costs**.   All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

(a)      Buyer and Seller shall pay their respective:  (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)      Seller shall pay (i) the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) one-half of the escrow fees, and (iii) the premium for a CLTA Standard Owner's Policy of Title Insurance for the Land.

-24-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

(c)      Buyer shall pay (i) one-half of the escrow fees, (iii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, (ii) premium for Buyer's Title Policy in excess of the premium for a CLTA Standard Owner's Policy of Title Insurance, if any, together with the costs of any endorsement Buyer shall request, and (iii) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)      Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.      Prorations**.  Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1      Utility Charges.  The Parties agree that utility and water charges (other than assessments collected with real property assessments by the county tax assessor) shall not be prorated in Escrow.  Seller shall be liable for all such charges incurred prior to the Closing (subject to reimbursement under Section 9, as applicable) and Buyer shall be liable for all such charges incurred after the Closing.

13.2      Water Loan Payment. The December Water Loan Payment shall not be a credit to the Seller as of Close of Escrow or otherwise prorated.

13.3      Other Apportionments.  Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest bills and assessments, with Seller being liable for all real estate taxes, assessments and water district or water company assessments for the Property attributable to a period before the Closing.  Rent or income under all residential, farm related, hunting and mineral, and other leases, if any, or any Contracts (except as provided in Section 13.2 above) shall be prorated as of the Close of Escrow.  Such prorations and apportionments shall be made such that Seller is allocated or liable for all such amounts attributable to the period before the Close of Escrow and Buyer shall be allocated or liable for all such amounts attributable to the period following the Close of Escrow. If any such taxes, assessments, or charges relate to periods prior to the Close of Escrow but are billed or become due after the Close of Escrow, such amounts shall be a credit against the Purchase Price at Closing unless such amounts are unknown in which case Seller shall remain liable for (and promptly reimburse Buyer for) the portion allocable to the period prior to the Close of Escrow. If any such taxes, assessments, or charges relate to periods following the Close of Escrow but are paid by Seller at or prior to the Close of Escrow, such amounts shall be a credit to Seller as an addition to the Purchase Price for the portion allocable to the period following the Close of Escrow.

13.4      Survival.  The provisions of this Section 13 shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this Section 13 must be made in writing to the other Party within six months after the Closing Date.

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

14.     **Risk of Loss**.  Risk of physical loss, casualty or condemnation affecting the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof.  In the event of the loss, destruction of a material part of the Property or condemnation prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, both Parties may be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property to its condition prior to the subject loss, casualty or condemnation, within thirty (30) days of receipt of notice and has fully paid all costs thereof and cleared any potential liens associated therewith (in which case, if applicable, the Closing Date shall be extended) or Buyer and Seller agree to reduce the Purchase Price by the value of the lost, destroyed or condemned portion of the Property.

15.     **Assignment**.  Buyer may assign to any entity which is either owned or controlled by, or under common control with, Buyer (each, an "**Authorized Assignee**"), any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of such assignment at least three (3) days prior to the Close of Escrow, containing the name of the Authorized Assignee and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement.  Any other proposed assignment shall require the written consent of Seller, which may be withheld at his sole discretion, but if consent is so granted shall then be an Authorized Assignee.  Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee.

16.     **Receivership Matters**. Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Seller, and if Buyer is the Successful Bidder, Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

17.     **Backup Bidder**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the Marketing Procedures, Buyer will serve as the Back-up Bidder.  If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of (i) sixty (60) days following the date on which the Sale Order becomes final and non-appealable, or (ii) the closing of the sale to the Successful Bidder.  If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will

20039.001/Westlands Alt OB PSA (5)

forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

**18.** **Brokers**. Buyer and Seller each represent and warrant to the other that, except for Capstone Capital Markets, LLC ("**Seller's Broker**") and _____ ("**Buyer's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the imposition of liability for the payment of any other real estate brokerage commission, finder's fee or other fee or otherwise in connection with the transaction described herein. Seller shall be responsible for the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith. Buyer shall be responsible for the payment of a commission or fee to Buyer's Broker in accordance with its separate agreement therewith. In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

**19.** **Attorney's Fees; Pre-litigation Dispute Resolution**. Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement. In the event of any action between the Parties hereto for breach of or to enforce any provision or right hereunder, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action. The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

**20.** **Notices**. All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery; provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice. All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail shall be deemed delivered three (3) business days after deposit in the United States Mails, and any notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

If to Buyer:          _____
                      _____
                      _____
                      _____
                      Attn: _____
                      Telephone:   _____
                      Email: _____

-27-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

With a copy to:                _____
_____
_____
_____
Attn: _____
Telephone:     _____
Email: _____

If to Seller:

Lance Miller, Receiver
c/o Pivot Group
1230 Rosecrans Avenue
Suite 300 – PMB928
Manhattan Beach, CA 90266
Attn:  Lance Miller or Matt Covington
Telephone:     424-363-0599
Email:  lance.miller@pivotgrp.com and
matt.covington@pivotgrp.com

With a copy to:

Katten Muchin Rosenman LLP
2121 North Pearl Street, Suite 1100
Dallas, TX 75201-2591
Attn:  John Mitchell and Michaela Crocker
Telephone:     214-765-3600
Email:  john.mitchell@katten.com and
michaela.crocker@katten.com

and

Cutts Law, PC
5088 N. Fruit Ave, Ste 101
Fresno, CA 93711
Attn:  Lisa A. Cutts
Telephone:     559-226-8177
Email: lac@cutts-law.com

        21.    **Waivers**.  Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver.  Any such waiver shall be in writing and delivered to the other Party and the Escrow Holder.  No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

        22.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement. To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

-28-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

23.    **Business Days**.  In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed.  Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24.    **WAIVER OF JURY TRIAL**.  TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "DISPUTE", AND COLLECTIVELY, ANY OR ALL, THE "DISPUTES") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS.  THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

25.    **Entire Agreement**.    This Agreement and the Confidentiality and Nondisclosure Agreement (if any) entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto.  The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement. This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged.

26.    **Pending Receivership**.  Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Property, or otherwise.

27.    **Bidding Procedures**.  The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order.  Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order.  **Buyer and each person and/or entity: (i) participating in its bid to Purchase the Property by having made a specific capital commitment in writing designated to fund, in whole or in part, the acquisition of the Property pursuant to this Agreement (each, a "Participant") and (ii) that has or will have a direct ownership interest in Buyer or the Property**

-29-

**(each, a "Buyer Party") has agreed in writing to be bound by this Section 27 of the Agreement, substantially in the form set forth as Exhibit I, attached hereto, and also agree to be bound by and comply with the terms of the Marketing Procedures Order, the Sale Order, or any other orders entered by the Court with respect to the Property.  Buyer and such Buyer Parties and Participants further agree that each hereby waives any right it may hold to appeal, seek vacatur of, reconsideration of, collaterally challenge, or otherwise challenge a Court-approved sale of the Property on any grounds other than the Seller, in his capacity as receiver, failed to materially comply with the terms of the Marketing Procedures Order and that such failure directly resulted in a materially lower purchase price than what could have been otherwise obtained.  Buyer and each Buyer Party and Participant that has agreed in writing to be bound by this Section 27 further agree that neither Section 6.2(e) nor this Section 27 confer appellate or other rights upon such parties that do not otherwise exist under applicable law.**

**Buyer's Initials:** _____

**28.** **Validity**.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**29.** **Facsimile Electronic Signatures**.  For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

**30.** **Time**.  Time is of the essence of this Agreement.

**31.** **Counterparts**.  This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

**32.** **Binding Offer**. Buyer agrees that, upon written notice to Buyer by Seller that this Agreement as executed by Buyer only (the "**Offer**") is the subject of a notice filed with the Court, this Agreement (as may be amended by written agreement of Seller and Buyer) shall be irrevocable for a period of 60 days from the date of such notice or such other period as agreed to by the Parties in writing (the "**Irrevocable Period**"). If the Court enters a Sale Order approving this Agreement (as may be amended by written agreement of the Seller and Buyer), then a binding agreement of purchase and sale (without any conditions whatsoever for the benefit of the Buyer, including any conditions for review or approval by third party advisors of the Buyer, financial, planning, banking, legal or otherwise) comes into existence immediately upon the Seller's acceptance.  Buyer acknowledges that this Section 32 obligates the Buyer to complete the purchase of the Property in accordance with the terms of this Agreement (as may be amended by written agreement of Seller and Buyer) upon Seller's acceptance.  Notwithstanding the foregoing, the provisions of Section 14 of this Agreement shall apply during the Irrevocable Period in the event of a casualty or condemnation affecting the Property.

*SUBJECT TO ONGOING REVIEW AND COMMENT*

**SIGNATURES FOLLOW NEXT PAGE**

20039.001/Westlands Alt OB PSA (5)

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER                                              BUYER

_____                            **[buyer sig blocks]**
Lance Miller, solely in his capacity as
Court-appointed Receiver

Date of Execution: _____               Date of Execution: _____

Effective Date:_____

ACCEPTANCE BY ESCROW HOLDER


CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.


CHICAGO TITLE COMPANY,
a California corporation

By: _____
Name: _____
Title: _____

Escrow Number: _____

Dated: _____

-33-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

***TO BE VERIFIED BY PRELIMINARY REPORT***

(ATTACHED)

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT B

FORM OF MARKETING PROCEDURES ORDER

(ATTACHED)

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT C

FORM OF SALE ORDER

(ATTACHED)

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT D

FORM OF RELEASE

_____ ("**Buyer**"), [as successor by assignment to _____], and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB pending in the U.S. District Court for the Eastern District of California (the "**Court**") have previously entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ (as such may have been amended, prior to the date hereof, the "**Agreement**"). Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees (collectively, including Buyer, "**Releasors**"), hereby releases Seller, The Prudential Insurance Company of America, PAR U Hartford Life & Annuity Comfort Trust, PGIM Real Estate Finance, LLC, and their respective partners, professionals, agents, employees, shareholders, members, affiliates, principals, beneficiaries, subsidiaries, successors, and assigns (collectively with Seller, "**Releasees**") from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of action, whether in law or in equity, which Buyer asserts or could assert at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter, claim, occurrence, damages or injury (collectively, "**Claims**"), to the extent arising out of a condition or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and entities, hereby waives the protections and benefits afforded California Civil Code Section 1542, acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

Notwithstanding anything stated to the contrary in this Agreement, the foregoing release shall not extend to (and shall expressly exclude): (i) claims arising from Seller's intentional fraud or willful misconduct; or (ii) claims for breach of Seller's express representations, warranties, covenants, or indemnities under the Agreement or any document delivered at Closing, but solely to the extent so provided for under such Agreement or document delivered at Closing) claims arising from Seller's intentional fraud.

-37-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

This Release is made by Buyer for the benefit of Seller and the Releasees on _____.

[Buyer Signature Block]

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT E

Form of Deed

Recording Requested By And

**When Recorded Return To:**

**Mail Tax Statements To:**

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

**GRANT DEED**

THE UNDERSIGNED RECEIVER DECLARES:

DOCUMENTARY TRANSFER TAX IS $_____

____Unincorporated Area        ____City of _____
___Computed on full value of interest or property conveyed, or
___Computed on full value less value of liens or encumbrances remaining at time of sale

Assessor's Parcel No. _____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby **grant, sell and convey** to _____ ("**Grantee**")**,** the following described real property and improvements thereon, in the County of _____, State of California, and more particularly described as follows:

See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE

Dated: _____, 202_                      _____
                                                   LANCE MILLER, solely in his
                                                   capacity as Court-appointed Receiver

-39-

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT F

Form of Bill of Sale

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to _____ ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2027 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property situated in _____ County[ies], California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference.  The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OTHER THAN THE WARRANTY OF TITLE SET FORTH ABOVE, AS TO THE PERSONAL PROPERTY INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of _____, 202__

SELLER

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver

[attach legal description exhibit]

-40-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT G

Form of Assignment Agreement

**ASSIGNMENT AGREEMENT**

THIS ASSIGNMENT AGREEMENT ("Assignment") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the ("**Assignor**"), pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and _____("**Assignee**").

A.    Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**").

B.    Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those contracts affecting the Property as set forth on Exhibit B, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows.

1.    Assignor hereby assigns to Assignee all its right, title, obligation, and interest as in and to the Assigned Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Assigned Contracts to be performed after the date hereof.

2.    Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Assigned Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.  This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

3.    Assignor has not previously assigned the Assigned Contracts and has, subject to the required consent of any counterparty, authority to assign the Assigned Contracts (and to the extent counterparty consent is required under any Assigned Contract and has been obtained, the consent is attached hereto as Exhibit C).  Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Assigned Contracts.

-41-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

4.      Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Assigned Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.  Assignor shall use commercially reasonable efforts, consistent with its authority as receiver, to assist in obtaining such Consents

5.      In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.


ASSIGNOR                                      ASSIGNEE

                                              **[assignee sig blocks]**


_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver




[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

-42-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT H

Form of Pistachio Assumption Agreement

**PISTACHIO CONTRACT
ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS PISTACHIO CONTRACT ASSIGNMENT AND ASSUMPTION AGREEMENT ("Assignment") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the ("**Assignor**"), pursuant to the _____("**Sale Order**") entered in the case styled *The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC et. al.*, Case No. 1:24-cv-01102-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and _____("**Assignee**").

A.      Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Pistachio Property**"), and other real property.

B.      Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those pistachio purchase and/or marketing contracts affecting the Pistachio Property as set forth on <u>Exhibit B</u>, attached hereto and incorporated by reference (the "**Pistachio Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows.

1.      Assignor hereby assigns to Assignee all its right, title, obligation, and interest as in and to the Pistachio Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Pistachio Contracts to be performed after the date hereof.

2.      Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Pistachio Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.  This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

3.      Assignor has not previously assigned the Pistachio Contracts and has, subject to the required consent of any counterparty, authority to assign the Pistachio Contracts (and to the extent

-43-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

counterparty consent is required under any Pistachio Contract and has been obtained, the consent is attached hereto as <u>Exhibit C</u>).  Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Pistachio Contracts.

4.      Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Pistachio Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.  Assignor shall use commercially reasonable efforts, consistent with its authority as receiver, to assist in obtaining such Consents

5.      Assignee acknowledges that the obligation under the Pistachio Contracts to deliver 100% of the pistachios produced from the Pistachio Property to the counterparties thereof (collectively, the "**Pistachio Purchaser**") is a covenant burdening the Pistachio Property which has been bargained for by Assignor with Pistachio Purchaser, but for which payment (the "**Covenant Compensation**") will not be made until delivery of 100% of the pistachios produced from the Pistachio Property in each of the 2026 and 2027 crop years.  In the event that Assignee shall not perform under the Pistachio Contracts, and the Covenant Compensation is not paid in full to Assignor by Pistachio Purchaser, then the Covenant Compensation (or any unpaid portion thereof) shall become an obligation of Assignee under this Assignment, and shall be due and payable within ten (10) business days following written demand from Assignor.

6.      In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.


IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.


ASSIGNOR                                                     ASSIGNEE

                                                             **[assignee sig blocks]**

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver



[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

*SUBJECT TO ONGOING REVIEW AND COMMENT*

EXHIBIT I

Form of Joinder by Buyer Parties

JOINDER BY BUYER PARTY(IES)

The below listed Buyer Party(ies) hereby join(s) in the making of the foregoing Amended and Restated Purchase and Sale Agreement and Joint Escrow Instructions dated [___], 2026 for the purpose of evidencing their agreement to the provisions of Section 27 thereof.

DATE: _____

[SIG BLOCKS TO BE DETERMINED]

-45-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 1.1(g)

Contract Schedule

1. Pistachio Contract as defined in Section 1.6, and included in Schedule 1.6.

2. Option and Purchase Agreement, dated March 23, 2018, as amended by that certain First Amendment to Option and Purchase Agreement, dated November 30, 2018, and that certain Second Amendment to Option and Purchase Agreement, dated March 30, 2022, each by and between Sageberry III, LLC, a California limited liability company ("**Sageberry III**") and Sageberry IV, LLC, a California limited liability company ("**Sageberry IV**"), and **SAN LUIS WEST SOLAR, LLC**, a California limited liability company ("**SLWS**"); as further amended by that certain Third Amendment to Option and Purchase Agreement, dated September 20, 2023, and that certain Fourth Amendment to Option and Purchase Agreement, dated October 21, 2024, each by and between **SAGEBERRY FARMS, LLC**, a California limited liability company, and SLWS; as further amended by that certain Fifth Amendment to Option and Purchase Agreement, dated March 21, 2025, as further amended by that certain Sixth Amendment to Option and Purchase Agreement, dated August 21, 2025, each by and between Seller and SLWS, as further amended by that certain Seventh Amendment to Option and Purchase Agreement, dated February 27, 2026, each by and between Seller and SLWS. (2018-0039681, et al)

3. Option Agreement dated May 30, 2024, by and between Cantua Orchards, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company. (2024-0114658)

4. Option Agreement dated May 30, 2024, by and between ACDF, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company. (2024-0114802)

5. Option Agreement dated May 30, 2024, by and between Sageberry Farms, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company. (APNs 068-071-39, et al)(2024-0114656)

6. Option Agreement dated May 30, 2024, by and between Sageberry Farms, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company (APNs 078-020-54s, et al) (2024-0099910)

7. Capacity Option Agreement, dated December 16, 2019, by and between Sageberry I, LLC, a California limited liability company, and Westlands Transmission, LLC, a Delaware limited liability company. (2019-0151297)

8. Option Agreement for Easement dated April 2, 2024, by and between C & A Farms, LLC, a California limited liability company, and IP Land Holdings, LLC, a Delaware limited liability company. (2024-0045807) ***[in the process of verifying if terminated by option holder]***

9. Option and Land Lease Agreement dated _____, by and between Windfall Farms I, a general partnership, and Fresno MSA Limited Partnership d/b/a Verizon Wireless. (2019-0055262)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

10. Option and Lease Agreement dated October 26, 2023, by and between ACDF, LLC, a California limited liability company, ands T-Mobile West LLC, a Delaware limited liability company. (2024-0024975) (may be expired)

11. Solar Lease Option Agreement dated March 10, 2023, by and between ACDF, LLC, a California limited liability company, and Boulevard Associates, LLC, a Delaware limited liability company. (2023-0035321)

12. Solar Lease Option Agreement dated March 10, 2023, by and between Bear Flag Farms LLC, a California limited liability company, and Boulevard Associates, LLC, a Delaware limited liability company. (2023-0035337)

13. [Intentionally deleted]

14. Farming Lease dated May 9, 2023, by and between Bear Flag Farms, LLC, a California limited liability company (as Landlord) and EGC Investments, Inc, a California corporation (as Tenant") with respect to 36.61 acres of cherries on Fresno County APN 027-040-13.

15. Farming Lease dated May 9, 2023, by and between Bear Flag Farms, LLC, a California limited liability company (as Landlord) and EGC Investments, Inc, a California corporation (as Tenant") with respect to 36.41 acres of apricots on Fresno County APN 027-040-13.

16. Lease Agreement dated January 1, 2019, made by and between Sageberry Farms, LLC, a California limited liability company, and Arroyo Pasajero Mutual Water Company, a California nonprofit mutual benefit corporation, as amended by that certain First Amendment to Lease Agreement dated March 31, 2021, and as further amended by that certain Second Amendment to Lease Agreement dated September 19, 2024.

17. Residential Leases

    a. Lease Agreement dated effective March 16, 2025, by and between Granville Farms, LLC, a California limited liability company (who entered the lease as Granville Farms) as Landlord, and Jesus Rivera and Estefani Vazquez, as Tenant, with respect to 35540 W. Kamm Ave, Cantua Creek, CA 93608.

    b. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Rafael Vazquez and Laura Morales, as Tenant, with respect to 35542 W. Kamm Ave, Cantua Creek, CA 93608.

    c. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Angel Barajas and Maria Irma Lainez, as Tenant, with respect to 35544 W. Kamm Ave, Cantua Creek, CA 93608.

    d. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Carmen Arteaga Barajas and Eva Angelina Llamas, as Tenant, with respect to 35546 W. Kamm Ave, Cantua Creek, CA 93608.

**e.** Residential Lease dated April 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Amodor and Flor Amador, as Tenant, with respect to 35548 W. Kamm Ave, Cantua Creek, CA 93608.

**f.** Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Alan Elijas and Angelica Vivanco, as Tenant, with respect to 35550 W. Kamm Ave, Cantua Creek, CA 93608

**g.** Residential Lease dated February 1, 2019, by and between Gradon Farms, LLC, a California limited liability company, as Landlord, and Brigido Enriquez Cano and Amparo Aguirre, as Tenant, with respect to 16801 W. Tractor Ave, Huron, CA 93234.

**h.** Residential lease dated January 1, 2018, by and between T.J.S. Corporation, as Landlord, and Isidro Pacheco, as Tenant, with respect to 16803 W. Tractor Ave, Huron, CA 93234.

**i.** Lease Agreement dated effective June 7, 2022, by and between Gradon Farms, LLC, a California limited liability company (who entered the lease as Gradon Farms) as Landlord, and Hector Lainez, as Tenant, with respect to 44594 W. Manning Ave, Firebaugh, CA 93622.

18. [Intentionally deleted].

19. Option Agreement dated September 30, 2023, by and between ACDF, LLC, a California limited liability company (as successor by merger to Bishop Farms 15, LLC, a California limited liability company), and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated October 10, 2024, as amended by that Second Amendment to Option Agreement, dated October 18, 2024.

20. Option Agreement dated September 30, 2023, by and between Gradon Farms, LLC, a California limited liability company, ACDF, LLC, a California limited liability company, and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated May 30, 2024, as amended by that certain Second Amendment to Option Agreement, dated October 18, 2024.

21. [Intentionally deleted].

22. Option Agreement dated September 30, 2023, by and between Sageberry Farms (erroneously originally entered into by Maricopa Orchards, LLC, a California limited liability company), and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated October 10, 2024.

23. Option Agreement dated September 30, 2023, by and between ACDF, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated October 10, 2024.

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

24. Option Agreement dated May 30, 2024, by and between Granville Farms, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company.

25. Option Agreement dated May 30, 2024, by and between Gradon Farms, LLC, a California limited liability company, and SJV Transmission LandCo, LLC, a Delaware limited liability company.

26. [Intentionally deleted].

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 1.1(h)

Poso Creek Interests/Water

| Vested Owner (subject to Receivership) | Membership Interest (%) | Stored Water (AF) |
|---|---|---|
| Maricopa Orchards, LLC | 25.398 | 28,164* |
| ACDF, LLC | 25.398 | 17,700 |
| **TOTAL** | **50.796** | **45,864** |

*An additional 1500 AF is owned subject to lien in favor of MetLife.

-50-

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 1.6

Pistachio Contract and Memorandum

1.  Pistachio Contract (attached)

2.  Pistachio Memorandum (attached)

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 1.11(a)

Concurrent Sale Transaction

Real property:  Fresno County APNs 038-141-59s, 038-130-35s, 038-130-71s, 038-130-62s, 038-200-04s, 038-130-19s, 038-130-58s, 038-200-09s, and 038-210-25s.

Other Property:  a 3.569% interest in POSO CREEK WATER COMPANY, LLC (standing in the name of Kamm South, LLC), together with 1,084 AF of stored water.

-52-

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 1.11(b)

Ancillary Sales Transactions

1.  "**FMAC Receivership**"

    Real property:  Fresno County APNs 040-020-18s and 038-141-21s.

    Purchase Price:  $2,346,147.00

2.  "**Doctors**"

    Real property:  Fresno County APN 038-210-40s.

    Purchase Price:  $437,341.00

3.  "**Assemi**"

    Real property:  Fresno County APNs 038-300-17s, 038-300-30s, 038-130-03s and 038-130-04s

    Other Property:

    (i)    a 9.178% interest in POSO CREEK WATER COMPANY, LLC (standing in the name of Farid Assemi, as Trustee of the Amended  and Restated Farid Assemi Revocable Trust dated January 24, 2007, as amended), together with 0 AF of stored water;

    (ii)    a 9.178% interest in POSO CREEK WATER COMPANY, LLC (standing in the name of Farshid Assemi and Sonia Rosemary Assemi, as Co-Trustees of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi  Revocable Trust dated January 31, 2007, as amended), together with 0 AF of stored water; and

    (iii)    a 9.178% interest in POSO CREEK WATER COMPANY, LLC (standing in the name of Darius Assemi, as  Trustee of the Amended and Restated Darius Assemi Revocable Trust  dated January 30, 2007, as amended), together with 0 AF of stored water;

    Purchase Price:  $6,585,898.00

4.  "**Met Receivership PSA**"

    Other Property:  (i)1500 AF of stored water held by POSO CREEK WATER COMPANY, LLC, for the benefit of MARICOPA ORCHARDS, LLC, and (ii) release of liens in and to the membership interests of MARICOPA ORCHARDS, LLC in and to POSO CREEK WATER COMPANY, LLC.

    Purchase Price:  $1,077,188.00

5.  "**Manning Ave**"

Other Property:  a 2.746% interest in POSO CREEK WATER COMPANY, LLC (standing in the name of MANNING AVENUE PISTACHIOS, LLC), together with 290 AF of stored water.

Purchase Price:  $208,256.00

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 5.2(h)

Leases and Specific Title Encumbrances

1. Pistachio Memorandum as defined in Section 1.6 and attached to Schedule 1.6

2. Farming Lease dated May 9, 2023, by and between Bear Flag Farms, LLC, a California limited liability company (as Landlord) and EGC Investments, Inc, a California corporation (as Tenant") with respect to 36.61 acres of cherries on Fresno County APN 027-04-13.

3. Farming Lease dated May 9, 2023, by and between Bear Flag Farms, LLC, a California limited liability company (as Landlord) and EGC Investments, Inc, a California corporation (as Tenant") with respect to 36.41 acres of apricots on Fresno County APN 027-04-13.

4. Lease Agreement dated January 1, 2019, made by and between Sageberry Farms, LLC, a California limited liability company, and Arroyo Pasajero Mutual Water Company, a California nonprofit mutual benefit corporation, as amended by that certain First Amendment to Lease Agreement dated March 31, 2021, and as further amended by that certain Second Amendment to Lease Agreement dated September 19, 2024.

5. Residential Leases

   a. Lease Agreement dated effective March 16, 2025, by and between Granville Farms, LLC, a California limited liability company (who entered the lease as Granville Farms) as Landlord, and Jesus Rivera and Estefani Vazquez, as Tenant, with respect to 35540 W. Kamm Ave, Cantua Creek, CA 93608.

   b. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Rafael Vazquez and Laura Morales, as Tenant, with respect to 35542 W. Kamm Ave, Cantua Creek, CA 93608.

   c. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Angel Barajas and Maria Irma Lainez, as Tenant, with respect to 35544 W. Kamm Ave, Cantua Creek, CA 93608.

   d. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Carmen Arteaga Barajas and Eva Angelina Llamas, as Tenant, with respect to 35546 W. Kamm Ave, Cantua Creek, CA 93608.

   e. Residential Lease dated April 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Jose Amodor and Flor Amador, as Tenant, with respect to 35548 W. Kamm Ave, Cantua Creek, CA 93608.

   f. Residential Lease dated February 1, 2019, by and between Granville Farms, LLC, a California limited liability company, as Landlord, and Alan Elijas and Angelica Vivanco, as Tenant, with respect to 35550 W. Kamm Ave, Cantua Creek, CA 93608

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

g.  Residential Lease dated February 1, 2019, by and between Gradon Farms, LLC, a California limited liability company, as Landlord, and Brigido Enriquez Cano and Amparo Aguirre, as Tenant,  with respect to 16801 W. Tractor Ave, Huron, CA 93234.

h.  Residential lease dated January 1, 2018, by and between T.J.S. Corporation, as Landlord, and Isidro Pacheco, as Tenant,  with respect to 16803 W. Tractor Ave, Huron, CA 93234.

i.  Lease Agreement dated effective June 7, 2022,  by and between Gradon Farms, LLC, a California limited liability company (who entered the lease as Gradon Farms) as Landlord,  and Hector Lainez, as Tenant, with respect to 44594 W. Manning Ave, Firebaugh, CA 93622.

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 7.1

Exceptions to Seller's Representations

None.

20039.001/Westlands Alt OB PSA (5)

*SUBJECT TO ONGOING REVIEW AND COMMENT*

SCHEDULE 10.1(c)

Permitted Exceptions

(note: green highlighted items are subject to final title insurer confirmations, and Receiver will use commercially reasonable efforts to secure such changes.)

1.      ALL Schedule B exceptions listed on that certain Preliminary Report issued by Chicago Title Company with a Title Number of 45006152-MW Amendment F, dated effective June 3, 2026 except the following:  2, 18 – 27, 64 – 66, 76, 81 – 89, 104, 111 - 114,  118, 119, 129, 142 – 144, 155 – 159, 176, 177, 194, 199, 202 – 208, 229 – 232, 260 – 269, 278, 295, 309 – 316, 333 – 346, 387 – 391, 421 – 427, 463, 467 – 473, 505, 510 – 517, 544, 550 – 561, 630 – 637, 659, 656 – 678, 708 – 712, 744 – 746, 765 – 769, 784 – 788, 814 – 817, 841 – 847, 870 – 874, 893 – 896, 910 – 913, 930 – 932, 943,  946, 947, 951 – 954, 974 – 983, 1026, 1027, 1038, 1039, 1049, 1054 – 1058, 1084 – 1089, 1117 – 1122, 1138, 1141 – 1145,  1174 – 1179, 1215 – 1218, 1247, 1250 – 1257, 1308 - 1316, 1370 – 1373, 1395 – 1399, 1415 – 1417, 1443 – 1435, 1443, 1448- 1450, 1463 – 1466, 1491 – 1499, 1530, 1531, 1547, 1548, 1565, 1566, 1571, 1572, 1582 – 1584, 1597 – 1833, 1835 – 1837, 1918, 1923 – 1925, 1996, 1997 – 1999, 2020, 2021 – 2033, 2037 – 2047, 2053 – 2104, 2111-2120, 2122, 2126, 2128, 2130, 2137, 2138, 2211 - 2217; provided that:

        a.      Schedule B exception 948 to be limited to Parcel 134.

        b.      Schedule B exception 2008 to be limited to Arroyo Pasajero and EGC Investments, Inc.